# EXHIBIT A

## EMPLOYMENT AGREEMENT

AGREEMENT, dated January 1, 2015 (the "Effective Date"), by and between RENAISSANCE TECHNOLOGIES LLC (the "Company"), a Delaware limited liability company, and DAVID MITCHELL MAGERMAN (the "Employee").

WHEREAS, the Employee is an "at will" employee and a Principal of the Company;

WHEREAS, as a Principal, the Employee has access to highly sensitive proprietary strategic information of the Company;

WHEREAS, the Employee and the Company are parties to an employment agreement dated June 11, 2010 (together with any subsequent amendments, the "Prior Agreement");

WHEREAS, the Company and the Employee desire to enter into a new agreement as of the Effective Date that will supersede and replace the Prior Agreement other than as set forth herein; and

WHEREAS, the Company desires to employ the Employee on the terms and conditions set forth herein, and the Employee wishes to be so employed.

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  **Employment**. Subject to the terms and conditions set forth herein, the Company hereby employs the Employee, and the Employee hereby accepts such employment.

2.  **At Will**. The Employee's employment shall be "at will." This means that the Employee's employment and this Agreement may be terminated at any time by either party for any reason or no reason at all, with or without cause or notice.

3.  **Employment Services**. The Employee shall render services to the Company as a full-time member of its Technical staff. The Employee shall, at all times, discharge the Employee's responsibilities in a diligent and faithful manner consistent with the Employee's duty of loyalty to the Company. The Employee shall devote all business time, effort, and skill to the Company.

4.  **Compensation**.

    a.  The Company shall pay the Employee a salary (the "Base Salary") at the rate of $251,212 per annum.

    b.  In addition to the Base Salary and subject to satisfactory performance of the Employee's duties hereunder, the Company shall pay the Employee a bonus (the "Bonus"), payable semiannually, based on the performance as of June 30th and December 31st of each year (each, a "Bonus Period") of the various funds for which the Company acts as investment adviser. The amount of the Bonus shall be determined by reference to the Company's Bonus Pool to which approximately 50% of the Company's Net Income From Operations (as defined below) is

allocated and in relation to which the Employee has been allocated 12,500 points. For these purposes, Net Income From Operations shall equal the sum of (i) management fees and performance allocations that are earned from the Medallion funds (calculated as if a 5% management fee and a 36% performance allocation were earned with respect to investments made in fee-free accounts), (ii) management fees and performance allocations that are received from other Renaissance-sponsored investment vehicles for the applicable Bonus Period, and (iii) income received by the Company under investment advisory and administrative agreements, net of the Company's customary expenses and reserves, all as calculated in a manner consistent with past practices. Notwithstanding anything to the contrary, all Bonus amounts will be prorated for any partial periods of employment.

c.      The Base Salary and the Bonus will be reviewed by the Company from time to time and are subject to increase or decrease in the sole discretion of the Company.

d.      The Base Salary and the Bonus are payable in accordance with the Company's regular payroll practices and are subject to withholdings as required by law.

5.      **Employee Benefits**.  The Employee shall be entitled to the following perquisites and employee benefits:

a.      The Employee shall be entitled to paid vacation of 30 days per annum, subject to change in accordance with the Company's vacation policy as in effect from time to time.

b.      The Employee shall be entitled to those employment benefits generally made available to employees of the Company and shall have the right to participate in the employee benefit plans maintained by the Company on behalf of employees generally (including any 401(k) plan, healthcare plans, group life and disability insurance) to the extent permitted by such plans subject to their terms and conditions.  Nothing herein shall be deemed to obligate the Company to adopt any employee benefit plan or prevent it from modifying or terminating any plan previously maintained by it.

6.      **No Conflict**.  The Employee represents and warrants to the Company that the Employee is free to enter into this Agreement and has no contractual commitments, restrictions, or obligations that will in any way preclude or interfere with the Employee's employment by the Company, conduct of Company business, or ability to enter into this Agreement and perform hereunder.

7.      **Intellectual Property**.  "Intellectual Property" means all works, including scientific or mathematical papers or publications or any work that may be the subject matter of copyright or patent protection; trade secrets; advertising or marketing concepts; information; documents; data; formulae; algorithms; designs; models; drawings; computer programs, processing systems and techniques; source codes; including all discoveries, developments, improvements, modifications, and inventions and all statutory protection obtained or obtainable thereon. The Employee hereby assigns all worldwide right, title, and interest to the Company in and to Intellectual Property created, made, conceived, expressed, developed, actually or constructively reduced to practice, or authored (collectively, "Created") by the Employee solely or jointly with others or with the use of information, materials, or facilities of or provided by the Company and received by the Employee during the Employee's employment by the Company.

In addition, any Intellectual Property that qualifies as a *work made for hire* under the U.S. Copyright laws shall be a *work made for hire* and shall be owned by the Company. The Employee waives any "moral rights" (as the term is commonly understood) the Employee may now or hereafter have in or to any such Intellectual Property throughout the universe.

8.    **Confidential Information**.  "Confidential Information" means all Intellectual Property Created by the Employee and all other Intellectual Property and other information relating to the business and affairs of the Company and its affiliates directly or indirectly disclosed by or on behalf of the Company to the Employee whether in writing or orally, including without limitation research, business strategies, trading positions, and execution procedures, models, algorithms, mathematically based information, investor lists, contracts, costs, profits, markets, sales, existing and potential customers, suppliers and employees, plans for future development, promotional methods, financial data, personnel information, and any other information of a similar nature not available to the public.

9.    **Use Of Confidential Information**.  The Employee acknowledges and agrees that Confidential Information is critical to the Company and belongs to it. The Employee shall use Confidential Information exclusively for the purposes of satisfying the Employee's duties and obligations to the Company.

