**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

David Magerman,

                Plaintiff,

       v.

Robert Mercer,

             Defendant.

Civil Action No. 2:17-cv-3490

**MEMORANDUM IN SUPPORT OF MOTION TO
COMPEL ARBITRATION AND DISMISS**

## TABLE OF CONTENTS

Page(s)

INTRODUCTION .................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 3

LEGAL STANDARD .............................................................................................. 9

ARGUMENT ...................................................................................................... 11

I.   The Court Should Dismiss And Compel Mandatory Arbitration Under The
     Employment Agreement ............................................................................ 11

     A.   Magerman Is Party To An Agreement To Arbitrate, And Mercer Can Enforce
          That Agreement Under The Controlling State Contract Law ....................... 13

          1.   Nonsignatory Officers Can Enforce Arbitration Of A Claim That "Relates To
               Their Behavior" As Officers ............................................................... 13

          2.   Magerman Is Also Equitably Estopped From Avoiding Arbitration .......... 15

          3.   Pennsylvania And Federal Common Law Also Require Arbitration .......... 16

     B.   The Entire Dispute Falls Within The Scope Of The Arbitration Clause ......... 18

II.  Magerman's Claims Fail As A Matter Of Law ............................................... 19

     A.   Magerman's Section 1981 Claim Should Be Dismissed For Failure To
          State A Claim ...................................................................................... 20

          1.   Magerman Fails To Plausibly Allege That He Engaged In Protected Activity
               By Opposing An Underlying Section 1981 Violation ............................... 21

          2.   Magerman's Claims That Mercer "Ordered" Or "Directed" Magerman's
               Suspension And Termination Are Entirely Conclusory ........................... 27

          3.   Magerman Has Not Plausibly Alleged That Any Reporting Of Purported
               Racial Discrimination Was The "But-For" Cause Of His Suspension Or
               Termination ..................................................................................... 29

     B.   Magerman's Pennsylvania State Law Claim Fails As A Matter Of Law. ......... 32

          1.   Magerman's Dispute Is Governed By New York's Substantive Law, Which
               Does Not Allow His Pennsylvania State Law Claim ............................... 32

          2.   The Pennsylvania Courts Have Also Rejected The Claim's Legal Premise ............ 33

CONCLUSION ................................................................................................... 39

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Al-Khazraji v. St. Francis Coll.*,
   784 F.2d 505 (3d Cir. 1986).....................................................................................27

*Am. Graphics Inst., Inc. v. Darling*,
   No. 2:03-cv-374, 2003 WL 21652246 (E.D. Pa. May 22, 2003)............................12

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009).................................................................................13, 15, 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................10, 25, 28, 29

*Barber v. CSX Distrib. Servs.*,
   68 F.3d 694 (3d Cir. 1995).....................................................................................22

*Battaglia v. McKendry*,
   233 F.3d 720 (3d Cir. 2000)...................................................................................19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................10

*Bimbo Bakeries USA, Inc. v. Botticella*,
   613 F.3d 102 (3d Cir. 2010)...................................................................................35

*Blair v. Scott Specialty Gases*,
   283 F.3d 595 (3d Cir. 2002)...................................................................................12

*Brown v. Philip Morris Inc.*,
   250 F.3d 789 (3d Cir. 2001)............................................................................20, 23

*Cacciola v. Work N Gear*,
   23 F. Supp. 3d 518 (E.D. Pa. 2014) ......................................................................26

*Caplan v. L Brands/Victoria's Secret Stores, LLC*,
   210 F. Supp. 3d 744 (W.D. Pa. 2016)..............................................................21, 22

*Carvalho-Grevious v. Del. State Univ.*,
   851 F.3d 249 (3d Cir. 2017)...........................................................27, 29, 30, 31

*Castleberry v. STI Group*,
   863 F.3d 259 (3d Cir. 2017)............................................................20, 22, 24

*CBOCS W., Inc. v. Humphries*,
   553 U.S. 442 (2008)........................................................................................20, 21

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Century Indem. Co. v. Certain Underwriters at Lloyd's, London*,
    584 F.3d 513 (3d Cir. 2009) ....................................................................18, 19

*Clinkscales v. Children's Hosp. of Phila.*,
    No. 06-cv-3919, 2009 WL 1259104 (E.D. Pa. May 7, 2009) ....................27, 28, 29

*Conner v. Ass'n of Flight Attendants-CWA*,
    No. 2:13-cv-2464, 2014 WL 6973298 (E.D. Pa. Dec. 10, 2014) ..........29, 30, 31, 32

*Crawford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    319 N.E.2d 408 (N.Y. 1974) .......................................................................15

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
    450 F.3d 130 (3d Cir. 2006) ........................................................................25

*Daniels v. Sch. Dist. of Phila.*,
    776 F.3d 181 (3d Cir. 2015) ....................................................................20, 22

*Davis v. Am. Soc'y of Civ. Eng'rs*,
    330 F. Supp. 2d 647 (E.D. Va. 2004) ............................................................24

*Degidio v. Centro Props., LLC*,
    No. 2:11-cv-1353, 2013 WL 440131 (E.D. Pa. Feb. 4, 2013) ............................26

*DiBello v. Salkowitz*,
    772 N.Y.S.2d 663 (N.Y. App. Div. 2004) .......................................................14

*Dimattei v. Diskin Motors, Inc.*,
    No. 2:16-cv-5183, 2017 WL 1283943 (E.D. Pa. Apr. 6, 2017) ...........................12

*Dodds v. Pulte Home Corp.*,
    909 A.2d 348 (Pa. Super. Ct. 2006) ..............................................................16

*Douglas v. Nesbit*,
    No. 1:16-cv-01836, 2017 WL 1021680 (M.D. Pa. Mar. 16, 2017) ..................27, 28

*Duplan v. City of N.Y.*,
    No. 2:15-cv-4136, 2017 WL 1232473 (E.D.N.Y. Mar. 30, 2017) ...................30, 32

*Ellis v. Budget Maint., Inc.*,
    25 F. Supp. 3d 749 (E.D. Pa. 2014) ..............................................................22

*Farrell v. Planters Lifesavers Co.*,
    206 F.3d 271 (3d Cir. 2000) ........................................................................30

*Field v. Phila. Elec. Co.*,
    565 A.2d 1170 (Pa. Super. Ct. 1989) ............................................................38

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Flintkote Co. v. Aviva PLC,*
    769 F.3d 215 (3d Cir. 2014) ...................................................................... 13

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009) ...................................................................... 10

*Fraser v. Nationwide Mut. Ins. Co.,*
    352 F.3d 107 (3d Cir. 2003) ...................................................................... 35

*Geary v. U.S. Steel Corp.,*
    319 A.2d 174 (Pa. 1974) ...................................................................... 33, 38

*Giganti v. Gen-X Strategies, Inc.,*
    222 F.R.D. 299 (E.D. Va. 2004) .................................................................. 9

*Gist v. Burlington Coat Factory Warehouse Corp.,*
    No. 1:13-cv-1094, 2014 WL 4105015 (D.N.J. Aug. 19, 2014) .............................. 21

*Glantz v. Auto. Serv. Ass'n of Pa., Inc.,*
    No. 1:91-cv-5630, 1991 WL 270017 (E.D. Pa. Dec. 11, 1991) ........................ 24, 30

*Gonzalez v. Comcast Corp.,*
    No. 1:03-cv-445, 2004 WL 1737693 (D. Del. July 30, 2004) ................................. 27

*Griswold v. Coventry First LLC,*
    762 F.3d 264 (3d Cir. 2014) .................................................................. 17, 18

*Guidotti v. Legal Helpers Debt Resolution, LLC,*
    716 F.3d 764 (3d Cir. 2013) ...................................................................... 10

*Hassan v. Marriott Corp.,*
    663 N.Y.S.2d 558 (N.Y. App. Div. 1997) ...................................................... 33

*Heron v. Sky NJ, LLC,*
    No. 2:15-cv-5686, 2016 WL 705246 (E.D. Pa. Feb. 23, 2016) ........................ 10, 12

*Highland HC, LLC v. Scott,*
    978 N.Y.S.2d 302 (N.Y. App. Div. 2014) ...................................................... 14

*Hirschfeld Prods. v. Mirvish,*
    673 N.E.2d 1232 (N.Y. 1996) ...................................................................... 14

*Hoffman v. Finger Lakes Instrumentation, LLC,*
    789 N.Y.S.2d 410 (N.Y. Sup. Ct. 2005) ........................................................ 15

*Homa v. Am. Express Co.,*
    558 F.3d 225 (3d Cir. 2009) ...................................................................... 10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Invista S.A.R.L. v. Rhodia, S.A.*,
  625 F.3d 75 (3d Cir. 2010)....................................................................12, 18, 19

*Johnson v. Res. for Human Dev., Inc.*,
  843 F. Supp. 974 (E.D. Pa. 1994) .................................................................27, 29

*Kachmar v. SunGard Data Sys., Inc.*,
  109 F.3d 173 (3d Cir. 1997)..........................................................................29

*Kates v. King*,
  487 F. App'x 704 (3d Cir. 2012) ....................................................................36

*Kellman v. Whyte*,
  10 N.Y.S.3d 232 (N.Y. App. Div. 2015) ..........................................................15

*Kelly v. Ret. Pension Plan for Certain Home Office*,
  73 F. App'x 543 (3d Cir. 2003) ....................................................................37

*Leibowitz v. Bank Leumi Tr. Co. of N.Y.*,
  548 N.Y.S.2d 513 (N.Y. App. Div. 1989) ........................................................33

*Lipman Bros. v. Apprise Software, Inc.*,
  No. 5:13-cv-4439, 2015 WL 4476983 (E.D. Pa. July 22, 2015) .............................33

*Madziva v. Phila. Hous. Auth.*,
  No. 1215 C.D. 2013, 2014 WL 1891388 (Pa. Commw. Ct. May 12, 2014) ..................35

*McGhee v. Thomas Jefferson Univ. Hosp.*,
  No. 2:12-cv-2919, 2013 WL 4663541 (E.D. Pa. Aug. 29, 2013) ................... *passim*

*Estate of Oliva ex rel. McHugh v. New Jersey*,
  604 F.3d 788 (3d Cir. 2010).....................................................................20, 21, 22

*McLaughlin v. Gastrointestinal Specialists, Inc.*,
  750 A.2d 283 (Pa. 2000) ............................................................................37

*MCPC Inc. v. N.L.R.B.*,
  813 F.3d 475 (3d Cir. 2016)........................................................................37

*Miller v. Allstate Ins. Co.*,
  763 A.2d 401 (Pa. Super. Ct. 2000) ...............................................................33

*Moore v. City of Phila.*,
  461 F.3d 331 (3d Cir. 2006)........................................................................25

*Morse v. Lower Merion Sch. Dist.*,
  132 F.3d 902 (3d Cir. 1997)........................................................................28

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Mosley v. Del. River Port Auth.*,
   No. 1:99-cv-4147, 2000 WL 1534743 (D.N.J. Aug. 7, 2000) ...............................1, 8

