**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| David Magerman, | |
| Plaintiff, | |
| v. | Civil Action No. 2:17-cv-3490 |
| Robert Mercer, | |
| Defendant. | |

**DEFENDANT ROBERT MERCER'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR RULE 11 SANCTIONS**

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 3

LEGAL STANDARD............................................................................................ 10

ARGUMENT ...................................................................................................... 11

I.   Sanctions Are Warranted Under Rule 11(b)(2) Because There Is No Reasonable Basis In Law For Magerman's Claims ........................................................................ 12

    A.  Magerman's Retaliation Claim Cannot Succeed Under Section 1981 ........................... 12

        1.  Magerman Fails To Plausibly Allege That He Engaged In Protected Activity By Opposing An Underlying Section 1981 Violation ............................................... 13

        2.  Magerman's Claims That Mercer "Ordered" Or "Directed" Magerman's Suspension And Termination Are Entirely Conclusory And Evidence His Improper Motive ........................................................................... 19

        3.  Magerman Has Not Plausibly Alleged That Any Reporting Of Purported Racial Discrimination Was The "But-For" Cause Of His Suspension Or Termination.................................................................................. 22

    B.  Magerman's Wrongful Discharge Claim Cannot Succeed Under Pennsylvania Law .... 25

        1.  There Is No Public Policy Exception For Wrongful Termination By Private Employers Based On Purported Burdens On Freedom Of Speech........................... 26

        2.  The Complaint Itself Admits Plausible And Legitimate Reasons For Terminating Magerman's Employment ................................................... 30

    C.  The Employment Agreement Requires Magerman To Bring Any And All Claims "Relating To" His Employment In Binding Arbitration, Not Federal Court.................. 31

        1.  Mercer Can Enforce The Employment Agreement's Binding Arbitration Provision .............................................................................. 32

        2.  The Entire Dispute Falls Within The Scope Of The Arbitration Clause ................. 34

II.  Sanctions Are Warranted Under Rule 11(b)(1) Because The Complaint Is A Transparent Attempt To Generate Publicity By Publicly Smearing Mercer ........................ 36

CONCLUSION.................................................................................................. 39

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agnello v. Instant Cash Advance Corp.*,
　No. 1:08-cv-14659, 2009 WL 1702289 (E.D. Mich. June 16, 2009) .....................................18

*Al-Khazraji v. St. Francis Coll.*,
　784 F.2d 505 (3d Cir. 1986).................................................................................................19

*Arthur Andersen LLP v. Carlisle*,
　556 U.S. 624 (2009).............................................................................................................33

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009).......................................................................................................17, 20

*Barber v. CSX Distrib. Servs.*,
　68 F.3d 694 (3d Cir. 1995)...................................................................................................14

*Battaglia v. McKendry*,
　233 F.3d 720 (3d Cir. 2000).................................................................................................35

*Bimbo Bakeries USA, Inc. v. Botticella*,
　613 F.3d 102 (3d Cir. 2010).................................................................................................27

*Brown v. Philip Morris Inc.*,
　250 F.3d 789 (3d Cir. 2001)...........................................................................................12, 15

*Cacciola v. Work N Gear*,
　23 F. Supp. 3d 518 (E.D. Pa. 2014) .....................................................................................18

*Caplan v. L Brands/Victoria's Secret Stores, LLC*,
　210 F. Supp. 3d 744 (W.D. Pa. Sept. 28, 2016).............................................................13, 14

*Carvalho-Grevious v. Del. State Univ.*,
　851 F.3d 249 (3d Cir. 2017)...................................................................................... *passim*

*Castleberry v. STI Grp.*,
　863 F.3d 259 (3d Cir. 2017).........................................................................................13, 14, 16

*CBOCS W., Inc. v. Humphries*,
　553 U.S. 442 (2008).......................................................................................................12, 14

*Century Indem. Co. v. Certain Underwriters at Lloyd's, London*,
　584 F.3d 513 (3d Cir. 2009).................................................................................................34

*Clinkscales v. Children's Hosp. of Phila.*,
　No. 06-cv-3919, 2009 WL 1259104 (E.D. Pa. May 7, 2009)......................................19, 20, 21

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Conner v. Ass'n of Flight Attendants-CWA*,
    No. 2:13-cv-2464, 2014 WL 6973298 (E.D. Pa. Dec. 10, 2014) ................................22, 23, 24

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990)...................................................................................................10, 22

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
    450 F.3d 130 (3d Cir. 2006)......................................................................................17, 18

*Daniels v. Sch. Dist. of Phila.*,
    776 F.3d 181 (3d Cir. 2015).......................................................................................13, 14

*Davis v. Am. Soc'y of Civ. Eng'rs*,
    330 F. Supp. 2d 647 (E.D. Va. 2004) ................................................................................16

*Degidio v. Centro Props., LLC*,
    No. 2:11-cv-1353, 2013 WL 440131 (E.D. Pa. Feb. 4, 2013)................................................18

*DiBello v. Salkowitz*,
    772 N.Y.S.2d 663 (N.Y. App. Div. 2004) ........................................................................33

*DiPaolo v. Moran*,
    407 F.3d 140 (3d Cir. 2005).........................................................................................10

*Douglas v. Nesbit*,
    No. 1:16-cv-01836, 2017 WL 1021680 (M.D. Pa. Mar. 16, 2017) ....................................19, 20

*Duplan v. City of N.Y.*,
    No. 2:15-cv-4136, 2017 WL 1232473 (E.D.N.Y. Mar. 30, 2017) ....................................23, 24

*Dura Sys., Inc. v. Rothbury Invs., Ltd.*,
    886 F.2d 551 (3d Cir. 1989).........................................................................................32

*Ellis v. Budget Maint., Inc.*,
    25 F. Supp. 3d 749 (E.D. Pa. 2014) ................................................................................14

*Farrell v. Planters Lifesavers Co.*,
    206 F.3d 271 (3d Cir. 2000).........................................................................................23

*Field v. Phila. Elec. Co.*,
    565 A.2d 1170 (Pa. Super. Ct. 1989)................................................................................30

*Fraser v. Nationwide Mut. Ins. Co.*,
    352 F.3d 107 (3d Cir. 2003).......................................................................................27, 28

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Geary v. U.S. Steel Corp.*,
   319 A.2d 174 (Pa. 1974) ...................................................................................26, 30

*Giganti v. Gen-X Strategies, Inc.*,
   222 F.R.D. 299 (E.D. Va. 2004) ..............................................................................9

*Gist v. Burlington Coat Factory Warehouse Corp.*,
   No. 1:13-cv-1094, 2014 WL 4105015 (D.N.J. Aug. 19, 2014)..............................13

*Glantz v. Auto. Serv. Ass'n of Pa., Inc.*,
   No. 1:91-cv-5630, 1991 WL 270017 (E.D. Pa. Dec. 11, 1991) .......................16, 23

*Gonzalez v. Comcast Corp.*,
   No. 1:03-cv-445, 2004 WL 1737693 (D. Del. July 30, 2004)................................19

*Griswold v. Coventry First LLC*,
   762 F.3d 264 (3d Cir. 2014).....................................................................................34

*Hassan v. Marriott Corp.*,
   663 N.Y.S.2d 558 (N.Y. App. Div. 1997) ..............................................................25

*Hirschfeld Prods. v. Mirvish*,
   673 N.E.2d 1232 (N.Y. 1996)..................................................................................33

*Hoffman v. Finger Lakes Instrumentation, LLC*,
   789 N.Y.S.2d 410 (N.Y. Sup. Ct. 2005) .................................................................33

*Invista S.A.R.L. v. Rhodia, S.A.*,
   625 F.3d 75 (3d Cir. 2010).................................................................................32, 34

*Johnson v. Res. for Human Dev., Inc.*,
   843 F. Supp. 974 (E.D. Pa. 1994) ......................................................................20, 21

*Kates v. King*,
   487 F. App'x 704 (3d Cir. 2012) .............................................................................29

*Kellman v. Whyte*,
   10 N.Y.S.3d 232 (N.Y. App. Div. 2015) ................................................................34

*Kelly v. Ret. Pension Plan for Certain Home Office*,
   73 F. App'x 543 (3d Cir. 2003) ...............................................................................29

*Lal v. Borough of Kennett Square*,
   935 F. Supp. 570 (E.D. Pa. 1996) ...........................................................................10

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Leibowitz v. Bank Leumi Tr. Co. of N.Y.*,
   548 N.Y.S.2d 513 (N.Y. App. Div. 1989) ..............................................................25

*Leuallen v. Borough of Paulsboro*,
   180 F. Supp. 2d 615 (D.N.J. 2002) .......................................................................19

*Lipman Bros. v. Apprise Software, Inc.*,
   No. 5:13-cv-4439, 2015 WL 4476983 (E.D. Pa. July 22, 2015) ...........................26

*Madziva v. Phila. Hous. Auth.*,
   No. 1215 C.D. 2013, 2014 WL 1891388 (Pa. Commw. Ct. May 12, 2014) ...........27

*McGhee v. Thomas Jefferson Univ. Hosp.*,
   No. 2:12-cv-2919, 2013 WL 4663541 (E.D. Pa. Aug. 29, 2013) ...........14, 21, 23, 24

*Estate of Oliva ex rel. McHugh v. New Jersey*,
   604 F.3d 788 (3d Cir. 2010).............................................................................12, 13, 14

*McLaughlin v. Gastrointestinal Specialists, Inc.*,
   750 A.2d 283 (Pa. 2000) ................................................................................29, 30

*MCPC Inc. v. N.L.R.B.*,
   813 F.3d 475 (3d Cir. 2016)..................................................................................30

*Miller v. Allstate Ins. Co.*,
   763 A.2d 401 (Pa. Super. Ct. 2000) .....................................................................25

*Moore v. City of Phila.*,
   461 F.3d 331 (3d Cir. 2006)..................................................................................18

*Morris v. Orman*,
   No. 87-cv-5149, 1992 WL 398363 (E.D. Pa. Dec. 31, 1992)................................10

*Morse v. Lower Merion Sch. Dist.*,
   132 F.3d 902 (3d Cir. 1997)..................................................................................20

*Mosley v. Del. River Port Auth.*,
   No. 1:99-cv-4147, 2000 WL 1534743 (D.N.J. Aug. 7, 2000)..............................1, 8

*Murphy v. Am. Home Prods. Corp.*
   448 N.E.2d 86 (N.Y. 1983)...................................................................................25

*N. Jersey Secretarial Sch., Inc. v. McKiernan*,
   713 F. Supp. 577 (S.D.N.Y. 1989)........................................................................21

# TABLE OF AUTHORITIES
(continued)

Page(s)

*N.L.R.B. v. United Food & Commercial Workers Union, Local 23, AFL-CIO,*
  484 U.S. 112 (1987) .................................................................................................30

*Napier v. Thirty or More Unidentified Fed. Agents, Emps. or Officers,*
  855 F.2d 1080 (3d Cir. 1988) .................................................................................10

*Noe v. Interstate Brands Corp.,*
  188 F.R.D. 513 (S.D. Ind. 1999) ............................................................................19