10.    **Nondisclosure Of Confidential Information And Return Of Company Property**.

a.    The Employee shall safeguard the secrecy and confidentiality of Confidential Information, which the Employee acknowledges constitutes "trade secrets" of the Company. The Employee shall not disclose any Confidential Information to any third party during the Employee's employment by the Company or thereafter except for the following:

(i)  information that at the time of disclosure is part of the public knowledge or literature and is readily accessible to such third party, provided that any combination of features shall not be deemed within this exception merely because individual features are part of the public knowledge or literature and readily accessible to such third party but only if the combination itself and its principles of operation are part of the public knowledge or literature and are readily accessible to such third party;

(ii)  information required by law to be disclosed; or

(iii)  information disclosed with the express prior written consent of the Company.

b.    Upon termination of the Employee's employment for any reason or upon request of the Company at any time, the Employee shall immediately return to the Company (i) all Confidential Information and all copies thereof (whether in electronic or paper form), including without limitation all documents, notes, records, files, abstracts, or derivative works (as well as any passwords applicable thereto), and (ii) all other property of the Company, including without limitation passes, keys, credit cards, computer access codes, software, hardware, telephones, computers, and equipment. The Employee will not access, view, alter, or use the Company's

computer system or any information contained therein, or attempt to do so, subsequent to the Employee's last day of employment.

11.   <u>Noncompetition</u>.

a.   The Employee acknowledges the duty to advance the interests of the Company faithfully and to refrain from taking any action inconsistent with the Company's interests. The Employee further acknowledges the nature of the Company's business and the efforts the Company undertakes to develop, preserve, and protect its competitive advantage. Without the prior written consent of the Company, which consent shall not be unreasonably withheld, the Employee shall not, during the Employee's employment by the Company and for a one-year period thereafter, directly or indirectly own, manage, operate, participate in, be employed by, or be otherwise interested in, any activity, transaction, person, entity, or other enterprise that directly competes with the Company or any of its direct or indirect affiliates with respect to the Company's primary business activity, the mathematically based trading of futures and securities.

b.   The Employee acknowledges that the Company takes significant steps to develop, preserve, and protect the relationships it has with its employees, representatives, agents, and independent contractors and that these relationships are critical to its business. The Employee shall not, during the Employee's employment by the Company and for a one-year period thereafter, (i) induce, influence, or seek to induce or influence any person who has been engaged as an employee, representative, agent, independent contractor, or otherwise by the Company or any of its direct or indirect affiliates to terminate his or her relationship with the Company or any of its affiliates or (ii) hire or enter into a joint venture or partnership with any person who has been engaged as an employee, representative, agent, independent contractor, or otherwise by the Company or any of its direct or indirect affiliates, <u>provided</u> that Section 11(b)(ii) hereof shall not apply to representatives, agents, or independent contractors the activities of which already include the same tasks for competitors of the Company or any of its direct or indirect affiliates.

c.   In the event that the Company terminates the employment of the Employee without "Just Cause" (as defined below), the Company shall pay the Employee's Base Salary for one year from the date of such termination.

d.   For purposes of Section 11(c) hereof, "Just Cause" means the Company's good faith determination that termination of the Employee's employment is necessary by reason of (i) the commission by the Employee of any act that, if successfully prosecuted by the appropriate authorities, would constitute a felony under state or federal law; (ii) fraud, dishonesty, or any conduct that has, or may be reasonably expected to have, a material negative effect on the business or reputation of the Company; or (iii) the material breach by the Employee of the provisions of this Agreement (or any rules, policies, procedures, or guidelines of the Company), including without limitation the confidentiality and noncompetition provisions set forth herein.

12.   <u>Nondisparagement</u>. The Employee agrees not to make any disparaging or negative statement about the Company; any of its affiliates; any of their officers, directors, shareholders, members, managers, employees, representatives, and agents; or any of their businesses and activities, <u>provided</u> that nothing herein shall preclude the Employee from testifying as required by lawful subpoena or other legal process, making good faith reports to

governing regulatory bodies or authorities, or communicating inside the Company consistent with legitimate business needs.

13.   **Cooperation**. The Employee agrees to cooperate with and assist the Company as to matters that occurred during the Employee's employment, including with respect to any action, claim, arbitration, or proceeding. The Company shall reimburse the Employee for reasonable out-of-pocket expenses incurred in connection with such cooperation.

14.   **Reasonableness**. The Employee agrees and acknowledges that the restrictions and limitations in this Agreement, including without limitation Sections 9 through 11 hereof, are reasonable and necessary to protect the legitimate business interests of the Company. The Employee acknowledges that all restrictions and limitations relating to the period following the end of his or her employment will apply regardless of the reason that the employment ends. The Employee also acknowledges that the Company would not have entered into this Agreement unless the Employee had agreed to such restrictions and limitations. If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, the court shall have the authority to modify and/or "blue pencil" this Agreement to render it enforceable and to effect the intent of the parties to the fullest extent permitted by law.

15.   **Enforcement of Rights; Injunctive Relief**. The parties acknowledge and agree that in the event of an actual or threatened breach by the Employee of Sections 9 through 11 hereof, the Company will suffer substantial irreparable harm for which there is no adequate remedy at law. In recognition of the foregoing, the parties agree that, in addition to such other remedies as the Company may have at law, without posting any bond or security or requirement for proof of actual damages, the Company shall be entitled to equitable relief from a court or arbitral tribunal of competent jurisdiction in the form of specific performance; temporary, preliminary, or permanent injunctive relief; or any other equitable remedy that may be available. Such equitable relief shall not affect the Company's right to obtain damages or other relief from a court of competent jurisdiction on account of any actual or threatened breach by the Employee of Sections 9 through 11 hereof.

16.   **Notices**. Any notice, request, instruction, or other document to be given under this Agreement to any party hereunder by the other party shall be in writing and delivered personally, with receipt thereof acknowledged, or sent by registered or certified mail, postage prepaid, to the following addresses:

If to the Company:

> Renaissance Technologies LLC
> 800 Third Avenue
> New York, New York 10022
> Attention: Mark Silber

If to the Employee:

> David Mitchell Magerman
> 117 Raynham Rd
> Merion Station, PA 19066

or to such other address as a party hereto may hereafter designate in writing to the other party, provided that any notice of a change of address shall become effective only upon receipt thereof.

17.   **Benefit; Assignment**.

a.       This Agreement shall be binding upon and inure to the benefit of the Company and its permitted successors and assigns.

b.       This Agreement shall be binding upon and inure to the benefit of the Employee and his or her personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees, and legatees. This Agreement is personal to the Employee, and the Employee may not assign any rights or obligations under this Agreement.