*Mumma v. Pennsy Supply, Inc.*,
   448 F. App'x 295 (3d Cir. 2011) ........................................................................12

*Murphy v. Am. Home Prods. Corp.*
   448 N.E.2d 86 (N.Y. 1983)................................................................................33

*N.L.R.B. v. United Food & Commercial Workers Union, Local 23, AFL-CIO*,
   484 U.S. 112 (1987)...........................................................................................37

*Nationwide Ins. Co. of Columbus, Ohio v. Patterson*,
   953 F.2d 44 (3d Cir. 1991).................................................................................9

*Novosel v. Nationwide Ins. Co.*,
   721 F.2d 894 (3d Cir. 1983)..........................................................................35, 36

*Paul v. Lankenau Hosp.*,
   569 A.2d 346 (Pa. 1990) ....................................................................................34

*Payne v. Abbott Labs.*,
   999 F. Supp. 1145 (N.D. Ill. 1998) ................................................................24, 25

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993).............................................................................11

*Prewitt v. Walgreens Co.*,
   No. 5:12-cv-6967, 2013 WL 6284166 (E.D. Pa. Dec. 2, 2013) .............................34

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   7 F.3d 1110 (3d Cir. 1993)..................................................................................18

*Provenzano v. Ohio Valley Gen. Hosp.*,
   121 A.3d 1085 (Pa. Super. Ct. 2015) ..............................................................16, 17

*Pryor v. Nat'l Collegiate Athletic Ass'n*,
   288 F.3d 548 (3d Cir. 2002)................................................................................11

*Purjes v. Plausteiner*,
   No. 1:15-cv-2515, 2016 WL 552959 (S.D.N.Y. Feb. 10, 2016) ..........................3, 11

*Reynolds v. Aria Health*,
   No. 2:12-cv-2954, 2013 WL 2392903 (E.D. Pa. May 31, 2013).........................30, 32

*Robert Bosch, LLC v. Snap-On Inc.*,
   No. 2:12-cv-11503, 2014 WL 12660103 (E.D. Mich. Sept. 16, 2014) .....................9

# TABLE OF AUTHORITIES

(continued)

Page(s)

*Rudolph & Beer, LLP v. Roberts*,
    688 N.Y.S.2d 553 (N.Y. App. Div. 1999) ............................................................15

*Rueda v. Nexeo Sols., LLC*,
    No. 3:14-cv-3801, 2015 WL 1472057 (D.N.J. Mar. 31, 2015) ........................21, 22

*Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*,
    No. 2593 EDA 2015 (Pa. Super. Ct. June 30, 2017) .............................................17

*Sanchez v. SunGard Availability Servs. LP*,
    362 F. App'x 283 (3d Cir. 2010) ...........................................................................22

*Seldon v. Nat'l R.R. Passenger Corp.*,
    452 F. Supp. 2d 604 (E.D. Pa. 2006) ...............................................................22, 26

*Stanley v. City of Pittsburgh*,
    No. 2:15-cv-555, 2016 WL 3920477 (W.D. Pa. July 15, 2016) .......................27, 28

*Tracinda Corp. v. DaimlerChrysler AG*,
    362 F. Supp. 2d 487 (D. Del. 2005) ........................................................................8

*Tracinda Corp. v. DaimlerChrysler AG*,
    502 F.3d 212 (3d Cir. 2007) ..............................................................................17, 18

*Univ. of Tex. S.W. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013) ..........................................................................................29

*Velez v. QVC, Inc.*,
    227 F. Supp. 2d 384 (E.D. Pa. 2002) .....................................................................24

*Villari Brandes & Giannone, PC v. Wells Fargo Fin. Leasing, Inc.*,
    No. 2:13-cv-297, 2013 WL 5468497 (E.D. Pa. Sept. 30, 2013) ...........................36

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) .........................................................................................35, 36

*Weaver v. Harpster*,
    975 A.2d 555 (Pa. 2009) ........................................................................................34

*Westawski v. Merck & Co.*,
    No. 2:14-cv-3239, 2015 WL 463949 (E.D. Pa. Feb. 4, 2015) ...............................37

*White v. Sunoco Inc.*,
    189 F. Supp. 3d 486 (E.D. Pa. 2016) ....................................................................16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Statutes**

9 U.S.C. § 3 ...................................................................................................................12

9 U.S.C. § 4 .............................................................................................................11, 12

42 U.S.C. § 1981 .................................................................................................... *passim*

**Constitutional Provision**

Pa. Const. art. I § 7 ........................................................................................................34

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) ..................................................................................................12

Fed. R. Civ. P. 12(b)(6) .......................................................................................... *passim*

Fed. R. Evid. 408 .............................................................................................................9

*Federal Procedure, Lawyers' Edition* § 62:508 ...........................................................11

*Restatement (Second) of Conflict of Laws* § 187 .........................................................33

## INTRODUCTION

Plaintiff David Magerman voluntarily dismissed this frivolous lawsuit against Defendant Robert Mercer on the last day of his safe harbor period after having been served with a Rule 11 sanctions motion.  He and his counsel realized their lawsuit alleging wrongful termination was fatally flawed because Mercer was not his employer—Renaissance Technologies LLC ("Renaissance") was—and he was required under his employment agreement to arbitrate such claims in any event.  Now, in a transparent attempt to generate self-serving publicity, again disparage Mercer, and exert pressure on Renaissance (of which Mercer is a principal) to settle with Magerman after he walked away from settlement discussions, Plaintiff has desperately refiled his Complaint against Mercer without addressing any of the fatal flaws in his prior filing.  Indeed, if anything, Magerman's second bite at the apple is even more legally flawed than his original Complaint.  Hence, dismissal is required.

This is a purported employment retaliation case that is not even brought against the Plaintiff's employer and contractually required to be arbitrated in any event.  Its true motivation, in Plaintiff David Magerman's own words, is to extend his "15 minutes" of fame by publicly maligning Defendant Robert Mercer, a senior executive at Magerman's former firm, over Mercer's "political activities and the causes he supports."  Compl. ¶¶ 67, 75.[1]  Magerman's personal vendetta against Mercer for his support of President Trump, however, has no place in this Court.  He is already arbitrating against his former employer, Renaissance, as he is contractually obligated to do.  Indeed, he filed an amended arbitration demand that follows this

---

[1]  *See* Declaration of Jason C. Schwartz ("Schwartz Decl.") Ex. A (David M. Magerman, *When a Hedge Fund Billionaire 'Buys' Democracy: Magerman on Mercer*, philly.com (Mar. 1, 2017), http://www.philly.com/ philly/blogs/inq-phillydeals/Billionaires_and_Democracy_Magerman_Mercer_Renaissance_Trump_ Bannon_Conway.html) at 2.  Magerman authored this op-ed and incorporates it by reference in his Complaint. *See* Compl. ¶ 68; *see, e.g.*, *Mosley v. Del. River Port Auth.*, No. 1:99-cv-4147, 2000 WL 1534743, at *5 (D.N.J. Aug. 7, 2000) ("A complaint . . . incorporates . . . any documents which are attached to it or upon which it relies, even if the plaintiff has not chosen [to attach] those documents.").

Complaint nearly verbatim.  His contrived claims against Mercer, while frivolous and vexatious, have to be litigated there, if anywhere, and Magerman knew it, but—for the second time—he filed this publicity-seeking federal lawsuit anyway.  The Court should therefore immediately dismiss this Complaint because this dispute has to be arbitrated by contract.

Moreover, this Complaint, like the first one, fails to state a claim against Mercer on its face, requiring dismissal for that independent reason as well.  The "facts" upon which it purports to be based are fictitious slander.  But even assuming them *arguendo* for purposes of this motion, neither of Magerman's two causes of action has any credible foundation in law.  The first cause of action, for retaliation in violation of Section 1981, fails because, among other reasons, Magerman never alleges that Mercer engaged in—or that Magerman ever complained about—race discrimination in contracting, which is a basic prerequisite for a Section 1981 violation.  In a failed attempt to address this fatal deficiency, Magerman alleges that he "intended to convey" that Mercer's political views might lead minorities to self-select out from pursuing job opportunities at Renaissance.  But even if Magerman had *actually* conveyed these sentiments (instead of simply "intend[ing] to convey" them) and even if he was correct that minority candidates chose not to pursue jobs with Renaissance because one of its leaders supported President Trump (while the founder supported Hillary Clinton), this still would not state a claim under Section 1981.  The second cause of action, for wrongful discharge in violation of Pennsylvania public policy, likewise remains fatally deficient because the public policy theory on which Magerman relies has been roundly rejected by the courts.  Magerman's efforts to remedy that deficiency in this second incarnation of the suit still fail to articulate anything close to a cognizable claim: under controlling Pennsylvania Supreme Court and Third Circuit precedent, neither the National Labor Relations Act nor unspecified supposed contractual

obligations with out-of-state clients qualifies as the public policy of the Commonwealth of Pennsylvania.  Moreover, Magerman brought this suit in blatant violation of his contractual duty to arbitrate these claims—a duty set forth in the employment agreement Magerman himself attached to his Complaint.  Indeed, he has already effectively acknowledged just that: contemporaneous with the filing of the first improper Complaint, he initiated a JAMS arbitration against his former employer, Renaissance, containing virtually identical allegations.  After walking away from settlement negotiations with the company, he filed this second Complaint and amended the JAMS arbitration demand in tandem with it.[2]  The only conceivable purpose for these mirror-image Complaints, which are subject to the same arbitration provision, is to publicly defame Mercer and to embarrass Renaissance.  The Court should not countenance such procedural gamesmanship and abuse of court process.  Instead, it should dismiss Magerman's baseless Complaint, bring a halt to his impermissible attempt to circumvent his arbitration agreement, and put an end to his public smear campaign against Mercer.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

What follows is a recitation of the factual allegations made in this Complaint.  To be crystal clear from the outset, the core of those allegations is false in all material respects, especially in alleging that Mercer made any of the offensive statements falsely attributed to him. In reality, in the unlikely event that this case is not immediately dismissed, the evidence will show that Mercer never made any such offensive statements.  Nevertheless, in making this

---

[2]   The various filings, together with demonstrative redlines, are attached as exhibits to the Schwartz Declaration as follows:  Exhibit B is a comparison of the May court Complaint with the August court Complaint.  Exhibit C is the May JAMS demand, and Exhibit D is a redline of that document against the May court Complaint.  Exhibit E is the August arbitration demand, and Exhibit F compares that document to the present court Complaint.  The Court can properly take judicial notice of these materials and consider them at the motion-to-dismiss stage.  *See, e.g.*, *Purjes v. Plausteiner*, No. 1:15-cv-2515, 2016 WL 552959, at *4 (S.D.N.Y. Feb. 10, 2016) (citing cases allowing judicial notice of arbitration filings at motion to dismiss stage).

[3]   For these same reasons, a Rule 11 motion will be filed against Magerman and his counsel should they not dismiss the Complaint prior to the end of that Rule's safe harbor period.

motion, it is necessary to repeat the false allegations in this Complaint and then explain why, even as alleged, this Complaint must be dismissed.