*Novosel v. Nationwide Ins. Co.,*
  721 F.2d 894 (3d Cir. 1983) ...................................................................................28

*Paul v. Lankenau Hosp.,*
  569 A.2d 346 (Pa. 1990) .........................................................................................26

*Payne v. Abbott Labs.,*
  999 F. Supp. 1145 (N.D. Ill. 1998) ........................................................................17

*In re Pharmacy Benefit Managers Antitrust Litig.,*
  700 F.3d 109 (3d Cir. 2012) ...................................................................................32

*Prewitt v. Walgreens Co.,*
  No. 5:12-cv-6967, 2013 WL 6284166 (E.D. Pa. Dec. 2, 2013) .............................27

*Provenzano v. Ohio Valley Gen. Hosp.,*
  121 A.3d 1085 (Pa. Super. Ct. 2015) .....................................................................34

*Purjes v. Plausteiner,*
  No. 1:15-cv-2515, 2016 WL 552959 (S.D.N.Y. Feb. 10, 2016) ..............................3

*Reynolds v. Aria Health,*
  No. 2:12-cv-2954, 2013 WL 2392903 (E.D. Pa. May 31, 2013).....................23, 24

*Rhodes v. MacDonald,*
  670 F. Supp. 2d 1363 (M.D. Ga. 2009) ..................................................................37

*Rueda v. Nexeo Sols., LLC,*
  No. 3:14-cv-3801, 2015 WL 1472057 (D.N.J. Mar. 31, 2015) ........................13, 14

*Sanchez v. SunGard Availability Servs. LP,*
  362 F. App'x 283 (3d Cir. 2010) .............................................................................14

*Seldon v. Nat'l R.R. Passenger Corp.,*
  452 F. Supp. 2d 604 (E.D. Pa. 2006) ................................................................14, 18

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Soo San Choi v. D'Appolonia*,
  252 F.R.D. 266 (W.D. Pa. 2008) ...................................................................................10, 11

*Stanley v. City of Pittsburgh*,
  No. 2:15-cv-555, 2016 WL 3920477 (W.D. Pa. July 15, 2016).......................................19, 20

*Thomason v. Norman E. Lehrer, P.C.*,
  182 F.R.D. 121 (D.N.J. 1998)............................................................................................37

*Tracinda Corp. v. DaimlerChrysler AG*,
  362 F. Supp. 2d 487 (D. Del. 2005)......................................................................................8

*Tracinda Corp. v. DaimlerChrysler AG*,
  502 F.3d 212 (3d Cir. 2007)................................................................................................34

*United States v. Vastola*,
  25 F.3d 164 (3d Cir. 1994)..................................................................................................32

*Univ. of Tex. S.W. Med. Ctr. v. Nassar*,
  133 S. Ct. 2517 (2013)........................................................................................................22

*Vehicle Operation Techs. LLC v. Am. Honda Motor Co. Inc.*,
  67 F. Supp. 3d 637 (D. Del. 2014)......................................................................................11

*Velez v. QVC, Inc.*,
  227 F. Supp. 2d 384 (E.D. Pa. 2002) ..................................................................................16

*Villari Brandes & Giannone, PC v. Wells Fargo Fin. Leasing, Inc.*,
  No. 2:13-cv-297, 2013 WL 5468497 (E.D. Pa. Sept. 30, 2013)............................................29

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008)............................................................................................................28

*Weaver v. Harpster*,
  975 A.2d 555 (Pa. 2009)......................................................................................................26

*Westawski v. Merck & Co.*,
  No. 2:14-cv-3239, 2015 WL 463949 (E.D. Pa. Feb. 4, 2015)..............................................30

**Statute**

42 U.S.C. § 1981............................................................................................................ *passim*

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Constitutional Provisions**

Pa. Const. art. I § 7......................................................................................27

U.S. Const. amend. I ...............................................................................6, 27

**Other Authorities**

Fed. R. Civ. P. 11 ................................................................................ *passim*

Fed. R. Civ. P. 11(b)(1)...........................................................................10, 36

Fed. R. Civ. P. 11(b)(2)......................................................................10, 12, 36

Fed. R. Civ. P. 11(c)(2)................................................................................11

Fed. R. Civ. P. 11(c)(4)................................................................................11

Fed. R. Evid. 408 .........................................................................................9

Restatement (Second) of Conflict of Laws § 187 .......................................25

## INTRODUCTION

Plaintiff David Magerman voluntarily dismissed this frivolous lawsuit against Defendant Robert Mercer on the last day of his safe harbor period after having been served with a Rule 11 sanctions motion.  He and his counsel realized their lawsuit alleging wrongful termination was fatally flawed because Mercer was not his employer—Renaissance Technologies LLC ("Renaissance") was—and he was required under his employment agreement to arbitrate such claims in any event.  Now, in a transparent attempt to generate self-serving publicity, again disparage Mercer, and exert pressure on Renaissance (of which Mercer is a principal) to settle with Magerman after he walked away from settlement discussions, Plaintiff has desperately refiled his Complaint against Mercer without addressing any of the fatal flaws in his prior filing. Indeed, if anything, Magerman's second bite at the apple is even more sanctionable than his original Complaint.  Tellingly, after again being served with a Rule 11 motion, his original counsel withdrew.  But replacement counsel has taken up the mantle.  Hence, he and his new counsel should now be sanctioned over their frivolous, vexatious litigation conduct.

This is a purported employment retaliation case that is not even brought against the Plaintiff's employer and contractually required to be arbitrated in any event. Its true motivation, in Plaintiff David Magerman's own words, is to extend his "15 minutes" of fame by publicly maligning Defendant Robert Mercer, a senior executive at Magerman's former firm, over Mercer's "political activities and the causes he supports."  Compl. ¶¶ 67, 75.[1]  Magerman's personal vendetta against Mercer for his support of President Trump, however, has no place in

---

[1]  *See* Declaration of Jason C. Schwartz ("Schwartz Decl.") Ex. A (David M. Magerman, *When a Hedge Fund Billionaire 'Buys' Democracy: Magerman on Mercer*, philly.com (Mar. 1, 2017), http://www.philly.com/philly/blogs/inq-phillydeals/Billionaires_and_Democracy_Magerman_Mercer_Renaissance_Trump_Bannon_Conway.html) at 2.  Magerman authored this op-ed and incorporates it by reference in his Complaint. *See* Compl. ¶ 68; *see, e.g.*, *Mosley v. Del. River Port Auth.*, No. 1:99-cv-4147, 2000 WL 1534743, at *5 (D.N.J. Aug. 7, 2000) ("A complaint . . . incorporates . . . any documents which are attached to it or upon which it relies, even if the plaintiff has not chosen [to attach] those documents.").

this Court.  He is already arbitrating against his former employer, Renaissance, as he is contractually obligated to do.  Indeed, he filed an amended arbitration demand that follows this Complaint nearly verbatim.  His contrived claims against Mercer, while frivolous and vexatious, have to be litigated there, if anywhere, and Magerman knew it, but—for the second time—he filed this publicity-seeking federal lawsuit anyway.  And for that and all of the other reasons explained here, his lawsuit fails to satisfy even the most basic standards of Rule 11.

The "facts" upon which this Complaint purports to be based are fictitious slander, but even assuming them *arguendo* for purposes of this motion, neither of Magerman's two causes of action has any credible foundation in law, and the re-filing of this lawsuit was plainly for improper motives.  The first cause of action, for retaliation in violation of Section 1981, fails because, among other reasons, Magerman never alleges that Mercer engaged in—or that Magerman ever complained about—race discrimination in contracting, which is a basic prerequisite for a Section 1981 violation.  In a failed attempt to address this fatal deficiency, Magerman alleges that he "intended to convey" that Mercer's political views might lead minorities to self-select out from pursuing job opportunities at Renaissance.  But even if Magerman had *actually* conveyed these sentiments (instead of simply "intend[ing] to convey" them) and even if he was correct that minority candidates chose not to pursue jobs with Renaissance because one of its leaders supported President Trump (while the founder supported Hillary Clinton), this still would not state a claim under Section 1981.  The second cause of action, for wrongful discharge in violation of Pennsylvania public policy, likewise remains fatally deficient because the public policy theory on which Magerman relies has been roundly rejected by the courts.  Magerman's efforts to remedy that deficiency in this second incarnation of the suit still fail to articulate anything close to a cognizable claim: under controlling

Pennsylvania Supreme Court and Third Circuit precedent, neither the National Labor Relations Act nor unspecified supposed contractual obligations with out-of-state clients qualifies as the public policy of the Commonwealth of Pennsylvania.  Moreover, Magerman brought this suit in blatant violation of his contractual duty to arbitrate these claims—a duty set forth in the employment agreement Magerman himself attached to his Complaint.  Indeed, he has already effectively acknowledged just that: contemporaneous with the filing of the first improper Complaint, he initiated a JAMS arbitration against his former employer, Renaissance, containing virtually identical allegations.  After walking away from settlement negotiations with the company, he filed this second Complaint and amended the JAMS arbitration demand in tandem with it.[2]  The only conceivable purpose for these mirror-image Complaints, which are subject to the same arbitration provision, is to publicly defame Mercer and to embarrass Renaissance.  The Court should not countenance such procedural gamesmanship and abuse of court process.

## FACTUAL AND PROCEDURAL BACKGROUND

What follows is a recitation of the factual allegations made in this Complaint.  To be crystal clear from the outset, the core of those allegations is false in all material respects, especially in alleging that Mercer made any of the offensive statements falsely attributed to him.  In reality, in the unlikely event that this case is not immediately dismissed, the evidence will show that Mercer never made any such offensive statements.  Nevertheless, in making this motion, it is necessary to repeat the false allegations in this Complaint and then explain why, even as alleged, this Complaint is sanctionable.

---

[2]  The various filings, together with demonstrative redlines, are attached as exhibits to the Schwartz Declaration as follows:  Exhibit B is a comparison of the May court Complaint with the August court Complaint.  Exhibit C is the May JAMS demand, and Exhibit D is a redline of that document against the May court Complaint.  Exhibit E is the August arbitration demand, and Exhibit F compares that document to the present court Complaint.  The Court can properly take judicial notice of these materials and consider them.  *See, e.g.*, *Purjes v. Plausteiner*, No. 1:15-cv-2515, 2016 WL 552959, at *4 (S.D.N.Y. Feb. 10, 2016) (citing cases allowing judicial notice of arbitration filings at motion to dismiss stage).

Plaintiff David Magerman is a former research scientist for Renaissance Technologies LLC, a highly successful New York-based investment management company.  Compl. ¶ 6.  He is a Democrat who vehemently opposes President Donald Trump and his supporters.  *Id.* ¶¶ 34, 60; Compl. Ex. D at 1, 3-4; Compl. Ex. F (Dkt. 1-1) at 5.  Magerman apparently considers President Trump—and by association, his supporters—to be racist.  *See* Compl. ¶¶ 28, 39, 41.