18.   **Entire Agreement; Amendment**. This Agreement contains the entire understanding between the Company and the Employee with respect to the subject matter hereof and supersedes all prior agreements, negotiations, and understandings, whether oral or written, between the Company and the Employee with respect to the subject matter hereof except for any prior or contemporaneous confidentiality, trade secret, nondisclosure, noncompetition, and nonsolicitation covenants, which, together with such covenants in this Agreement, shall be enforced to the fullest extent permitted by law. In addition, any Intellectual Property waivers that were executed in connection with prior employment agreements between the Employee and the Company shall remain in full force and effect and shall apply equally to this Agreement. This Agreement may not be amended or modified except by a written instrument signed by both the Company and the Employee.

19.   **Severability**. If any provision of this Agreement is held to be invalid or unenforceable, such illegality or unenforceability shall not affect the validity or enforceability of the other provisions hereof, and such other provisions shall remain in full force and effect, unaffected by such invalidity or unenforceability.

20.   **Governing Law**. This Agreement shall be governed by the laws of the State of New York without reference to the conflict or choice of laws provisions thereof.

21.   **Arbitration**. Except as provided in Section 15 hereof, the parties agree that any disputes arising out of or relating to (i) this Agreement or the breach hereof and/or (ii) the Employee's employment with the Company, including but not limited to tort claims, claims relating to intellectual property, and claims for discrimination, sexual harassment and retaliation, shall be settled by binding arbitration before one neutral arbitrator in accordance with the Employment Arbitration Rules and Procedures of JAMS. The arbitration shall take place in New York City. The award rendered by the arbitrator shall be binding upon the parties, and judgment on the award may be entered in any court of competent jurisdiction. Each party shall pay one-half of the costs, fees, and expenses of the arbitration, including the arbitrator's fees, and each party shall bear its own attorneys' fees and expenses.

The parties agree that in connection with any such arbitration there shall be no discovery of the contents of the Company's trading systems, including its source code, absent a showing that such information is absolutely necessary to determine the dispute, in which case the parties agree that (i) any such discovery will be limited strictly to information that is absolutely

necessary for determination of the dispute, and (ii) they will enter into a confidentiality agreement adequate to ensure that the information is not disclosed to a third party or used other than in the arbitration.

22.    **Captions; Construction**.  Captions contained in this Agreement are inserted only as a matter of convenience and shall in no way define, limit, or extend the scope or intent of this Agreement or any provision hereof or in any way affect the construction or interpretation thereof.  The parties further acknowledge that this Agreement shall not be construed more strictly against either of them.

23.    **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

24.    **Survival**.  Sections 9 through 15 and 21 hereof shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the date first written above.

RENAISSANCE TECHNOLOGIES LLC

By: _____
Name: Mark Silber
Title:  Executive Vice President

_____
**DAVID MITCHELL MAGERMAN**

# EXHIBIT B

# RENAISSANCE TECHNOLOGIES LLC

# CODE OF ETHICS

## and

# COMPLIANCE MANUAL

**February 1, 2012**

**as last amended February 1, 2017**

- Illinois (including spouse and minor children) **[Chairman of the Board only]**
- Maryland
- New Jersey (including spouse)
- New Mexico
- Pennsylvania (including immediate family)
- Texas (excluding family members, except in Dallas)
- Vermont
- Virginia

Notification Jurisdictions

Notification is required in the following jurisdictions:

- Denver, Colorado (including spouse)
- Illinois (state and local)
- Detroit, Michigan (including spouse)

## ·Communications with Media, Regulators, Clients and Investors
### Law and Policy

Communications with media and regulators are governed by Firm policy intended to minimize risk resulting from inappropriate disclosures or public statements. In addition, individuals who make false statements to government regulators are subject to criminal liability.

Communications with Clients and investors are also governed by Section 206 and Rule 206(4)-8 of the Advisers Act. Rule 206(4)-8 makes it a fraudulent practice for any investment adviser to make a material misstatement in or omission from any communication with an investor or prospective investor in a pooled investment vehicle.

**Media Relations.** It is the Firm's general policy that no communications with the press or other news media should take place without the approval of the Chief Compliance Officer or the General Counsel. This prohibition includes, but is not limited to, interviews by print or electronic media, appearances on national network, local or cable television broadcasts and written investment-related articles for publication.

If the purpose of the communication with the media is to promote the business of the Firm, such activities may be considered advertising under the various securities laws. Accordingly, a copy of any prepared comments, script or text should be forwarded to the Chief Compliance Officer for prior review. All inquiries from the media must be referred to the Chief Compliance Officer or the Chief Operating Officer for a response.

**Regulatory Inquiries, Client Complaints and Other Matters.** It is the Firm's policy that all regulatory inquiries, Client/investor complaints and legal matters concerning the Firm be handled by the Chief Compliance Officer or the General Counsel. Employees receiving such inquiries should refer them immediately to the Chief Compliance Officer or the General Counsel.

Regulatory inquiries may be received by mail, telephone or personal visit. In the case of a personal visit, demand may be made for the immediate production or inspection of documents. While any telephone or personal inquiry should be handled in a courteous manner, the caller or visitor should

49

be informed that a response requires the approval of the Firm's Chief Compliance Officer or the General Counsel, and that any subsequent inquiries should be made to the Chief Compliance Officer or the General Counsel. Letter inquiries should be forwarded to the Chief Compliance Officer or General Counsel. Under no circumstances should any documents or material be released without prior approval of the Chief Compliance Officer or the General Counsel, nor should any Employee have substantive discussions with any regulatory personnel without prior consultation with the Chief Compliance Officer or the General Counsel.

### ·Communications with Media, Regulators, Clients and Investors Procedures

**Communications with the Media.** The following procedures apply to all communications with the media:

- All media calls or queries must be referred immediately to the Chief Compliance Officer or Chief Operating Officer.
- All inquiries from the press and any unsolicited inquiry concerning any fund presently offered and advised by the Firm (including to confirm information about the fund) should be referred to the Chief Compliance Officer or General Counsel.
- Any personal or family relationships with a member of the media should be made known to the Chief Compliance Officer or General Counsel. Members of the media are not invited as reporters to Firm events. This fact should be made clear to any person who might be invited to a Firm event based on a personal relationship with an Employee.
- An Employee who wishes to publish an article, paper or other publication (including in any electronic media, such as a blog, webcast or social networking website), appear in public, speak on behalf of, or represent the Firm must receive prior written approval from the Chief Compliance Officer or General Counsel.