Plaintiff David Magerman is a former research scientist for Renaissance Technologies LLC, a highly successful New York-based investment management company.  Compl. ¶ 6.  He is a Democrat who vehemently opposes President Donald Trump and his supporters.  *Id.* ¶¶ 34, 60; Compl. Ex. D at 1, 3-4; Compl. Ex. F (Dkt. 1-1) at 5.  Magerman apparently considers President Trump—and by association, his supporters—to be racist.  *See* Compl. ¶¶ 28, 39, 41.

Defendant Robert Mercer is co-Chief Executive Officer of Renaissance.  Compl. ¶ 8.  He is a supporter of conservative causes and candidates, including then-candidate Donald Trump's 2016 campaign for the presidency.  *Id.* ¶ 27.[4]

Beginning in January 2017, Magerman engaged in a concerted scheme to gain publicity for his political views by disparaging Mercer over his support of President Trump.  *See* Compl. ¶ 33.  Magerman knew that by attacking Mercer—a world-renowned, influential businessman— Magerman could gain access to a wider platform to share his opinion than would otherwise be available to him.  *See id.* ¶¶ 27, 29, 31, 60, 68.

To that end, on January 16, 2017, Magerman called Mercer.  Compl. ¶ 33.  According to the Complaint, Magerman criticized Mercer's support of President-elect Trump, and they discussed a range of policy matters.  *Id.* ¶¶ 34-38.  Afterwards, Magerman bad-mouthed Mercer to other Renaissance employees, including Peter Brown, Renaissance's co-Chief Executive

---

[4] Renaissance employs individuals who hold diverse political views and freely express those views publicly, including through contributing substantial financial support to preferred causes.  Historically, some of its leaders "have leaned Democratic," including its founder and chairman, James Simons, who is a leading contributor to Democratic Party candidates and causes.  Compl. Ex. D at 2; Compl. Ex. F (Dkt. 1-1) at 9. Indeed, Magerman himself expressly made this point to rebut online allegations that the company was involved in attacks on Hillary Clinton.  *See* Schwartz Decl. Ex. G (@DavidMagerman, Twitter (May 18, 2017, 4:33 AM), https://twitter.com/DavidMagerman/status/865168438146236417 ("Not sure why you are hanging this on RenTech.  It was founded by Jim Simons, who gave $25m to get Hillary elected.")).

Officer, claiming falsely that Mercer had "made a series of racist comments." *Id.* ¶¶ 35-36, 39. Magerman claims he told Brown that he "belie[ved] that Mercer's public political views and association with alt-right groups were damaging to the image and reputation of Renaissance, by which Magerman" claims that, in his own mind, he "*intended* to convey, *inter alia*, that Mercer's publicly-stated views prevented the company from hiring a more diverse workforce of Highly-Compensated Employees." *Id.* ¶ 39 (first emphasis added). Magerman also claims that he "advised Brown that he was concerned that Mercer's embrace of right wing causes and candidates was bad for Renaissance and could damage the company's standing with investors and prospective employees who would not want to be associated with Mercer's ideology." *Id.* ¶ 41.

Magerman also alleges that during his tenure as "a hiring manager for highly-compensated managerial and technical positions . . . from approximately 1997 to 2006" (eleven years ago), he "participated in the hiring of people for around 20-30 positions," and "[t]o the best of his recollection, none of the candidates presented to [him] to be interviewed that were eventually hired were African American." Compl. ¶¶ 19-21. Magerman alleges based on his "genera[l] familiar[ity] with the workforce at Renaissance's East Setauket office"—an office in which he did not work—that "there were never any African American employees working as Highly-Compensated Employees" during his employment at Renaissance. *Id.* ¶¶ 23-25. Magerman further claims that "Mercer has decision-making control over Renaissance hiring practices and the hiring of Highly Compensated Employees," that "Mercer's political views affect the culture at Renaissance," and that "[t]he failure of Renaissance to hire African Americans to managerial and technical positions as Highly Compensated Employees is, on belief, the result of the effect of Mercer's political views on the culture of Renaissance." *Id.*

¶¶ 76-78.

Magerman also disparaged Mercer in the press.  *See* Compl. ¶ 60.  Magerman claims he did so because he was "alarmed by his boss's personal views and backing of policies and statements Magerman found to be divisive and harmful to the poor and minorities," and he "felt obligated to speak out against Mercer's support for racist policies and the implication that Magerman and other Renaissance employees shared those views."  *Id.* ¶¶ 49, 51.  He adds that he was supposedly motivated by his "concer[n] that Renaissance did not employ any African Americans as Highly-Compensated Employees as a result of which he was denied the opportunity to work with and associate with highly-compensated African Americans and other minorities in managerial and technical positions who could be advantageous to Magerman in his future business dealings."  *Id.* ¶ 50.  On February 23, 2017, the *Wall Street Journal* published an interview with Magerman, in which he maligned Mercer and his daughter, Rebekah Mercer, for exercising their First Amendment rights of political speech in supporting President Trump.  *Id.* ¶¶ 60, 65; *see also* Compl. Ex. D.  In this interview, Magerman claimed that Mercer was "harming the country" by supporting President Trump and said that Mercer "ha[d] to stop." Compl. Ex. D at 2.

Magerman was suspended from his employment at Renaissance on February 24, 2017. Compl. ¶ 66.  He claims that during his suspension he spoke to co-Chief Executive Officer Brown and told him that "Mercer's public political views and association with the alt-right were harmful to the image and reputation of Renaissance, by which Magerman" supposedly—and in his own mind—"*intended* to convey, *inter alia*, that Mercer's publicly-stated views and activities prevented the company from hiring a more diverse workforce of Highly-Compensated Employees."  *Id.* ¶ 70 (first emphasis added).  Magerman also alleges that he "advised his

immediate supervisors at Renaissance, Jim Her[r]nstein and Stephen Della Pietra, that public awareness of Mercer's views, combined with the lack of minorities in the company would damage Renaissance from an EEO perspective." *Id.* ¶ 71.  Magerman alleges "[u]pon information and belief" that Herrnstein "and Della Pietra reported their conversations with Magerman to senior management at Renaissance and that this information was conveyed to Mercer." *Id.*

On March 1, 2017, seeking to capitalize on the increased attention generated by his attack on Mercer before his "15 minutes" of fame were up, Magerman published an opinion piece in the *Philadelphia Inquirer*'s online blog falsely accusing Mercer of "effectively buying shares" in the Presidency and "pa[ying] for th[e] seats" of certain White House appointees.  Schwartz Decl. Ex. A at 2-3; *see also* Compl. ¶ 68; Compl. Ex. F (Dkt. 1-1) at 5.

On April 20, 2017, Magerman again tried to gain attention for himself and stir up controversy when he drove three hours to attend a charity poker tournament in New York sponsored by Renaissance's founder, James Simons—an event Magerman knew would be attended by many of the senior-most people in the financial services industry (including Mercer), as well as other current and former Renaissance employees.  *See* Compl. ¶ 73; Compl. Ex. E at 1-2.  After consuming several glasses of scotch, Magerman intentionally sought out Mercer's daughter, Rebekah, and "hover[ed] nearby" while she played poker.  Compl. Ex. E at 2.  A verbal altercation, witnessed by several attendees, ensued, during which Magerman "told [Ms. Mercer] he felt bad" about his criticism of her family, "adding that her family had played a supportive role when he joined Renaissance more than two decades ago."  *Id.* at 3.  By Magerman's own admission, he "was a little impacted by . . . alcohol" during this incident, and it

"wasn't one of [his] finest moments." *Id.*[5]  Security escorted Magerman out of the event.  *Id.*

Magerman alleges that Renaissance terminated his employment shortly thereafter, on or about April 29, 2017.  Compl. ¶ 75.  He concedes that he was an at-will employee whose employment could "be terminated at any time" by Renaissance "for any reason or no reason at all, with or without cause or notice."  *Id.* ¶ 89; Compl. Ex. A ¶ 2.  Magerman also concedes that his employment was governed by an employment agreement requiring that "*any disputes arising out of or relating to* . . . [his] employment with [Renaissance] . . . shall be settled by binding arbitration."  Compl. ¶ 9; Compl. Ex. A ¶ 21 (emphasis added).  That agreement also prohibits disparagement of Renaissance and any of its employees.  Compl. ¶ 10; Compl. Ex. A ¶ 12.  Magerman further acknowledges that Renaissance's employee handbook contains a similar nondisparagement prohibition.  *See* Compl. ¶¶ 11-12.

On May 5, 2017, Magerman filed his original federal lawsuit against Mercer, alleging that his termination constituted unlawful retaliation in violation of his civil rights under 42 U.S.C. § 1981 and wrongful discharge in violation of public policy under Pennsylvania law.  Compl., No. 2:17-cv-2083 (May 5, 2017), ECF No. 1; *see also* Schwartz Decl. Ex. B.  At the same time, on or about May 9, 2017, Magerman submitted a Notice of Claim and Demand for Arbitration to JAMS, asserting virtually identical claims against Renaissance.  *See* Schwartz Decl. Exs. C, D.  On June 6, 2017, in accordance with Rule 11, Mercer's counsel served a Motion for Sanctions and accompanying papers on Magerman's counsel and demanded withdrawal of that frivolous Complaint.  Magerman dismissed the suit on the last day of the safe

---

[5]  Not only is this article attached to the Complaint and therefore incorporated by reference, *see Mosley*, 2000 WL 1534743, at *5, but Magerman's statements quoted herein constitute party admissions excluded from hearsay, *see Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 495 (D. Del. 2005) (finding that executive "adopted the statements he made during the interview that were printed in [a newspaper] article," and "[a]s such, those statements are not hearsay, but are admissions of a party opponent under [Federal Rule of Evidence] 801(d)(2)(B)").

harbor period, which had been extended at Magerman's request until July 5, 2017.  *See* Schwartz Decl. Ex. H (Notice of Dismissal, No. 2:17-cv-2083 (July 5, 2017), ECF No. 8).

Magerman then proceeded to engage in settlement discussions with Renaissance. However, those negotiations broke down in early August.  On August 3, Magerman renewed his public vendetta by filing this revised Complaint, and concurrently filed a matching amended arbitration demand against Renaissance.  *See* Schwartz Decl. Exs. E, F; *see also* Schwartz Decl. Ex. G (@DavidMagerman, Twitter (Aug. 4, 2017, 4:21 AM), https://twitter.com/ DavidMagerman/status/893431766022844416 ("Tried to negotiate settlement with #RenTech + ground rules for future engagement. Talks failed. Refiled lawsuit against #Mercer yesterday.")).[6]

On August 14, 2017, Mercer's counsel again served a Motion for Sanctions and accompanying papers on Magerman's counsel, pursuant to Rule 11's safe harbor provision. Magerman failed to dismiss his Complaint, necessitating this filing.[7]

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal both when arbitration is required and when the claims themselves are facially deficient.  *See Nationwide Ins. Co. of Columbus, Ohio v. Patterson*, 953 F.2d 44, 45 n.1 (3d Cir. 1991) ("[d]ismissal . . . because the dispute is covered by an arbitration provision is generally effected under Rule 12(b)(6)").