Defendant Robert Mercer is co-Chief Executive Officer of Renaissance.  Compl. ¶ 8.  He is a supporter of conservative causes and candidates, including then-candidate Donald Trump's 2016 campaign for the presidency.  *Id.* ¶ 27.[3]

Beginning in January 2017, Magerman engaged in a concerted scheme to gain publicity for his political views by disparaging Mercer over his support of President Trump.  *See* Compl. ¶ 33.  Magerman knew that by attacking Mercer—a world-renowned, influential businessman— Magerman could gain access to a wider platform to share his opinion than would otherwise be available to him.  *See id.* ¶¶ 27, 29, 31, 60, 68.

To that end, on January 16, 2017, Magerman called Mercer.  Compl. ¶ 33.  According to the Complaint, Magerman criticized Mercer's support of President-elect Trump, and they discussed a range of policy matters.  *Id.* ¶¶ 34-38.  Afterwards, Magerman bad-mouthed Mercer to other Renaissance employees, including Peter Brown, Renaissance's co-Chief Executive Officer, claiming falsely that Mercer had "made a series of racist comments."  *Id.*. ¶¶ 35-36, 39.  Magerman claims he told Brown that he "belie[ved] that Mercer's public political views and

---

[3] Renaissance employs individuals who hold diverse political views and freely express those views publicly, including through contributing substantial financial support to preferred causes.  Historically, some of its leaders "have leaned Democratic," including its founder and chairman, James Simons, who is a leading contributor to Democratic Party candidates and causes.  Compl. Ex. D at 2; Compl. Ex. F (Dkt. 1-1) at 9.  Indeed, Magerman himself expressly made this point to rebut online allegations that the company was involved in attacks on Hillary Clinton.  *See* Schwartz Decl. Ex. G (@DavidMagerman, Twitter (May 18, 2017, 4:33 AM), https://twitter.com/DavidMagerman/status/865168438146236417 ("Not sure why you are hanging this on RenTech.  It was founded by Jim Simons, who gave $25m to get Hillary elected.")).

association with alt-right groups were damaging to the image and reputation of Renaissance, by which Magerman" claims that, in his own mind, he "*intended* to convey, *inter alia*, that Mercer's publicly-stated views prevented the company from hiring a more diverse workforce of Highly-Compensated Employees." *Id.* ¶ 39 (first emphasis added).  Magerman also claims that he "advised Brown that he was concerned that Mercer's embrace of right wing causes and candidates was bad for Renaissance and could damage the company's standing with investors and prospective employees who would not want to be associated with Mercer's ideology." *Id.* ¶ 41.

Magerman also alleges that during his tenure as "a hiring manager for highly-compensated managerial and technical positions . . . from approximately 1997 to 2006" (eleven years ago), he "participated in the hiring of people for around 20-30 positions," and "[t]o the best of his recollection, none of the candidates presented to [him] to be interviewed that were eventually hired were African American."  Compl. ¶¶ 19-21.  Magerman alleges based on his "genera[l] familiar[ity] with the workforce at Renaissance's East Setauket office"—an office in which he did not work—that "there were never any African American employees working as Highly-Compensated Employees" during his employment at Renaissance.  *Id.* ¶¶ 23-25.  Magerman further claims that "Mercer has decision-making control over Renaissance hiring practices and the hiring of Highly Compensated Employees," that "Mercer's political views affect the culture at Renaissance," and that "[t]he failure of Renaissance to hire African Americans to managerial and technical positions as Highly Compensated Employees is, on belief, the result of the effect of Mercer's political views on the culture of Renaissance."  *Id.* ¶¶ 76-78.

Magerman also disparaged Mercer in the press.  *See* Compl. ¶ 60.  Magerman claims he

did so because he was "alarmed by his boss's personal views and backing of policies and

statements Magerman found to be divisive and harmful to the poor and minorities," and he "felt

obligated to speak out against Mercer's support for racist policies and the implication that

Magerman and other Renaissance employees shared those views."  *Id*. ¶¶ 49, 51.  He adds that he

was supposedly motivated by his "concer[n] that Renaissance did not employ any African

Americans as Highly-Compensated Employees as a result of which he was denied the

opportunity to work with and associate with highly-compensated African Americans and other

minorities in managerial and technical positions who could be advantageous to Magerman in his

future business dealings."  *Id.* ¶ 50.  On February 23, 2017, the *Wall Street Journal* published an

interview with Magerman, in which he maligned Mercer and his daughter, Rebekah Mercer, for

exercising their First Amendment rights of political speech in supporting President Trump.  *id.*

¶¶ 60, 65; *see also* Compl. Ex. D.  In this interview, Magerman claimed that Mercer was

"harming the country" by supporting President Trump and said that Mercer "ha[d] to stop."

Compl. Ex. D at 2.

Magerman was suspended from his employment at Renaissance on February 24, 2017.

Compl. ¶ 66.  He claims that during his suspension he spoke to co-Chief Executive Officer

Brown and told him that "Mercer's public political views and association with the alt-right were

harmful to the image and reputation of Renaissance, by which Magerman" supposedly—and in

his own mind—"*intended* to convey, *inter alia*, that Mercer's publicly-stated views and activities

prevented the company from hiring a more diverse workforce of Highly-Compensated

Employees."  *Id.* ¶ 70 (first emphasis added).  Magerman also alleges that he "advised his

immediate supervisors at Renaissance, Jim Her[r]nstein and Stephen Della Pietra, that public

awareness of Mercer's views, combined with the lack of minorities in the company would damage Renaissance from an EEO perspective." *Id.* ¶ 71.  Magerman alleges "[u]pon information and belief" that Herrnstein "and Della Pietra reported their conversations with Magerman to senior management at Renaissance and that this information was conveyed to Mercer." *Id.*

On March 1, 2017, seeking to capitalize on the increased attention generated by his attack on Mercer before his "15 minutes" of fame were up, Magerman published an opinion piece in the *Philadelphia Inquirer*'s online blog falsely accusing Mercer of "effectively buying shares" in the Presidency and "pa[ying] for th[e] seats" of certain White House appointees.  Schwartz Decl. Ex. A at 2-3; *see also* Compl. ¶ 68; Compl. Ex. F (Dkt. 1-1) at 5.

On April 20, 2017, Magerman again tried to gain attention for himself and stir up controversy when he drove three hours to attend a charity poker tournament in New York sponsored by Renaissance's founder, James Simons—an event Magerman knew would be attended by many of the senior-most people in the financial services industry (including Mercer), as well as other current and former Renaissance employees.  *See* Compl. ¶ 73; Compl. Ex. E at 1-2.  After consuming several glasses of scotch, Magerman intentionally sought out Mercer's daughter, Rebekah, and "hover[ed] nearby" while she played poker.  Compl. Ex. E at 2.  A verbal altercation, witnessed by several attendees, ensued, during which Magerman "told [Ms. Mercer] he felt bad" about his criticism of her family, "adding that her family had played a supportive role when he joined Renaissance more than two decades ago." *Id.* at 3.  By Magerman's own admission, he "was a little impacted by . . . alcohol" during this incident, and it

"wasn't one of [his] finest moments."  *Id.*[4]  Security escorted Magerman out of the event.  *Id.*

Magerman alleges that Renaissance terminated his employment shortly thereafter, on or about April 29, 2017.  Compl. ¶ 75.  He concedes that he was an at-will employee whose employment could "be terminated at any time" by Renaissance "for any reason or no reason at all, with or without cause or notice."  *Id.* ¶ 89; Compl. Ex. A ¶ 2.  Magerman also concedes that his employment was governed by an employment agreement requiring that "any disputes arising out of or relating to . . . [his] employment with [Renaissance] . . . shall be settled by binding arbitration."  Compl. ¶ 9; Compl. Ex. A ¶ 21 (emphasis added).  That agreement also prohibits disparagement of Renaissance and any of its employees.  Compl. ¶ 10; Compl. Ex. A ¶ 12.  Magerman further acknowledges that Renaissance's employee handbook contains a similar nondisparagement prohibition.  *See* Compl. ¶¶ 11-12.

On May 5, 2017, Magerman filed his original federal lawsuit against Mercer, alleging that his termination constituted unlawful retaliation in violation of his civil rights under 42 U.S.C. § 1981 and wrongful discharge in violation of public policy under Pennsylvania law. Compl., No. 2:17-cv-2083 (May 5, 2017), ECF No. 1; *see also* Schwartz Decl. Ex. B.  At the same time, on or about May 9, 2017, Magerman submitted a Notice of Claim and Demand for Arbitration to JAMS, asserting virtually identical claims against Renaissance.  *See* Schwartz Decl. Exs. C, D.  On June 6, 2017, in accordance with Rule 11, Mercer's counsel served a Motion for Sanctions and accompanying papers on Magerman's counsel and demanded withdrawal of that frivolous Complaint.  Magerman dismissed the suit on the last day of the safe

---

[4]  Not only is this article attached to the Complaint and therefore incorporated by reference, *see Mosley*, 2000 WL 1534743, at *5, but Magerman's statements quoted herein constitute party admissions excluded from hearsay, *see Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 495 (D. Del. 2005) (finding that executive "adopted the statements he made during the interview that were printed in [a newspaper] article," and "[a]s such, those statements are not hearsay, but are admissions of a party opponent under [Federal Rule of Evidence] 801(d)(2)(B)").

harbor period, which had been extended at Magerman's request until July 5, 2017. *See* Schwartz Decl. Ex. H (Notice of Dismissal, No. 2:17-cv-2083 (July 5, 2017), ECF No. 8).

Magerman then proceeded to engage in settlement discussions with Renaissance. However, those negotiations broke down in early August.[5]  On August 3, Magerman renewed his public vendetta by filing this revised Complaint, and concurrently filed a matching amended arbitration demand against Renaissance. *See* Schwartz Decl. Exs. E, F; Schwartz Decl. Ex. G (@DavidMagerman, Twitter (Aug. 4, 2017, 4:21 AM), https://twitter.com/DavidMagerman/status/893431766022844416 ("Tried to negotiate settlement with #RenTech + ground rules for future engagement. Talks failed. Refiled lawsuit against #Mercer yesterday.")).

On August 14, 2017, Mercer's counsel again served a Motion for Sanctions and accompanying papers on Magerman's counsel, pursuant to Rule 11's safe harbor provision.  On August 31, 2017, Magerman's counsel at Cozen O'Connor P.C. advised undersigned counsel that they would be withdrawing and that William Harvey and Rona Rosen of Klehr Harrison Harvey Branzburg LLP would be representing Magerman in this matter. *See* Schwartz Decl. Ex. I; *see also* ECF Nos. 4-5 (appearances by new counsel), 6-7 (withdrawals by prior counsel). New counsel requested a "short extension of the safe harbor period until September 8," "in order to meaningfully evaluate the Rule 11 Motion." *See* Schwartz Decl. Ex. I.  Mercer assented to an extension through 5:00 p.m. on the requested day. *See id*.  Accordingly, the safe harbor period has been satisfied as to new counsel, who have made the determination to stand by the

---

[5]  Inclusion of that fact in this motion does not implicate Federal Rule of Evidence 408, because it is not introduced to "prove or disprove the validity or amount of a disputed claim."  Instead, it demonstrates Magerman's bad faith and improper motives in filing this Complaint. *See, e.g.*, *Giganti v. Gen-X Strategies, Inc.*, 222 F.R.D. 299, 313 (E.D. Va. 2004) (citing cases "consider[ing] settlement documents when reviewing a motion for sanctions" and finding no Rule 408 barrier).