**Regulatory Inquiries.** All regulatory inquiries concerning the Firm are handled by the Chief Compliance Officer or General Counsel. Employees receiving such inquiries, whether by mail, telephone or personal visit, must refer them immediately to the Chief Compliance Officer or General Counsel. Under no circumstances should any documents or material be released without prior approval of the Chief Compliance Officer or General Counsel, nor should any Employee have substantive discussions with any regulatory personnel without prior consultation with the Chief Compliance Officer or General Counsel. The Chief Compliance Officer will maintain records of any inquiries and accompanying responses.

**Communications with Investors or Prospective Investors.** All communications with investors or prospective investors, including private placement memoranda, forms of investor reports, or responses to "requests for proposals" must be pre-approved by the Chief Compliance Officer.

**Client Complaints.** Any Employee receiving a complaint, whether oral or written, from any Client or from any investor in a private fund or account managed by the Firm must promptly bring such complaint to the attention of the Chief Compliance Officer or General Counsel. Employees should not attempt to respond to or resolve any complaint by themselves. All responses to such complaints must be handled by the Chief Compliance Officer or General Counsel. The Chief Compliance Officer will maintain records of any complaints and accompanying responses.

# EXHIBIT C

From: "David Magerman" <magerman@rentec.com>
To: "Mark Silber" <silber@rentec.com>, "Carla Porter" <carla@rentec.com>, "Lavonne Wesner" <lavonne@rentec.com>
Cc: "David Magerman" <dmmagerman@gmail.com>
Sent: Sunday, January 29, 2017 6:59:10 AM
Subject: Exercising my rights to free speech

Dear Mark, Carla and Lavonne,

I am informing you of my plans to speak out against the Trump administration, and, in particular, the role being played by current and former Renaissance employees.  I plan to abide by the employee handbook, even though I am not sure that the terms in it are legal and enforceable.  Nonetheless, since I agreed to them, I will abide by them.

To wit, the employee handbook requires:

1) I refrain from "insubordination, discourtesy, rudeness, and/or abuse of fellow employees or other persons involved in Company business."  As such, I will make an effort to avoid all of these acts to the best of my ability.

2) I cannot make or publish "false, vicious, or malicious statements concerning employees, the Company or its business."  I plan to only make honest and accurate statements about an employee and a former employee, and I will make no reference to the Company or its business, except to identify myself as a long-time employee of the Company.

3) I cannot communicate with the media in any forms "concerning Renaissance matters."  I plan to mention nothing relating to Renaissance matters.  I will make no mention of my role at the Company nor divulge any details of the business of the Company.

I fully understand that a corporation has no legal obligation with respect to an employee's constitutional rights, and that I could be putting myself in a bad light with management for speaking out in a public forum against a fellow employee, especially one in senior management.  However, completely independent of my role at Renaissance, I am a respected communal leader, a person with responsibilities under my religion and under my conscience, and someone who would naturally be outspoken against what I deem to be morally or legally wrong, regardless of my relationship to its perpetrators.

I have great respect for Bob Mercer as a manager and as a brilliant scientific thinker, and I have no plans to defame him or Rebekah frivolously or with malice.  Nonetheless, the Mercers' public and blatant support for the Trump candidacy, presidency and agenda has cast a taint on all Renaissance employees, including myself.  To disallow employees to politely and honestly, but publicly, respond to this taint, and and to prevent us from disavowing it in as public a forum as he has been allowed to promote it, is frankly unfair and untenable.

I do not believe that the act of speaking out publicly against the current administration and its supporters should jeopardize my employment status, as nothing I plan to do violates my employment agreement.  In fact, I believe if I had acted as Bob has, casting a negative light on the company and its employees by openly taking a political stance which many, including current employees, business partners, and investors, find abhorrent, I believe I might be more likely to be accused of violating my employment contract.  And, unlike the president of the United States, who is immune from some rules governing the morality of government employees, I believe the CEO is bound by the same employee handbook that all employees are bound by.

1

I would appreciate a response from our legal counsel and human resources to affirm that, as long as I abide by the rules of the employee handbook to the best of my ability, my employment at Renaissance will not be jeopardized, and I will not be subject to any retaliation in the workplace for my public speech.  If you believe I have misunderstood my obligations as an employee, I would appreciate it if you would inform me of your perception of the correct interpretation, so that I can do everything I can to avoid violating it.

Thank you.

-- David Magerman

# EXHIBIT D

# 'You Have to Stop,' Renaissance Executive Tells Boss About Trump Support

At some companies, a divisive presidential campaign has led to disharmony in the workplace

*By Gregory Zuckerman | Photographs by Matt Stanley for The Wall Street Journal*

D avid Magerman says he was in his home office in suburban Philadelphia earlier this month when the phone rang. His boss, hedge-fund billionaire Robert Mercer, was on the line.

"I hear you're going around saying I'm a white supremacist," Mr. Mercer said. "That's ridiculous."

In the prior weeks, Mr. Magerman, a registered Democrat who calls himself a centrist, had complained to colleagues about Mr. Mercer's role as a prominent booster of Donald Trump's presidential campaign.

Now word of Mr. Magerman's criticism had reached Mr. Mercer, co-chief executive of Renaissance Technologies LLC, one of the world's most successful hedge funds.



David Magerman, at home in Merion Station, Pa., is an employee with Renaissance Technologies who has begun speaking out against President Donald Trump, though one of his top bosses, Robert Mercer, is a prominent supporter of the president.

"Those weren't my exact words," Mr. Magerman said he told Mr. Mercer, stammering and then explaining his concerns about Mr. Trump's policy

positions, rhetoric and cabinet choices. "If what you're doing is harming the country then you have to stop."

Mr. Mercer declined to comment through a spokesman. In a statement, Renaissance's chairman and founder, Jim Simons, who has been a prominent financial backer of Democrats, said, "I have worked closely with Bob Mercer since he joined our firm almost 25 years ago. While our politics differ dramatically, I have always thought him to be of impeccable character."

A presidential campaign that divided much of the country also has created tensions within companies. Some senior employees, accustomed to settling grievances behind closed doors, are rebelling in unusually public ways, the polarization playing out for the world to see. Days after the election, a partner at Peter Thiel 's venture-capital firm, Founders Fund, wrote a blog post expressing fears of a Trump presidency, which Mr. Thiel had worked to promote. A spokesman for the firm declined to comment.

After the November election, Grub Hub Inc., chief executive Matt Maloney seemingly suggested in an email to staff that employees who supported Mr. Trump should resign, citing the "hateful politics" of the new president. He later said the message had been misconstrued.