---

[6]  Inclusion of that fact in this motion does not implicate Federal Rule of Evidence 408, because it is not introduced to "prove or disprove the validity or amount of a disputed claim."  Instead, it demonstrates Magerman's bad faith and improper motives in filing this Complaint. *See, e.g.*, *Giganti v. Gen-X Strategies, Inc.*, 222 F.R.D. 299, 313 (E.D. Va. 2004) (citing cases "consider[ing] settlement documents" and finding no Rule 408 barrier).  Indeed, the *existence* of such discussions without any details as to their contents is plainly beyond the scope of the rule. *See Robert Bosch, LLC v. Snap-On Inc.*, No. 2:12-cv-11503, 2014 WL 12660103, at *3 (E.D. Mich. Sept. 16, 2014).

[7]  On August 31, 2017, Magerman's counsel at Cozen O'Connor P.C. advised undersigned counsel that they would be withdrawing and that William Harvey and Rona Rosen of Klehr Harrison Harvey Branzburg LLP would be representing Magerman in this matter.  At new counsel's request, Mercer agreed to extend the Rule 11 safe harbor deadline until 5:00 p.m. on September 8, 2017.

Dismissal in favor of arbitration is required when "'it is apparent, based on the face of the complaint, and documents relied upon in the complaint, that [the] claims are subject to an enforceable arbitration clause.'"  *Heron v. Sky NJ, LLC*, No. 2:15-cv-5686, 2016 WL 705246, at *2 (E.D. Pa. Feb. 23, 2016) (quoting *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013)); *see also Homa v. Am. Express Co.*, 558 F.3d 225, 228 n.1 (3d Cir. 2009) (endorsing "traditional practice of treating a motion to compel as a motion to dismiss for failure to state a claim upon which relief can be granted" (internal quotation marks omitted)).

Further, to survive a motion to dismiss under Rule 12(b)(6) the complaint must also "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Thus, while the court accepts as true the complaint's factual allegations, the complaint must contain more than "conclusory statements" or "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557; alteration original); *see also Fowler*, 578 F.3d at 210.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" cannot survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.  Furthermore, the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In evaluating a Rule 12(b)(6) motion, the court may consider (1) the complaint; (2) "documents which are attached to or submitted with the complaint"; (3) other "documents

whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading"; and (4) "[d]ocuments that the defendant attaches to the motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to the claim." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (emphasis omitted) (quoting *Federal Procedure, Lawyers' Edition* § 62:508); *see also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993) (permitting court to "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document" because "the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished").  The Court can also take judicial notice of other documents, such as those filed in an arbitration proceeding.  *See, e.g.*, *Purjes v. Plausteiner*, No. 1:15-cv-2515, 2016 WL 552959, at *4 (S.D.N.Y. Feb. 10, 2016) (citing cases allowing judicial notice of arbitration filings at motion-to-dismiss stage).

## ARGUMENT

### I.    The Court Should Dismiss And Compel Mandatory Arbitration Under The Employment Agreement.

The Federal Arbitration Act requires the Court to compel Magerman to comply with his written "agree[ment]" to submit "*any disputes arising out of or relating to . . . [his] employment with [Renaissance]*" to binding arbitration.  Compl. Ex. A ¶ 21 (emphasis added); *see* 9 U.S.C. § 4.  (Upon "petition . . . the court shall make an order directing the parties to proceed to arbitration.").  Dismissal is also required under Rule 12(b)(6) because this "enforceable arbitration clause" is clearly presented "on the face of the complaint" and in the "documents

relied upon in the complaint." *Heron*, 2016 WL 705246, at *2 (internal quotation marks omitted).[8]

Tellingly, Magerman filed nearly identical claims against Renaissance—with the vast majority of the allegations copied verbatim in the Complaint—in a JAMS arbitration he initiated contemporaneously with his first (subsequently dismissed) lawsuit. *See* Schwartz Decl. Ex. D. Nonetheless, in complete disregard of the arbitration agreement under which he brought his mirror-image claims against Renaissance, Magerman brought this parallel challenge to the termination of his employment in federal court for a second time, relying on that same agreement, and even attaching it to his Complaint (again).

This is not permitted.  Because there is an "agreement to arbitrate," and "the dispute at issue falls within the scope of that agreement," *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 84 (3d Cir. 2010) (internal quotation marks omitted), the Federal Arbitration Act requires that the Court "shall" grant a motion to compel.  9 U.S.C. § 4.

Moreover, when, as here, "all the claims involved in an action are arbitrable," it is "appropriate" to "dismiss the proceedings . . . for reasons of judicial efficiency." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 600 (3d Cir. 2002) (internal quotation marks and citations omitted); *see also, e.g.*, *Mumma v. Pennsy Supply, Inc.*, 448 F. App'x 295, 297 (3d Cir. 2011) (district court "properly dismissed . . . complaint in favor of arbitration"); *Am. Graphics Inst., Inc. v. Darling*, No. 2:03-cv-374, 2003 WL 21652246, at *8 n.7  (E.D. Pa. May 22, 2003) (noting "multiple" Third Circuit cases endorsing dismissal in such circumstances).[9]

---

[8]   The presence of a "valid arbitration agreement" also supports dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).  *See Dimattei v. Diskin Motors, Inc.*, No. 2:16-cv-5183, 2017 WL 1283943, at *1 n.1 (E.D. Pa. Apr. 6, 2017).

[9]   As an alternative to an order to compel and *dismissal*, the Court can compel arbitration and *stay* the case under the FAA.  *See* 9 U.S.C. § 3 (providing that a court "shall on application of one of the parties" stay the case when the "issue involved . . . is referable to arbitration under" a binding arbitration agreement).

Accordingly, the Court should dismiss the case and further order that Magerman can only pursue his claims against Mercer in accordance with his employment agreement, as part of the arbitration he has already initiated to pursue the same grievances against Renaissance.

**A.    Magerman Is Party To An Agreement To Arbitrate, And Mercer Can Enforce That Agreement Under The Controlling State Contract Law.**

Here, there is no dispute that there is an agreement to arbitrate:  Magerman attached it to, and relied upon it, in both his original Complaint and this one (*see* Compl. ¶ 9; *id.* Ex. A; Schwartz Decl. Ex. B), and he conceded its validity by initiating an arbitration for identical claims against his employer, Renaissance, and then amending that claim to match this new Complaint.  *See* Schwartz Decl. Exs. D, F.  Moreover, nonsignatory executives like Mercer have a well-established right to enforce arbitration clauses against signatories when the relevant state's "principles of contract and agency law" provide a general right for third parties to "enforc[e] contracts."  *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (internal quotation marks omitted; citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631-632 (2009)); *see Arthur Andersen*, 556 U.S. at 631 (listing examples of applicable legal principles, including estoppel).

Under New York substantive law—selected in the employment agreement's choice-of-law clause (Compl. Ex. A ¶ 20)—arbitration is required both because Magerman challenges Mercer's actions as an officer of the signatory employer and under principles of equitable estoppel.  The same theories also require arbitration under both Pennsylvania state law and Third Circuit federal common law.

**1.    Nonsignatory Officers Can Enforce Arbitration Of A Claim That "Relates To Their Behavior" As Officers.**

New York has adopted the federal rule of "consistently afford[ing] agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct

relates to their behavior as officers or directors or . . . agents of the corporation." *Hirschfeld*

*Prods. v. Mirvish*, 673 N.E.2d 1232, 1233 (N.Y. 1996). As the state Court of Appeals has

explained, this "rule is necessary . . . to prevent circumvention of arbitration agreements." *Id.*;

*see, e.g.*, *Highland HC, LLC v. Scott*, 978 N.Y.S.2d 302, 307 (N.Y. App. Div. 2014) (reiterating

rule).

     A New York appellate court has in fact applied this rule to enforce arbitration under facts

strikingly similar to those presented in this case: In *DiBello v. Salkowitz*, 772 N.Y.S.2d 663

(N.Y. App. Div. 2004), an employee sued the employer and one of its employees for, among

other things, defamation and racial discrimination. *Id.* at 664. The plaintiff and the corporate

defendants had signed an agreement providing that "any dispute or claim, *whether based on*

contract, *tort, discrimination*, retaliation, or otherwise, *relating to*, arising from, *or connected in*

*any manner with*" the agreement "shall be resolved through final and binding arbitration." *Id.*

(emphases in original). The clause in *DiBello* mirrors the arbitration clause here. *See* Compl.

Ex. A ¶ 21 (agreeing to arbitrate "any disputes arising out of or relating to . . . [his] employment

with [Renaissance], including but not limited to tort claims, claims relating to intellectual

property, and claims for discrimination, sexual harassment and retaliation").

     The Appellate Division, citing *Hirschfeld*, held that the individual defendant "is entitled

to demand arbitration of the claims against him no less than [the corporate defendant] is entitled

to demand arbitration of the claims against it." *DiBello*, 772 N.Y.S.2d at 665. So too is Mercer

"entitled to demand arbitration of the claims against him, no less than" Renaissance would be

"the claims against it." *Id.*

     Magerman's behavior in this case underscores the wisdom and applicability of the New

York rule. He is simultaneously demanding arbitration of virtually identical claims against

Renaissance under the employment agreement.  That is further evidence that he has "always" and *continues to* "trea[t] [it] as governing the parties' relationship." *Rudolph & Beer, LLP v. Roberts*, 688 N.Y.S.2d 553, 555 (N.Y. App. Div. 1999).  The New York Court of Appeals has "explicitly rejected" attempts to avoid arbitration in such circumstances as "baseless." *Id.* (citing *Crawford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 319 N.E.2d 408 (N.Y. 1974)).

### 2.    Magerman Is Also Equitably Estopped From Avoiding Arbitration.

New York law also equitably estops Magerman from resisting arbitration.  *See Arthur Andersen*, 556 U.S. at 631 (recognizing estoppel as state-law ground for enforcing arbitration).

The employment agreement clearly serves as the foundation for the entire action.  Magerman readily acknowledges that it "governed" his employment, and in fact attaches it to his Complaint.  *See* Compl. ¶ 9; Compl. Ex. A.  He further seeks lost wages that would otherwise have been paid under the agreement.  *See* Compl. ¶¶ 87, 100.  And he is simultaneously pursuing almost identical claims in arbitration pursuant to the agreement.  *See* Schwartz Decl. Ex. F.  Equitable estoppel requires that Magerman take the bitter with the sweet, and binds him to the arbitration clause.  Otherwise, he would impermissibly be allowed to "have it both ways, . . . seek[ing] to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains the arbitration provision, but, on the other hand, deny the arbitratio[n] [clause]'s applicability because the defendant is a non-signatory." *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 414-15 (N.Y. Sup. Ct. 2005) (internal quotation marks omitted); *see Kellman v. Whyte*, 10 N.Y.S.3d 232, 232-33 (N.Y. App. Div. 2015) (citing *Hoffman* and holding that signatory plaintiff is required to "arbitrate . . . her claims against nonsignatories . . . because [her] claims are intertwined with the agreement").