Complaint, and are thus accountable for it.[6]  *Cf. DiPaolo v. Moran*, 407 F.3d 140, 145 (3d Cir. 2005) (holding that safe harbor defense can be waived).  Magerman failed to dismiss his Complaint within the extended safe harbor period, necessitating this filing.

## LEGAL STANDARD

"[T]he central purpose of Rule 11 is to deter baseless filings in district court."  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).  Accordingly, the rule prohibits both legal claims that are not "warranted by existing law," Fed. R. Civ. P. 11(b)(2), and filings made "for any improper purpose, such as to harass," Fed. R. Civ. P. 11(b)(1); *see Soo San Choi v. D'Appolonia*, 252 F.R.D. 266, 271 (W.D. Pa. 2008) ("The clear purpose of [Rule 11] is to discourage the filing of frivolous, unsupported, or unreasonable lawsuits.") (awarding sanctions in Section 1981 discrimination case with inadequate factual support).

A legal claim is sanctionable if it is not "based on a plausible view of the law," Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment, meaning that it must be "reasonabl[e] under the circumstances."  *Napier v. Thirty or More Unidentified Fed. Agents, Emps. or Officers*, 855 F.2d 1080, 1090 (3d Cir. 1988) (internal quotation marks omitted).

The filing of implausible legal claims may serve as evidence of an improper purpose.  *See Lal v. Borough of Kennett Square*, 935 F. Supp. 570, 577 (E.D. Pa. 1996) (finding suit had an improper purpose when "all of the claims in the original and amended complaints are barred by obvious and well-settled defenses"), *aff'd*, 124 F.3d 187 (3d Cir. 1997).  Of course, a plaintiff's own admissions may also reveal improper motives.  *See Morris v. Orman*, No. 87-cv-5149, 1992 WL 398363, at *6-7 (E.D. Pa. Dec. 31, 1992) (finding evidence of improper motive where

---

[6]  Recognizing the infirmities in their filing, at 4:30 pm new counsel made a hollow eleventh-hour offer to dismiss their Section 1981 claim (for a second time) *without prejudice*.  Dismissal without prejudice is no answer to the substantively frivolous nature of the Section 1981 claim.  Nor, of course, does it resolve Magerman's equally frivolous wrongful-discharge claim or his blatant failure to abide by his agreement to arbitrate.

"plaintiff was, by his own admission, bent on getting back at the people involved in his prosecution," and threatened to add co-defendants to the litigation "to hurt political chances of Republicans").

"Once a court determines that Rule 11 has been violated, it retains broad discretion in determining appropriate sanctions," *Soo San Choi*, 252 F.R.D. at 274, that "suffic[e] to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Its arsenal of available tools includes dismissal with prejudice, *see, e.g.*, *Vehicle Operation Techs. LLC v. Am. Honda Motor Co. Inc.*, 67 F. Supp. 3d 637, 656 (D. Del. 2014), as well as "reasonable expenses, including attorney's fees, incurred for the [sanctions] motion." Fed. R. Civ. P. 11(c)(2).

## ARGUMENT

This Complaint is utterly incompatible with Rule 11's requirements. Magerman's claims lack any reasonable basis in law. First, his Section 1981 retaliation claim fails because, among other reasons, Magerman does not allege that Mercer engaged in, or that he (Magerman) complained about, race discrimination in contracting, or even that he believed such discrimination had occurred, all of which is required to establish a Section 1981 violation. Magerman's attempt to solve these problems by saying he "intended to" make such a complaint is patently insufficient. Second, Magerman's claim for wrongful discharge in violation of Pennsylvania public policy similarly fails because he does not actually allege facts that support a public-policy theory accepted by Pennsylvania courts. His vaguely framed invocation of the National Labor Relations Act fails because a federal statute cannot provide the basis for a violation of Pennsylvania public policy. Third, Magerman brought this lawsuit in blatant violation of his employment agreement's arbitration clause. Finally, Magerman filed this

11

Complaint for the improper purposes of harassing Mercer for his political views, embarrassing Renaissance, and generating attention for Magerman's own personal and political gain.  This misconduct warrants Rule 11 sanctions.

I.      **Sanctions Are Warranted Under Rule 11(b)(2) Because There Is No Reasonable Basis In Law For Magerman's Claims.**

A.      **Magerman's Retaliation Claim Cannot Succeed Under Section 1981.**

Magerman's Section 1981 retaliation claim fails as a matter of law because he has not plausibly alleged that Mercer retaliated against him for reporting racial discrimination in the making and enforcement of contracts.  Because a reasonable inquiry into the facts and law prior to filing the Complaint would have revealed this deficiency, sanctions are warranted.

Section 1981 prohibits racial discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981(a).  Typically, "to state a claim for discrimination under § 1981, a plaintiff must allege facts in support of the following elements: (1) that plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts."  *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (internal quotation marks, brackets, and ellipsis omitted).

Section 1981 also provides a cause of action for retaliation against an individual who reports racial discrimination in violation of Section 1981, even if he is not the target of direct discrimination.  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010) (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452 (2008)).  To state such a claim, a plaintiff must plead facts showing that (1) "he engaged in protected activity" by opposing "an underlying section 1981 violation" while "act[ing] under a good faith, reasonable belief that a violation existed"; (2) "his employer took an adverse employment action against him"; and

(3) "there was a causal connection between his participation in the protected activity and the adverse employment action." *Castleberry v. STI Group*, 863 F.3d 259, 267 (3d Cir. 2017) (internal quotation marks and citations omitted); *see also Oliva*, 604 F.3d at 798; *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015); *Rueda v. Nexeo Sols., LLC*, No. 3:14-cv-3801, 2015 WL 1472057, at *2 (D.N.J. Mar. 31, 2015). Magerman's claim is foreclosed by law and worthy of sanctions because he does not and cannot plausibly allege facts supporting any of the elements of a Section 1981 retaliation claim.

**1.      Magerman Fails To Plausibly Allege That He Engaged In Protected Activity By Opposing An Underlying Section 1981 Violation.**

First, Magerman has not plausibly alleged that Mercer discriminated against anyone based on race in the making and enforcement of contracts in violation of Section 1981. Because "an underlying section 1981 violation" is required to establish retaliation, *Oliva*, 604 F.3d at 798, Magerman necessarily also has not plausibly alleged that he engaged in activity that is protected under Section 1981. Furthermore, even if he had plausibly alleged an underlying Section 1981 violation, Magerman nevertheless has not plausibly alleged that he reported any purported violation to his employer with sufficient specificity to qualify as protected activity, or that at the time he reasonably believed that such a violation had occurred. As a result, Magerman's retaliation claim must fail.

To plead that he has engaged in "protected activity," a retaliation plaintiff must plausibly allege that he complained about race discrimination in the making and enforcement of contracts in violation of Section 1981. *Gist v. Burlington Coat Factory Warehouse Corp.*, No. 1:13-cv-1094, 2014 WL 4105015, at *4 (D.N.J. Aug. 19, 2014) ("For a complaint to amount to protected activity, it must implicate an employment practice made illegal by § 1981." (internal quotation marks and alterations omitted)); *see also Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210

F. Supp. 3d 744, 753 (W.D. Pa. Sept. 28, 2016) (citing *CBOCS W.*, 553 U.S. at 452) ("The underpinning of a § 1981 retaliation claim is that an individual was punished for opposing conduct that violates § 1981, whether that individual, or some third party, was the victim of the § 1981 violation.").  Significantly, in the Third Circuit, a retaliation plaintiff must plausibly allege "that there ha[s] been an underlying section 1981 violation" in order to plead that he engaged in activity protected by the statute.  *Castleberry*, 863 F.3d at 267 (quoting *Oliva*, 604 F.3d at 798); *see also Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 753 (E.D. Pa. 2014); *Rueda*, 2015 WL 1472057, at *2 (granting motion to dismiss retaliation claim because the plaintiff "fail[ed] to allege facts to support the requirement of an underlying § 1981 violation").  He must also plausibly allege that he "acted under a good faith, reasonable belief that a violation existed" when he made his complaint.  *Castleberry*, 863 F.3d at 267 (quoting *Daniels*, 776 F.3d at 193).

 "Protected activity may consist of . . . 'informal protests of discriminatory employment practices, including making complaints to management.'"  *McGhee v. Thomas Jefferson Univ. Hosp.*, No. 2:12-cv-2919, 2013 WL 4663541, at *4 (E.D. Pa. Aug. 29, 2013) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).  However, "[c]omplaints must be specific enough to notify the employer of the particular type of discrimination being opposed, and allow the employer to discern that the employee opposes an unlawful practice."  *Caplan*, 210 F. Supp. 3d at 754 (citing *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010)); *see also Barber*, 68 F.3d at 702; *Seldon v. Nat'l R.R. Passenger Corp.*, 452 F. Supp. 2d 604, 610 (E.D. Pa. 2006).  "Complaints about 'unfair treatment in general' or expressions of 'dissatisfaction . . .' that do not specifically complain of discrimination are not protected activity."  *Seldon*, 452 F. Supp. 2d at 610 (quoting *Barber*, 68 F.3d at 701-02).

The factual allegations presented by Magerman simply do not support a finding of protected activity:  He has made no allegations that he reported conduct by Mercer that racially discriminated against anyone in the making or enforcement of contracts, or even that he reasonably believed as much.  Rather, Magerman alleges that during a telephone conversation on January 16, 2017, Mercer expressed support for some of the Trump administration's policy positions and made supposedly "racist comments" relating to the adoption of the Civil Rights Act and whether racism continues to be a problem in the United States.  Compl. ¶¶ 35, 82. Magerman further asserts "[u]pon information and belief" that "Mercer created a pattern and practice of racial discrimination in the hiring of African Americans at Renaissance, as evidenced by the [purported] complete exclusion of African Americans in positions as Highly Compensated Employees."  *Id.* ¶ 80.  Magerman includes no information as to *how* Mercer purportedly created such a pattern and practice, other than to say that "Mercer's public political views, association with the alt-right, and racist comments deterred potential qualified African Americans from applying for positions as Highly Compensated Employees at Renaissance."  *Id.* ¶ 81.[7]

Notably absent from the Complaint are any allegations that Mercer or anyone else intentionally discriminated based on race against any individual with respect to that individual's employment at Renaissance (or otherwise), including by actually preventing any individual from obtaining a position at Renaissance, or that Mercer intentionally interfered based on race with any individual's ability to make and enforce contracts, as required to state a claim for direct discrimination under Section 1981.  *See Brown*, 250 F.3d at 797.  Rather, Magerman odiously accuses Mercer of racial discrimination based solely on his support for conservative candidates

---

[7]   As a factual matter, this claim is entirely implausible, particularly given that Renaissance's founder and chairman, James Simons, is a leading contributor to Democratic Party candidates and causes, and Renaissance's leadership historically "leans left."  Compl. Ex. D at 2; Compl. Ex. F (Dkt. 1-2) at 35.

and causes, without any evidence that Mercer either intended to or did exclude any African Americans from Renaissance.  Magerman's outrageous smear by political association theory proceeds as follows:  (1) President Trump was "widely attacked in the media as being racist" for various acts and omissions, including failing to renounce support by certain extremist individuals, Compl. ¶ 28; (2) Mercer supported President Trump's campaign and other conservative political causes, *id.* ¶¶ 27, 29; (3) Mercer is therefore a racist, *id.* ¶¶ 35, 51; (4) Mercer is a leader of Renaissance, *id.* ¶ 8; and (5) qualified minority candidates would therefore conclude that Renaissance is a racially discriminatory employer and would not apply for jobs there, *id.* ¶ 81.