Historically, some leaders of Renaissance, which is based on Long Island, N.Y., have leaned Democratic, including Mr. Simons, who donated to Hillary Clinton 's 2016 presidential campaign.

Some Renaissance executives chafed at the unwanted publicity brought to the firm by Mr. Mercer's activities during the presidential race, according to people close to the matter. In addition to providing crucial financial help when Mr. Trump's candidacy was lagging, Mr. Mercer and his daughter Rebekah advised the campaign, suggesting the installation of two Mercer family confidantes, Steve Bannon and Kellyanne Conway, atop the campaign. Those two now hold senior White House positions.

Until now, however, nobody within the tight-lipped hedge fund has gone public with a grievance.

"His views show contempt for the social safety net that he doesn't need, but many Americans do," said Mr. Magerman, 48 years old, during an interview with The Wall Street Journal at the Dairy Café, a kosher restaurant he owns in Bala Cynwyd, Pa. "Now he's using the money I helped him make to implement his worldview" by supporting Mr. Trump and encouraging that "government be shrunk down to the size of a pinhead."

Mr. Magerman, a 20-year Renaissance veteran who helped design the fund's trading systems, says he is speaking only for himself, and that there is no sign of a broad insurrection at the firm.

Mr. Magerman makes millions of dollars a year, drives a Tesla and says he gives more than $10 million in charity annually. A research scientist, he is one of 100 partners at the firm, but he isn't one of Renaissance's most senior executives.





David Magerman, top left, reads George Orwell's "1984" at his home in Merion Station, Pa., on Feb. Top right, a 19th-century clock sits on shelf in in his home office; above, his home in Merion Station.

"I'd like to think I'm speaking out in a way that won't risk my job, but it's very possible they could fire me," he said. "My wife isn't comfortable with me jeopardizing my job, but she realizes it's my prerogative and agrees with my sentiments."

He has concluded that every new piece of code he developed for Renaissance helped Mr. Mercer make more money and gave him greater ability to influence the country.

To try to counteract his boss's activities, Mr. Magerman says he has been in touch with local Democratic leaders and plans to make major contributions to the party. He says he called Planned Parenthood to offer his assistance and contacted Jared Kushner, Mr. Trump's son-in-law and White House adviser, to voice his concerns about Ms. Conway and Mr. Bannon. He says he failed to reach Mr. Kushner.

Mr. Magerman says he first spoke with Mr. Mercer in January, when Mr. Magerman, who donates to local schools, called Mr. Mercer to ask for the opportunity to reach out to Rebekah Mercer to offer the administration help on education policy.

During the call, they talked politics, disagreeing about some of the administration's early steps. After airing his concerns with others at the company, Mr. Magerman received the second call from Mr. Mercer two weeks ago.



David Magerman drives to his restaurant, the Dairy Cafe, in Bala Cynwyd, Pa.

The conversation grew strained. After telling Mr. Mercer to stop harming the country, he said Mr. Mercer responded that his goal had been to defeat Mrs. Clinton and that he wouldn't remain very involved in politics.

"How can you say you're not involved?" Mr. Magerman said, citing an outside group Rebekah Mercer was involved in that was aimed at boosting Mr. Trump's agenda.

Mr. Magerman has one idea that would reduce the power of people like Mr. Mercer. He said he was thinking about reaching out to Democratic Sen. Elizabeth Warren (D., Mass.) to craft proposals to reduce speculative trading, which presumably would curtail Renaissance's profits.

Mr. Magerman says he hopes his public statements won't cost him his job.

But if he does get fired, he says, he would have more time to devote to politics and other causes.

"This is my life's work—I ran a group that wrote the trading system they still use," he said. "But I feel relieved I'm now doing something, and if they fire me, maybe it's for the best."



David Magerman, at the Dairy Cafe in Bala Cynwyd, Pa.

**Write to** Gregory Zuckerman at gregory.zuckerman@wsj.com

---

'You Have to Stop,' Renaissance Executive Tells Boss About Trump Support
By **GREGORY ZUCKERMAN** | Photographs by Matt Stanley for The Wall Street Journal
Feb. 23, 2017 5:30 a.m. ET

# EXHIBIT E

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

https://www.wsj.com/articles/renaissance-feud-spills-over-to-hedge-fund-poker-night-1493424763

MARKETS

# Renaissance Feud Spills Over to Hedge Fund Poker Night

Executive David Magerman says he had hoped to repair frayed relationship with Mercers



David Magerman, shown on Feb. 16, was suspended from Renaissance Technologies Corp. after he publicly criticized the Long Island hedge fund's co-chief executive Robert Mercer. PHOTO: FOR THE WALL STREET JOURNAL

*By Gregory Zuckerman*
April 28, 2017 8:12 p.m. ET

As David Magerman counted down to April 20, a confrontation with Rebekah Mercer wasn't on his mind.

The Renaissance Technologies Corp. executive was anticipating the annual hedge-fund poker tournament that evening at New York's St. Regis hotel benefiting Math for America, which supports math and science teachers. The event serves as an annual showdown among investors who rely on computer models and are known as quants, professional poker players and others.

He knew James Simons, Math for America's founder and chairman of Renaissance, the Long Island hedge fund where Mr. Magerman worked, would be there, as would other Renaissance executives, including Robert Mercer, the firm's co-chief executive officer.

It would be the first time Mr. Magerman would see many people in the industry since his decision in late February to criticize the role Mr. Mercer and his daughter Rebekah played helping Donald Trump's presidential campaign. Subsequent to speaking with The Wall Street Journal about his views, the 48-year-old executive was suspended from Renaissance without pay in the fallout from the high-profile disagreement.

Mr. Magerman remains suspended, but he chose to attend the poker event. Mr. Magerman and others at the event recently described what transpired to The Wall Street Journal.

For weeks, Mr. Magerman vacillated between desiring an exit agreement with Renaissance and hoping to remain. Recently, he and the firm had decided they could work together again, he said. Mr. Magerman viewed the poker evening as an opportunity to repair the frayed relationship.

"I was anxious," he said. "But I wanted to reintroduce myself and be part of the culture again, to show I was making an effort."

Driving three hours from his home outside Philadelphia, Mr. Magerman reached the St. Regis and pledged $5,000 to enter the tournament. Just after 7 p.m., he began playing No Limit Hold 'Em at a table with about seven others, including Mr. Simons and Dan Harrington, a member of the Poker Hall of Fame.