### 3.   Pennsylvania And Federal Common Law Also Require Arbitration.

The outcome remains the same should the Court look past the employment agreement's own clear language selecting New York substantive law.  The only other two conceivable possibilities—Pennsylvania law and federal common law—similarly require arbitration, and do not let Magerman escape his agreement to arbitrate by naming Mercer as the defendant rather than Renaissance.[10]

The Pennsylvania rule is clear:  "[P]arties to an agreement cannot attempt to defeat an arbitration clause simply by . . . adding a principal as a defendant who was not a party to the agreement."  *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 350 (Pa. Super. Ct. 2006) (allowing signatory's parent entity to enforce arbitration because of the "obvious and close nexus between the non-signatories and the contract or the contracting parties").

In fact, the Pennsylvania Superior Court recently applied that rule to compel arbitration under facts similar to those here.  In *Provenzano v. Ohio Valley General Hospital*, 121 A.3d 1085 (Pa. Super. Ct. 2015), the court held that nonsignatory board members of an employer can enforce an arbitration clause in the employer's agreement with the plaintiff.  Relying on agency law, the court explained that when a "principal is bound by an arbitration agreement, its agents, employees and representatives are generally likewise bound and *can enforce the arbitration agreement*, even as non-signatories to the agreement."  *Id.* at 1097 (emphasis added); *see id.* (finding "non-signatory officers . . . entitled to arbitration by virtue of arbitration agreement entered into by corporation, because arbitration agreement applied to them as corporate agents").  This is especially appropriate when the plaintiff "essentially identifies the" individual

---

[10]   When the outcome of the arbitration question "would be the same regardless of whose law [is] appl[ied], [the court] need not decide the choice-of-law question."  *White v. Sunoco Inc.*, 189 F. Supp. 3d 486, 491 (E.D. Pa. 2016).

defendant "as [an] agen[t] of" the employer carrying out the challenged acts.  *Id.* at 1103; *see also Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, No. 2593 EDA 2015, 2017 WL 2823523, *2 n.2 (Pa. Super. Ct. June 30, 2017) (overruling lower court to allow affiliated entity with "obvious and close nexus" to signatory to enforce arbitration agreement).

The application of that rule to this case is clear:  There is no question that Renaissance itself  (the principal and signatory) is bound by the arbitration agreement.  And just like the plaintiff in *Provenzano*, Magerman's Complaint is focused on Mercer's actions in his capacity as an agent, arguing that "Renaissance, *at the direction of Mercer* . . . fired Magerman."  Compl. ¶ 75 (emphasis added); *see also id.* ¶ 83 ("Mercer, as co-Chief Executive Officer of Renaissance, took an adverse employment action against Magerman by suspending him, threatening him, and then firing him.").  Indeed, he is pursuing relief against Renaissance in arbitration for *exactly* the same alleged acts.  *See* Schwartz Decl. Ex. E ¶ 80 ("Renaissance took an adverse employment action against Magerman by suspending him, threatening him, and then firing him.").  Accordingly, like the board members in *Provenzano*, Mercer can enforce the arbitration agreement.

Additionally, the Third Circuit's federal common law recognizes both agency and equitable estoppel as grounds for preventing a signatory from escaping arbitration with a nonsignatory.[11]  First, the Circuit has a "well-settled" rule that under "traditional agency principles" "nonsignatory agents may invoke a valid arbitration agreement entered into by their principal."  *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 224 (3d Cir. 2007) (citing

---

[11]  After *Arthur Andersen*'s holding that "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract," 556 U.S. at 631 (internal quotation marks omitted), the Third Circuit will "rely on [its] prior decisions" about the enforceability of arbitration clauses "so long as they do not conflict with" the "relevant state contract principles."  *Griswold v. Coventry First LLC*, 762 F.3d 264, 272 n.6 (3d Cir. 2014).

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993)).  The

Circuit similarly recognizes the "related" doctrine of equitable estoppel, *id.*, allowing

nonsignatories to enforce arbitration with signatories based on "the close relationship between

the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's

obligations and duties in the contract . . . and [the fact that] the claims were intimately founded

in and intertwined with the underlying contract obligations," *Griswold v. Coventry First LLC*,

762 F.3d 264, 272 (3d Cir. 2014) (internal quotation marks omitted; alterations original).

Magerman's claims fall squarely within both frameworks—they challenge Mercer's actions

taken in his capacity as a senior corporate officer relating to an employment relationship

"governed" by the contract containing the arbitration clause.  Compl. ¶ 9.

### B.     The Entire Dispute Falls Within The Scope Of The Arbitration Clause.

The second requirement for enforcing an arbitration clause is that "the dispute at issue

falls within the scope of that agreement."  *Invista*, 625 F.3d at 84 (internal quotation marks

omitted).  The "presumption of arbitrability" at this step is overcome only if "it may be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

asserted dispute."  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d

513, 524 (3d Cir. 2009) (internal quotation marks omitted).

That presumption is not even needed to conclude the analysis here:  Magerman "agree[d]

that *any disputes arising out of or relating to . . . [his] employment with [Renaissance]*, including

but not limited to *tort claims*, claims relating to intellectual property, and *claims for

discrimination*, sexual harassment and *retaliation*, shall be settled by binding arbitration" before

JAMS.  Compl. Ex. A ¶ 21 (emphases added).  The plain language of the employment agreement

and the Complaint make clear that this entire dispute obviously "aris[es] out of" *and* "relat[es]

to" Magerman's employment with Renaissance.  Although utterly lacking in merit (*see infra*

Part II), the entire premise of both the Section 1981 claim and the Pennsylvania state law claim is that his employment was improperly terminated. *See* Compl. ¶¶ 83, 84, 87 (alleging "adverse employment action"); *id.* ¶¶ 75, 89, 98 (citing status as "at will" employee under employment agreement, and alleging "wrongful[l] discharg[e]" and "fir[ing]"). He asserts claims for *retaliation* (*id.* ¶¶ 67, 75) for reporting *discrimination* (*id.* ¶ 79-87) and for the *tort* of wrongful discharge (*id.* ¶¶ 88-100), both of which are expressly covered by the arbitration clause. Compl. Ex. A ¶ 21. And he initiated a JAMS arbitration containing identical allegations contemporaneously with the filing of his initial Complaint, which he amended to match this Complaint, leaving no doubt that he himself acknowledges that these claims are within the scope of the arbitration provision. *See* Schwartz Decl. Exs. C, D, E, F. Moreover, on the civil cover sheet accompanying the Complaint, he checked the box for "employment," and summarized the action as "Plaintiff was wrongfully discharged for engaging in protected activity." ECF No. 1-3.

To the extent there is any conceivable remaining doubt (which there should not be), it must be resolved by the Third Circuit's directive to give "phrases such as 'arising under' and 'arising out of' . . . in arbitration provisions . . . broad construction." *Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000).

*   *   *   *   *

Magerman has a clear "agreement to arbitrate" with Mercer, and Magerman's entire dispute "falls within the scope of that agreement." *Invista*, 625 F.3d at 84 (quoting *Century Indem. Co.*, 584 F.3d at 522) (internal quotation marks omitted). Accordingly, the Court should compel arbitration under the FAA and dismiss the case.

## II.     Magerman's Claims Fail As A Matter Of Law.

Should the Court not dismiss in favor of arbitration, it should nonetheless dismiss the case because Magerman fails to even plausibly allege facts supporting required elements of both

the Section 1981 and state-law claims.  The Pennsylvania claim also relies on a legal theory that has been clearly rejected by state and federal courts alike.

     **A.**     **Magerman's Section 1981 Claim Should Be Dismissed For Failure To State A Claim.**

Magerman's Section 1981 retaliation claim fails as a matter of law because he has not plausibly alleged that Mercer retaliated against him for reporting racial discrimination in the making and enforcement of contracts.

Section 1981 prohibits racial discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981(a).  Typically, "to state a claim for discrimination under § 1981, a plaintiff must allege facts in support of the following elements: (1) that plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts."  *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (internal quotation marks, brackets, and ellipsis omitted).

Section 1981 also provides a cause of action for retaliation against an individual who reports racial discrimination in violation of Section 1981, even if he is not the target of direct discrimination.  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010) (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452 (2008)).  To state such a claim, a plaintiff must plead facts showing that (1) "he engaged in protected activity" by opposing "an underlying section 1981 violation" while "act[ing] under a good faith, reasonable belief that a violation existed"; (2) "his employer took an adverse employment action against him"; and (3) "there was a causal connection between his participation in the protected activity and the adverse employment action."  *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) (internal quotation marks and citations omitted); *see also Oliva*, 604 F.3d at 798; *Daniels v. Sch. Dist. of*

*Phila.*, 776 F.3d 181, 193 (3d Cir. 2015); *Rueda v. Nexeo Sols., LLC*, No. 3:14-cv-3801, 2015 WL 1472057, at *2 (D.N.J. Mar. 31, 2015).  Because Magerman has not alleged sufficient facts to support any of the elements of a Section 1981 retaliation claim, his claim must be dismissed.

### 1.    Magerman Fails To Plausibly Allege That He Engaged In Protected Activity By Opposing An Underlying Section 1981 Violation.

First, Magerman has not plausibly alleged that Mercer discriminated against anyone based on race in the making and enforcement of contracts in violation of Section 1981.  Because "an underlying section 1981 violation" is required to establish retaliation, *Oliva*, 604 F.3d at 798, Magerman necessarily also has not plausibly alleged that he engaged in activity that is protected under Section 1981.  Furthermore, even if he had plausibly alleged an underlying Section 1981 violation, Magerman nevertheless has not plausibly alleged that he reported any purported violation to his employer with sufficient specificity to qualify as protected activity, or that at the time he reasonably believed that such a violation had occurred.  As a result, Magerman's retaliation claim must fail.

To plead that he has engaged in "protected activity," a retaliation plaintiff must plausibly allege that he complained about race discrimination in the making and enforcement of contracts in violation of Section 1981.  *Gist v. Burlington Coat Factory Warehouse Corp.*, No. 1:13-cv-1094, 2014 WL 4105015, at *4 (D.N.J. Aug. 19, 2014) ("For a complaint to amount to protected activity, it must implicate an employment practice made illegal by § 1981." (internal quotation marks and alterations omitted)); *see also Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 753 (W.D. Pa. Sept. 28, 2016) (citing *CBOCS West*, 553 U.S. at 452) ("The underpinning of a § 1981 retaliation claim is that an individual was punished for opposing conduct that violates § 1981, whether that individual, or some third party, was the victim of the § 1981 violation.").  Significantly, in the Third Circuit, a retaliation plaintiff must plausibly

allege "that there ha[s] been an underlying section 1981 violation" in order to plead that he engaged in activity protected by the statute. *Castleberry*, 863 F.3d at 267 (quoting *Oliva*, 604 F.3d at 798); *see also Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 753 (E.D. Pa. 2014); *Rueda*, 2015 WL 1472057, at *2 (granting motion to dismiss retaliation claim because the plaintiff "fail[ed] to allege facts to support the requirement of an underlying § 1981 violation"). He must also plausibly allege that he "acted under a good faith, reasonable belief that a violation existed" when he made his complaint. *Castleberry*, 863 F.3d at 267 (quoting *Daniels*, 776 F.3d at 193).