Moreover, even assuming that Mercer's alleged comments to Magerman were "racist," "[s]tray remarks in the workplace"—unconnected to any challenged employment decision or alleged interference with the making or enforcement of contracts—are not actionable under Section 1981.  *See Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 406-07 (E.D. Pa. 2002) (internal quotation marks omitted) (finding that isolated comments by decisionmakers and non-decisionmakers did not constitute direct evidence of discrimination); *Davis v. Am. Soc'y of Civ. Eng'rs*, 330 F. Supp. 2d 647, 657 (E.D. Va. 2004) ("[P]assing racial remarks do not trigger § 1981 sanctions."), *aff'd*, 123 F. App'x 139 (4th Cir. 2005).[8]  Furthermore, Section 1981 does not extend its reach so far as to protect statements about another individual's alleged personal or political views.  *Glantz v. Auto. Serv. Ass'n of Pa., Inc.*, No. 1:91-cv-5630, 1991 WL 270017, at *1 (E.D. Pa. Dec. 11, 1991).  In addition, allegations that there are few, or even no, African Americans in high-level positions—without any evidence of "intentional, purposeful

---

[8]   These alleged comments also are not sufficiently "severe or pervasive" to support a claim of a hostile work environment.  *Cf. Castleberry*, 863 F.3d at 267 (finding that a supervisor's use of a racially charged slur in front of plaintiffs and their non-African-American coworkers, accompanied by threats of termination (which ultimately occurred) was sufficiently severe to create a hostile work environment).

discrimination"—do not suffice to state a claim for Section 1981 liability.  *See Payne v. Abbott Labs.*, 999 F. Supp. 1145, 1153 (N.D. Ill. 1998) (dismissing Section 1981 claim where plaintiffs relied exclusively on reports indicating small percentage of African American employees in higher-level positions).

Thus, Magerman is simply incorrect when he asserts that he "engaged in protected activity" by reporting Mercer's alleged "racist comments" to Brown and "criticiz[ing] what he believes are hateful statements and policies from President Trump and Mercer's support thereof," without any allegation of underlying interference with anyone's right to contract based on race.  *See* Compl. ¶¶ 35, 82.  Furthermore, his claim that this amounts to protected activity is a legal conclusion that should not be afforded the presumption of truth.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Magerman's vague alleged concern regarding the purported lack of African Americans in upper-level management at Renaissance also cannot plausibly be read to allege racial discrimination in hiring or promotion.  *See Payne*, 999 F. Supp. at 1153.  However, even assuming that it could, Magerman does not allege that he reported this alleged concern to anyone at Renaissance.  In fact he admits in this second incarnation of his Complaint that at most he supposedly "*intended* to convey" concern about how Mercer's publicly known political views might be perceived by or have an impact on the pool of prospective Renaissance employees.  *See* Compl. ¶¶ 39, 41, 70, 71 (emphasis added).  That is, of course, an admission that he did not *actually* convey anything of the sort.  And "intending" is not sufficient.

The case law is crystal clear that the plaintiff's "subjective state of mind is . . . irrelevant for purposes of determining whether [h]e engaged in protected conduct."  *Curay-Cramer v.*

*Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006).  Thus it makes no difference what Magerman "intended to" convey, because "[i]t is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative." *Id.* (granting motion to dismiss in Title VII case); *see also Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006) ("To determine if retaliation plaintiffs sufficiently opposed discrimination, we look to the *message being conveyed.*" (internal quotation marks omitted; emphasis added)); *Cacciola v. Work N Gear*, 23 F. Supp. 3d 518, 533 (E.D. Pa. 2014) (Title VII and Pennsylvania Human Rights Act case holding that "an employee's intent in what she was conveying is irrelevant" in determining if activity was protected).  Or, in the words of this Court, "it is the substance of the *objective communication* to the employer that defines the 'protected activity' and remains the hallmark of a retaliation claim." *Degidio v. Centro Props., LLC*, No. 2:11-cv-1353, 2013 WL 440131, at *6 (E.D. Pa. Feb. 4, 2013) (Jones, J.).

Accordingly, Magerman has not plausibly alleged that he notified Renaissance of the particular type of discrimination he purportedly opposed in a manner that would have allowed Renaissance to discern that he was opposing an alleged unlawful practice.  *Seldon*, 452 F. Supp. 2d at 610 (granting motion to dismiss Section 1981 retaliation claim because plaintiff did not allege "that she ever complained of discrimination" to her employer).

Because Magerman has not alleged *any* grounds—let alone reasonable grounds—to believe that Mercer violated any person's Section 1981 rights to make and enforce contracts, or that Magerman complained about any such violation, Magerman cannot demonstrate that he engaged in any protected activity, his claim of retaliation must fail, and Rule 11 sanctions are warranted.  *See, e.g.*, *Agnello v. Instant Cash Advance Corp.*, No. 1:08-cv-14659, 2009 WL 1702289, at *1 (E.D. Mich. June 16, 2009) (awarding Rule 11 sanctions in Section 1981

retaliation case where plaintiff failed to allege any race discrimination); *Leuallen v. Borough of Paulsboro*, 180 F. Supp. 2d 615, 619 (D.N.J. 2002) (awarding Rule 11 sanctions in Section 1981 discrimination case because "a section 1981 claim requires, at a minimum, a contract and the denial of a racial minority's right to make or enforce such contract"); *Noe v. Interstate Brands Corp.*, 188 F.R.D. 513, 515 (S.D. Ind. 1999) (imposing Rule 11 sanctions in Section 1981 retaliation case where plaintiff "failed to address or plead an essential element of that cause of action—the existence and enforcement of an express or implied contractual right").

### 2. Magerman's Claims That Mercer "Ordered" Or "Directed" Magerman's Suspension And Termination Are Entirely Conclusory And Evidence His Improper Motive.

Moreover, Magerman's baseless assertions that Mercer played any role in the decisions to suspend and terminate Magerman's employment are entirely conclusory, and demonstrate that Magerman's true motivation for bringing this suit is to harass Mercer.

To state a retaliation claim against an individual defendant, a plaintiff must plead that the particular defendant was "personally involved in" the challenged retaliation, and he "intentionally caused" the plaintiff's employer "to infringe on [the plaintiff's] Section 1981 rights, or . . . authorized, directed, or participated in the alleged [retaliatory] conduct." *Al-Khazraji v. St. Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986), *aff'd*, 481 U.S. 604 (1987); *see also Clinkscales v. Children's Hosp. of Phila.*, No. 06-cv-3919, 2009 WL 1259104, at *5 (E.D. Pa. May 7, 2009) (granting individual defendants' motion to dismiss discrimination claims); *Douglas v. Nesbit*, No. 1:16-cv-01836, 2017 WL 1021680, at *6 (M.D. Pa. Mar. 16, 2017) (same); *Stanley v. City of Pittsburgh*, No. 2:15-cv-555, 2016 WL 3920477, at *3 (W.D. Pa. July 15, 2016) (denying in part motion to reconsider dismissal of claims against individual defendants); *Gonzalez v. Comcast Corp.*, No. 1:03-cv-445, 2004 WL 1737693, at *3 (D. Del.

19

July 30, 2004) (granting individual defendant's motion for summary judgment on retaliation claim).

"[P]ersonal liability under Section 1981 must be predicated on the actor's personal involvement and there must therefore be some affirmative link to causally connect the actor with the [retaliatory] action." *Johnson v. Res. for Human Dev., Inc.*, 843 F. Supp. 974, 978 (E.D. Pa. 1994) (granting individual defendants' motion to dismiss).  A retaliation claim cannot succeed where "it is not clear that [an individual defendant] had any meaningful bearing on the ultimate decision" to take an adverse employment action against the plaintiff.  *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 263 (3d Cir. 2017) (affirming summary judgment in favor of individual defendant on plaintiff's Section 1981 claim).

"[V]ague, conclusory allegations" that a defendant "personally engaged in discriminatory conduct through unspecified means"—without any "actual facts describing *how*" the defendant "directed, participated in, or authorized the discriminatory conduct"—"are insufficient to withstand" a motion to dismiss. *Clinkscales*, 2009 WL 1259104, at *5 (emphasis in original). So too are "allegations that provide a 'formulaic recitation of the elements of a cause of action.'" *Stanley*, 2016 WL 3920477, at *3 (quoting *Iqbal*, 556 U.S. at 678) (denying in part motion to reconsider dismissal of individual retaliation claim); see also *Clinkscales*, 2009 WL 1259104, at *5 ("[T]he Court 'need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss.'" (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997))).  Likewise, a complaint that "merely attempt[s] to hold [an individual defendant] personally culpable for [his] agents' alleged acts of misconduct, based solely on [his] supervisory status," without any factual support for his direct participation in discriminatory action, cannot survive at the motion to dismiss stage. *Douglas*, 2017 WL 1021680, at *6.

Here, Magerman's claims that his "suspension was ordered personally by Mercer" (Compl. ¶ 67) and that Magerman was fired "at the direction of Mercer" *(id.* ¶ 75), are merely "legal conclusion[s] dressed as fact." *McGhee*, 2013 WL 4663541, at *6.  Magerman offers no support for these bald assertions.  He has presented no details whatsoever indicating that Mercer actually was personally involved in, or authorized, directed, or participated in, any adverse employment action taken against Magerman.  Rather, he conclusorily claims "it is inconceivable to [him] that Mercer did not personally direct that [Magerman] be fired," "[b]ased on Mercer's role in the company."  Compl. ¶ 83.  Because Magerman has not offered any factual allegations that would support an affirmative link connecting Mercer with Magerman's suspension or termination, his retaliation claim cannot succeed. *See Clinkscales*, 2009 WL 1259104, at *5; *Johnson*, 843 F. Supp. at 978.