Most of the approximately 200 players in the carpeted, second-floor ballroom wore suits or sports jackets, contrasting with Mr. Magerman's jeans and open-collar dress shirt. He stopped by Mr. Mercer's table, complimenting him on his suit, a friendly exchange that buoyed Mr. Magerman.

When Mr. Simons ducked into a side room to smoke, Mr. Magerman followed. He apologized to Mr. Simons for the negative attention thrust on the publicity-shy firm after his criticism of the Mercers. "I'm sorry how things played out," he said he told Mr. Simons. "I respect you and want you to know that."

Mr. Mercer, Mr. Simons and Renaissance declined to comment for this article.

Back at his table, Mr. Magerman lost some early hands but remained in good spirits, pledging an additional $15,000 for buy-ins to continue playing.

A few tables away, Mr. Mercer was playing against investors and others, including sports-finance executive Chris English. Mr. Mercer won several early hands, Mr. English later said. But soon Mr. English detected Mr. Mercer's tell, or a clue that might give Mr. English a crucial advantage.

"When he has a great hand, he whistles patriotic songs," Mr. English said of Mr. Mercer, referring to tunes like "The Battle Hymn of the Republic." "When he's not sure, he hums them."

Seizing on his discovery, Mr. English won a pot over Mr. Mercer.

Mr. Magerman hit his own losing streak. Around 10:30 p.m., after he consumed several glasses of 12-year-old scotch, Mr. Magerman left the tournament. He decided to watch others play, including Ms. Mercer, a former Renaissance employee. The two hadn't spoken in years, but Mr. Magerman said he hoped for a friendly interaction.

When Ms. Mercer saw Mr. Magerman hovering nearby, he said she became agitated.

"You're pond scum," Ms. Mercer told him, repeatedly, according to Mr. Magerman and two people at the table. "You've been pond scum for 25 years; I've always known it."

Shaken, Mr. Magerman walked around the table to be next to Ms. Mercer. She told Mr. Magerman that his criticism of the Mercers' support for Mr. Trump had put her family in danger, he said.

"How could you do this to my father? He was so good to you," she said, according to two people at the table.

Mr. Magerman told her he felt bad, adding that her family had played a supportive role when he joined Renaissance more than two decades ago.

"I loved your family," Mr. Magerman told Ms. Mercer, he said.

Ms. Mercer told him to leave.

"Karma is a bitch," she told Mr. Magerman, he and another person at the event said.

A spokeswoman for Ms. Mercer declined to comment on this article.

A security member approached, telling Mr. Magerman to back away from the table. He refused, dodged the security and approached Mr. Simons, asking for help. Mr. Simons said he thought it best if Mr. Magerman left, according to Mr. Magerman and another person at the event.

Security forced him outside to the curb, Mr. Magerman said.

"I'm not denying I was a little impacted by the alcohol," Mr. Magerman told The Wall Street Journal several days after the event. "But that doesn't change what she said to me, or what I said to her. I didn't start the fight, and I didn't resort to the petty name calling like she did."

Upstairs, players buzzed about the confrontation. Play continued and Mr. Mercer, rebounding from his earlier setback, was on a tear. Other quants—including Mr. Simons, Peter Muller of PDT Partners, and Mr. Mercer's co-CEO, Peter Brown —exited the tournament but Mr. Mercer kept going, Mr. English said. In the evening's last big pot around 1 a.m., he knocked out Mr. English.

"He might have been humming to reverse his tell," Mr. English said, trying to explain his loss. "It was so loud I couldn't tell."

Mr. Mercer smiled and accepted congratulations from rivals, an attendee said.

Around the same time, Mr. Magerman was on his way back to Philadelphia. On Friday, his lawyers discussed final terms of a potential departure with Renaissance representatives though his fate was still uncertain.

"It wasn't one of my finest moments, it wasn't my intent to create a scene," he said. "She pushed my buttons and I gave her a reaction."

**Write to** Gregory Zuckerman at gregory.zuckerman@wsj.com

*Appeared in the Apr. 29, 2017, print edition as 'At Poker Tournament: Politics, Drinks, Recriminations.'*

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

# EXHIBIT F

A REPORTER AT LARGE  MARCH 27, 2017 ISSUE

# THE RECLUSIVE HEDGE-FUND TYCOON BEHIND THE TRUMP PRESIDENCY

*How Robert Mercer exploited America's populist insurgency.*

**By Jane Mayer**



*Nick Patterson, a former colleague of Mercer's, said, "In my view, Trump wouldn't be President if not for Bob."*

ILLUSTRATION BY OLIVER MUNDAY / ANIMATION BY JAMES IACOBELLI / PHOTOGRAPH BY ANDREW TOTH / GETTY

L ast month, when President Donald Trump toured a Boeing aircraft plant in North Charleston, South Carolina, he saw a familiar face in the crowd that greeted him: Patrick Caddell, a former Democratic political operative and pollster who, for forty-five years, has been prodding insurgent Presidential candidates to attack the Washington establishment. Caddell, who lives in Charleston, is perhaps best known for helping Jimmy Carter win the 1976 Presidential race. He is also remembered for having collaborated with his friend Warren Beatty on the 1998 satire

Case 2:17-cv-03490-CDJ    Document 1-1    Filed 08/03/17    Page 28 of 36

"Bulworth." In that film, a kamikaze candidate abandons the usual talking points and excoriates both the major political parties and the media; voters love his unconventionality, and he becomes improbably popular. If the plot sounds familiar, there's a reason: in recent years, Caddell has offered political advice to Trump. He has not worked directly for the President, but at least as far back as 2013 he has been a contractor for one of Trump's biggest financial backers: Robert Mercer, a reclusive Long Island hedge-fund manager, who has become a major force behind the Trump Presidency.

During the past decade, Mercer, who is seventy, has funded an array of political projects that helped pave the way for Trump's rise. Among these efforts was public-opinion research, conducted by Caddell, showing that political conditions in America were increasingly ripe for an outsider candidate to take the White House. Caddell told me that Mercer "is a libertarian—he *despises* the Republican establishment," and added, "He thinks that the leaders are corrupt crooks, and that they've ruined the country."