"Protected activity may consist of . . . 'informal protests of discriminatory employment practices, including making complaints to management.'" *McGhee v. Thomas Jefferson Univ. Hosp.*, No. 2:12-cv-2919, 2013 WL 4663541, at *4 (E.D. Pa. Aug. 29, 2013) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).  However, "[c]omplaints must be specific enough to notify the employer of the particular type of discrimination being opposed, and allow the employer to discern that the employee opposes an unlawful practice." *Caplan*, 210 F. Supp. 3d at 754 (citing *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010)); *see also Barber*, 68 F.3d at 702; *Seldon v. Nat'l R.R. Passenger Corp.*, 452 F. Supp. 2d 604, 610 (E.D. Pa. 2006).  "Complaints about 'unfair treatment in general' or expressions of 'dissatisfaction . . .' that do not specifically complain of discrimination are not protected activity." *Seldon*, 452 F. Supp. 2d at 610 (quoting *Barber*, 68 F.3d at 701-02).

The factual allegations presented by Magerman simply do not support a finding of protected activity:  He has made no allegations that he reported conduct by Mercer that racially discriminated against anyone in the making or enforcement of contracts, or even that he reasonably believed as much.  Rather, Magerman alleges that during a telephone conversation on

January 16, 2017, Mercer expressed support for some of the Trump administration's policy positions and made supposedly "racist comments" relating to the adoption of the Civil Rights Act and whether racism continues to be a problem in the United States.  Compl. ¶¶ 35, 82. Magerman further asserts "[u]pon information and belief" that "Mercer created a pattern and practice of racial discrimination in the hiring of African Americans at Renaissance, as evidenced by the [purported] complete exclusion of African Americans in positions as Highly Compensated Employees."  *Id.* ¶ 80.  Magerman includes no information as to *how* Mercer purportedly created such a pattern and practice, other than to say that "Mercer's public political views, association with the alt-right, and racist comments deterred potential qualified African Americans from applying for positions as Highly Compensated Employees at Renaissance."  *Id.* ¶ 81.[12]

Notably absent from the Complaint are any allegations that Mercer or anyone else intentionally discriminated based on race against any individual with respect to that individual's employment at Renaissance (or otherwise), including by actually preventing any individual from obtaining a position at Renaissance, or that Mercer intentionally interfered based on race with any individual's ability to make and enforce contracts, as required to state a claim for direct discrimination under Section 1981.  *See Brown*, 250 F.3d at 797.  Rather, Magerman odiously accuses Mercer of racial discrimination based solely on his support for conservative candidates and causes, without any evidence that Mercer either intended to or did exclude any African Americans from Renaissance.  Magerman's outrageous smear by political association theory proceeds as follows:  (1) President Trump was "widely attacked in the media as being racist" for various acts and omissions, including failing to renounce support by certain extremist

---

[12]   As a factual matter, this claim is entirely implausible, particularly given that Renaissance's founder and chairman, James Simons, is a leading contributor to Democratic Party candidates and causes, and Renaissance's leadership historically "lean[s] Democratic."  Compl. Ex. D at 2; Compl. Ex. F (Dkt. 1-1) at 9.

individuals, Compl. ¶ 28; (2) Mercer supported President Trump's campaign and other

conservative political causes, *id.* ¶¶ 27, 29; (3) Mercer is therefore a racist, *id.* ¶¶ 35, 51;

(4) Mercer is a leader of Renaissance, *id.* ¶ 8; and (5) qualified minority candidates would

therefore conclude that Renaissance is a racially discriminatory employer and would not apply

for jobs there, *id.* ¶ 81.

Moreover, even assuming that Mercer's alleged comments to Magerman were "racist,"

"[s]tray remarks in the workplace"—unconnected to any challenged employment decision or

alleged interference with the making or enforcement of contracts—are not actionable under

Section 1981.  *See Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 406-07 (E.D. Pa. 2002) (internal

quotation marks omitted) (finding that isolated comments by decisionmakers and non-

decisionmakers did not constitute direct evidence of discrimination); *Davis v. Am. Soc'y of Civ.

Eng'rs*, 330 F. Supp. 2d 647, 657 (E.D. Va. 2004) ("[P]assing racial remarks do not trigger

§ 1981 sanctions."), *aff'd*, 123 F. App'x 139 (4th Cir. 2005).[13]  Furthermore, Section 1981 does

not extend its reach so far as to protect statements about another individual's alleged personal or

political views.  *Glantz v. Auto. Serv. Ass'n of Pa., Inc.*, No. 1:91-cv-5630, 1991 WL 270017, at

*1 (E.D. Pa. Dec. 11, 1991).  In addition, allegations that there are few, or even no, African

Americans in high-level positions—without any evidence of "intentional, purposeful

discrimination"—do not suffice to state a claim for Section 1981 liability.  *See Payne v. Abbott

Labs.*, 999 F. Supp. 1145, 1153 (N.D. Ill. 1998) (dismissing Section 1981 claim where plaintiffs

relied exclusively on reports indicating small percentage of African American employees in

higher-level positions).

---

[13]   These alleged comments also are not sufficiently "severe or pervasive" to support a claim of a hostile work
environment.  *Cf. Castleberry*, 863 F.3d at 267 (finding that a supervisor's use of a racially charged slur in front
of plaintiffs and their non-African-American coworkers, accompanied by threats of termination (which
ultimately occurred) was sufficiently severe to create a hostile work environment).

Thus, Magerman is simply incorrect when he asserts that he "engaged in protected activity" by reporting Mercer's alleged "racist comments" to Brown and "criticiz[ing] what he believes are hateful statements and policies from President Trump and Mercer's support thereof," without any allegation of underlying interference with anyone's right to contract based on race. *See* Compl. ¶¶ 35, 82. Furthermore, his claim that this amounts to protected activity is a legal conclusion that should not be afforded the presumption of truth. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Magerman's vague alleged concern regarding the purported lack of African Americans in upper-level management at Renaissance also cannot plausibly be read to allege racial discrimination in hiring or promotion. *See Payne*, 999 F. Supp. at 1153. However, even assuming that it could, Magerman does not allege that he reported this alleged concern to anyone at Renaissance. In fact he admits in this second incarnation of his Complaint that at most he supposedly "*intended* to convey" concern about how Mercer's publicly known political views might be perceived by or have an impact on the pool of prospective Renaissance employees. *See* Compl. ¶¶ 39, 41, 70, 71 (emphasis added). That is, of course, an admission that he did not *actually* convey anything of the sort. And "intending" is not sufficient.

The case law is crystal clear that the plaintiff's "subjective state of mind is . . . irrelevant for purposes of determining whether [h]e engaged in protected conduct." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006). Thus it makes no difference what Magerman "intended to" convey, because "[i]t is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative." *Id.* (granting motion to dismiss in Title VII case); *see also Moore v. City of Phila.*, 461 F.3d 331,

343 (3d Cir. 2006) ("To determine if retaliation plaintiffs sufficiently opposed discrimination, we look to the *message being conveyed.*" (internal quotation marks omitted; emphasis added)); *Cacciola v. Work N Gear*, 23 F. Supp. 3d 518, 533 (E.D. Pa. 2014) (Title VII and Pennsylvania Human Rights Act case holding that "an employee's intent in what she was conveying is irrelevant" in determining if activity was protected). Or, in the words of this Court, "it is the substance of the *objective communication* to the employer that defines the 'protected activity' and remains the hallmark of a retaliation claim." *Degidio v. Centro Props., LLC*, No. 2:11-cv-1353, 2013 WL 440131, at *6 (E.D. Pa. Feb. 4, 2013) (Jones, J.).

Accordingly, Magerman has not plausibly alleged that he notified Renaissance of the particular type of discrimination he purportedly opposed in a manner that would have allowed Renaissance to discern that he was opposing an alleged unlawful practice. *Seldon*, 452 F. Supp. 2d at 610 (granting motion to dismiss Section 1981 retaliation claim because plaintiff did not allege "that she ever complained of discrimination" to her employer).

Because Magerman has not alleged *any* grounds—let alone reasonable grounds—to believe that Mercer violated any person's Section 1981 rights to make and enforce contracts, or that Magerman complained about any such violation, Magerman cannot demonstrate that he engaged in any protected activity, and his claim of retaliation must fail. *See, e.g.*, *McGhee*, 2013 WL 4663541, at *4 (granting motion to dismiss Section 1981 retaliation claim where plaintiff alleged she filed an EEOC complaint alleging racial discrimination because she "d[id] not allege a single fact that could give rise to an inference of discriminatory conduct based on any race").

### 2. Magerman's Claims That Mercer "Ordered" Or "Directed" Magerman's Suspension And Termination Are Entirely Conclusory.

Moreover, Magerman's baseless assertions that Mercer played any role in the decisions to suspend and terminate Magerman's employment are entirely conclusory and unsupported by fact.

To state a retaliation claim against an individual defendant, a plaintiff must plead that the particular defendant was "personally involved in" the challenged retaliation, and he "intentionally caused" the plaintiff's employer "to infringe on [the plaintiff's] Section 1981 rights, or . . . authorized, directed, or participated in the alleged [retaliatory] conduct." *Al-Khazraji v. St. Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986), *aff'd*, 481 U.S. 604 (1987); *see also Clinkscales v. Children's Hosp. of Phila.*, No. 06-cv-3919, 2009 WL 1259104, at *5 (E.D. Pa. May 7, 2009) (granting individual defendants' motion to dismiss discrimination claims); *Douglas v. Nesbit*, No. 1:16-cv-01836, 2017 WL 1021680, at *6 (M.D. Pa. Mar. 16, 2017) (same); *Stanley v. City of Pittsburgh*, No. 2:15-cv-555, 2016 WL 3920477, at *3 (W.D. Pa. July 15, 2016) (denying in part motion to reconsider dismissal of claims against individual defendants); *Gonzalez v. Comcast Corp.*, No. 1:03-cv-445, 2004 WL 1737693, at *3 (D. Del. July 30, 2004) (granting individual defendant's motion for summary judgment on retaliation claim).

"[P]ersonal liability under Section 1981 must be predicated on the actor's personal involvement and there must therefore be some affirmative link to causally connect the actor with the [retaliatory] action." *Johnson v. Res. for Human Dev., Inc.*, 843 F. Supp. 974, 978 (E.D. Pa. 1994) (granting individual defendants' motion to dismiss). A retaliation claim cannot succeed where "it is not clear that [an individual defendant] had any meaningful bearing on the ultimate decision" to take an adverse employment action against the plaintiff. *Carvalho-Grevious v. Del.*

*State Univ.*, 851 F.3d 249, 263 (3d Cir. 2017) (affirming summary judgment in favor of individual defendant on plaintiff's Section 1981 claim).