Furthermore, it is obvious that Magerman has alleged these baseless "facts" to justify suing Mercer as an individual—rather than Magerman's employer, Renaissance—for his purportedly retaliatory suspension and termination.  Magerman's choice to sue Mercer without any factual evidence of an affirmative link connecting Mercer with Magerman's suspension or termination, demonstrates his improper motive—to harass Mercer and generate publicity for Magerman's own political views. *See supra* Part II.  As a result, Magerman's retaliation claim cannot succeed, and Rule 11 sanctions are warranted. *See, e.g.*, *N. Jersey Secretarial Sch., Inc. v. McKiernan*, 713 F. Supp. 577, 587 (S.D.N.Y. 1989) (awarding Rule 11 sanctions where "a reasonable prefiling inquiry should have precluded [individual defendants'] inclusion in the complaint").

**3.    Magerman Has Not Plausibly Alleged That Any Reporting Of Purported Racial Discrimination Was The "But-For" Cause Of His Suspension Or Termination.**

Magerman's claim is also foreclosed by law because he has not plausibly alleged the required causal connection between any reporting of Mercer's purported racial discrimination and his suspension or termination.

To plead causation for a retaliation claim, a plaintiff must plausibly allege that retaliatory animus was the "but-for" cause of the employer's adverse action.  *Conner v. Ass'n of Flight Attendants-CWA*, No. 2:13-cv-2464, 2014 WL 6973298, at *3 (E.D. Pa. Dec. 10, 2014) (granting motion to dismiss); *see Carvalho-Grevious*, 851 F.3d at 258 (citing *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013)) ("[A] retaliation plaintiff's ultimate burden is to prove that retaliatory animus was the 'but-for' cause of the adverse employment action.") (addressing retaliation claims under Title VII and Section 1981 together).  Although at the prima facie stage a retaliation plaintiff need only "produce evidence sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse employment action," *id.* at 259 (internal quotation marks and brackets omitted; emphasis in original), the Third Circuit has observed that it is "confident that Federal Rule of Civil Procedure 11's certification requirements will deter an attorney from filing a frivolous claim of retaliation when his client is patently unable to meet her ultimate causal burden."  *Id.* (citing *Cooter & Gell*, 496 U.S. at 393).  In any event, to survive a motion to dismiss, a complaint "must demonstrate on its face that it is plausible that [the plaintiff] will be able to prove that 'but for' [the defendant's] retaliatory motive, [the plaintiff] would not have" suffered an adverse employment action.  *Conner*, 2014 WL 6973298, at *3.

A plaintiff can demonstrate a causal connection directly by evidence of retaliatory animus or indirectly through such evidence as: (1) a "close temporal proximity between engaging in the protected activity and the adverse action" that is "*unduly suggestive*" of retaliatory motive; and

(2) "circumstances indicating a pattern of antagonism following the protected conduct."

*McGhee*, 2013 WL 4663541, at *6 (internal quotation marks and citations omitted; emphasis in original) (granting motion to dismiss); *see also Carvalho-Grevious*, 851 F.3d at 260; *Reynolds v. Aria Health*, No. 2:12-cv-2954, 2013 WL 2392903, at *8 (E.D. Pa. May 31, 2013) (granting motion to dismiss); *Duplan v. City of N.Y.*, No. 2:15-cv-4136, 2017 WL 1232473, at *6 (E.D.N.Y. Mar. 30, 2017) (same).  However, these factors are not exclusive, and "'each case must be considered with a careful eye to the specific facts and circumstances encountered.'" *Reynolds*, 2013 WL 2392903, at *8 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)); *see also Carvalho-Grevious*, 851 F.3d at 260.

Here, Magerman's claim fails from the outset because he does not even allege that retaliation for his alleged reporting of purported racial discrimination is the "but-for" cause of his suspension and termination.  Rather, he claims that Mercer retaliated against him for his "criticisms of Mercer's political activities and the causes he supports" (Compl. ¶¶ 67, 75)— activity which is well outside Section 1981.  *Glantz*, 1991 WL 270017, at *1.  Furthermore, Magerman himself puts forth alternative plausible and legitimate reasons for his suspension and termination, including his violation of the nondisparagement clause of his employment agreement (Compl. ¶ 52), and his drunken altercation with Mercer's daughter at a charity event witnessed by numerous Renaissance and industry colleagues, which Magerman admits did not cast him in a positive light.  *Id.* ¶¶ 73-74; Compl. Ex. E at 2-3; *see also infra* Part I(B)(2).  On this basis alone, his claim must fail.  *See Conner*, 2014 WL 6973298, at *5-6 (granting motion to dismiss in Title VII retaliation case where plaintiff failed to allege that retaliation was the but-for cause of her termination and instead alleged a different but-for cause—her employer's discovery of her ethical violations).

Furthermore, even if Magerman had alleged that retaliation for his alleged reporting of purported racial discrimination was the "but-for" cause of his suspension and termination, his Complaint contains no allegations of circumstantial factors that would support such a claim and render it plausible.  For example, the at least three-week gap between when Magerman allegedly reported Mercer's purported "racist comments" to Brown and Magerman's suspension (*see* Compl. ¶¶ 33, 39-41, 82), and the subsequent unspecified interval between his supposed additional complaints during his suspension and his ultimate termination (*see id.* ¶¶ 66, 70-71, 75), are not close enough in time to be "unusually suggestive of retaliatory motive."  *See Carvalho-Grevious*, 851 F.3d at 260 (finding plaintiff's termination a few weeks after she submitted a complaint was not "unusually suggestive of retaliatory motive"); *see also Conner*, 2014 WL 6973298, at *4 (noting that the Third Circuit has found "temporal proximity of two days to be unusually suggestive of causation," whereas "temporal proximity of more than ten days required additional evidence").  Nor has Magerman pleaded any facts indicating a "pattern of antagonism" by Mercer or Renaissance following Magerman's purported protected activity. *See McGhee*, 2013 WL 4663541, at *7 (granting motion to dismiss Section 1981 retaliation claim after finding no pattern of antagonism when plaintiff was disciplined at work for valid reasons after complaining of alleged discrimination).

Thus, Magerman has failed to plausibly allege that retaliation for his alleged reporting of purported racial discrimination was the but-for cause of his termination.  *See Conner*, 2014 WL 6973298, at *5-6 (granting motion to dismiss); *McGhee*, 2013 WL 4663541, at *7 (same); *Reynolds*, 2013 WL 2392903, at *8 (same); *Duplan*, 2017 WL 1232473, at *6 (same).  Because a reasonable pre-filing inquiry into the facts and law would have revealed his inability to meet his

ultimate causal burden, Rule 11 sanctions are warranted.  *See Carvalho-Grevious*, 851 F.3d at 259.

**B.    Magerman's Wrongful Discharge Claim Cannot Succeed Under Pennsylvania Law.**

Sanctions are also warranted for the assertion of the Pennsylvania common law claim, which has numerous glaring and fatal defects.  First, the wrongful discharge claim suffers from a threshold problem:  Magerman agreed that his employment would be "governed by the laws of the State of New York without reference to the conflict or choice of laws provisions thereof." Compl. Ex. A ¶ 20.  A claim brought under *Pennsylvania* state law (*see* Compl. ¶ 98, claiming "Mercer therefore wrongfully discharged Magerman under Pennsylvania law") is thus fatally flawed even were it otherwise viable.  Indeed, Magerman essentially concedes this point in his arbitration against his employer, in which he asserts his wrongful discharge claim under New York law.  Schwartz Decl. Exs. C, E.  Magerman's attempt to evade this choice of law provision is particularly egregious here because New York has rejected the underlying legal theory and has no parallel cause of action:  "It is well settled" in New York "that there is no statutory or common law cause of action in tort for abusive or wrongful discharge of an at will employee," *Hassan v. Marriott Corp.*, 663 N.Y.S.2d 558, 560 (N.Y. App. Div. 1997), and the courts have "expressly" ruled that any public policy exceptions must be specifically created by the state legislature, *Leibowitz v. Bank Leumi Tr. Co. of N.Y.*, 548 N.Y.S.2d 513, 516 (N.Y. App. Div. 1989) (citing *Murphy v. Am. Home Prods. Corp.* 448 N.E.2d 86 (N.Y. 1983)).[9]

The claim also cannot conceivably succeed even under *Pennsylvania* law.  Pennsylvania allows "no right of action against [an] employer for wrongful discharge" of an at-will employee

---

[9]   Pennsylvania courts, which have adopted Restatement (Second) of Conflict of Laws § 187, would honor the agreement's choice of New York law.  *See Miller v. Allstate Ins. Co.*, 763 A.2d 401, 403 (Pa. Super. Ct. 2000)

when (1) "no clear mandate of public policy is violated" by the alleged termination, or (2) "the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship." *Geary v. U.S. Steel Corp.*, 319 A.2d 174, 180 (Pa. 1974). Both bars are present here: Pennsylvania courts have authoritatively and specifically rejected the public policy reasoning presented by Magerman's factual allegations, finding Pennsylvania's freedom-of-speech protections apply only to *state* actors absent one narrow set of circumstances not even alleged here. Federal courts sitting in diversity agree. And the Complaint itself, together with the attached and incorporated documents, readily concedes a "plausible legitimate reason" for termination. Accordingly, even accepting the distorted "facts" as presented in the Complaint, this claim fails as a matter of law.

### 1.     There Is No Public Policy Exception For Wrongful Termination By Private Employers Based On Purported Burdens On Freedom Of Speech.

Pennsylvania courts start with a strong presumption *against* finding the "clear mandate of public policy" required for a right of action. It exists "in only the most limited of circumstances," *Paul v. Lankenau Hosp.*, 569 A.2d 346, 348 (Pa. 1990) (internal quotation marks omitted), and the Pennsylvania Supreme Court has warned that "[o]nly in the clearest of cases may a court make public policy the basis of its decision," *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009). Magerman argues that his termination qualifies because there is a "clear mandate of public policy against forced political speech and conditioning employment on political subordination." Compl. ¶ 93. But nothing he alleges remotely qualifies as "forced political

---

(holding that a contract's "explicit choice of law clause" governs absent exceptions not present here). That rule extends to the tort claims in this case under the "fair import" of the employment agreement: its expansive arbitration (venue) provision explicitly includes "torts" "relating to" the agreement and is adjacent to the choice-of-law provision. *See Lipman Bros. v. Apprise Software, Inc.*, No. 5:13-cv-4439, 2015 WL 4476983, at *2 (E.D. Pa. July 22, 2015) (internal quotation marks omitted) (interpreting similar agreement); Compl. Ex. A ¶¶ 20-21.

speech," and the courts have specifically rejected all other efforts to apply freedom-of-speech protections in the private employee context (including any broader notion of "political subordination").  Because he does not allege a violation of any recognized mandate, the claim fails on its face.