Trump greeted Caddell warmly in North Charleston, and after giving a speech he conferred privately with him, in an area reserved for V.I.P.s and for White House officials, including Stephen Bannon, the President's top strategist, and Jared Kushner, Trump's son-in-law. Caddell is well known to this inner circle. He first met Trump in the eighties. ("People said he was just a clown," Caddell said. "But I've learned that you should always pay attention to successful 'clowns.'") Caddell shared the research he did for Mercer with Trump and others in the campaign, including Bannon, with whom he has partnered on numerous projects.

Case 2:17-cv-03490-CDJ   Document 1-1   Filed 08/03/17   Page 29 of 36

The White House declined to divulge what Trump and Caddell discussed in North Charleston, as did Caddell. But that afternoon Trump issued perhaps the most incendiary statement of his Presidency: a tweet calling the news media "the enemy of the American people." The proclamation alarmed liberals and conservatives alike. William McRaven, the retired Navy admiral who commanded the 2011 raid that killed Osama bin Laden, called Trump's statement a "threat to democracy." The President is known for tweeting impulsively, but in this case his words weren't spontaneous: they clearly echoed the thinking of Caddell, Bannon, and Mercer. In 2012, Caddell gave a speech at a conference sponsored by Accuracy in Media, a conservative watchdog group, in which he called the media "the enemy of the American people." That declaration was promoted by Breitbart News, a platform for the pro-Trump alt-right, of which Bannon was the executive chairman, before joining the Trump Administration. One of the main stakeholders in Breitbart News is Mercer.

Mercer is the co-C.E.O. of Renaissance Technologies, which is among the most profitable hedge funds in the country. A brilliant computer scientist, he helped transform the financial industry through the innovative use of trading algorithms. But he has never given an interview explaining his political views. Although Mercer has recently become an object of media speculation, Trevor Potter, the president of the Campaign Legal Center, a nonpartisan watchdog group, who formerly served as the chairman of the Federal Election Commission, said, "I have no idea what his political views are—they're unknown, not just to the public but also to most people who've been active in politics for the past thirty years." Potter, a Republican, sees Mercer as emblematic of a major shift in American politics that has occurred

Case 2:17-cv-03490-CDJ   Document 1-1   Filed 08/03/17   Page 30 of 36

since 2010, when the Supreme Court made a controversial ruling in Citizens United v. Federal Election Commission. That ruling, and several subsequent ones, removed virtually all limits on how much money corporations and nonprofit groups can spend on federal elections, and how much individuals can give to political-action committees. Since then, power has tilted away from the two main political parties and toward a tiny group of rich mega-donors.

Private money has long played a big role in American elections. When there were limits on how much a single donor could give, however, it was much harder for an individual to have a decisive impact. Now, Potter said, "a single billionaire can write an eight-figure check and put not just their thumb but their whole hand on the scale—and we often have no idea who they are." He continued, "Suddenly, a random billionaire can change politics and public policy—to sweep everything else off the table—even if they don't speak publicly, and even if there's almost no public awareness of his or her views."

Through a spokesman, Mercer declined to discuss his role in launching Trump. People who know him say that he is painfully awkward socially, and rarely speaks. "He can barely look you in the eye when he talks," an acquaintance said. "It's probably helpful to be highly introverted when getting lost in code, but in politics you have to talk to people, in order to find out how the real world works." In 2010, when the *Wall Street Journal* wrote about Mercer assuming a top role at Renaissance, he issued a terse statement: "I'm happy going through my life without saying anything to anybody." According to the paper, he once told a colleague that he preferred the company of cats to humans.

Several people who have worked with Mercer believe that, despite his oddities, he has had surprising success in aligning the Republican Party, and consequently America, with his personal beliefs, and is now uniquely positioned to exert influence over the Trump Administration. In February, David Magerman, a senior employee at Renaissance, spoke out about what he regards as Mercer's worrisome influence. Magerman, a Democrat who is a strong supporter of Jewish causes, took particular issue with Mercer's empowerment of the alt-right, which has included anti-Semitic and white-supremacist voices. Magerman shared his concerns with Mercer, and the conversation escalated into an argument. Magerman told colleagues about it, and, according to an account in the *Wall Street Journal*, Mercer called Magerman and said, "I hear you're going around saying I'm a white supremacist. That's ridiculous." Magerman insisted to Mercer that he hadn't used those words, but added, "If what you're doing is harming the country, then you have to stop." After the *Journal* story appeared, Magerman, who has worked at Renaissance for twenty years, was suspended for thirty days. Undaunted, he published an op-ed in the Philadelphia *Inquirer*, accusing Mercer of "effectively buying shares in the candidate." He warned, "Robert Mercer now owns a sizeable share of the United States Presidency."

Nick Patterson, a former senior Renaissance employee who is now a computational biologist at the Broad Institute, agrees that Mercer's influence has been huge. "Bob has used his money very effectively," he said. "He's not the first person in history to use money in politics, but in my view Trump wouldn't be President if not for Bob. It doesn't get much more effective than that."

Case 2:17-cv-03490-CDJ   Document 1-1   Filed 08/03/17   Page 32 of 36

Patterson said that his relationship with Mercer has always been collegial. In 1993, Patterson, at that time a Renaissance executive, recruited Mercer from I.B.M., and they worked together for the next eight years. But Patterson doesn't share Mercer's libertarian views, or what he regards as his susceptibility to conspiracy theories about Bill and Hillary Clinton. During Bill Clinton's Presidency, Patterson recalled, Mercer insisted at a staff luncheon that Clinton had participated in a secret drug-running scheme with the C.I.A. The plot supposedly operated out of an airport in Mena, Arkansas. "Bob told me he believed that the Clintons were involved in murders connected to it," Patterson said. Two other sources told me that, in recent years, they had heard Mercer claim that the Clintons have had opponents murdered.

The Mena story is one of several dark fantasies put forth in the nineties by *The American Spectator*, an archconservative magazine. According to Patterson, Mercer read the publication at the time. David Brock, a former *Spectator* writer who is now a liberal activist, told me that the alleged Mena conspiracy was based on a single dubious source, and was easily disproved by flight records. "It's extremely telling that Mercer would believe that," Brock said. "It says something about his conspiratorial frame of mind, and the fringe circle he was in. We at the *Spectator* called them Clinton Crazies."