"[V]ague, conclusory allegations" that a defendant "personally engaged in discriminatory conduct through unspecified means"—without any "actual facts describing *how*" the defendant "directed, participated in, or authorized the discriminatory conduct"—"are insufficient to withstand" a motion to dismiss. *Clinkscales*, 2009 WL 1259104, at *5 (emphasis in original). So too are "allegations that provide a 'formulaic recitation of the elements of a cause of action.'" *Stanley*, 2016 WL 3920477, at *3 (quoting *Iqbal*, 556 U.S. at 678) (denying in part motion to reconsider dismissal of individual retaliation claim); *see also Clinkscales*, 2009 WL 1259104, at *5 ("[T]he Court 'need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss.'" (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997))). Likewise, a complaint that "merely attempt[s] to hold [an individual defendant] personally culpable for [his] agents' alleged acts of misconduct, based solely on [his] supervisory status," without any factual support for his direct participation in discriminatory action, cannot survive at the motion to dismiss stage. *Douglas*, 2017 WL 1021680, at *6.

Here, Magerman's claims that his "suspension was ordered personally by Mercer" (Compl. ¶ 67) and that Magerman was fired "at the direction of Mercer" (*id.* ¶ 75), are merely "legal conclusion[s] dressed as fact." *McGhee*, 2013 WL 4663541, at *6. Magerman offers no support for these bald assertions. He has presented no details whatsoever indicating that Mercer actually was personally involved in, or authorized, directed, or participated in, any adverse employment action taken against Magerman. Rather, he conclusorily claims "it is inconceivable to [him] that Mercer did not personally direct that [Magerman] be fired," "[b]ased on Mercer's role in the company." Compl. ¶ 83. Because Magerman has not offered any factual allegations

28

that would support an affirmative link connecting Mercer with Magerman's suspension or termination, his retaliation claim cannot survive a motion to dismiss.  *See Clinkscales*, 2009 WL 1259104, at *5; *Johnson*, 843 F. Supp. at 978.

> **3.     Magerman Has Not Plausibly Alleged That Any Reporting Of Purported Racial Discrimination Was The "But-For" Cause Of His Suspension Or Termination.**

Magerman's claim is also foreclosed by law because he has not plausibly alleged the required causal connection between any reporting of Mercer's purported racial discrimination and his suspension or termination.

To plead causation for a retaliation claim, a plaintiff must plausibly allege that retaliatory animus was the "but-for" cause of the employer's adverse action.  *Conner v. Ass'n of Flight Attendants-CWA*, No. 2:13-cv-2464, 2014 WL 6973298, at *3 (E.D. Pa. Dec. 10, 2014) (granting motion to dismiss); *see Carvalho-Grevious*, 851 F.3d at 258 (citing *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013)) ("[A] retaliation plaintiff's ultimate burden is to prove that retaliatory animus was the 'but-for' cause of the adverse employment action.") (addressing retaliation claims under Title VII and Section 1981 together).  Although at the prima facie stage a retaliation plaintiff need only "produce evidence 'sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse [employment] action,'" *Carvalho-Grevious*, 851 F.3d at 259 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); emphasis in original), this does not diminish the plaintiff's obligation to allege sufficient facts upon which relief can be granted at the pleading stage to survive a Rule 12(b)(6) motion.  *See Conner*, 2014 WL 6973298, at *3; *see also Iqbal*, 556 U.S. at 678.  In other words, to survive a motion to dismiss, a complaint "must demonstrate on its face that it is plausible that [the plaintiff] will be able to prove that 'but for' [the defendant's] retaliatory motive, [the

plaintiff] would not have" suffered an adverse employment action.  *Conner*, 2014 WL 6973298, at *3.

A plaintiff can demonstrate a causal connection directly by evidence of retaliatory animus or indirectly through such evidence as: (1) a "close temporal proximity between engaging in the protected activity and the adverse action" that is "*unduly suggestive*" of retaliatory motive; and (2) "circumstances indicating a pattern of antagonism following the protected conduct." *McGhee*, 2013 WL 4663541, at *6 (internal quotation marks and citations omitted; emphasis in original) (granting motion to dismiss); *see also Carvalho-Grevious*, 851 F.3d at 260; *Reynolds v. Aria Health*, No. 2:12-cv-2954, 2013 WL 2392903, at *8 (E.D. Pa. May 31, 2013) (granting motion to dismiss); *Duplan v. City of N.Y.*, No. 2:15-cv-4136, 2017 WL 1232473, at *6 (E.D.N.Y. Mar. 30, 2017) (same).  However, these factors are not exclusive, and "'each case must be considered with a careful eye to the specific facts and circumstances encountered.'" *Reynolds*, 2013 WL 2392903, at *8 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)); *see also Carvalho-Grevious*, 851 F.3d at 260.

Here, Magerman's claim fails from the outset because he does not even allege that retaliation for his alleged reporting of purported racial discrimination is the "but-for" cause of his suspension and termination.  Rather, he claims that Mercer retaliated against him for his "criticisms of Mercer's political activities and the causes he supports" (Compl. ¶¶ 67, 75)— activity which is well outside Section 1981.  *Glantz*, 1991 WL 270017, at *1.  Furthermore, Magerman himself puts forth alternative plausible and legitimate reasons for his suspension and termination, including his violation of the nondisparagement clause of his employment agreement (Compl. ¶ 52), and his drunken altercation with Mercer's daughter at a charity event witnessed by numerous Renaissance and industry colleagues, which Magerman admits did not

cast him in a positive light.  *Id.* ¶¶ 73-74; Compl. Ex. E at 2-3; *see also infra* pp. 7-8.  On this

basis alone, his claim must fail.  *See Conner*, 2014 WL 6973298, at *5-6 (granting motion to

dismiss in Title VII retaliation case where plaintiff failed to allege that retaliation was the but-for

cause of her termination and instead alleged a different but-for cause—her employer's discovery

of her ethical violations).

      Furthermore, even if Magerman had alleged that retaliation for his alleged reporting of

purported racial discrimination was the "but-for" cause of his suspension and termination, his

Complaint contains no allegations of circumstantial factors that would support such a claim and

render it plausible.  For example, the at least three-week gap between when Magerman allegedly

reported Mercer's purported "racist comments" to Brown and Magerman's suspension (*see*

Compl. ¶¶ 33, 39-41, 82), and the subsequent unspecified interval between his supposed

additional complaints during his suspension and his ultimate termination (*see id.* ¶¶ 66, 70-71,

75), are not close enough in time to be "unusually suggestive of retaliatory motive."  *See*

*Carvalho-Grevious*, 851 F.3d at 260 (finding plaintiff's termination a few weeks after she

submitted a complaint was not "unusually suggestive of retaliatory motive"); *see also Conner*,

2014 WL 6973298, at *4 (noting that the Third Circuit has found "temporal proximity of two

days to be unusually suggestive of causation," whereas "temporal proximity of more than ten

days required additional evidence").  Nor has Magerman pleaded any facts indicating a "pattern

of antagonism" by Mercer or Renaissance following Magerman's purported protected activity.

*See McGhee*, 2013 WL 4663541, at *7 (granting motion to dismiss Section 1981 retaliation

claim after finding no pattern of antagonism when plaintiff was disciplined at work for valid

reasons after complaining of alleged discrimination).

Thus, Magerman has failed to plausibly allege that retaliation for his alleged reporting of purported racial discrimination was the but-for cause of his termination, and his Section 1981 retaliation claim must be dismissed.  *See Conner*, 2014 WL 6973298, at *5-6 (granting motion to dismiss); *McGhee*, 2013 WL 4663541, at *7 (same); *Reynolds*, 2013 WL 2392903, at *8 (same); *Duplan*, 2017 WL 1232473, at *6 (same).

### B.    Magerman's Pennsylvania State Law Claim Fails As A Matter Of Law.

Magerman's claim for wrongful discharge under Pennsylvania state law is also legally insufficient, and must be dismissed under Rule 12(b)(6).  As an initial matter, he agreed that his employment would be governed by New York substantive law, yet he now raises a claim under Pennsylvania law with no New York analogue.  And in any event, his claim is not viable under Pennsylvania law, where the courts have rejected the imposition of protections against *government* interference with free speech on *private* employers.

### 1.    Magerman's Dispute Is Governed By New York's Substantive Law, Which Does Not Allow His Pennsylvania State Law Claim.

First, the wrongful discharge claim suffers from a threshold problem:  Magerman agreed that his employment would be "governed by the laws of the State of New York without reference to the conflict or choice of laws provisions thereof."  Compl. Ex. A ¶ 20.  A claim brought under *Pennsylvania* state law (*see* Compl. ¶ 98, claiming "Mercer therefore wrongfully discharged Magerman under Pennsylvania law") is thus fatally flawed even were it otherwise viable.  Indeed, Magerman essentially concedes this point in his arbitration against his employer, in which he asserts his wrongful discharge claim under New York law.  Schwartz Decl. Exs. C, E.  Magerman's attempt to evade this choice of law provision is particularly egregious here because New York has rejected the underlying legal theory and has no parallel cause of action:  "It is well settled" in New York "that there is no statutory or common law cause of action in tort for

abusive or wrongful discharge of an at will employee," *Hassan v. Marriott Corp.*, 663 N.Y.S.2d

558, 560 (N.Y. App. Div. 1997), and the courts have "expressly" ruled that any public policy

exceptions must be specifically created by the state legislature, *Leibowitz v. Bank Leumi Tr. Co.*

*of N.Y.*, 548 N.Y.S.2d 513, 516 (N.Y. App. Div. 1989) (citing *Murphy v. Am. Home Prods. Corp.*

448 N.E.2d 86 (N.Y. 1983)).[14]

> ### 2.    The Pennsylvania Courts Have Also Rejected The Claim's Legal Premise.

This claim also cannot conceivably succeed even under *Pennsylvania* law, which allows

"no right of action against [an] employer for wrongful discharge" of an at-will employee when

(1) "no clear mandate of public policy is violated" by the alleged termination, or (2) "the

complaint itself discloses a plausible and legitimate reason for terminating an at-will

employment relationship." *Geary v. U.S. Steel Corp.*, 319 A.2d 174, 180 (Pa. 1974).  Both bars

are present here:  Pennsylvania courts have authoritatively and specifically rejected the public

policy reasoning presented by Magerman's factual allegations, finding Pennsylvania's freedom-

of-speech protections apply only to *state* actors absent one narrow set of circumstances not even

alleged here.  Federal courts sitting in diversity agree.  And the Complaint itself, together with

the attached and incorporated documents, readily concedes a "plausible legitimate reason" for

termination.  Accordingly, even accepting the distorted "facts" as presented in the Complaint,

this claim fails as a matter of law.

---

[14] Pennsylvania courts, which have adopted *Restatement (Second) of Conflict of Laws* § 187, would honor the agreement's choice of New York law.  *See Miller v. Allstate Ins. Co.*, 763 A.2d 401, 403 (Pa. Super. Ct. 2000) (holding that a contract's "explicit choice of law clause" governs absent exceptions not present here).  That rule extends to the tort claims in this case under the "fair import" of the employment agreement: its expansive arbitration (venue) provision explicitly includes "torts" "relating to" the agreement and is adjacent to the choice-of-law provision.  *See Lipman Bros. v. Apprise Software, Inc.*, No. 5:13-cv-4439, 2015 WL 4476983, at *2 (E.D. Pa. July 22, 2015) (internal quotation marks omitted) (interpreting similar agreement); Compl. Ex. A ¶¶ 20-21.