Like its federal counterpart, the Pennsylvania Constitution provides for freedom of speech.  *See* Pa. Const. art. I § 7.  And like the First Amendment to the U.S. Constitution, the Pennsylvania provision only applies to state action, not private employers.  Thus, as this Court recently held, "Pennsylvania courts have declined to find a public policy exception for wrongful termination claims against non-state actors based on Article I of the Pennsylvania Constitution." *Prewitt v. Walgreens Co.*, No. 5:12-cv-6967, 2013 WL 6284166, at *3 & nn.17-18 (E.D. Pa. Dec. 2, 2013) (citing extensive Third Circuit and state Superior Court precedent).  Indeed, the Third Circuit has specifically "rejected" Magerman's position that "the Pennsylvania Constitution [serves as [a] limitatio[n]" on private "employers' discretion to fire at-will employees." *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 112 (3d Cir. 2003).[10]

This well-established law clearly forecloses Magerman's claim here: that his private employer terminated him for his decision to voice disagreement with an executive's political preferences.  Apparently recognizing this fatal defect, the Complaint attempts to invoke an extremely narrow and virtually abandoned holding allowing a cause of action against a private employer for "forced political speech."  *See* Compl. ¶¶ 91, 93.  To be sure, in 1983, the Third Circuit found it improper to "conditio[n] employment upon political subordination" and "coerce

---

[10]  *Fraser* is controlling absent "persuasive evidence of a change in Pennsylvania law."  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 116 n.12 (3d Cir. 2010) (internal quotation marks omitted).  And there is no such evidence.  *See, e.g.*, *Madziva v. Phila. Hous. Auth.*, No. 1215 C.D. 2013, 2014 WL 1891388, at *6 (Pa. Commw. Ct. May 12, 2014) (highlighting "key" distinction between "purely private" actor and "public actor" in evaluating allegations of terminating an at-will employee in "deprivation of a constitutional liberty interest" (internal quotation marks omitted)).

individual employee assistance to the corporate political agenda" by requiring "participat[ion] in [a] lobbying effort." *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 896, 899, 901 n.9 (3d Cir. 1983). But twenty years later, the Third Circuit expressly rejected a "broa[d]" reading of that case, explaining that based on intervening Pennsylvania cases it had "limited *Novosel* to its facts—a firing based on *forced* political speech." *Fraser*, 352 F.3d at 112-13 (emphasis added). In doing so, it foreclosed any possible reliance on a broader construction of *Novosel*'s mention of "political subordination"—which in any event was never relied on by any court.

Magerman makes no allegations that could even generously be called "forced political speech." He complains merely that he was forced to "tacitly support or at least condone" positions he opposes. Compl. ¶ 91. But "forced" or "compelled" speech is when someone is "require[d] . . . to *reproduce* another's speech against [his] will," and is "actually force[d]" to speak. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457 & n.10 (2008) (emphasis added). Compelling participation in a lobbying campaign at the pain of firing, as in *Novosel*, fits that description. In contrast, it is not enough, for example, that the speaker believes "confusion will force [him] to speak to clarify [his] position." *Id.* at 457 n.10. And that is, at most, all Magerman argues.

Moreover, even if a broader "political subordination" theory were legally viable (it is not, as detailed above), the Complaint and its exhibits also directly undercut any argument that "subordination" to one particular political view was a condition of his employment at Renaissance. Compl. ¶ 93. As documented in the *Wall Street Journal* article attached to the Complaint, in the 2016 presidential election, the founder of Renaissance and its current chairman, James Simons, was one of the top Democratic donors, while Mercer was one of the top Republican donors. Compl. Ex. F (Dkt. 1-1) at 9; *see also supra* note 4 (discussing diverse

political views of Renaissance leaders); Schwartz Decl. Ex. G (@DavidMagerman, Twitter (May 18, 2017, 4:33 AM), https://twitter.com/DavidMagerman/status/865168438146236417 (rebutting online allegations claiming company was involved in attacks on Hillary Clinton and writing "Not sure why you are hanging this on RenTech.  It was founded by Jim Simons, who gave $25m to get Hillary elected.")).  When considering a motion to dismiss, courts need not accept as true conclusory allegations like these that are contradicted by materials attached to the complaint.  *Villari Brandes & Giannone, PC v. Wells Fargo Fin. Leasing, Inc.*, No. 2:13-cv-297, 2013 WL 5468497, at *1 n.1 (E.D. Pa. Sept. 30, 2013); *see also Kates v. King*, 487 F. App'x 704, 706 (3d Cir. 2012) (affirming district court Rule 12(b)(6) dismissal of a claim when the plaintiff "attached documents to his complaint contradicting his assertion").

Finally, the inclusion in this Complaint—see Schwartz Decl. Ex. B—of language referencing the National Labor Relations Act ("NLRA") does absolutely nothing to solve these problems.  First, a purported violation of *federal* law cannot serve as the "public policy" for a *Pennsylvania* wrongful-termination claim.  The "Pennsylvania Supreme Court has held that in order for the public policy exception to apply, the alleged violation of public policy must be of Pennsylvania public policy, not solely an alleged violation of federal law."  *Kelly v. Ret. Pension Plan for Certain Home Office*, 73 F. App'x 543, 545 (3d Cir. 2003) (citing *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 289 (Pa. 2000)).  In the words of the Pennsylvania Supreme Court, "[p]ublic policy of the Commonwealth must be just that, the policy of this Commonwealth."  *McLaughlin*, 750 A.2d at 289.  Accordingly, "in order to set forth a claim for wrongful discharge a Plaintiff must do more than show a possible violation of a federal statute."  *Id.*  Instead, he must "allege that some *public* policy of *this* Commonwealth is

implicated, undermined, or violated," as determined by Pennsylvania's state "Constitution, court decisions, and statutes promulgated by its legislature." *Id.* at 288-89.[11]

Moreover, as the state Supreme Court explained, Plaintiff's approach would "essentially allow a plaintiff to reformulate a federal administrative scheme into a state private cause of action," and in the process "overcome the presumption of at-will employment." *McLaughlin*, 750 A.2d at 290 (rejecting public policy claim based on the federal Occupational Safety and Health Act); *see also Westawski v. Merck & Co.*, No. 2:14-cv-3239, 2015 WL 463949, at *10 (E.D. Pa. Feb. 4, 2015) (employing same reasoning as to the federal Sarbanes-Oxley Act).[12]

## 2. The Complaint Itself Admits Plausible And Legitimate Reasons For Terminating Magerman's Employment.

Magerman's claim is also foreclosed for the separate and independent reason that "the complaint itself discloses a plausible and legitimate reason for terminating [his] at-will employment relationship." *Geary*, 319 A.2d at 180; *see Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1182 (Pa. Super. Ct. 1989) ("Even where an important public policy is involved, an employer may discharge an employee if he has separate, plausible reasons for doing so.").

Magerman admits knowingly, intentionally, and willfully violating the nondisparagement clause of his employment agreement and the employee handbook by publicly criticizing Mercer. Magerman plainly admits that he "was aware of alleged restrictions under the Employment

---

[11] Relatedly, to the extent he is attempting to bring an action directly under the NLRA, that would necessarily fail. The NLRA only applies to "concerted activity"—that is, when the employee has an "intent to induce or effect group action in furtherance of group interests." *MCPC Inc. v. N.L.R.B.*, 813 F.3d 475, 484, 486 (3d Cir. 2016). Magerman makes no such suggestion. Further, the NLRA is a "comprehensive" scheme for the disposition of unfair labor practice charges which "exhaustively sets out the stages through which such charges may pass," and allows for "judicial review . . . only in respect of Board orders." *N.L.R.B. v. United Food & Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 131 (1987).

[12] For the same reasons, the extremely vague references to supposed obligations pursuant to contracts with public entities in other states cannot conceivably qualify as a Pennsylvania "public policy" exception. *See* Compl. ¶¶ 17, 92-93.

Agreement and Handbook to avoid publicly disparaging either Renaissance or its employees,"
and that he nonetheless "gave an interview to a reporter for the *Wall Street Journal*, in which
[he] criticized . . . Mercer's support for the President's agenda." *See* Compl. ¶ 52; *see also*
Compl. Ex. D at 2 (Magerman's statement to the *Wall Street Journal* that Mercer's "views show
contempt for the social safety net that he doesn't need"). Indeed, Magerman told the *Wall Street
Journal* in that very interview that "it's very possible they could fire me" because of those
comments about Mercer. Compl. Ex. D at 3; *see also id.* at 4 ("[I]f they fire me, maybe it's for
the best.").

Magerman further admits to engaging in a drunken confrontation with Mercer's daughter
at a charity poker night sponsored by Renaissance's founder and attended by many of the senior-
most people in the financial services industry. This confrontation was witnessed by numerous
coworkers and colleagues and reported by a national newspaper and occurred immediately
before Magerman alleges he was discharged. *See* Compl. ¶¶ 73-74; Compl. Ex. E at 2-3.
Magerman himself concedes that "[i]t wasn't one of [his] finest moments." Compl. Ex. E at 3.

Magerman's admitted failure to abide by the employment agreement and handbook and
his unprofessional conduct at a major charity event sponsored by the founder of Renaissance are
"plausible and legitimate reason[s]" for his termination, and are fatal to the claim.

## C.    The Employment Agreement Requires Magerman To Bring Any And All Claims "Relating To" His Employment In Binding Arbitration, Not Federal Court.

The Complaint is also completely frivolous because it was filed in clear violation of
Magerman's written "agree[ment] that *any disputes arising out of or relating to . . . [his]
employment* with [Renaissance], including but not limited to *tort claims*, claims relating to
intellectual property, and claims for discrimination, sexual harassment and *retaliation*, shall be
settled by binding arbitration" before JAMS. Compl. Ex. A ¶ 21 (emphases added). Indeed,

Magerman filed nearly identical claims against Renaissance—with the vast majority of the allegations copied verbatim from the Complaint—in a JAMS arbitration initiated contemporaneously with the original filing of this lawsuit, and he filed an amended arbitration demand against Renaissance contemporaneous with, and tracking, this new court filing.  *See* Schwartz Decl. Ex. F.  Nonetheless, in complete disregard of the arbitration agreement under which he brought his mirror-image claims against Renaissance, Magerman brought this parallel challenge to the termination of his employment in federal court, relying on that same agreement, and even attaching it to his Complaint.

The Federal Arbitration Act evinces a "strong federal policy in favor of arbitration" (*In re Pharmacy Benefit Managers Antitrust Litig.*, 700 F.3d 109, 116 (3d Cir. 2012)), and a court must enforce arbitration when "(1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement."  *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 84 (3d Cir. 2010) (internal quotation marks omitted).

Both criteria are indisputably met here:  Mercer is clearly entitled to enforce the arbitration agreement, notwithstanding Magerman's attempt to avoid it by not naming his actual employer, Renaissance, as a defendant.  And the dispute, which challenges the termination of Magerman's employment, is obviously "within the scope" of that agreement.  Because there is no "plausible view of the law" to the contrary, this attempt to avoid arbitration is sanctionable. *United States v. Vastola*, 25 F.3d 164, 169 n.9 (3d Cir. 1994) (citing *Dura Sys., Inc. v. Rothbury Invs., Ltd.*, 886 F.2d 551, 556 (3d Cir. 1989)).

### 1. Mercer Can Enforce The Employment Agreement's Binding Arbitration Provision.

Mercer is entitled to enforce the arbitration agreement under well-established precedent allowing nonsignatories to compel arbitration by signatories to the same extent the "relevant

state contract law" allows a "contract to be enforced by or against nonparties to the contract." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631-32 (2009).