Patterson also recalled Mercer arguing that, during the Gulf War, the U.S. should simply have taken Iraq's oil, "since it was there." Trump, too, has said that the U.S. should have "kept the oil." Expropriating another country's natural resources is a violation of international law. Another onetime senior employee at Renaissance recalls hearing Mercer downplay the dangers posed by nuclear war. Mercer, speaking of the atomic bombs that the

U.S. dropped on Hiroshima and Nagasaki, argued that, outside of
the immediate blast zones, the radiation actually made Japanese
citizens healthier. The National Academy of Sciences has found
no evidence to support this notion. Nevertheless, according to the
onetime employee, Mercer, who is a proponent of nuclear power,
"was very excited about the idea, and felt that it meant nuclear
accidents weren't such a big deal."

Mercer strongly supported the nomination of Jeff Sessions to be
Trump's Attorney General. Many civil-rights groups opposed the
nomination, pointing out that Sessions has in the past expressed
racist views. Mercer, for his part, has argued that the Civil Rights
Act, in 1964, was a major mistake. According to the onetime
Renaissance employee, Mercer has asserted repeatedly that
African-Americans were better off economically before the civil-
rights movement. (Few scholars agree.) He has also said that the
problem of racism in America is exaggerated. The source said
that, not long ago, he heard Mercer proclaim that there are no
white racists in America today, only black racists. (Mercer,
meanwhile, has supported a super PAC, Black Americans for a
Better Future, whose goal is to "get more Blacks involved in the
Republican Party.")

"Most people at Renaissance didn't challenge him" about politics,
Patterson said. But Patterson clashed with him over climate
change; Mercer said that concerns about it were overblown. After
Patterson shared with him a scientific paper on the subject,
Mercer and his brother, Randall, who also worked at the hedge
fund, sent him a paper by a scientist named Arthur Robinson,
who is a biochemist, not a climate expert. "It *looked* like a
scientific paper, but it was completely loaded with selective and
biased information," Patterson recalled. The paper argued that, if

Case 2:17-cv-03490-CDJ    Document 1-1    Filed 08/03/17    Page 34 of 36

climate change were real, future generations would "enjoy an Earth with far more plant and animal life." Robinson owns a sheep ranch in Cave Junction, Oregon, and on the property he runs a laboratory that he calls the Oregon Institute of Science and Medicine. Mercer helps subsidize Robinson's various projects, which include an effort to forestall aging.

Patterson sent Mercer a note calling Robinson's arguments "completely false." He never heard back. "I think if you studied Bob's views of what the ideal state would look like, you'd find that, basically, he wants a system where the state just gets out of the way," Patterson said. "Climate change poses a problem for that world view, because markets can't solve it on their own."

Magerman told the *Wall Street Journal* that Mercer's political opinions "show contempt for the social safety net that he doesn't need, but many Americans do." He also said that Mercer wants the U.S. government to be "shrunk down to the size of a pinhead." Several former colleagues of Mercer's said that his views are akin to Objectivism, the philosophy of Ayn Rand. Magerman told me, "Bob believes that human beings have no inherent value other than how much money they make. A cat has value, he's said, because it provides pleasure to humans. But if someone is on welfare they have negative value. If he earns a thousand times more than a schoolteacher, then he's a thousand times more valuable." Magerman added, "He thinks society is upside down—that government helps the weak people get strong, and makes the strong people weak by taking their money away, through taxes." He said that this mind-set was typical of "instant billionaires" in finance, who "have no stake in society," unlike the industrialists of the past, who "built real things."

Another former high-level Renaissance employee said, "Bob thinks the less government the better. He's happy if people don't trust the government. And if the President's a bozo? He's fine with that. He wants it to *all* fall down."

The 2016 Presidential election posed a challenge for someone with Mercer's ideology. Multiple sources described him as animated mainly by hatred of Hillary Clinton. But Mercer also distrusted the Republican leadership. After the candidate he initially supported, Senator Ted Cruz, of Texas, dropped out of the race, Mercer sought a disruptive figure who could upend both the Democratic Party and the Republican Party. Patterson told me that Mercer seems to have applied "a very Renaissance Technologies way of thinking" to politics: "He probably estimated the probability of Trump winning, and when it wasn't very high he said to himself, 'O.K., what has to happen in order for this twenty-per-cent thing to occur?' It's like playing a card game when you haven't got a very good hand."

Mercer, as it happens, is a superb poker player, and his political gamble appears to have paid off. *Institutional Investor* has called it "Robert Mercer's Trade of the Century."

In the 2016 campaign, Mercer gave $22.5 million in disclosed donations to Republican candidates and to political-action committees. Tony Fabrizio, a Republican pollster who worked for the Trump campaign, said that Mercer had "catapulted to the top of the heap of right-of-center power brokers." It's worth noting that several other wealthy financiers, including Democrats such as Thomas Steyer and Donald Sussman, gave even more money to campaigns. (One of the top Democratic donors was James Simons, the retired founder of Renaissance Technologies.)

Case 2:17-cv-03490-CDJ Document 1-1 Filed 08/03/17 Page 36 of 36

Nevertheless, Mercer's political efforts stand apart. Adopting the strategy of Charles and David Koch, the billionaire libertarians, Mercer enlarged his impact exponentially by combining short-term campaign spending with long-term ideological investments. He poured millions of dollars into Breitbart News, and—in what David Magerman has called "an extreme example of modern entrepreneurial philanthropy"—made donations to dozens of politically tinged organizations.

Like many wealthy families, the Mercers have a private foundation. At first, the Mercer Family Foundation, which was established in 2004, had an endowment of only half a million dollars, and most of its grants went to medical research and conventional charities. But by 2008, under the supervision of Mercer's ardently conservative daughter, Rebekah, the foundation began giving millions of dollars to interconnected nonprofit groups, several of which played crucial roles in propagating attacks on Hillary Clinton. By 2015, the most recent year for which federal tax records are available, the foundation had grown into a $24.5-million operation that gave large sums to ultraconservative organizations.

On top of this nonprofit spending, Mercer invested in private businesses. He put ten million dollars into Breitbart News, which was conceived as a conservative counterweight to the Huffington Post. The Web site freely mixes right-wing political commentary with juvenile rants and racist innuendo; under Bannon's direction, the editors introduced a rubric called Black Crime. The site played a key role in undermining Hillary Clinton; by tracking which negative stories about her got the most clicks and "likes," the editors helped identify which story lines and phrases were the most