### a) There Is No Public Policy Exception For Wrongful Termination By Private Employers Based On Purported Burdens On Freedom Of Speech.

Pennsylvania courts start with a strong presumption *against* finding the "clear mandate of public policy" required for a right of action. It exists "in only the most limited of circumstances," *Paul v. Lankenau Hosp.*, 569 A.2d 346, 348 (Pa. 1990) (internal quotation marks omitted), and the Pennsylvania Supreme Court has warned that "[o]nly in the clearest of cases may a court make public policy the basis of its decision," *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009). Magerman argues that his termination qualifies because there is a "clear mandate of public policy against forced political speech and conditioning employment on political subordination." Compl. ¶ 93. But nothing he alleges remotely qualifies as "forced political speech," and the courts have specifically rejected all other efforts to apply freedom-of-speech protections in the private employee context (including any broader notion of "political subordination"). Because he does not allege a violation of any recognized mandate, the claim fails on its face.

Like its federal counterpart, the Pennsylvania Constitution provides for freedom of speech. *See* Pa. Const. art. I § 7. And like the First Amendment to the U.S. Constitution, the Pennsylvania provision only applies to state action, not private employers. Thus, as this Court recently held, "Pennsylvania courts have declined to find a public policy exception for wrongful termination claims against non-state actors based on Article I of the Pennsylvania Constitution." *Prewitt v. Walgreens Co.*, No. 5:12-cv-6967, 2013 WL 6284166, at *3 & nn.17-18 (E.D. Pa. Dec. 2, 2013) (citing extensive Third Circuit and state Superior Court precedent). Indeed, the Third Circuit has specifically "rejected" Magerman's position that "the Pennsylvania

Constitution [serves] as [a] limitatio[n]" on private "employers' discretion to fire at-will employees." *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 112 (3d Cir. 2003).[15]

This well-established law clearly forecloses Magerman's claim here: that his private employer terminated him for his decision to voice disagreement with an executive's political preferences.  Apparently recognizing this fatal defect, the Complaint attempts to invoke an extremely narrow and virtually abandoned holding allowing a cause of action against a private employer for "forced political speech."  *See* Compl. ¶¶ 91, 93.  To be sure, in 1983, the Third Circuit found it improper to "conditio[n] employment upon political subordination" and "coerce individual employee assistance to the corporate political agenda" by requiring "participat[ion] in [a] lobbying effort."  *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 896, 899, 901 n.9 (3d Cir. 1983).  But twenty years later, the Third Circuit expressly rejected a "broa[d]" reading of that case, explaining that based on intervening Pennsylvania cases it had "limited *Novosel* to its facts—a firing based on *forced* political speech."  *Fraser*, 352 F.3d at 112-13 (emphasis added). In doing so, it foreclosed any possible reliance on a broader construction of *Novosel*'s mention of "political subordination"—which in any event was never relied on by any court.

Magerman makes no allegations that could even generously be called "forced political speech."  He complains merely that he was forced to "tacitly support or at least condone" positions he opposes.  Compl. ¶ 91.  But "forced" or "compelled" speech is when someone is "require[d] . . . to *reproduce* another's speech against [his] will," and is "actually force[d]" to speak.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457 & n.10 (2008)

---

[15]   *Fraser* is controlling absent "persuasive evidence of a change in Pennsylvania law."  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 116 n.12 (3d Cir. 2010) (internal quotation marks omitted).  And there is no such evidence.  *See, e.g.*, *Madziva v. Phila. Hous. Auth.*, No. 1215 C.D. 2013, 2014 WL 1891388, at *6 (Pa. Commw. Ct. May 12, 2014) (highlighting "key" distinction between "purely private" actor and "public actor" in evaluating allegations of terminating an at-will employee in "deprivation of a constitutional liberty interest" (internal quotation marks omitted)).

(emphasis added).  Compelling participation in a lobbying campaign at the pain of firing, as in *Novosel*, fits that description.  In contrast, it is not enough, for example, that the speaker believes "confusion will force [him] to speak to clarify [his] position."  *Id.* at 457 n.10.  And that is, at most, all Magerman argues.

Moreover, even if a broader "political subordination" theory were legally viable (it is not, as detailed above), the Complaint and its exhibits also directly undercut any argument that "subordination" to one particular political view was a condition of his employment at Renaissance.  Compl. ¶ 93.  As documented in the *Wall Street Journal* article attached to the Complaint, in the 2016 presidential election, the founder of Renaissance and its current chairman, James Simons, was one of the top Democratic donors, while Mercer was one of the top Republican donors.  Compl. Ex. F (Dkt. 1-1) at 9; *see also supra* note 4 (discussing diverse political views of Renaissance leaders); *see also* Schwartz Decl. Ex. G (@DavidMagerman, Twitter (May 18, 2017, 4:33 AM), https://twitter.com/DavidMagerman/status/8651684 38146236417 (rebutting online allegations claiming company was involved in attacks on Hillary Clinton and writing "Not sure why you are hanging this on RenTech.  It was founded by Jim Simons, who gave $25m to get Hillary elected.")).  When considering a motion to dismiss, courts need not accept as true conclusory allegations like these that are contradicted by materials attached to the complaint.  *Villari Brandes & Giannone, PC v. Wells Fargo Fin. Leasing, Inc.*, No. 2:13-cv-297, 2013 WL 5468497, at *1 n.1 (E.D. Pa. Sept. 30, 2013); *see also Kates v. King*, 487 F. App'x 704, 706 (3d Cir. 2012) (affirming district court Rule 12(b)(6) dismissal of a claim when the plaintiff "attached documents to his complaint contradicting his assertion").

Finally, the inclusion in this Complaint—*see* Schwartz Decl. Ex. B—of language referencing the National Labor Relations Act ("NLRA") does absolutely nothing to solve these

problems.  First, a purported violation of *federal* law cannot serve as the "public policy" for a *Pennsylvania* wrongful-termination claim.  The "Pennsylvania Supreme Court has held that in order for the public policy exception to apply, the alleged violation of public policy must be of Pennsylvania public policy, not solely an alleged violation of federal law."  *Kelly v. Ret. Pension Plan for Certain Home Office*, 73 F. App'x 543, 545 (3d Cir. 2003) (citing *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 289 (Pa. 2000)).  In the words of the Pennsylvania Supreme Court, "[p]ublic policy of the Commonwealth must be just that, the policy of this Commonwealth."  *McLaughlin*, 750 A.2d at 289.  Accordingly, "in order to set forth a claim for wrongful discharge a Plaintiff must do more than show a possible violation of a federal statute."  *Id.*  Instead, he must "allege that some *public* policy of *this* Commonwealth is implicated, undermined, or violated," as determined by Pennsylvania's state "Constitution, court decisions, and statutes promulgated by its legislature."  *Id.* at 288-89.[16]

Moreover, as the state Supreme Court explained, Plaintiff's approach would "essentially allow a plaintiff to reformulate a federal administrative scheme into a state private cause of action," and in the process "overcome the presumption of at-will employment."  *McLaughlin*, 750 A.2d at 290 (rejecting public policy claim based on the federal Occupational Safety and Health Act); *see also Westawski v. Merck & Co.*, No. 2:14-cv-3239, 2015 WL 463949, at *10 (E.D. Pa. Feb. 4, 2015) (employing same reasoning as to the federal Sarbanes-Oxley Act).[17]

---

[16]   Relatedly, to the extent he is attempting to bring an action directly under the NLRA, that would necessarily fail. The NLRA only applies to "concerted activity"—that is, when the employee has an "intent to induce or effect group action in furtherance of group interests." *MCPC Inc. v. N.L.R.B.*, 813 F.3d 475, 484, 486 (3d Cir. 2016). Magerman makes no such suggestion.  Further, the NLRA is a "comprehensive" scheme for the disposition of unfair labor practice charges which "exhaustively sets out the stages through which such charges may pass," and allows for "judicial review . . . only in respect of [National Labor Relations Board] orders." *N.L.R.B. v. United Food & Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 131 (1987).

[17]   For the same reasons, the extremely vague references to supposed obligations pursuant to contracts with public entities in other states cannot conceivably qualify as a Pennsylvania "public policy" exception.  *See* Compl. ¶¶ 17, 92-93.

37

**b) The Complaint Itself Admits Plausible And Legitimate Reasons For Terminating Magerman's Employment.**

Magerman's claim is also foreclosed for the separate and independent reason that "the complaint itself discloses a plausible and legitimate reason for terminating [his] at-will employment relationship." *Geary*, 319 A.2d at 180; *see Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1182 (Pa. Super. Ct. 1989) ("Even where an important public policy is involved, an employer may discharge an employee if he has separate, plausible reasons for doing so.").

Magerman admits knowingly, intentionally, and willfully violating the nondisparagement clause of his employment agreement and the employee handbook by publicly criticizing Mercer. Magerman plainly admits that he "was aware of alleged restrictions under the Employment Agreement and Handbook to avoid publicly disparaging either Renaissance or its employees," and that he nonetheless "gave an interview to a reporter for the *Wall Street Journal*, in which [he] criticized . . . Mercer's support for the President's agenda." *See* Compl. ¶ 52; *see also* Compl. Ex. D at 2 (Magerman's statement to the *Wall Street Journal* that Mercer's "views show contempt for the social safety net that he doesn't need").  Indeed, Magerman told the *Wall Street Journal* in that very interview that "it's very possible they could fire me" because of those comments about Mercer.  Compl. Ex. D at 3; *see also id.* at 4 ("[I]f they fire me, maybe it's for the best.").

Magerman further admits to engaging in a drunken confrontation with Mercer's daughter at a charity poker night sponsored by Renaissance's founder and attended by many of the senior-most people in the financial services industry.  This confrontation was witnessed by numerous coworkers and colleagues and reported by a national newspaper and occurred immediately before Magerman alleges he was discharged.  *See* Compl. ¶¶ 73-74; Compl. Ex. E at 2-3. Magerman himself concedes that "[i]t wasn't one of [his] finest moments."  Compl. Ex. E at 3.

Magerman's admitted failure to abide by the employment agreement and handbook and his unprofessional conduct at a major charity event sponsored by the founder of Renaissance are "plausible and legitimate reason[s]" for his termination, and are fatal to the claim.

## CONCLUSION

For the foregoing reasons, Mercer respectfully asks the Court to compel arbitration and dismiss the case in favor of arbitration or, in the alternative, to dismiss on the merits.

Dated:  September 5, 2017                 Respectfully submitted,

s/ Melanie L. Katsur
Randy M. Mastro (*pro hac vice admission pending*)
rmastro@gibsondunn.com
Mylan L. Denerstein (*pro hac vice admission pending*)
mdenerstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Jason C. Schwartz (*pro hac vice admission pending*)
jschwartz@gibsondunn.com
Melanie L. Katsur (PA 88458)
mkatsur@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5303
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Robert Mercer*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 5th day of September, 2017, I caused a copy of the foregoing to be served upon all counsel of record via ECF.

s/ Melanie L. Katsur
Melanie L. Katsur