Here, Magerman agreed that his employment agreement would be "governed by the laws of the State of New York without reference to the conflict or choice of laws provisions thereof." Compl. Ex. A ¶ 20.  Under New York law, Mercer can enforce the clause as an officer of Renaissance, and Magerman is also equitably estopped from avoiding arbitration.

First, New York has adopted the rule of "consistently afford[ing] agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or . . . agents of the corporation."  *Hirschfeld Prods. v. Mirvish*, 673 N.E.2d 1232, 1233 (N.Y. 1996).  Applying this rule, a state appellate court has enforced arbitration under facts strikingly similar to those in this case.  Like Magerman here, the plaintiff in *DiBello v. Salkowitz*, 772 N.Y.S.2d 663 (N.Y. App. Div. 2004), signed an arbitration agreement covering "any dispute or claim, *whether based on* contract, *tort, discrimination*, retaliation, or otherwise, *relating to*, arising from, *or connected in any manner with*" the agreement.  *Id.* at 664 (emphases in original); *see* Compl. Ex. A ¶ 21.  The plaintiff then sued an individual corporate officer, but the court concluded that the officer was "entitled to demand arbitration of the claims against him no less than [the corporate defendant] is entitled to demand arbitration of the claims against it."  *DiBello*, 772 N.Y.S.2d at 665.

Second, Magerman is equitably estopped from avoiding arbitration under the agreement that he acknowledges "governed" his employment, and which he attaches to his Complaint.  *See* Compl. ¶ 9; Compl. Ex. A ¶ 21.  Otherwise, he would impermissibly be allowed to "have it both ways," invoking the agreement in his suit but avoiding its arbitration clause.  *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 414-15 (N.Y. Sup. Ct. 2005) (internal quotation

marks omitted); *see Kellman v. Whyte*, 10 N.Y.S.3d 232, 232-33 (N.Y. App. Div. 2015) (plaintiff is required to "arbitrate . . . her claims against nonsignatories . . . because [her] claims are intertwined with the agreement").

The result is the same under both Pennsylvania law and federal common law. Pennsylvania courts require arbitration in these circumstances under agency doctrine, explaining that when a "principal is bound by an arbitration agreement, its agents, employees and representatives are generally likewise bound and can enforce the arbitration agreement, even as non-signatories to the agreement." *Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1097 (Pa. Super. Ct. 2015). Third Circuit common law also includes the "well-settled" rule that under "traditional agency principles" "nonsignatory agents may invoke a valid arbitration agreement entered into by their principal." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 224 (3d Cir. 2007); *see also Griswold v. Coventry First LLC*, 762 F.3d 264, 272 (3d Cir. 2014) (recognizing equitable estoppel as grounds for compelling arbitration).

### 2. The Entire Dispute Falls Within The Scope Of The Arbitration Clause.

The second requirement for enforcing an arbitration clause is that "the dispute at issue falls within the scope of that agreement." *Invista*, 625 F.3d at 84 (internal quotation marks omitted). The "presumption of arbitrability" at this step is overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009) (internal quotation marks omitted).

That presumption is not even needed to conclude the analysis here: Magerman "agree[d] that *any disputes arising out of or relating to . . . [his] employment* with [Renaissance], including but not limited to *tort claims*, claims relating to intellectual property, and claims for

34

discrimination, sexual harassment and *retaliation*, shall be settled by binding arbitration" before

JAMS.  Compl. Ex. A ¶ 21 (emphases added).  The plain language of the employment agreement

and the Complaint make clear that this entire dispute obviously "aris[es] out of" *and* "relat[es]

to" Magerman's employment with Renaissance.  Although utterly lacking in merit (*see supra*

Parts I(A) & I(B)), the entire premise of both the Section 1981 claim and the Pennsylvania state

law claim is that his employment was improperly terminated.  *See* Compl. ¶¶ 83, 84, 87 (alleging

"adverse employment action"); *id.* ¶¶ 89, 93, Count II (citing status as "at-will" employee under

employment agreement, and alleging "[w]rongful [d]ischarge" and "fir[ing]").  And he initiated a

JAMS arbitration containing identical allegations contemporaneously with the filing of the

original Complaint, and amended it concurrent with the filing of the present Complaint.  That

leaves no doubt that he himself acknowledges that these claims are within the scope of the

arbitration provision.  *See* Schwartz Decl. Exs. D, F.  Moreover, on the civil cover sheet

accompanying the Complaint, he checked the box for "employment," and summarized the action

as "Plaintiff was wrongfully discharged for engaging in protected activity."  ECF No. 1-3.

To the extent there is any conceivable remaining doubt (which there should not be), it

must be resolved by the Third Circuit's directive to give "phrases such as 'arising under' and

'arising out of' . . . in arbitration provisions . . . broad construction."  *Battaglia v. McKendry*, 233

F.3d 720, 727 (3d Cir. 2000).

\*        \*        \*        \*        \*

Magerman's entire Complaint suffers from repeated fundamental legal flaws, revealing

the action's true purpose and making its filing sanctionable:  His Section 1981 retaliation claim

cannot succeed under existing law because he fails to allege that Mercer retaliated against him

for complaining about racial discrimination in the making and enforcement of contracts.  His

wrongful discharge claim is specifically foreclosed by a long line of clear precedent holding that Pennsylvania's free-speech protections do not apply to private employers' relationships with their at-will employees.  And his employment agreement requires him to bring any and all claims "relating to" his employment in binding arbitration, rather than in federal court.  These clear legal infirmities warrant sanctions under Rule 11(b)(2).  All of this was pointed out in the Rule 11 motion served in response to the first Complaint, and none of it has been addressed at all in this new Complaint.  Indeed, the filing of this new frivolous Complaint, without curing any of these apparent and fatal defects, is even more worthy of sanctions.

## II.     Sanctions Are Warranted Under Rule 11(b)(1) Because The Complaint Is A Transparent Attempt To Generate Publicity By Publicly Smearing Mercer.

Magerman's claims were also brought for the "improper purpose[s]" of garnering publicity for his own political views and harassing Mercer and Renaissance.  Fed. R. Civ. P. 11(b)(1).

Magerman's true motivation for bringing this lawsuit is obvious.  In early 2017, he began a calculated campaign to generate attention for his own personal and political gain by publicly disparaging Mercer.  Magerman is not well known beyond the Philadelphia community. Wanting to share his own political views with a broader audience, he concocted a conflict with Mercer to try to take advantage of the national platform afforded by Mercer's wide renown.

Indeed, Magerman has implicitly acknowledged that this is his purpose in an opinion piece he authored for a Philadelphia newspaper, noting that he "would like the opportunity to clarify [his] message" "[a]s [his] 15 minutes" of fame arising from his conflict with Mercer "tick down."  Schwartz Decl. Ex. A at 2.  The fact that Magerman omitted this piece—which admits his attention-seeking motive—from the Complaint, even though he attached several other

36

articles, speaks volumes.  This lawsuit is merely a continuation of that strategy—another attempt by Magerman to use his self-made "conflict" with Mercer to keep himself in the spotlight.

Magerman is also improperly using this lawsuit to harass Mercer for his political beliefs. Magerman asserts that he "find[s]" Mercer's political views "abhorrent" (Schwartz Decl. Ex. A at 2), and has accused him of "harming the country" by supporting President Trump's candidacy and advocating for conservative policies.  Compl. Ex. D at 2-3.  Magerman also cynically accuses Mercer of supporting President Trump's campaign in order to "bu[y] shares in the candidate," rather than because the campaign or candidate aligned with Mercer's political views. Schwartz Decl. Ex. A at 2; *see also* Schwartz Decl. Ex. G (@DavidMagerman, Twitter (July 19, 2017, 12:20 PM), https://twitter.com/DavidMagerman/status/887754013931966465).  This lawsuit is nothing more than an impermissible attempt by Magerman to attack Mercer for his political expression through this frivolous litigation—a clearly improper purpose which warrants sanction.  *See Thomason v. Norman E. Lehrer, P.C.*, 182 F.R.D. 121, 130 (D.N.J. 1998) (imposing sanctions where "[c]learly, the only purpose to" bringing lawsuit "was to harass [the defendant]"); *see also Rhodes v. MacDonald*, 670 F. Supp. 2d 1363, 1375 (M.D. Ga. 2009) (imposing sanctions for "using a legal action for which no reasonable expectation of obtaining relief existed in order to pursue a political and/or personal agenda").

The timing of this new Complaint also reveals its improper motivation.  Magerman withdrew his original Complaint in the face of a sanctions motion, and only filed this new, equally (if not more) defective Complaint after he walked away from his settlement discussions with Renaissance.

Magerman's true purpose is also evidenced by his attempt to avoid the binding arbitration clause in his employment agreement.  There, he and Renaissance "agree[d] that any disputes

arising out of or relating to (i) this Agreement or the breach hereof and/or (ii) the Employee's employment with the Company, including but not limited to tort claims, . . . [and] claims for discrimination . . . shall be settled by binding arbitration" in New York City.  Compl. Ex. A at ¶ 21.  However, a private arbitration would not advance Magerman's aim of attracting publicity. Thus, while contemporaneously initiating an identical arbitration against Renaissance, he filed this public lawsuit against Mercer in an improper attempt to embarrass him and Renaissance. Magerman's invocation of the clearly-governing arbitration provision and concurrent filing of a mirror-image Complaint in this Court underscore his bad faith and improper motives.  He seeks to avoid application of the employment agreement by suing only Mercer—rather than his employer, Renaissance—in federal district court, notwithstanding clear legal authority that any such claims against Mercer are subject to the same arbitration provision as the parallel claims against Renaissance.  This impermissible attempt by Magerman to circumvent his contractual obligations via court proceedings warrants sanctions.

## CONCLUSION

For all of the reasons explained here, this Court should impose Rule 11 sanctions, including but not limited to payment of Defendant Robert Mercer's reasonable attorneys' fees and costs,[13] and dismissing this Complaint with prejudice.

Dated:  September 8, 2017                    Respectfully submitted,

                                             /s Randy M. Mastro
                                             Randy M. Mastro (*pro hac vice admission pending*)
                                             rmastro@gibsondunn.com
                                             Mylan L. Denerstein (*pro hac vice admission pending*)
                                             mdenerstein@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
                                             200 Park Avenue
                                             New York, NY 10166-0193
                                             Telephone:  212.351.4000
                                             Facsimile:  212.351.4035

                                             Jason C. Schwartz (*pro hac vice admission pending*)
                                             jschwartz@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
                                             1050 Connecticut Avenue, N.W.
                                             Washington, DC 20036-5303
                                             Telephone:  202.955.8500
                                             Facsimile:  202.467.0539

                                             *Attorneys for Robert Mercer*

---

[13]   Should the Court grant this relief, Mercer is prepared to submit a detailed application for the attorneys' fees and costs he has incurred due to the violations described above.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of September, 2017, I caused a copy of the foregoing to be served upon all counsel of record via ECF.


/s Randy M. Mastro
Randy M. Mastro