IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

David Magerman,

        Plaintiff,

   v.

Robert Mercer,

        Defendant.

Civil Action No. 2:17-cv-3490

## <u>DECLARATION OF JASON C. SCHWARTZ</u>

I, Jason C. Schwartz, declare as follows:

1.     I am an attorney at law licensed to practice in the State of Maryland, the Commonwealth of Virginia, and the District of Columbia.  I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, counsel for Robert Mercer.  I submit this Declaration in support of Mr. Mercer's Motion For Rule 11 Sanctions.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would competently testify to them under oath.

2.     Attached hereto as **Exhibit A** is a true and correct copy of Plaintiff David M. Magerman's column entitled *When a Hedge Fund Billionaire 'Buys' Democracy: Magerman on Mercer*, published on philly.com on March 1, 2017, and available at http://www.philly.com/ philly/blogs/inq-phillydeals/Billionaires_and_Democracy_Magerman_Mercer_Renaissance_ Trump_Bannon_Conway.html.

3.     Attached hereto as **Exhibit B** is a true and correct copy of a redline comparison of the Complaint in this case (ECF No. 1), with the dismissed Complaint (No. 2:17-cv-2083, ECF No. 1).

4.      Attached hereto as **Exhibit C** is a true and correct copy of the Notice Of Claim And Demand For Arbitration in *Magerman v. Renaissance Techs. LLC*, dated May 9, 2017.

5.      Attached hereto as **Exhibit D** is a true and correct copy of a redline comparison of the Complaint (Doc. 1) and the JAMS Demand For Arbitration (Ex. C).

6.      Attached hereto as **Exhibit E** is a true and correct copy of the Amended Notice of Claim and Demand For Arbitration in *Magerman v. Renaissance Techs. LLC*, dated August 3, 2017.

7.      Attached hereto as **Exhibit F** is a true and correct copy of a redline comparison of the current Complaint (ECF No. 1) and the Amended Notice of Claim and Demand For Arbitration (Ex. E).

8.      Attached hereto as **Exhibit G** are true and correct copies of selected posts from David Magerman's Twitter account, @DavidMagerman.

9.      Attached hereto as **Exhibit H** is a true and correct copy of the Notice of Dismissal for the first complaint (No. 2:17-cv-2083, ECF No. 8).

10.     Attached hereto as **Exhibit I** is a true and correct copy of my email correspondence with Plaintiff's current counsel on August 31, 2017 and September 1, 2017.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 8th day of September, 2017.

/s/ Jason C. Schwartz
Jason C. Schwartz
jschwartz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5303
Telephone:  202.955.8500
Facsimile:  202.467.0539

# EXHIBIT A

When a hedge fund billionaire 'buys' democracy: Magerman on Mercer

**Business (Http://Www.Philly.Com/Business)** — PhillyDeals (http://www.philly.com/philly/blogs/inq-phillydeals)

# When a hedge fund billionaire 'buys' democracy: Magerman on Mercer

**Updated:** MARCH 1, 2017 — 10:55 AM EST



David M. Magerman

 by **Joseph N. DiStefano**, Staff Writer 🐦 @PhillyJoeD (http://twitter.com/PhillyJoeD) |
✉ JoeD@phillynews.com (mailto:JoeD@phillynews.com)

The Oligarchy of the 0.001 Percenters
By David M. Magerman

*Last week, I was interviewed by a Wall Street Journal reporter, and the reporter's subsequent article included some of my views about my boss's political engagement.* [Magerman, a Main Line resident, was suspended from his job at Renaissance Technologies Corp. after criticizing co-CEO Robert Mercer's role in the Trump presidency. See WSJ story here (https://www.wsj.com/articles/you-have-to-stop-renaissance-executive-tells-boss-about-trump-support-1487845803), Inquirer here. (http://www.philly.com/philly/blogs/inq-phillydeals/Mercer-Magerman-Trump-Bannon-hedge-fund-manager-fired-dispute.html)]

*The article was thoroughly and professionally researched and well-written, and it reflected my views accurately. However, since it was a news article and not an opinion piece, it did not fully convey the message I was hoping to send. As my 15 minutes tick down, I would like the opportunity to clarify my message.*

The First Amendment of our Constitution is the cornerstone of our democracy. Everyone has a right to express their views and to support politicians who share them.

A problem for democracy arises when financial support for politicians and political action transitions from giving gifts to making investments.

When the government becomes more like a corporation, with the richest 0.001% buying shares and demanding board seats, then we cease to be a representative democracy and become an oligarchy instead.

Robert Mercer, the co-CEO of Renaissance Technologies and my boss's boss, holds views with which I disagree and, in some cases, find abhorrent.

Nevertheless, I fully support his desire to engage in conversations about his views, financially support like-minded politicians, and speak out in support of political actions that further his goals. It is the willingness of political activists to expend their resources on the causes they believe in that make America a great democracy.

However, there is a difference between giving someone money to support their views, on the one hand, and investing in someone in a contractually binding way to see that the politician's views and actions are supplanted by the donor's, on the other.

Robert Mercer hasn't invested in Donald Trump because he believes in Trump's campaign platform. He preferred Ted Cruz during the campaign, and Ted Cruz was clearly no fan of Donald Trump. Looking at Mercer's historical political giving patterns, Cruz is far more aligned with Mercer's worldview than is Trump.

So, what did Mercer's investment in Trump amount to? He was effectively buying shares in the candidate, and Robert Mercer now owns a sizeable share of the United States Presidency.

Stephen Bannon came from Breitbart News, of which Mercer owns a significant percentage, and Kellyanne Conway came from Mercer's circle of political foundations. And, of course, Mercer's daughter Rebekah represents his interests and his worldview with her presence on the transition committee and her close relationship with Bannon and Conway.

6/6/2017     When a hedge fund billionaire buys democracy: Magerman vs. Mercer

Case 2:17-cv-03400-GDJ Document 15-2 Filed 09/08/17 Page 6 of 93

Mercer also has insisted that Trump use his company Cambridge Analytica, which uses its statistical models of voter psychology to get unpopular initiatives (like electing Donald Trump) through the electorate.

Mercer has surrounded our President with *his* people, and his people have an outsized influence over the running of our country, simply because Robert Mercer paid for their seats.

Robert Mercer is an extreme example of modern entrepreneurial philanthropy.

Donors to a variety of causes, political, religious and social, do not think of their donations as gifts, with no strings attached, but investments that carry the entitlement to influence decision-making, hiring, and mission.

I know this because up until recently I *was* one of those donors. I tried to buy influence in the schools in my community, in my synagogue, and in other communal institutions.

These investments all failed for one key reason: communal institutions are not for sale, and you should not be able to buy stock in them. They require donations in order to operate, but they should serve their community, not their donors.

When communal organizations, or governments, allow their donors to subvert their missions, they inevitably betray their missions, as our government is betraying us now.

I have learned this lesson, and it is time for Robert Mercer and the rest of the 0.001 percenters to learn it too.

With great wealth comes great power, but also great responsibility.

As long as our government is being run by corruptible human beings, the wealthiest Americans will always have the resources to buy influence and affect policy.

But when the government is overrun by 0.001 percenters, and the checks and balances of the government break down, the America will cease to be a democracy for 300 million people, and instead will be an oligarchy for 3,000.

---

Read more by **Joseph N. DiStefano**

---

## MORE COVERAGE

**Tech chief sues hedge fund boss for wrongful firing on Trump comments, racism accusations**
May 8 - 10:15 PM
(http://www.philly.com/philly/blogs/inq-phillydeals/Magerman-sues-Renaissance-for-wrongful-firing-Trump-Mercer-comments-Lower-Merion-Breitbart-conway.html)

---

**Published:** March 1, 2017 — 10:53 AM EST   |   **Updated:** March 1, 2017 — 10:55 AM EST

---

## Thanks for your continued support...

We recently asked you to support our journalism. The response, in a word, is heartening. You have encouraged us in our mission — to provide quality news and watchdog journalism. Some of you have even followed through with subscriptions, which is especially gratifying. Our role as an independent, fact-based news organization has never been clearer. And our promise to you is that we will always strive to provide indispensable journalism to our community. Subscriptions are available for home delivery of the print edition and for a digital replica viewable on your mobile device or computer. Subscriptions start as low as 25¢ per day.
**We're thankful for your support in every way.**
(https://myaccount.inquirer.com/dssSubscribe.aspx?pid=2237)



© Copyright (//www.philly.com/philly/about/copyright/) 2017 Philadelphia Media Network (Digital), LLC    Terms of Use & Privacy Policy
(//www.philly.com/philly/about/terms_of_use/)

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DAVID MAGERMAN,
                Plaintiff,               Civil Action No.
v.
ROBERT MERCER,              JURY TRIAL DEMANDED
                Defendant.

## COMPLAINT

Plaintiff, David Magerman, by and through his undersigned counsel, hereby asserts the following claims against Defendant Robert Mercer.

## THE PARTIES

**1.**     Plaintiff, David Magerman, is a resident of the Commonwealth of Pennsylvania residing at 117 Raynham Road, Merion Station, Pennsylvania 19066.

2.     Defendant, Robert Mercer, is a resident of the State of New York residing at 149 Harbor Road, Saint James, New York 11780.

## JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over Mercer because Mercer purposefully directed his activities at Pennsylvania, the litigation arises out of those activities, and the exercise of personal jurisdiction comports with fair play and substantial justice.

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the action arises under the laws of the United States and all other claims are so related to the claim in the action within the Court's original jurisdiction that they form part of the same case or controversy. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states and the amount in controversy is in excess of $75,000.00, exclusive of interests and costs.

5.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

**Overview of Magerman's Work at Renaissance**

6.       Magerman was formerly an employee of Renaissance Technologies L.L.C. ("Renaissance"), an investment management company trading in global financial markets and based in East Setauket, New York and New York City.

7.       Although Renaissance is based in New York, for the past seven years Magerman worked primarily from his home in Pennsylvania.

8.       Mercer is Renaissance's co-Chief Executive Officer.

9.       Magerman had been employed by Renaissance for approximately the last 22 years with the exception of one two-year hiatus from the company. Magerman's most recent employment with Renaissance began on or about July 2010 and was governed by an employment agreement revised in January 2015 (the "Employment Agreement"). A copy of the Employment Agreement is attached hereto as Exhibit A.

10.      Section 12 of the Employment Agreement contains a provision prohibiting Magerman from making "any disparaging or negative statement about the Company; any of its affiliates; any of their officers, directors, shareholders, members, managers, employees, representatives and agents ...."

~~10~~ 11.      Renaissance also had an employee handbook and policy manual (the ~~"Handbook") that~~ "Handbook") and Code of Ethics and Compliance Manual (the "Code of Ethics") that Renaissance claims governs employee conduct.

~~11.      The Handbook provides, among other things, that an employee cannot publicly disparage Renaissance or any of its employees.~~

12.     The Handbook provides, among other things, a series of overbroad restrictions employee speech that are in violation of the National Labor Relations Act. 29 U.S.C. § 151, et seq. Specifically, these restrictions purported to restrict Magerman from:

a)      Engaging in "discourtesy, rudeness, and/or abuse to fellow employees or other persons involved in Company business" in violation of the National Labor Board's rulings in *First Transit, Inc.,* 360 NLRB 619 (2011) and *Karl Knaus Motors, Inc.,* 358 NLRB 1754 (2012);

b)      "Making or publishing false, vicious or malicious statements concerning employees, the Company or its business" in violation of the National Labor Board's rulings in *Lafayette Park Hotel,* 326 NLRB 824, 825 (1998), *enf'd,* 203 F.3d 52 (D.C. Cir. 1999); *Chipotle Servs., LLC,* 364 NLRB No. 72, slip op. at 1 (Aug. 18, 2016); and *Casino San Pablo,* 361 NLRB No. 148, slip op. at 4 (Dec. 16, 2014);

c)      "Communicating with the media in any forms including blogs, chat sites, web forums or editorial pages concerning Renaissance without express written permission from the Chief Compliance Officer, which is a serious infraction of the confidentiality policy" in violation of the National Labor Board's rulings in *Hacienda de Salud-Espanola,* 317 NLRB 962, 966 (1995); and *Pier Sixty, LLC,* 362 NLRB No. 59, slip op. at 23-24 (Mar. 31, 2015), *aff'd, NLRB v. Pier Sixty, LLC,* 855 F.3d 115 (2d Cir. 2017); and

d)      "Engaging in any other act evidencing poor judgment, dishonesty, or disregard for the law or the Company's policies and reputation" in violation of the National Labor Board's rulings in *Lafayette Park Hotel,* 326 NLRB 824, 825 (1998), *enf'd,* 203 F.3d 52 (D.C. Cir. 1999); and *Lutheran Heritage Village-Livonia,* 343 NLRB 646 (2004).

13.     The National Labor Relations Board has also held in *Quicken Loans, Inc.,* 359 NLRB 1201 (2013), *enfd,* 830 F.3d 542 (D.C. Cir. 2016), that a non-disparagement provision of the type contained in the Employment Agreement is invalid and unenforceable under the National Labor Relations Act.

14.     The Code of Ethics provides that an employee can communicate with the press or other news media with the approval of either the Chief Compliance Officer or the General Counsel. A copy of the relevant portion of the Code of Ethics is attached as Exhibit B.

~~12~~15.   Magerman was a research scientist at Renaissance who designed mathematical and statistical algorithms to direct Renaissance's investment decisions on the international financial markets.

~~13~~16.   The algorithms written by Magerman have been used by Renaissance to earn billions of dollars in revenue and have helped to make Mercer one of the wealthiest people in the United States.

17.     Renaissance managed money for a wide array of clients, including public entities such as the University of California, public employee pension funds for government employees in New York and California, and other entities that required Renaissance to hire and advance minorities, including African Americans, in the workplace.

~~14~~18.   Renaissance and Mercer recognized the value that Magerman contributed to the company, paying him a salary and bonuses worth millions of dollars annually.

Employment Practices at Renaissance

19.     During his employment at Renaissance, Magerman also served as a hiring manager for highly-compensated managerial and technical positions for approximately nine years, from approximately 1997-2006.

20.     Magerman participated in the hiring of people for around 20-30 positions from among candidates who were presented to him to interview by Renaissance's Human Resources Department or by his superiors at Renaissance.

21.     To the best of his recollection, none of the candidates presented to Magerman to be interviewed that were eventually hired were African American.

22.     During the time that Magerman was involved in the hiring process, Renaissance

employed subjective hiring criteria.

23.   During the period from 2010 through the present, Magerman has been generally familiar with the workforce at Renaissance's East Setauket office based on making several visits to that facility per year and making presentations to and otherwise interacting with employees at that location.

24.   The East Setauket office has about 200 total employees, which include about 100-125 employees in management or significant technical positions earning salaries and bonuses in excess of $500,000 per year ("Highly-Compensated Employees").

25.   During Magerman's employment at Renaissance, there were never any African American employees working as Highly-Compensated Employees in the East Setauket office.

26.   Mercer, as co-CEO of Renaissance, established the culture of the company, which is reflected in Renaissance's hiring practices.

**Magerman's Conversations with Mercer**

~~15~~27.   Mercer has long been a public supporter of ~~conservative~~ultra-conservative political causes and candidates, including then-candidate Donald Trump during the 2016 presidential general election.

28.   During the Presidential campaign, Trump engaged in several actions for which he was widely attacked in the media as being racist, including:

•   Failing to renounce David Duke, a white nationalist and former Ku Klux Klan in February of 2016;

•   Implying in May of 2016 that the Honorable Gonzalo Curiel, the federal judge presiding over a class action against the for-profit Trump University, could not fairly hear the case because of his Mexican heritage;

•   Serving as a leading proponent of "birtherism," the racist conspiracy theory that

President Barak Obama was not born in the United States;

•       Condoning the physical attack on an African American protester at a campaign rally in Alabama in November of 2015.

~~16~~29.   Mercer and his daughter were influential advisors to the Trump campaign, recommending the hiring of two Mercer family associates, Stephen K. Bannon and Kellyanne Conway.

~~17~~30.   Bannon became the Chief Executive Officer of the Trump campaign and is now White House Chief Strategist. Conway became the Campaign Manager of the Trump campaign and is now Counselor to the President.

~~18~~31.   Mercer is also a major investor in Breitbart ~~News, an alt-right media organization that Bannon used to~~Holdings, Inc. ("Breitbart"), which operates Breitbart News and Breitbart Media, alt-right media organizations that Bannon used to lead.

32.     During the time Mercer was a major investor in Breitbart and Bannon served as chairman of Breitbart Media, Breitbart News was engaged in creating what national media characterized as an online haven for white nationalists.

~~19~~33.   On January 16, 2017, Magerman called Mercer and asked if he had time for a personal conversation regarding Mercer's support for President Trump.

~~20~~34.   The two discussed issues such as the Affordable Care Act and the social safety net, with Mercer expressing support for the Trump administration's positions on these issues and Magerman expressing opposition.

35.     The conversation then turned to the subject of racial minorities, at which time ~~21.~~   Mercer then made a series of racist comments, saying things such as:

a)      The United States began to go in the wrong direction after the passage of the Civil Rights Act in the 1960s;

b)      African Americans were doing fine in the late-1950s and early-1960s before the Civil Rights Act;

c)      The Civil Rights Act "infantilized" African Americans by making them dependent on government and removing any incentive to work;

d)      The only racist people remaining in the United States are black; and

e)      White people have no racial animus toward African Americans anymore, and if there is any, it is not something that the government should be concerned with.

36.     Mercer also stated that he did not believe in affirmative action.

~~22~~37.   Magerman was stunned by these comments and pushed back, pointing out that society was segregated before the Civil Rights Act and African Americans were required to use separate and inferior schools, water fountains, and other everyday services and items.

~~23~~38.   Mercer responded that those issues were not important.

~~24~~39.   Magerman reported the conversation to Peter Brown, Mercer's co-Chief Executive Officer at Renaissance, along with his belief that Mercer's public political views and association with alt-right groups such as Breitbart News were damaging to the image and reputation of Renaissance, by which Magerman intended to convey, *inter alia,* that Mercer's publicly-stated views prevented the company from hiring a more diverse workforce of Highly-Compensated Employees.

~~Executive Officer at Renaissance, who~~40.   Brown expressed disbelief that Mercer would make comments like those. Brown asked if he could share with Mercer his conversation with Magerman and asked if Magerman ~~like those and asked if Magerman~~ would be willing to talk to Mercer again. Magerman agreed.

41.     Magerman advised Brown that he was concerned that Mercer's embrace of right wing causes and candidates was bad for Renaissance and could damage the company's standing with investors and prospective employees who would not want to be associated with

Mercer's ideology.

2542.   On February 5, 2017, Mercer called Magerman and stated, in a threatening manner, "I hear you're going around saying I'm a white supremacist."

43.   Magerman denied that he had labelled Mercer a white supremacist, and denies that he ever used the term "white supremacist" in describing Mercer.

2644.   Magerman told Mercer that that is not what Magerman had said, but then quoted back to Mercer the comments about African Americans that Mercer had made in their prior conversation and that Magerman had reported to Brown.

conversation.

2745.   At first, Mercer disputed that he had said such things, although he did not actually deny saying them.

2846.   In the course of rehashing the conversation, however, Mercer repeated many of these same views, and even cited research that allegedly supported his opinion that the Civil Rights Act harmed African Americans economically.

2947.   Magerman was skeptical of the supposed data that Mercer relied on, but nonetheless pointed out that, even if it was true, there is more to someone's well-being than money, and segregation was still degrading and destructive and the United States was right to get rid of it.

3048.   Mercer scoffed at this suggestion.

**Magerman Speaks to the Press About Mercer's Political Views**

3149.   Magerman continued to be alarmed by his boss's personal views and backing of policies and statements Magerman found to be divisive and harmful to the poor and minorities.

3250.   Magerman was also concerned that Renaissance did not employ any African Americans

in high-level positions. as Highly-Compensated Employees as a result of which he was denied the opportunity to work with and associate with highly-compensated African Americans and other minorities in managerial and technical positions who could be advantageous to Magerman in his future business dealings.

33 51.   Magerman felt obligated to speak out against these Mercer's support for racist policies and the support that some implication that Magerman and other Renaissance employees had for them shared those views.

34 52.   Magerman, however, was aware of alleged restrictions under the Employment Agreement and Handbook to avoid publicly disparaging either Renaissance or its employees, even though such policies are illegal and unenforceable.

35 53.   On January 29, 2017, before speaking publicly, Magerman sent a written memorandum to several Renaissance executives, including General Counsel Carla Porter, Chief  Compliance Officer Mark Silber and Director of Human Resources Lavonne Wesner. A copy of Magerman's January 29, 2017 memorandum, sent by email, is attached hereto as Exhibit B C.

36 54.   In that memorandum, Magerman stated, *inter alia*, "the Mercers' public and blatant support for the Trump candidacy, presidency and agenda has cast a taint on all Renaissance employees, including myself. To disallow employees to politely and honestly, but publicly, respond to this taint, and to prevent us from disavowing it in as public a forum as he has been allowed to promote it, is frankly unfair and untenable." (Ex. B C.)

37 55.   Magerman also sought guidance in writing as to what he would be allowed to say that would not subject him "to any retaliation in the workplace for my public speech." *(Id.)*

38 56.   Magerman never received a written response to this email.

39 57.   After sending the email, however, Magerman did consult telephonically with Silber, the Chief Compliance Officer, regarding Magerman's intention to speak to the press about his concerns.

58.    Silber told Magerman that he could speak to the press, but that Renaissance's biggest concerns were that its trade secrets were protected and that the company did not appear to have infighting among its employees.

4059.   Silber told Magerman that told Silber that Silber would have a chance to review the statements Magerman was intending to make were permissible under company policymade to the media before they were published.

4160.   Magerman then gave an interview to a reporter for the *Wall Street Journal,* in which Magerman criticized President Trump and Mercer's support for the President's agenda.

61.    Magerman's statements were made available to Silber, who then denied that Magerman had ever been given permission to speak to the press.

62.    Upon information, Magerman alleges that Mercer became aware that Magerman had given an interview to a reporter for the *Wall Street Journal,* and communicated false information about Magerman to John Gasthalter, a public relations representative of Renaissance, in an effort to coerce Magerman from having any further communications with the press about Mercer.

4263.   After the interview, a representative of RenaissanceUpon information, Magerman alleges Gasthalter, called the *Wall Street Journal* reporter and threatened to cut him off from any further information from Renaissance if he published thean article regarding Magerman's interview.

4364.   The Renaissance representativeUpon information, Magerman alleges that Gasthalter, at the instigation of Mercer, also made a number of false accusations about Magerman to the *Wall Street Journal* reporter and downplayed the significance of Magerman's substantial contributions to the success and profitability of Renaissance.

4465.   Despite this effort to sabotage Magerman and silence his opinions, an article regarding the interview was published in the *Wall Street Journal* on February 23, 2017. A copy of this article is attached hereto as Exhibit CD.

4566.   The following day, February 24, 2017, Magerman was suspended from Renaissance

without pay.

46<u>67</u>.   Upon information and belief, Magerman's suspension was ordered personally by Mercer and was in retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports.

47<u>68</u>.   Media stories about the *Wall Street Journal* article and Magerman's ensuing suspension were subsequently published in several other new sources, including the *Philadelphia Inquirer,* Philly.com and Dealbreaker.com.

48<u>69</u>.   Magerman and Renaissance attempted to work out a resolution of Magerman's suspension that would allow Magerman to return to work without compromising his right to free speech~~, but were unable to do so~~.

<u>70.    During his suspension, and prior to his employment being terminated, Magerman again told Brown that Mercer's public political views and association with the alt-right were harmful to the image and reputation of Renaissance, by which Magerman intended to convey, *inter alia,* that Mercer's publicly-stated views and activities prevented the company from hiring a more diverse workforce of Highly-Compensated Employees.</u>

<u>71.    During his suspension, and prior to his employment being terminated, Magerman advised his immediate supervisors at Renaissance, Jim Hernstein and Stephen Della Pietra, that public awareness of Mercer's views, combined with the lack of minorities in the company would damage Renaissance from an EEO perspective. Upon information and belief, Magerman alleges that Hernstein and Della Pietra reported their conversations with Magerman to senior management at Renaissance and that this information was conveyed to Mercer.</u>

49<u>72</u>.   On or around March 30, 2017, Renaissance paid Magerman the <u>base </u>compensation that it had withheld but *de facto* continued the suspension by locking  Magerman ~~out of the~~ <u>out of the</u> company's computers, isolating him from his colleagues and otherwise denying him the right to return to work.

50<u>73</u>.   On or around April 20, 2017, Magerman attended a charity poker tournament in

New York City attended by many Renaissance employees, including Mercer and his daughter.

5174.  At the tournament, Mercer's daughter confronted Magerman, calling him "pond scum" and saying that "[k]arma is a bitch." An April 29, 2017 article from the *Wall Street Journal* describing this altercation is attached hereto as Exhibit DE.

5275.  Renaissance, at the direction of Mercer and in further retaliation for Magerman's

criticisms of Mercer's political activities and the causes he supports, fired Magerman as of April

29, 2017, in a letter Magerman received on May 3, 2017.

76.   Mercer has decision-making control over Renaissance hiring practices and the hiring of Highly Compensated Employees.

77.   Mercer's political views affect the culture at Renaissance.

78.   The failure of Renaissance to hire African Americans to managerial and technical positions as Highly Compensated Employees is, on belief, the result of the effect of Mercer's political views on the culture of Renaissance.

## <u>COUNT I</u>

### Violation of 42 U.S.C. § 1981

5379.  Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

80.   Upon information and belief, Mercer created a pattern and practice of racial discrimination in the hiring of African Americans at Renaissance, as evidenced by the complete exclusion of African Americans in positions as Highly Compensated Employees.

81.   Mercer's public political views, association with the alt-right, and racist comments deterred potential qualified African Americans from applying for positions as Highly

Compensated Employees at Renaissance.

54 82.   Magerman, by reporting Mercer's racist comments to Brown, calling attention to the negative impact that Mercer's public political views, association with the alt-right, and racist comments were having on the image and reputation of Renaissance to Brown and others in management such as Porter, Silber, and Wesner, and exercising his right to free speech to criticize what he believes are hateful statements and policies from President Trump and Mercer's support thereof, engaged in protected activity to oppose racial discrimination in the making and enforcement of contracts.

55 83.   Mercer, as co-Chief Executive Officer of Renaissance, took an adverse employment action against Magerman by suspending him, threatening him, and then firing him. Based on Mercer's role in the company, it is inconceivable to Magerman that Mercer did not personally direct that he be fired.

56 84.   Magerman's protected activity — reporting Mercer's racist comments to a superior, calling attention to the negative impact that Mercer's public political views, association with the alt-right, and racist comments were having on the image and reputation of Renaissance and its ability to recruit diverse employees, and speaking out against Mercer's support for President Trump's prejudiced policies — was the direct and proximate cause of the adverse employment action taken by Mercer.

85.   Any contention that Magerman was not discharged because of his taking issue with Mercer's alt-right and racist comments and his criticism that these policies were hurting the image and reputation of the company and preventing it from having a more diverse workforce is pretextual.

57 86.   Mercer has therefore violated Magerman's civil rights by firing him for engaging in protected activity in opposing racial discrimination in the making and enforcement of contracts. Mercer's conduct is an outrageous attempt to deny Magerman his constitutional and federal statutory rights.

58 87.   As a direct and proximate result of this adverse employment action and Mercer's violation of

Magerman's civil rights, Magerman has incurred and continues to incur significant damages in the form of lost ~~wages~~compensation, bonuses, and investment income, and emotional and physical distress. In addition, Magerman has been deprived of retirement benefits to which he was entitled.

WHEREFORE, Plaintiff, David Magerman, demands judgment be entered in his favor  and against Defendant, Robert Mercer, and prays that this Court enter an Order granting the following relief:

1.      Compensatory damages in excess of $150,000.00;

2.      Expectation damages and consequential damages to be determined at trial;

3.      Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

4.      Punitive damages; and

5.      Such other relief that the Court deems appropriate.

## COUNT II

### Wrongful Discharge

~~59~~88.   Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

~~60~~89.   Under the Employment Agreement, Magerman was an employee at will at Renaissance. (Ex. A, ¶ 2.)

~~61~~90.   Mercer attempted to silence Magerman and prevent him from speaking out on political issues, even after Magerman received permission from Renaissance's Chief Compliance Officer to make the public statements attributed to him.

~~62~~91.   Mercer's actions are tantamount to forced political speech because, by insisting that

Magerman remain publicly silent about political issues, Mercer is forcing Magerman to tacitly support, or at least condone, Mercer's publicly announced and very visible political views. *See, e.g.,* Exhibit ~~E~~F.

92.     By advocating for a race-neutral image of Renaissance, Magerman was, *inter alia,* seeking to have the company comply with its legal obligations in connection with its handling of public funds.

~~63~~93.   Mercer's decision to suspend and subsequently fire Magerman violates a clear mandate of public policy against forced political speech and conditioning employment on political subordination, as well as the legal requirement that, by handling public funds, Renaissance was required to be at least race-neutral in hiring.

94.     Magerman was also fired for the exercise of free speech that was originally ~~political subordination~~approved by Renaissance.

~~64~~95.   ~~Mercer therefore wrongfully discharged~~Specifically, Magerman ~~under Pennsylvania law.~~sought permission from Silber, Renaissance's Chief Compliance Officer, to speak to the media, pursuant to the Code of Ethics. (Exs. B, C.)

96.     Magerman received permission to speak to the press from Silber.

97.     Upon information, when Silber informed Mercer that Magerman had spoken to  the press, Mercer ordered that Magerman be suspended, notwithstanding Silber's granting of permission to Magerman.

98.     Mercer therefore wrongfully discharged Magerman under Pennsylvania law.

99.     In addition, to the extent that Mercer contends that Magerman's employment was terminated as a result of a violation of the company's non-disparagement or other restrictive policies against speech, said policies are illegal and in violation of the National Labor Relations Act. *See First Transit, Inc.,* 360 NLRB 619 (2011); *Karl Knaus Motors, Inc.,* 358 NLRB 1754 (2012); *Lafayette Park Hotel,* 326 NLRB 824. 825 (1998), *enf'd,* 203 F.3d 52 (D.C. Cir. 1999); *Chipotle Servs., LLC,* 364 NLRB No. 72, slip op. at 1 (Aug. 18, 2016); *Casino San Pablo,* 361 NLRB No. 148, slip op. at 4 (Dec. 16, 2014); *Hacienda de Salud-Espanola,* 317 NLRB 962, 966

(1995); *Pier Sixty, LLC,* 362 NLRB No. 59, slip op. at 23-24 (Mar. 31, 2015), *aff'd, NLRB v. Pier Sixty, LLC,* 855 F.3d 115 (2d Cir. 2017); and *Lutheran Heritage Village-Livonia,* 343 NLRB 646 (2004).

~~65~~100. As a direct and proximate result of Mercer's wrongful discharge of Magerman, Magerman incurred and continues to incur significant damages in the form of lost ~~wages~~compensation and emotional and physical distress.

WHEREFORE, Plaintiff, David Magerman, demands judgment be entered in his favor and against Defendant, Robert Mercer, and prays that this Court enter an Order granting the following relief:

1.      Compensatory damages in excess of $150,000.00;

2.      Expectation damages and consequential damages to be determined at trial;

3.      Attorneys' fees and costs;

4.      Punitive damages; and

5.      Such other relief that the Court deems appropriate.

                                        Respectfully submitted,

Date: ~~May 5~~August 3, 2017              COZEN O'CONNOR

                                        BY: _____

                                        H. Robert Fiebach, Esquire (PA 02812)
                                        Jeffrey I. Pasek, Esquire (PA 23700)
                                        Thomas A. Leonard, Esquire (PA 317121)
                                        One Liberty Place
                                        1650 Market Street, Suite 2800
                                        Philadelphia, PA 19103
                                        215-665-2000
                                        215-665-2013 (fax)

                                        *Counsel for Plaintiff, David Magerman*

# EXHIBIT C

## JAMS EMPLOYMENT ARBITRATION

DAVID MAGERMAN,                       )
                                      )
              Claimant,               )     JAMS Case No. _____
                                      )
      v.                              )
                                      )
RENAISSANCE TECHNOLOGIES LLC,         )
                                      )
              Respondent.             )
_____      )

## NOTICE OF CLAIM AND DEMAND FOR ARBITRATION

Claimant, David Magerman, by and through his undersigned counsel, hereby asserts the

following claims against Respondent, Renaissance Technologies LLC.

## THE PARTIES

1.     Claimant, David Magerman, is a resident of the Commonwealth of Pennsylvania

residing at 117 Raynham Road, Merion Station, Pennsylvania 19066.

2.     Respondent, Renaissance Technologies LLC ("Renaissance"), is a Delaware

limited liability company with a principal place of business at 600 Route 25A, East Setauket,

New York 11733.

## AGREEMENT TO ARBITRATE

3.     Magerman and Renaissance agreed to arbitrate the claims raised herein pursuant

to the employment agreement executed by the parties on or around January 1, 2015 (the

"Employment Agreement"), a copy of which is attached hereto as Exhibit A.

## FACTUAL BACKGROUND

### Overview of Magerman's Work at Renaissance

4.     Renaissance is an investment management company trading in global financial

markets and based in East Setauket, New York and New York City.

5.     Although Renaissance is based in New York, Magerman worked primarily from his home in Pennsylvania.

6.     Magerman had been employed by Renaissance for approximately the last 22 years with the exception of one two-year hiatus from the company.

7.     Magerman was a research scientist at Renaissance who designed mathematical and statistical algorithms to direct Renaissance's investment decisions on the international financial markets.

8.     The algorithms written by Magerman have been used by Renaissance to earn billions of dollars in revenue.

9.     Renaissance recognized the value that Magerman contributed to the company, paying him a salary and bonuses worth millions of dollars annually.

10.     Renaissance had an employee handbook and policy manual (the "Handbook") that Renaissance claims governs employee conduct.

11.     The restrictions placed on employees by the Handbook violate federal employment law and a charge has been filed with the National Labor Relations Board for unfair labor practices.

12.     The Handbook provides, among other things, that an employee cannot publicly disparage Renaissance or any of its employees.

### Magerman's Conversations with Robert Mercer

13.     Renaissance's co-Chief Executive Officer is Robert Mercer.

14.     Mercer is one of the wealthiest people in the United States and has long been a public supporter of conservative political causes and candidates, including then-candidate Donald Trump during the 2016 presidential general election.

15.     Mercer and his daughter were influential advisors to the Trump campaign, recommending the hiring of two Mercer family associates, Stephen K. Bannon and Kellyanne Conway.

16.     Bannon became the Chief Executive Officer of the Trump campaign and is now White House Chief Strategist.  Conway became the Campaign Manager of the Trump campaign and is now Counselor to the President.

17.     Mercer is also a major investor in Breitbart News, an alt-right media organization that Bannon used to lead.

18.     On January 16, 2017, Magerman called Mercer and asked if he had time for a personal conversation regarding Mercer's support for President Trump.

19.     The two discussed issues such as the Affordable Care Act and the social safety net, with Mercer expressing support for the administration's positions on these issues and Magerman expressing opposition.

20.     Mercer then made a series of racist comments, saying things such as:

a)      The United States began to go in the wrong direction after the passage of the Civil Rights Act in the 1960s;

b)      African Americans were doing fine in the late-1950s and early-1960s before the Civil Rights Act;

c)      The Civil Rights Act "infantilized" African Americans by making them dependent on government and removing any incentive to work;

d)      The only racist people remaining in the United States are black; and

e)      White people have no racial animus toward African Americans anymore, and if there is any, it is not something that the government should be concerned with.

21.    Magerman was stunned by these comments and pushed back, pointing out that society was segregated before the Civil Rights Act and African Americans were required to use separate and inferior schools, water fountains, and other everyday services and items.

22.    Mercer responded that those issues were not important.

23.    Magerman reported the conversation to Peter Brown, Mercer's co-Chief Executive Officer at Renaissance, who expressed disbelief that Mercer would make comments like those and asked if Magerman would be willing to talk to Mercer again.  Magerman agreed.

24.    On February 5, 2017, Mercer called Magerman and stated, in a threatening manner, "I hear you're going around saying I'm a white supremacist."

25.    Magerman told Mercer that that is not what Magerman had said, but then quoted back to Mercer the comments about African Americans that Mercer had made in their prior conversation.

26.    At first, Mercer disputed that he had said such things, though he did not actually deny saying them.

27.    In the course of rehashing the conversation, however, Mercer repeated many of these same views, and even cited research that allegedly supported his opinion that the Civil Rights Act harmed African Americans economically.

28.    Magerman was skeptical of the supposed data that Mercer relied on, but nonetheless pointed out that, even if it was true, there is more to someone's well-being than money, and segregation was still degrading and destructive and the United States was right to get rid of it.

29.    Mercer scoffed at this suggestion.

4

### Magerman Speaks to the Press About Mercer's Political Views

30.     Magerman continued to be alarmed by his boss's personal views and backing of policies and statements Magerman found to be divisive and harmful to the poor.

31.     Magerman was also concerned that Renaissance did not employ any African Americans in high-level positions.

32.     Magerman felt obligated to speak out against these policies and the support that some Renaissance employees had for them.

33.     Magerman, however, was aware of the alleged restrictions under the Employment Agreement and Handbook to avoid publicly disparaging either Renaissance or its employees, even though such policies are illegal and unenforceable.

34.     On January 29, 2017, before speaking publicly, Magerman sent a written memorandum to several Renaissance executives, including General Counsel Carla Porter, Chief Compliance Officer Mark Silber and Director of Human Resources Lavonne Wesner.  A copy of Magerman's January 29, 2017 memorandum, sent by email, is attached hereto as Exhibit B.

35.     In that memorandum, Magerman stated, *inter alia*, "the Mercers' public and blatant support for the Trump candidacy, presidency and agenda has cast a taint on all Renaissance employees, including myself.  To disallow employees to politely and honestly, but publicly, respond to this taint, and to prevent us from disavowing it in as public a forum as he has been allowed to promote it, is frankly unfair and untenable."  (Ex. B.)

36.     Magerman also sought guidance in that email as to what he would be allowed to say that would not subject him "to any retaliation in the workplace for my public speech."  (*Id.*)

37.     Magerman never received a written response to this email.

5

38.     After sending the email, however, Magerman did consult telephonically with Silber, the Chief Compliance Officer, regarding Magerman's intention to speak to the press about his concerns.

39.     Silber told Magerman that the statements Magerman was intending to make were permissible under company policy.

40.     Magerman then gave an interview to a reporter for the *Wall Street Journal*, in which Magerman criticized President Trump and Mercer's support for the President's agenda.

41.     After the interview, a representative of Renaissance called the reporter and threatened to cut him off from any further information from Renaissance if he published the article.

42.     The Renaissance representative also made a number of false accusations about Magerman and downplayed the significance of Magerman's substantial contributions to the success and profitability of Renaissance.

43.     Despite this effort to sabotage Magerman and silence his opinions, an article regarding the interview was published in the *Wall Street Journal* on February 23, 2017.  A copy of this article is attached hereto as Exhibit C.

44.     The following day, February 24, 2017, Magerman was suspended from Renaissance without pay.

45.     Magerman's suspension was in retaliation for his criticisms of Mercer's political activities and the causes he supports.

46.     Media stories about the *Wall Street Journal* article and Magerman's ensuing suspension were subsequently published in several other news sources, including the *Philadelphia Inquirer*, Philly.com and Dealbreaker.com.

6

47.     Magerman and Renaissance attempted to work out a resolution of Magerman's suspension that would allow Magerman to return to work without compromising his right to free speech, but were unable to do so.

48.     On or around March 30, 2017, Renaissance paid Magerman the compensation that it had withheld but *de facto* continued the suspension by locking Magerman out of the company's computers, isolating him from his colleagues and otherwise denying him the right to return to work.

49.     On or around April 20, 2017, Magerman attended a charity poker tournament in New York City attended by many Renaissance employees, including Mercer and his daughter.

50.     At the tournament, Mercer's daughter confronted Magerman, calling him "pond scum" and saying that "[k]arma is a bitch." An April 29, 2017 article from the *Wall Street Journal* describing this altercation is attached hereto as Exhibit D.

51.     Renaissance, in further retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports, fired Magerman as of April 29, 2017, in a letter Magerman received on May 3, 2017.

## COUNT I
### Violation of 42 U.S.C. § 1981

52.     Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

53.     Magerman, by reporting Mercer's racist comments to Brown and exercising his free speech to criticize what he believes are hateful statements and policies from President Trump and Mercer's support thereof, engaged in protected activity.

54.     Renaissance took an adverse employment action against Magerman by suspending and then firing him.

7

55.     Magerman's protected activity – reporting Mercer's racist comments to a superior and speaking out against Mercer's support for President Trump's prejudiced policies – was the direct and proximate cause of the adverse employment action taken by Renaissance.

56.     Renaissance has therefore violated Magerman's civil rights by firing him for engaging in protected activity.  Renaissance's conduct is an outrageous attempt to deny Magerman his constitutional and federal statutory rights.

57.     As a direct and proximate result of this adverse employment action and Renaissance's violation of Magerman's civil rights, Magerman has incurred and continues to incur significant damages in the form of lost wages and emotional and physical distress.

58.     Moreover, the limitation on the award of attorneys' fees and costs in the Employment Agreement is not enforceable because it prevents Magerman from effectively vindicating his federal statutory rights in the arbitral forum – specifically, it prevents Magerman from securing attorneys' fees and costs pursuant to 42 U.S.C. § 1988 for Renaissance's violation of Magerman's civil rights pursuant to 42 U.S.C. § 1981.

WHEREFORE, Claimant, David Magerman, demands judgment be entered in his favor and against Respondent, Renaissance Technologies LLC, and prays that the Arbitrator enter an Order granting the following relief:

1.     Compensatory damages in excess of $1,000,000.00;

2.     Expectation damages and consequential damages to be determined at the arbitration hearing;

3.     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

4.     Punitive damages; and

5.     Such other relief that the Arbitrator deems appropriate.

## COUNT II
### Violation of New York Labor Law § 201-d

59.    Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

60.    Under the Employment Agreement, Magerman was an employee at Renaissance. (Ex. A.)

61.    Magerman engaged in political activities under New York Labor Law – to wit, publicly criticizing President Trump and Mercer's support for President Trump's policies.

62.    Magerman engaged in these political activities outside of working hours, off of the Renaissance's premises and without use of Renaissance's equipment or other property.

63.    Renaissance suspended and then fired Magerman because of these political activities.

64.    Renaissance therefore wrongfully discharged Magerman under New York law.

65.    As a direct and proximate result of Mercer's wrongful discharge of Magerman, Magerman incurred and continues to incur significant damages in the form of lost wages and emotional and physical distress.

WHEREFORE, Claimant, David Magerman, demands judgment be entered in his favor and against Respondent, Renaissance Technologies LLC, and prays that the Arbitrator enter an Order granting the following relief:

1.    Compensatory damages in excess of $1,000,000.00;

2.    Expectation damages and consequential damages to be determined at the arbitration hearing;

3.    Attorneys' fees and costs;

4.    Punitive damages; and

5.    Such other relief that the Arbitrator deems appropriate.

Respectfully submitted,

COZEN O'CONNOR

Date: May 9 , 2017          By: _____

H. Robert Fiebach, Esquire
Jeffrey I. Pasek, Esquire
Thomas A. Leonard, Esquire
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
215-665-2000
215-665-2013 (fax)
*Counsel for Claimant, David Magerman*

# EXHIBIT D

~~IN THE UNITED STATES DISTRICT COURT~~
~~FOR THE EASTERN DISTRICT OF PENNSYLVANIA~~**JAMS EMPLOYMENT ARBITRATION**

~~Civil Action~~JAMS Case No._____ ~~JURY TRIAL DEMANDED~~

DAVID MAGERMAN ,

~~Plaintiff,~~Claimant,

     v.

~~ROBERT MERCER,~~

RENAISSANCE TECHNOLOGIES LLC,

Respondent.


~~Defendant.~~ _____

~~COMPLAINT~~
**NOTICE OF CLAIM AND DEMAND FOR ARBITRATION**

    ~~Plaintiff~~Claimant, David Magerman, by and through his undersigned counsel, hereby

asserts the following claims against ~~Defendant Robert Mercer~~Respondent, Renaissance

Technologies LLC.

**THE PARTIES**

    1.    ~~Plaintiff~~Claimant, David Magerman, is a resident of the Commonwealth of

Pennsylvania residing at 117 Raynham Road, Merion Station, Pennsylvania 19066.

    2.    ~~Defendant, Robert Mercer, is a resident of the State of New York residing at~~

~~149 Harbor Road, Saint James, New York 11780.~~Respondent, Renaissance Technologies

LLC ("Renaissance"), is a Delaware limited liability company with a principal place of business at 600 Route 25A, East Setauket, New York 11733.

## ~~JURISDICTION AND VENUE~~
## AGREEMENT TO ARBITRATE

3.   ~~This Court has personal jurisdiction over Mercer because Mercer purposefully directed his activities at Pennsylvania, the litigation arises out of those activities, and the exercise of personal jurisdiction comports with fair play and substantial justice.~~

~~4.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the action arises under the laws of the United States and all other claims are so related to the claim in the action within the Court's original jurisdiction that they form part of the same case or controversy. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states and the amount in controversy is in excess of $75,000.00, exclusive of interests and costs.5.Venue is proper in *this* Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District~~Magerman and Renaissance agreed to arbitrate the claims raised herein pursuant to the employment agreement executed by the parties on or around January 1, 2015 (the "Employment Agreement"), a copy of which is attached hereto as Exhibit A.

### FACTUAL  BACKGROUND

### Overview of Magerman's Work at Renaissance

~~6.   Magerman was formerly an employee of~~ 4. Renaissance ~~Technologies L.L.C. ("Renaissance"),~~is an investment management company trading in global- financial markets and based in East Setauket, New York and New York City.

7.5.    Although Renaissance is based in New York, Magerman worked primarily from his home in Pennsylvania.

8.    Mercer is Renaissance's co-Chief Executive Officer.

9.6.    Magerman had been employed by Renaissance for approximately the last 22 years with the exception of one two-year hiatus from the company. Magerman's most recent employment with Renaissance began on or about 2010 and was governed by an employment agreement revised in January 2015 (the "Employment Agreement "). A copy of the Employment Agreement is attached hereto as Exhibit A.

10.    Renaissance also had an employee handbook and policy manual (the "Handbook") that Renaissance claims governs employee conduct.

11.    The Handbook provides, among other things, that an employee cannot publicly disparage Renaissance or any of its employees.

12.7.    Magerman was a research scientist at Renaissance who designed mathematical and statistical algorithms to direct Renaissance's investment decisions on the international financial markets.

13.8.    The algorithms written by Magerman have been used by Renaissance to earn billions of dollars in revenue and have helped to make Mercer one of the wealthiest people in the United States..

14.9.    Renaissance and Mercer recognized the value that Magerman contributed to the company, paying him a salary and bonuses worth millions of dollars annually.

10.    Renaissance had an employee handbook and policy manual (the "Handbook") that Renaissance claims governs employee conduct.

11.     The restrictions placed on employees by the Handbook violate federal employment law and a charge has been filed with the National Labor Relations Board for unfair labor practices.

12.     The Handbook provides, among other things, that an employee cannot publicly disparage Renaissance or any of its employees.

**Magerman's Conversations with Robert Mercer**

13.     Renaissance' s co-Chief Executive Officer is Robert Mercer.

15.14.  Mercer is one of the wealthiest people in the United States and has long been a public supporter of conservative political causes and candidates,  including then-candidate Donald Trump during the 2016 presidential  general   election.

16.15.  Mercer and his daughter were influential advisors to the Trump campaign, recommending the hiring of two Mercer family associates, Stephen K. Bannon and Kellyanne Conway.

17.16.  Bannon became the Chief Executive Officer of the Trump campaign and is now White House Chief Strategist. Conway became the Campaign Manager of the Trump campaign and is now Counselor to the President.

18.17.  Mercer is also a major investor in Breitbart News, an alt-right media organization that Bannon used to lead.

19.18.  On January 16, 2017, Magerman called Mercer and asked if he had time for a personal conversation regarding Mercer's support for President Trump.

20.19.  The two discussed issues such as the Affordable Care Act and the social safety net, with Mercer expressing support for the Trump administration' s positions on these issues and Magerman expressing opposition.

21.20. Mercer then made a series of racist comments, saying things such as:

a)   The United States began to go in the wrong direction after the passage of the Civil Rights Act in the 1960s;

b)   African Americans were doing fine in the late-1950s and early-1960s before the Civil Rights Act;

c)   The Civil Rights Act "infantilized" African Americans by making them dependent on government and removing any incentive to work;

d)   The only racist people remaining in the United States are black; and

e)   White people have no racial animus toward African Americans anymore, and if there is any, it is not something that the government should be concerned with.

22.21. Magerman was stunned by these comments and pushed back, pointing out that society was segregated before the Civil Rights Act and African Americans were required to use separate and inferior schools, water fountains, and other everyday services and items.

23.22. Mercer responded that those issues were not important.

24.23. Magerman reported the conversation to Peter Brown, Mercer's co-Chief Executive Officer at Renaissance, who expressed disbelief that Mercer would make comments like those and asked if Magerman would be willing to talk to Mercer again. Magerman agreed.

25.24. On February 5, 2017, Mercer called Magerman and stated, in a threatening manner, "I hear you're going around saying I'm a white supremacist."

26.25. Magerman told Mercer that that is not what Magerman had said, but then quoted back to Mercer the comments about African Americans that Mercer had made in their prior conversation.

27.26. At first, Mercer disputed that he had said such things, althoughthough he did not actually deny saying them.

28.27.  In the course of rehashing the conversation, however, Mercer repeated many of these same views, and even cited research that allegedly supported his opinion that the Civil Rights Act harmed African Americans economically.

29.28.  Magerman was skeptical of the supposed data that Mercer relied on, but nonetheless pointed out that, even if it was true, there is more to someone's well-being than money, and segregation was still degrading and destructive and the United States was right to get rid of it.

30.29.  Mercer scoffed at this suggestion .

### Magerman Speaks to the Press About Mercer's Political Views

31.30.  Magerman continued to be alarmed by his boss's personal views and backing of policies and statements Magerman found to be divisive and harmful to the poor.

32.31.  Magerman was also concerned that Renaissance did not employ any African Americans in high-level positions.

33.32.  Magerman felt obligated to speak out against these policies and the support that some Renaissance employees had for them.

34.33.  Magerman, however, was aware of the alleged restrictions under the Employment Agreement  and Handbook  to avoid publicly  disparaging  either Renaissance  or its employees, even though such policies are illegal and unenforceable .

35.34.  On January 29, 2017, before speaking publicly, Magerman sent a written memorandum to several Renaissance executives, including General Counsel Carla Porter, Chief Compliance Officer Mark Silber and Director of Human Resources Lavonne Wesner. A copy of Magerman's January 29, 2017 memorandum, sent by email, is attached hereto as Exhibit B.

36.35.  In that memorandum, Magerman stated, *inter alia,* "the Mercers' public and blatant support for the Trump candidacy, presidency and agenda has cast a taint on all Renaissance employees, including myself. To disallow employees to politely and honestly, but publicly, respond to this taint, and to prevent us from disavowing it in as public a forum as he has been allowed to promote it, is frankly unfair and untenable ." (Ex. B.)

37.36.  Magerman also sought guidance in ~~writing~~that email as to what he would be allowed to say that would not subject him "to any retaliation in the workplace for my public speech." *(Id.)*

38.37.  Magerman never received a written response to this email.

39.38.  After sending the email, however, Magerman did consult telephonically with Silber, the Chief Compliance Officer, regarding Magerman's intention to speak to the press about his concerns.

40.39.  Silber told Magerman that the statements Magerman was intending to make were permissible under company policy.

41.40.  Magerman then gave an interview to a reporter for the *Wall Street Journal,* in which Magerman criticized President Trump and Mercer's support for the President' 's agenda.

42.41.  After the interview, a representative of Renaissance called the reporter and threatened to cut him off from any further information from Renaissance if he published the article.

43.42.  The Renaissance representative also made a number of false accusations about Magerman and downplayed the significance of Magerman's substantial contributions to the success and profitability of Renaissance.

44.43.  Despite this effort to sabotage Magerman and silence his opinions, an article regarding the interview was published in the *Wall Street Journal* on February 23, 2017. A copy of this article is attached hereto as Exhibit C.

45.44.  The following day, February 24, 2017, Magerman was suspended from Renaissance without pay.

46.   Upon information and belief, 45. Magerman' s suspension was ordered personally by Mercer and was in retaliation for Magerman'shis criticisms of Mercer's political activities and the causes he supports.

47.46.  Media stories about the *Wall Street Journal* article and Magerman's ensuing suspension were subsequently published in several other newnews sources, including the *Philadelphia Inquirer ,* Philly.com and Dealbreaker.com.

48.47.  Magerman and Renaissance attempted to work out a resolution of Magerman' s suspension that would allow Magerman to return to work without compromising his right to free speech, but were unable to do so.

49.48.  On or around March 30, 2017, Renaissance paid Magerman the compensation that it had withheld but *defacto* continued the suspension by locking Magerman out of the company' s computers, isolating him from his colleagues and otherwise denying him the right to return to work.

50.49.  On or around April 20, 2017, Magerman attended a charity poker tournament in New York City attended by many Renaissance employees, ,including Mercer and his daughter.

51.50.  At the tournament, Mercer's daughter confronted Magerman, calling him "pond scum" and saying that "[k]arma is a bitch." An April 29, 2017 article from the *Wall Street Journal* describing this altercation is attached hereto as Exhibit D.

52.51.  Renaissance, at the direction of Mercer and in further retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports, fired Magerman as of April 29, 2017, in a letter Magerman received on May 3, 2017.

## COUNT I
### Violation of 42 U.S.C. §
### 1981

53.52.  Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

54.53.  Magerman, by reporting Mercer's racist comments to Brown and exercising his right to free speech to criticize what he believes are hateful statements and policies from President Trump and Mercer's support thereof, engaged in protected activity.

55.    Mercer, as co-Chief Executive Officer of 54. Renaissance, took an adverse employment action against Magerman by suspending and then firing him.

56.55.  Magerman's protected  activity - reporting Mercer's racist comments to a superior and speaking out against Mercer's support for President Trump's prejudiced policies – -was the direct and proximate cause of the adverse employment action taken by MercerRenaissance.

57.    Mercer56.    Renaissance has therefore violated Magerman's civil rights by firing him for engaging in protected activity. MercerRenaissance's conduct is an outrageous attempt to deny Magerman his constitutional and federal statutory rights.

58.57.  As a direct and proximate result of this adverse employment action and MercerRenaissance's violation of Magerman's civil rights, Magerman has incurred and continues to incur significant damages in the form of lost wages and emotional and physical distress.

58.    Moreover, the limitation on the award of attorneys' fees and costs in the Employment Agreement is not enforceable because it prevents Magerman from effectively vindicating his federal statutory rights in the arbitral forum -specifically, it prevents Magerman from securing attorneys' fees and costs pursuant to 42 U.S.C. § 1988 for Renaissance's violation of Magerman's civil rights pursuant  to 42 U.S.C. § 1981.

WHEREFORE, PlaintiffClaimant, David Magerman, demands judgment be entered in his favor and against Defendant, Robert MercerRespondent, Renaissance Technologies LLC, and prays that this Courtthe Arbitrator enter an Order granting the following relief:

1.    Compensatory damages in excess of $150,000.001,000,000.00;

2.    Expectation damages and consequential damages to be determined at trialthe arbitration hearing;

3.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

4.    Punitive damages; and

5.    Such other relief that the CourtArbitrator deems appropriate.

**COUNT II**
**Wrongful Discharge**
**Violation of New York Labor Law § 201-d**

59.     Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

60.     Under the Employment Agreement, Magerman was an employee ~~at will~~ at Renaissance. (Ex. A, ~~12.~~.)

61.     ~~Mercer attempted to silence~~ Magerman ~~and prevent him from speaking out on political issues, even after Magerman received permission from Renaissance's Chief Compliance Officer to make the public statements attributed to him~~ engaged in political activities under New York Labor Law -to wit, publicly criticizing President Trump and Mercer's support for President Trump's policies.

62.     ~~Mercer's actions are tantamount  to forced political  speech because, by insisting that Magerman remain publicly silent about political issues, Mercer is forcing Magerman to tacitly support, or at least condone, Mercer's publicly announced and very visible political views. *See, e.g.,* Exhibit E~~ Magerman engaged in these political activities outside of working hours, off of the Renaissance's premises and without use of Renaissance's equipment or other property.

63.     ~~Mercer's decision to suspend and subsequently fire Magerman violates a clear mandate of public policy against forced political speech and conditioning employment on political  subordination~~ Renaissance suspended and then fired Magerman because of these political activities.

64.     ~~Mercer~~ Renaissance therefore wrongfully discharged Magerman under ~~Pennsylvania~~ New York law.

65.     As a direct and proximate result of Mercer' s wrongful discharge of Magerman, Magerman incurred and continues to incur significant damages in the form of lost wages and emotional and physical distress.

WHEREFORE , ~~Plaintiff~~Claimant, David Magerman, demands judgment be entered in his favor and against ~~Defendant, Robert Mercer~~Respondent, Renaissance Technologies LLC, and prays that ~~this Court~~the Arbitrator enter an Order granting the following relief:

1.     Compensatory damages in excess of $~~150,000.00~~1,000,000.00;

2.     Expectation damages and consequential damages to be determined at ~~trial~~the arbitration hearing;

3.     Attorneys' fees and costs;

4.     Punitive damages; and

5.     Such other relief that the ~~Court~~Arbitrator deems appropriate.

Respectfully  submitted,

~~COZEN O'CONNOR~~

Date: May ~~5,~~ _9_ ,2017

COZEN O'CONNER

By:

    H. Robert Fiebach, Esquire ~~(PA 2812)~~
    Jeffrey I. Pasek, Esquire ~~(PA 23700)~~
    Thomas A. Leonard, Esquire ~~(PA 317121)~~
    One Liberty Place
    1650 Market Street, Suite 2800
    Philadelphia, PA 19103
    215-665-2000
    215-665-2013 (fax)
    *Counsel for ~~Plaintiff~~Claimant, David Magerman*

# EXHIBIT E

## JAMS EMPLOYMENT ARBITRATION

DAVID MAGERMAN,                          )
                                         )
        Claimant,                     )     JAMS Case No. 1425023846
                                         )
    v.                                  )
                                         )
RENAISSANCE TECHNOLOGIES LLC,            )
                                         )
        Respondent.                  )
                                         )

## AMENDED NOTICE OF CLAIM AND DEMAND FOR ARBITRATION

Claimant, David Magerman, by and through his undersigned counsel, hereby asserts the following amended claims against Respondent, Renaissance Technologies LLC.

### THE PARTIES

1.    Claimant, David Magerman, is a resident of the Commonwealth of Pennsylvania residing at 117 Raynham Road, Merion Station, Pennsylvania 19066.

2.    Respondent, Renaissance Technologies LLC ("Renaissance"), is a Delaware limited liability company with a principal place of business at 600 Route 25A, East Setauket, New York 11733.

### AGREEMENT TO ARBITRATE

3.    Magerman and Renaissance agreed to arbitrate the claims raised herein pursuant to the employment agreement executed by the parties on or around January 1, 2015 (the "Employment Agreement"), a copy of which is attached hereto as Exhibit A.

### FACTUAL BACKGROUND

#### Overview of Magerman's Work at Renaissance

4.    Renaissance is an investment management company trading in global financial markets and based in East Setauket, New York and New York City.

5.     Although Renaissance is based in New York, for the past seven years Magerman worked primarily from his home in Pennsylvania.

6.     Magerman had been employed by Renaissance for approximately the last 22 years with the exception of one two-year hiatus from the company.  Magerman's most recent employment with Renaissance began on or about July 2010 and was governed by the Employment Agreement.

7.     Section 12 of the Employment Agreement contains a provision prohibiting Magerman from making "any disparaging or negative statement about the Company; any of its affiliates; any of their officers, directors, shareholders, members, managers, employees, representatives and agents . . . ."

8.     Renaissance also had an employee handbook and policy manual (the "Handbook") and Code of Ethics and Compliance Manual (the "Code of Ethics") that Renaissance claims governs employee conduct.

9.     The Handbook provides, among other things, a series of overbroad restrictions employee speech that are in violation of the National Labor Relations Act.  29 U.S.C. § 151, et seq.  Specifically, these restrictions purported to restrict Magerman from:

      a)     Engaging in "discourtesy, rudeness, and/or abuse to fellow employees or other persons involved in Company business" in violation of the National Labor Board's rulings in *First Transit, Inc.*, 360 NLRB 619 (2011) and *Karl Knaus Motors, Inc.*, 358 NLRB 1754 (2012);

      b)     "Making or publishing false, vicious or malicious statements concerning employees, the Company or its business" in violation of the National Labor Board's rulings in *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998), enf'd, 203 F.3d 52 (D.C. Cir. 1999); *Chipotle Servs., LLC*, 364 NLRB No. 72, slip op. at 1 (Aug. 18, 2016); and *Casino San Pablo*, 361 NLRB No. 148, slip op. at 4 (Dec. 16, 2014);

      c)     "Communicating with the media in any forms including blogs, chat sites, web forums or editorial pages concerning Renaissance without express written permission from the Chief Compliance Officer, which is a serious

2

infraction of the confidentiality policy" in violation of the National Labor Board's rulings in *Hacienda de Salud-Espanola*, 317 NLRB 962, 966 (1995); and *Pier Sixty, LLC*, 362 NLRB No. 59, slip op. at 23-24 (Mar. 31, 2015), *aff'd*, *NLRB v. Pier Sixty, LLC*, 855 F.3d 115 (2d Cir. 2017); and

d) "Engaging in any other act evidencing poor judgment, dishonesty, or disregard for the law or the Company's policies and reputation" in violation of the National Labor Board's rulings in *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998), *enf'd*, 203 F.3d 52 (D.C. Cir. 1999); and *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004).

10.  The National Labor Relations Board has also held in *Quicken Loans, Inc.*, 359 NLRB 1201 (2013), *enf'd*, 830 F.3d 542 (D.C. Cir. 2016), that a non-disparagement provision of the type contained in the Employment Agreement is invalid and unenforceable under the National Labor Relations Act.

11.  The Code of Ethics provides that an employee can communicate with the press or other news media with the approval of either the Chief Compliance Officer or the General Counsel.  A copy of the relevant portion of the Code of Ethics is attached as Exhibit B.

12.  Magerman was a research scientist at Renaissance who designed mathematical and statistical algorithms to direct Renaissance's investment decisions on the international financial markets.

13.  The algorithms written by Magerman have been used by Renaissance to earn billions of dollars in revenue.

14.  Renaissance managed money for a wide array of clients, including public entities such as the University of California, public employee pension funds for government employees in New York and California, and other entities that required Renaissance to hire and advance minorities, including African Americans, in the workplace.

15.  Renaissance recognized the value that Magerman contributed to the company, paying him a salary and bonuses worth millions of dollars annually.

## Employment Practices at Renaissance

16.     During his employment at Renaissance, Magerman also served as a hiring manager for highly-compensated managerial and technical positions for approximately nine years, from approximately 1997-2006.

17.     Magerman participated in the hiring of people for around 20-30 positions from among candidates who were presented to him to interview by Renaissance's Human Resources Department or by his superiors at Renaissance.

18.     To the best of his recollection, none of the candidates presented to Magerman to be interviewed that were eventually hired were African American.

19.     During the time that Magerman was involved in the hiring process, Renaissance employed subjective hiring criteria.

20.     During the period from 2010 through the present, Magerman has been generally familiar with the workforce at Renaissance's East Setauket office based on making several visits to that facility per year and making presentations to and otherwise interacting with employees at that location.

21.     The East Setauket office has about 200 total employees, which include about 100-125 employees in management or significant technical positions earning salaries and bonuses in excess of $500,000 per year ("Highly-Compensated Employees").

22.     During Magerman's employment at Renaissance, there were never any African American employees working as Highly-Compensated Employees in the East Setauket office.

23.     Renaissance's co-Chief Executive Officer is Robert Mercer. As co-CEO, Mercer established the culture of the company, which is reflected in Renaissance's hiring practices.

**Magerman's Conversations with Mercer**

24.     Mercer has long been a public supporter of ultra-conservative political causes and

candidates, including then-candidate Donald Trump during the 2016 presidential general

election.

25.     During the Presidential campaign, Trump engaged in several actions for which he

was widely attacked in the media as being racist, including:

- Failing to renounce David Duke, a white nationalist and former Ku Klux Klan in February of 2016;

- Implying in May of 2016 that the Honorable Gonzalo Curiel, the federal judge presiding over a class action against the for-profit Trump University, could not fairly hear the case because of his Mexican heritage;

- Serving as a leading proponent of "birtherism," the racist conspiracy theory that President Barak Obama was not born in the United States;

- Condoning the physical attack on an African American protester at a campaign rally in Alabama in November of 2015.

26.     Mercer and his daughter were influential advisors to the Trump campaign,

recommending the hiring of two Mercer family associates, Stephen K. Bannon and Kellyanne

Conway.

27.     Bannon became the Chief Executive Officer of the Trump campaign and is now

White House Chief Strategist.  Conway became the Campaign Manager of the Trump campaign

and is now Counselor to the President.

28.     Mercer is also a major investor in Breitbart Holdings, Inc. ("Breitbart"), which

operates Breitbart News and Breitbart Media, alt-right media organizations that Bannon used to

lead.

29.     During the time Mercer was a major investor in Breitbart and Bannon served as chairman of Breitbart Media, Breitbart News was engaged in creating what national media characterized as an online haven for white nationalists.

30.     On January 16, 2017, Magerman called Mercer and asked if he had time for a personal conversation regarding Mercer's support for President Trump.

31.     The two discussed issues such as the Affordable Care Act and the social safety net, with Mercer expressing support for the Trump administration's positions on these issues and Magerman expressing opposition.

32.     The conversation then turned to the subject of racial minorities, at which time Mercer then made a series of racist comments, saying things such as:

    a)     The United States began to go in the wrong direction after the passage of the Civil Rights Act in the 1960s;

    b)     African Americans were doing fine in the late-1950s and early-1960s before the Civil Rights Act;

    c)     The Civil Rights Act "infantilized" African Americans by making them dependent on government and removing any incentive to work;

    d)     The only racist people remaining in the United States are black; and

    e)     White people have no racial animus toward African Americans anymore, and if there is any, it is not something that the government should be concerned with.

33.     Mercer also stated that he did not believe in affirmative action.

34.     Magerman was stunned by these comments and pushed back, pointing out that society was segregated before the Civil Rights Act and African Americans were required to use separate and inferior schools, water fountains, and other everyday services and items.

35.     Mercer responded that those issues were not important.

36.    Magerman reported the conversation to Peter Brown, Mercer's co-Chief Executive Officer at Renaissance, along with his belief that Mercer's public political views and association with alt-right groups such as Breitbart News were damaging to the image and reputation of Renaissance, by which Magerman intended to convey, *inter alia*, that Mercer's publicly-stated views prevented the company from hiring a more diverse workforce of Highly-Compensated Employees.

37.    Brown expressed disbelief that Mercer would make comments like those.  Brown asked if he could share with Mercer his conversation with Magerman and asked if Magerman would be willing to talk to Mercer again.  Magerman agreed.

38.    Magerman advised Brown that he was concerned that Mercer's embrace of right wing causes and candidates was bad for Renaissance and could damage the company's standing with investors and prospective employees who would not want to be associated with Mercer's ideology.

39.    On February 5, 2017, Mercer called Magerman and stated, in a threatening manner, "I hear you're going around saying I'm a white supremacist."

40.    Magerman denied that he had labelled Mercer a white supremacist, and denies that he ever used the term "white supremacist" in describing Mercer.

41.    Magerman then quoted back to Mercer the comments about African Americans that Mercer had made in their prior conversation and that Magerman had reported to Brown.

42.    At first, Mercer disputed that he had said such things, although he did not actually deny saying them.

43.     In the course of rehashing the conversation, however, Mercer repeated many of these same views, and even cited research that allegedly supported his opinion that the Civil Rights Act harmed African Americans economically.

44.     Magerman was skeptical of the supposed data that Mercer relied on, but nonetheless pointed out that, even if it was true, there is more to someone's well-being than money, and segregation was still degrading and destructive and the United States was right to get rid of it.

45.     Mercer scoffed at this suggestion.

**Magerman Speaks to the Press About Mercer's Political Views**

46.     Magerman continued to be alarmed by his boss's personal views and backing of policies and statements Magerman found to be divisive and harmful to the poor and minorities.

47.     Magerman was also concerned that Renaissance did not employ any African Americans as Highly-Compensated Employees as a result of which he was denied the opportunity to work with and associate with highly-compensated African Americans and other minorities in managerial and technical positions who could be advantageous to Magerman in his future business dealings.

48.     Magerman felt obligated to speak out against Mercer's support for racist policies and the implication that Magerman and other Renaissance employees shared those views.

49.     Magerman, however, was aware of alleged restrictions under the Employment Agreement and Handbook to avoid publicly disparaging either Renaissance or its employees, even though such policies are illegal and unenforceable.

50.     On January 29, 2017, before speaking publicly, Magerman sent a written memorandum to several Renaissance executives, including General Counsel Carla Porter, Chief

8

Compliance Officer Mark Silber and Director of Human Resources Lavonne Wesner. A copy of

Magerman's January 29, 2017 memorandum, sent by email, is attached hereto as Exhibit C.

51.     In that memorandum, Magerman stated, *inter alia*, "the Mercers' public and

blatant support for the Trump candidacy, presidency and agenda has cast a taint on all

Renaissance employees, including myself. To disallow employees to politely and honestly, but

publicly, respond to this taint, and to prevent us from disavowing it in as public a forum as he

has been allowed to promote it, is frankly unfair and untenable." (Ex. B.)

52.     Magerman also sought guidance in writing as to what he would be allowed to say

that would not subject him "to any retaliation in the workplace for my public speech." (*Id.*)

53.     Magerman never received a written response to this email.

54.     After sending the email, however, Magerman did consult telephonically with

Silber, the Chief Compliance Officer, regarding Magerman's intention to speak to the press

about his concerns.

55.     Silber told Magerman that he could speak to the press, but that Renaissance's

biggest concerns were that its trade secrets were protected and that the company did not appear

to have infighting among its employees.

56.     Magerman told Silber that Silber would have a chance to review the statements

Magerman made to the media before they were published.

57.     Magerman then gave an interview to a reporter for the *Wall Street Journal*, in

which Magerman criticized President Trump and Mercer's support for the President's agenda.

58.     Magerman's statements were made available to Silber, who then denied that

Magerman had ever been given permission to speak to the press.

59.     Upon information, Magerman alleges that Mercer became aware that Magerman had given an interview to a reporter for the *Wall Street Journal,* and communicated false information about Magerman to John Gasthalter, a public relations representative of Renaissance, in an effort to coerce Magerman from having any further communications with the press about Mercer.

60.     Upon information, Magerman alleges Gasthalter, called the *Wall Street Journal* reporter and threatened to cut him off from any further information from Renaissance if he published an article regarding Magerman's interview.

61.     Upon information, Magerman alleges that Gasthalter, at the instigation of Mercer, also made a number of false accusations about Magerman to the *Wall Street Journal* reporter and downplayed the significance of Magerman's substantial contributions to the success and profitability of Renaissance.

62.     Despite this effort to sabotage Magerman and silence his opinions, an article regarding the interview was published in the *Wall Street Journal* on February 23, 2017.  A copy of this article is attached hereto as Exhibit D.

63.     The following day, February 24, 2017, Magerman was suspended from Renaissance without pay.

64.     Magerman's suspension was in retaliation for his criticisms of Mercer's political activities and the causes he supports.

65.     Media stories about the *Wall Street Journal* article and Magerman's ensuing suspension were subsequently published in several other new sources, including the *Philadelphia Inquirer*, Philly.com and Dealbreaker.com.

66.     Magerman and Renaissance attempted to work out a resolution of Magerman's suspension that would allow Magerman to return to work without compromising his right to free speech.

67.     During his suspension, and prior to his employment being terminated, Magerman again told Brown that Mercer's public political views and association with the alt-right were harmful to the image and reputation of Renaissance, by which Magerman intended to convey, *inter alia*, that Mercer's publicly-stated views and activities prevented the company from hiring a more diverse workforce of Highly-Compensated Employees.

68.     During his suspension, and prior to his employment being terminated, Magerman advised his immediate supervisors at Renaissance, Jim Hernstein and Stephen Della Pietra, that public awareness of Mercer's views, combined with the lack of minorities in the company would damage Renaissance from an EEO perspective.  Upon information and belief, Magerman alleges that Hernstein and Della Pietra reported their conversations with Magerman to senior management at Renaissance and that this information was conveyed to Mercer.

69.     On or around March 30, 2017, Renaissance paid Magerman the base compensation that it had withheld but *de facto* continued the suspension by locking Magerman out of the company's computers, isolating him from his colleagues and otherwise denying him the right to return to work.

70.     On or around April 20, 2017, Magerman attended a charity poker tournament in New York City attended by many Renaissance employees, including Mercer and his daughter.

71.     At the tournament, Mercer's daughter confronted Magerman, calling him "pond scum" and saying that "[k]arma is a bitch."  An April 29, 2017 article from the *Wall Street Journal* describing this altercation is attached hereto as Exhibit E.

11

72.     Renaissance, in further retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports, fired Magerman as of April 29, 2017, in a letter Magerman received on May 3, 2017.

73.     Mercer has decision-making control over Renaissance hiring practices and the hiring of Highly Compensated Employees.

74.     Mercer's political views affect the culture at Renaissance.

75.     The failure of Renaissance to hire African Americans to managerial and technical positions as Highly Compensated Employees is, on belief, the result of the effect of Mercer's political views on the culture of Renaissance.

**COUNT I**
**Violation of 42 U.S.C. § 1981**

76.     Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

77.     Upon information and belief, Mercer created a pattern and practice of racial discrimination in the hiring of African Americans at Renaissance, as evidenced by the complete exclusion of African Americans in positions as Highly Compensated Employees.

78.     Mercer's public political views, association with the alt-right, and racist comments deterred potential qualified African Americans from applying for positions as Highly Compensated Employees at Renaissance.

79.     Magerman, by reporting Mercer's racist comments to Brown, calling attention to the negative impact that Mercer's public political views, association with the alt-right, and racist comments were having on the image and reputation of Renaissance to Brown and others in management such as Porter, Silber, and Wesner, and exercising his right to free speech to criticize what he believes are hateful statements and policies from President Trump and Mercer's

12

support thereof, engaged in protected activity to oppose racial discrimination in the making and enforcement of contracts.

80.     Renaissance took an adverse employment action against Magerman by suspending him, threatening him, and then firing him.

81.     Magerman's protected activity – reporting Mercer's racist comments to a superior, calling attention to the negative impact that Mercer's public political views, association with the alt-right, and racist comments were having on the image and reputation of Renaissance and its ability to recruit diverse employees, and speaking out against Mercer's support for President Trump's prejudiced policies – was the direct and proximate cause of the adverse employment action taken by Mercer.

82.     Any contention that Magerman was not discharged because of his taking issue with Mercer's alt-right and racist comments and his criticism that these policies were hurting the image and reputation of the company and preventing it from having a more diverse workforce is pretextual.

83.     Renaissance has therefore violated Magerman's civil rights by firing him for engaging in protected activity in opposing racial discrimination in the making and enforcement of contracts.  Renaissance's conduct is an outrageous attempt to deny Magerman his constitutional and federal statutory rights.

84.     As a direct and proximate result of this adverse employment action and Renaissance's violation of Magerman's civil rights, Magerman has incurred and continues to incur significant damages in the form of lost compensation, bonuses, and investment income, and emotional and physical distress.  In addition, Magerman has been deprived of retirement benefits to which he was entitled.

WHEREFORE, Claimant, David Magerman, demands judgment be entered in his favor and against Respondent, Renaissance Technologies LLC, and prays that the Arbitrator enter an Order granting the following relief:

1.  Compensatory damages in excess of $1,000,000.00;

2.  Expectation damages and consequential damages to be determined at trial;

3.  Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

4.  Punitive damages; and

5.  Such other relief that the Arbitrator deems appropriate.

## COUNT II
### Violation of New York Labor Law § 201-d

85.  Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

86.  Under the Employment Agreement, Magerman was an employee at Renaissance. (Ex. A.)

87.  Magerman engaged in political activities under New York Labor Law – to wit, publicly criticizing President Trump and Mercer's support for President Trump's policies.

88.  Magerman engaged in these political activities outside of working hours, off of the Renaissance's premises and without use of Renaissance's equipment or other property.

89.  Renaissance suspended and then fired Magerman because of these political activities.

90.  Renaissance therefore wrongfully discharged Magerman under New York law.

91.  As a direct and proximate result of Mercer's wrongful discharge of Magerman, Magerman incurred and continues to incur significant damages in the form of lost wages and emotional and physical distress.

WHEREFORE, Claimant, David Magerman, demands judgment be entered in his favor and against Respondent, Renaissance Technologies LLC, and prays that this Court enter an Order granting the following relief:

    1.    Compensatory damages in excess of $150,000.00;

    2.    Expectation damages and consequential damages to be determined at trial;

    3.    Attorneys' fees and costs;

    4.    Punitive damages; and

    5.    Such other relief that the Court deems appropriate.

## COUNT III
### Wrongful Discharge

92.    Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

93.    In the January 29, 2017 memorandum, pursuant to the Code of Ethics, Magerman sought permission to speak to the press regarding Mercer's political views.  (Exhibits B, C.)

94.    Magerman received approval from Silber, the Chief Compliance Officer, to speak to the press.

95.    Renaissance is bound by express statements limiting its right to discharge employees.

96.    Renaissance contravened its own rules and regulations by firing Magerman after he had received persmission from the Chief Compliance Officer to speak to the press.

97.    Renaissance therefore wrongfully discharged Magerman under New York law.

98.    As a direct and proximate result of Mercer's wrongful discharge of Magerman, Magerman incurred and continues to incur significant damages in the form of lost wages and emotional and physical distress.

WHEREFORE, Claimant, David Magerman, demands judgment be entered in his favor and against Respondent, Renaissance Technologies LLC, and prays that this Court enter an Order granting the following relief:

1. Compensatory damages in excess of $150,000.00;

2. Expectation damages and consequential damages to be determined at trial;

3. Attorneys' fees and costs;

4. Punitive damages; and

5. Such other relief that the Court deems appropriate.

Respectfully submitted,

COZEN O'CONNOR

Date: August 2, 2017                    By: _____

H. Robert Fiebach, Esquire (PA 02812)
Jeffrey I. Pasek, Esquire (PA 23700)
Thomas A. Leonard, Esquire (PA 317121)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
215-665-2000
215-665-2013 (fax)
*Counsel for Claimant, David Magerman*

# EXHIBIT F

**JAMS EMPLOYMENT ARBITRATIONIN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAVID MAGERMAN,<br><br>Claimant, Plaintiff,<br><br>v.<br><br>RENAISSANCE TECHNOLOGIES LLC,  ROBERT MERCER,<br><br>Respondent.  Defendant. | JAMS Case Civil Action No. 1425023846<br><br><br>JURY TRIAL DEMANDED |

**AMENDED NOTICE OF CLAIM AND DEMAND FOR ARBITRATIONCOMPLAINT**

ClaimantPlaintiff, David Magerman, by and through his undersigned counsel, hereby asserts the following amended claims against Respondent, Renaissance Technologies LLCDefendant Robert Mercer.

**THE PARTIES**

1.      ClaimantPlaintiff, David Magerman, is a resident of the Commonwealth of Pennsylvania residing at 117 Raynham Road, Merion Station, Pennsylvania 19066.

2.      Respondent, Renaissance Technologies LLC ("Renaissance"), is a Delaware limited liability company with a principal place of business at 600 Route 25A, East Setauket, New York 11733.Defendant, Robert Mercer, is a resident of the State of New York residing at 149 Harbor Road, Saint James, New York 11780.

AGREEMENT TO ARBITRATE

**JURISDICTION AND VENUE**

3.      This Court has personal jurisdiction over Mercer because Mercer purposefully directed his activities at Pennsylvania, the litigation arises out of those activities, and the exercise of personal jurisdiction comports with fair play and substantial justice.

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the action arises under the laws of the United States and all other claims are so related to the claim in the action within the Court's original jurisdiction that they form part of the same case or controversy. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states and the amount in controversy is in excess of $75,000.00, exclusive of interests and costs.

5.      3. Magerman and Renaissance agreed to arbitrate the claims raised herein pursuant to the employment agreement executed by the parties on or around January 1, 2015 (the "Employment Agreement"), a copy of which is attached hereto as Exhibit A Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.


**FACTUAL BACKGROUND**

*Overview of Magerman's Work at Renaissance*

6.      4. Magerman was formerly an employee of Renaissance is Technologies L.L.C. ("Renaissance"), an investment management company trading in global financial markets and based in East Setauket, New York and New York City.

7.      5. Although Renaissance is based in New York, for the past seven years Magerman worked primarily from his home in Pennsylvania.

8.      Mercer is Renaissance's co-Chief Executive Officer.

9.      6. Magerman had been employed by Renaissance for approximately the last 22 years with the exception of one two-year hiatus from the company. Magerman's most recent employment with Renaissance began on or about July 2010 and was governed by the an employment agreement revised in January 2015 (the "Employment Agreement"). A copy of the Employment Agreement is attached hereto as Exhibit A.

10.     7. Section 12 of the Employment Agreement contains a provision prohibiting Magerman from making "any disparaging or negative statement about the Company; any of its affiliates;

any of their officers, directors, shareholders, members, managers, employees, representatives and agents . . . ."

11.   8. Renaissance also had an employee handbook and policy manual (the "Handbook") and Code of Ethics and Compliance Manual (the "Code of Ethics") that Renaissance claims governs employee conduct.

12.   9. The Handbook provides, among other things, a series of overbroad restrictions employee speech that are in violation of the National Labor Relations Act. 29 U.S.C. § 151, et seq. Specifically, these restrictions purported to restrict Magerman from:

   a)   Engaging in "discourtesy, rudeness, and/or abuse to fellow employees or other persons involved in Company business" in violation of the National Labor Board's rulings in First Transit, Inc., 360 NLRB 619 (2011) and Karl Knaus Motors, Inc., 358 NLRB 1754 (2012);

   b)   "Making or publishing false, vicious or malicious statements concerning employees, the Company or its business" in violation of the National Labor Board's rulings in Lafayette Park Hotel, 326 NLRB 824, 825 (1998), enf'd, 203 F.3d 52 (D.C. Cir. 1999); Chipotle Servs., LLC, 364 NLRB No. 72, slip op. at 1 (Aug. 18, 2016); and Casino San Pablo, 361 NLRB No. 148, slip op. at 4 (Dec. 16, 2014);

   c)   "Communicating with the media in any forms including blogs, chat sites, web forums or editorial pages concerning Renaissance without express written permission from the Chief Compliance Officer, which is a serious infraction of the confidentiality policy" in violation of the National Labor Board's rulings in Hacienda de Salud-Espanola, 317 NLRB 962, 966 (1995); and Pier Sixty, LLC, 362 NLRB No. 59, slip op. at 23-24 (Mar. 31, 2015), aff'd, NLRB v. Pier Sixty, LLC, 855 F.3d 115 (2d Cir. 2017); and

   d)   "Engaging in any other act evidencing poor judgment, dishonesty, or disregard for the law or the Company's policies and reputation" in violation of the National Labor Board's rulings in Lafayette Park Hotel, 326 NLRB 824, 825 (1998), enf'd, 203 F.3d 52 (D.C. Cir. 1999); and Lutheran Heritage Village-Livonia, 343 NLRB 646 (2004).

13.   10. The National Labor Relations Board has also held in Quicken Loans, Inc., 359

NLRB 1201 (2013), enf'd, 830 F.3d 542 (D.C. Cir. 2016), that a non-disparagement provision of the type contained in the Employment Agreement is invalid and unenforceable under the National Labor Relations Act.

14.   11. The Code of Ethics provides that an employee can communicate with the press or other news media with the approval of either the Chief Compliance Officer or the General Counsel. A copy of the relevant portion of the Code of Ethics is attached as Exhibit B.

15.   12. Magerman was a research scientist at Renaissance who designed mathematical and statistical algorithms to direct Renaissance's investment decisions on the international financial markets.

16.   13. The algorithms written by Magerman have been used by Renaissance to earn billions of dollars in revenue and have helped to make Mercer one of the wealthiest people in the United States.

17.   14. Renaissance managed money for a wide array of clients, including public entities such as the University of California, public employee pension funds for government employees in New York and California, and other entities that required Renaissance to hire and advance minorities, including African Americans, in the workplace.

18.   15. Renaissance and Mercer recognized the value that Magerman contributed to the company, paying him a salary and bonuses worth millions of dollars annually.

*Employment Practices at Renaissance*

19.   16. During his employment at Renaissance, Magerman also served as a hiring manager for highly-compensated managerial and technical positions for approximately nine years, from approximately 1997-2006.

20.   17. Magerman participated in the hiring of people for around 20-30 positions from among candidates who were presented to him to interview by Renaissance's Human Resources Department or by his superiors at Renaissance.

21.   18. To the best of his recollection, none of the candidates presented to Magerman to be interviewed that were eventually hired were African American.

22.   19. During the time that Magerman was involved in the hiring process, Renaissance employed subjective hiring criteria.

23. 20. During the period from 2010 through the present, Magerman has been generally familiar with the workforce at Renaissance's East Setauket office based on making several visits to that facility per year and making presentations to and otherwise interacting with employees at that location.

24. 21. The East Setauket office has about 200 total employees, which include about 100-125 employees in management or significant technical positions earning salaries and bonuses in excess of $500,000 per year ("Highly-Compensated Employees").

25. 22. During Magerman's employment at Renaissance, there were never any African American employees working as Highly-Compensated Employees in the East Setauket office.

26. 23. Renaissance's co-Chief Executive Officer is Robert Mercer. As Mercer, as co-CEO of Renaissance, Mercer established the culture of the company, which is reflected in Renaissance's hiring practices.

*Magerman's Conversations with Mercer*

27. 24. Mercer has long been a public supporter of ultra-conservative political causes and candidates, including then-candidate Donald Trump during the 2016 presidential general election.

28. 25. During the Presidential campaign, Trump engaged in several actions for which he was widely attacked in the media as being racist, including:

- Failing to renounce David Duke, a white nationalist and former Ku Klux Klan in February of 2016;

- Implying in May of 2016 that the Honorable Gonzalo Curiel, the federal judge presiding over a class action against the for-profit Trump University, could not fairly hear the case because of his Mexican heritage;

- Serving as a leading proponent of "birtherism," the racist conspiracy theory that President Barak Obama was not born in the United States;

- Condoning the physical attack on an African American protester at a campaign rally in Alabama in November of 2015.

29. 26. Mercer and his daughter were influential advisors to the Trump campaign, recommending the hiring of two Mercer family associates, Stephen K. Bannon and Kellyanne Conway.

30. 27. Bannon became the Chief Executive Officer of the Trump campaign and is now White House Chief Strategist. Conway became the Campaign Manager of the Trump campaign and is now Counselor to the President.

31. 28. Mercer is also a major investor in Breitbart Holdings, Inc. ("Breitbart"), which operates Breitbart News and Breitbart Media, alt-right media organizations that Bannon used to lead.

32. 29. During the time Mercer was a major investor in Breitbart and Bannon served as chairman of Breitbart Media, Breitbart News was engaged in creating what national media characterized as an online haven for white nationalists.

33. 30. On January 16, 2017, Magerman called Mercer and asked if he had time for a personal conversation regarding Mercer's support for President Trump.

34. 31. The two discussed issues such as the Affordable Care Act and the social safety net, with Mercer expressing support for the Trump administration's positions on these issues and Magerman expressing opposition.

35. 32. The conversation then turned to the subject of racial minorities, at which time Mercer then made a series of racist comments, saying things such as:

a)      The United States began to go in the wrong direction after the passage of the Civil Rights Act in the 1960s;

b)      African Americans were doing fine in the late-1950s and early-1960s before the Civil Rights Act;

c)      The Civil Rights Act "infantilized" African Americans by making them dependent on government and removing any incentive to work;

d)      The only racist people remaining in the United States are black; and

e)      White people have no racial animus toward African Americans anymore, and if there is any, it is not something that the government should be concerned with.

36. 33. Mercer also stated that he did not believe in affirmative action.

37. 34. Magerman was stunned by these comments and pushed back, pointing out that society was segregated before the Civil Rights Act and African Americans were required to use separate and inferior schools, water fountains, and other everyday services and items.

38. 35. Mercer responded that those issues were not important.

39. 36. Magerman reported the conversation to Peter Brown, Mercer's co-Chief Executive Officer at Renaissance, along with his belief that Mercer's public political views and association with alt-right groups such as Breitbart News were damaging to the image and reputation of Renaissance, by which Magerman intended to convey, inter alia, that Mercer's publicly-stated views prevented the company from hiring a more diverse workforce of Highly- Compensated Employees.

40. 37. Brown expressed disbelief that Mercer would make comments like those. Brown asked if he could share with Mercer his conversation with Magerman and asked if Magerman would be willing to talk to Mercer again. Magerman agreed.

41. 38. Magerman advised Brown that he was concerned that Mercer's embrace of right wing causes and candidates was bad for Renaissance and could damage the company's standing with investors and prospective employees who would not want to be associated with Mercer's ideology.

42. 39. On February 5, 2017, Mercer called Magerman and stated, in a threatening manner, "I hear you're going around saying I'm a white supremacist."

43. 40. Magerman denied that he had labelled Mercer a white supremacist, and denies that he ever used the term "white supremacist" in describing Mercer.

44. 41. Magerman then quoted back to Mercer the comments about African Americans that Mercer had made in their prior conversation and that Magerman had reported to Brown.

45. 42. At first, Mercer disputed that he had said such things, although he did not actually deny saying them.

46. 43. In the course of rehashing the conversation, however, Mercer repeated many of these same views, and even cited research that allegedly supported his opinion that the Civil Rights Act harmed African Americans economically.

47. 44. Magerman was skeptical of the supposed data that Mercer relied on, but nonetheless pointed out that, even if it was true, there is more to someone's well-being than money, and segregation was still degrading and destructive and the United States was right to get rid of it.

48. 45. Mercer scoffed at this suggestion.

*Magerman Speaks to the Press About Mercer's Political Views*

49. ~~46.~~ Magerman continued to be alarmed by his boss's personal views and backing of policies and statements Magerman found to be divisive and harmful to the poor and minorities.

50. ~~47.~~ Magerman was also concerned that Renaissance did not employ any African Americans as Highly-Compensated Employees as a result of which he was denied the opportunity to work with and associate with highly-compensated African Americans and other minorities in managerial and technical positions who could be advantageous to Magerman in his future business dealings.

51. ~~48.~~ Magerman felt obligated to speak out against Mercer's support for racist policies and the implication that Magerman and other Renaissance employees shared those views.

52. ~~49.~~ Magerman, however, was aware of alleged restrictions under the Employment Agreement and Handbook to avoid publicly disparaging either Renaissance or its employees, even though such policies are illegal and unenforceable.

53. ~~50.~~ On January 29, 2017, before speaking publicly, Magerman sent a written memorandum to several Renaissance executives, including General Counsel Carla Porter, Chief Compliance Officer Mark Silber and Director of Human Resources Lavonne Wesner. A copy of Magerman's January 29, 2017 memorandum, sent by email, is attached hereto as Exhibit C.

54. ~~51.~~ In that memorandum, Magerman stated, inter alia, "the Mercers' public and blatant support for the Trump candidacy, presidency and agenda has cast a taint on all Renaissance employees, including myself. To disallow employees to politely and honestly, but publicly, respond to this taint, and to prevent us from disavowing it in as public a forum as he has been allowed to promote it, is frankly unfair and untenable." (Ex. ~~B~~C.)

55. ~~52.~~ Magerman also sought guidance in writing as to what he would be allowed to say that would not subject him "to any retaliation in the workplace for my public speech." (Id.)

56. ~~53.~~ Magerman never received a written response to this email.

57. ~~54.~~ After sending the email, however, Magerman did consult telephonically with Silber, the Chief Compliance Officer, regarding Magerman's intention to speak to the press about his concerns.

58. ~~55.~~ Silber told Magerman that he could speak to the press, but that Renaissance's biggest concerns were that its trade secrets were protected and that the company did not appear to have infighting among its employees.

59. 56. Magerman told Silber that Silber would have a chance to review the statements Magerman made to the media before they were published.

60. 57. Magerman then gave an interview to a reporter for the Wall Street Journal, in which Magerman criticized President Trump and Mercer's support for the President's agenda.

61. 58. Magerman's statements were made available to Silber, who then denied that Magerman had ever been given permission to speak to the press.

62. 59. Upon information, Magerman alleges that Mercer became aware that Magerman had given an interview to a reporter for the Wall Street Journal, and communicated false information about Magerman to John Gasthalter, a public relations representative of Renaissance, in an effort to coerce Magerman from having any further communications with the press about Mercer.

63. 60. Upon information, Magerman alleges Gasthalter, called the Wall Street Journal reporter and threatened to cut him off from any further information from Renaissance if he published an article regarding Magerman's interview.

64. 61. Upon information, Magerman alleges that Gasthalter, at the instigation of Mercer, also made a number of false accusations about Magerman to the Wall Street Journal reporter and downplayed the significance of Magerman's substantial contributions to the success and profitability of Renaissance.

65. 62. Despite this effort to sabotage Magerman and silence his opinions, an article regarding the interview was published in the Wall Street Journal on February 23, 2017. A copy of this article is attached hereto as Exhibit D.

66. 63. The following day, February 24, 2017, Magerman was suspended from Renaissance without pay.

67. 64. Upon information and belief, Magerman's suspension was ordered personally by Mercer and was in retaliation for his Magerman's criticisms of Mercer's political activities and the causes he supports.

68. 65. Media stories about the Wall Street Journal article and Magerman's ensuing suspension were subsequently published in several other new sources, including the Philadelphia Inquirer, Philly.com and Dealbreaker.com.

69. 66. Magerman and Renaissance attempted to work out a resolution of Magerman's suspension that would allow Magerman to return to work without compromising his right to free speech.

70. ~~67.~~ During his suspension, and prior to his employment being terminated, Magerman again told Brown that Mercer's public political views and association with the alt-right were harmful to the image and reputation of Renaissance, by which Magerman intended to convey, inter alia, that Mercer's publicly-stated views and activities prevented the company from hiring a more diverse workforce of Highly-Compensated Employees.

71. ~~68.~~ During his suspension, and prior to his employment being terminated, Magerman advised his immediate supervisors at Renaissance, Jim Hernstein and Stephen Della Pietra, that public awareness of Mercer's views, combined with the lack of minorities in the company would damage Renaissance from an EEO perspective. Upon information and belief, Magerman alleges that Hernstein and Della Pietra reported their conversations with Magerman to senior management at Renaissance and that this information was conveyed to Mercer.

72. ~~69.~~ On or around March 30, 2017, Renaissance paid Magerman the base compensation that it had withheld but de facto continued the suspension by locking Magerman out of the company's computers, isolating him from his colleagues and otherwise denying him the right to return to work.

73. ~~70.~~ On or around April 20, 2017, Magerman attended a charity poker tournament in New York City attended by many Renaissance employees, including Mercer and his daughter.

74. ~~71.~~ At the tournament, Mercer's daughter confronted Magerman, calling him "pond scum" and saying that "[k]arma is a bitch." An April 29, 2017 article from the Wall Street Journal describing this altercation is attached hereto as Exhibit E.

75. ~~72.~~ Renaissance, at the direction of Mercer and in further retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports, fired Magerman as of April 29, 2017, in a letter Magerman received on May 3, 2017.

76. ~~73.~~ Mercer has decision-making control over Renaissance hiring practices and the hiring of Highly Compensated Employees.

77. ~~74.~~ Mercer's political views affect the culture at Renaissance.

78. ~~75.~~ The failure of Renaissance to hire African Americans to managerial and technical positions as Highly Compensated Employees is, on belief, the result of the effect of Mercer's political views on the culture of Renaissance.

**COUNT I**

**Violation of 42 U.S.C. § 1981**

79. 76. Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

80.    77. Upon information and belief, Mercer created a pattern and practice of racial discrimination in the hiring of African Americans at Renaissance, as evidenced by the complete exclusion of African Americans in positions as Highly Compensated Employees.

81.    78. Mercer's public political views, association with the alt-right, and racist comments deterred potential qualified African Americans from applying for positions as Highly Compensated Employees at Renaissance.

82.    79. Magerman, by reporting Mercer's racist comments to Brown, calling attention to the negative impact that Mercer's public political views, association with the alt-right, and racist comments were having on the image and reputation of Renaissance to Brown and others in management such as Porter, Silber, and Wesner, and exercising his right to free speech to criticize what he believes are hateful statements and policies from President Trump and Mercer's support thereof, engaged in protected activity to oppose racial discrimination in the making and enforcement of contracts.

83.    80. Mercer, as co-Chief Executive Officer of Renaissance, took an adverse employment action against Magerman by suspending him, threatening him, and then firing him. Based on Mercer's role in the company, it is inconceivable to Magerman that Mercer did not personally direct that he be fired.

84.    81. Magerman's protected activity — reporting Mercer's racist comments to a superior, calling attention to the negative impact that Mercer's public political views, association with the alt-right, and racist comments were having on the image and reputation of Renaissance and its ability to recruit diverse employees, and speaking out against Mercer's support for President Trump's prejudiced policies — was the direct and proximate cause of the adverse employment action taken by Mercer.

85.    82. Any contention that Magerman was not discharged because of his taking issue with Mercer's alt-right and racist comments and his criticism that these policies were hurting the image and reputation of the company and preventing it from having a more diverse workforce is pretextual.

86.   83. Renaissance Mercer has therefore violated Magerman's civil rights by firing him for engaging in protected activity in opposing racial discrimination in the making and enforcement of contracts. Renaissance Mercer's conduct is an outrageous attempt to deny Magerman his constitutional and federal statutory rights.

87.   84. As a direct and proximate result of this adverse employment action and Renaissance Mercer's violation of Magerman's civil rights, Magerman has incurred and continues to incur significant damages in the form of lost compensation, bonuses, and investment income, and emotional and physical distress. In addition, Magerman has been deprived of retirement benefits to which he was entitled.

WHEREFORE, Claimant Plaintiff, David Magerman, demands judgment be entered in his favor and against Respondent, Renaissance Technologies LLC Defendant, Robert Mercer, and prays that the Arbitrator this Court enter an Order granting the following relief:

1.   Compensatory damages in excess of $1,000,000.00 150,000.00;

2.   Expectation damages and consequential damages to be determined at trial;

3.   Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

4.   Punitive damages; and

5.   Such other relief that the Court deems appropriate.

4.   Punitive damages; and

5.   Such other relief that the Arbitrator deems appropriate.

### COUNT II

### Violation of New York Labor Law § 201-d

85.   Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

86.   Under the Employment Agreement, Magerman was an employee at Renaissance. (Ex. A.)

87.   Magerman engaged in political activities under New York Labor Law — to wit, publicly criticizing President Trump and Mercer's support for President Trump's policies.

88.   Magerman engaged in these political activities outside of working hours, off of the Renaissance's premises and without use of Renaissance's equipment or other property.

89.   Renaissance suspended and then fired Magerman because of these political activities.

90.   Renaissance therefore wrongfully discharged Magerman under New York law.

91.    As a direct and proximate result of Mercer's wrongful discharge of Magerman, Magerman incurred and continues to incur significant damages in the form of lost wages and emotional and physical distress.

WHEREFORE, Claimant, David Magerman, demands judgment be entered in his favor and against Respondent, Renaissance Technologies LLC, and prays that this Court enter an Order granting the following relief:

1.    Compensatory damages in excess of $150,000.00;

2.    Expectation damages and consequential damages to be determined at trial;

3.    Attorneys' fees and costs;

## COUNT ~~III~~ II

### Wrongful Discharge

88.    ~~92.~~ Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

89.    Under the Employment Agreement, Magerman was an employee at will at Renaissance. (Ex. A, ¶ 2.)

90.    Mercer attempted to silence Magerman and prevent him from speaking out on political issues, even after Magerman received permission from Renaissance's Chief Compliance Officer to make the public statements attributed to him.

91.    Mercer's actions are tantamount to forced political speech because, by insisting that Magerman remain publicly silent about political issues, Mercer is forcing Magerman to tacitly support, or at least condone, Mercer's publicly announced and very visible political views. See, e.g., Exhibit F.

92.    By advocating for a race-neutral image of Renaissance, Magerman was, inter alia, seeking to have the company comply with its legal obligations in connection with its handling of public funds.

93.    Mercer's decision to suspend and subsequently fire Magerman violates a clear mandate of public policy against forced political speech and conditioning employment on political subordination, as well as the legal requirement that, by handling public funds, Renaissance was required to be at least race-neutral in hiring.

94.    Magerman was also fired for the exercise of free speech that was originally approved by Renaissance.

95.    93. In the January 29, 2017 memorandum, pursuant to the Code of Ethics Specifically, Magerman sought permission from Silber, Renaissance's Chief Compliance Officer, to speak to the press regarding Mercer's political views. (Exhibits media, pursuant to the Code of Ethics. (Exs. B, C.)

96.    94. Magerman received approval from Silber, the Chief Compliance Officer, permission to speak to the press from Silber.

95.    Renaissance is bound by express statements limiting its right to discharge employees.

97.    96. Renaissance contravened its own rules and regulations by firing Upon information, when Silber informed Mercer that Magerman after he had received permission from the Chief Compliance Officer to speak to the press had spoken to the press, Mercer ordered that Magerman be suspended, notwithstanding Silber's granting of permission to Magerman.

98.    97. Renaissance Mercer therefore wrongfully discharged Magerman under New York Pennsylvania law.

99.    In addition, to the extent that Mercer contends that Magerman's employment was terminated as a result of a violation of the company's non-disparagement or other restrictive policies against speech, said policies are illegal and in violation of the National Labor Relations Act. See First Transit, Inc., 360 NLRB 619 (2011); Karl Knaus Motors, Inc., 358 NLRB 1754 (2012); Lafayette Park Hotel, 326 NLRB 824, 825 (1998), enf'd, 203 F.3d 52 (D.C. Cir. 1999); Chipotle Servs., LLC, 364 NLRB No. 72, slip op. at 1 (Aug. 18, 2016); Casino San Pablo, 361 NLRB No. 148, slip op. at 4 (Dec. 16, 2014); Hacienda de Salud-Espanola, 317 NLRB 962, 966 (1995); Pier Sixty, LLC, 362 NLRB No. 59, slip op. at 23-24 (Mar. 31, 2015), aff'd, NLRB v. Pier Sixty, LLC, 855 F.3d 115 (2d Cir. 2017); and Lutheran Heritage Village-Livonia, 343 NLRB 646 (2004).

98.    100. As a direct and proximate result of Mercer's wrongful discharge of Magerman, Magerman incurred and continues to incur significant damages in the form of lost wages compensation and emotional and physical distress.

WHEREFORE, Claimant Plaintiff, David Magerman, demands judgment be entered in his favor and against Respondent, Renaissance Technologies LLC Defendant, Robert Mercer, and prays that this Court enter an Order granting the following relief:

1.      Compensatory damages in excess of $150,000.00;

2.      Expectation damages and consequential damages to be determined at trial;

3.      Attorneys' fees and costs;

4.      Punitive damages; and

5.      Such other relief that the Court deems appropriate.


Respectfully submitted,

COZEN O'CONNOR

Date: August 3, 2017

By:

H.  Robert Fiebach, Esquire (PA 02812)

Jeffrey I. Pasek, Esquire (PA 23700)

Thomas A. Leonard, Esquire (PA 317121)

One Liberty Place

1650 Market Street, Suite 2800

Philadelphia, PA 19103

215-665-2000

215-665-2013 (fax)

Counsel for ~~Claimant,~~Plaintiff David Magerman

# EXHIBIT G





**David Magerman**
@DavidMagerman

Follow

Replying to @nadaburger @TheRynheart and 6 others

Not sure why you are hanging this on RenTech. It was founded by Jim Simons, who gave $25m to get Hillary elected.

4:33 AM - 18 May 2017

2 Likes

2    2

Tweet your reply

**David Magerman** @DavidMagerman · May 18
Replying to @DavidMagerman @TheRynheart and 6 others
The Laufers were involved at RenTech long before Mercer, and they supported Hillary, hosting fundraisers.

**David Magerman**
@DavidMagerman

Follow

Any #RenTech employees want to explain their silence on #RobertMercer and his support of right-wing politics?  According to NLRB, you can!

12:20 PM - 19 Jul 2017

**3** Retweets **13** Likes



💬 3        ⟲ 3        ♡ 13        ✉

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAVID MAGERMAN, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:17-cv-02083-CDJ |
| | ) |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| ROBERT MERCER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## NOTICE OF DISMISSAL

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiff David Magerman, by

and through the undersigned counsel, voluntarily dismisses the complaint in the above-captioned

matter, prior to service of an answer by Defendant, and without prejudice.

Respectfully submitted,

COZEN O'CONNOR

Date: July 5, 2017    By:

H. Robert Fiebach, Esquire (PA 02812)
Jeffrey I. Pasek, Esquire (PA 23700)
Thomas A. Leonard, Esquire (PA 317121)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
215-665-2000
215-665-2013 (fax)
*Counsel for Plaintiff, David Magerman*

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2017 I caused a true and correct copy of the foregoing

Notice of Dismissal to be served on the following counsel of record via the Court's ECF system:

Jason C. Schwartz
Melanie L. Katsur
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
202- 955-8500
JSchwartz@gibsondunn.com
MKatsur@gibsondunn.com

Randy M. Mastro
Mylan L. Denerstein
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
212-351-4000
RMastro@gibsondunn.com
MDenerstein@gibsondunn.com

*Counsel for Defendant Robert Mercer*

# EXHIBIT I

**From:** Schwartz, Jason C.
**Sent:** Friday, September 1, 2017 2:13 PM
**To:** 'Rosen, Rona' <RRosen@klehr.com>; Fiebach, H. Robert <RFiebach@cozen.com>
**Cc:** Leonard, Thomas A. <TLeonard@cozen.com>; Harvey, William <WHarvey@klehr.com>; Lauren Brody <LBrody@brodybrowne.com>
**Subject:** RE: Magerman v,Renaissance and Magerman v. Mercer

Dear Counsel:

As you requested, Mr. Mercer will agree to extend the Rule 11 safe harbor period until 5 p.m. on Friday, September 8, in order to provide you with sufficient time to get up to speed and evaluate the motion.  Should you fail to dismiss the offending pleading by that date and time, we will consider you to have endorsed it as your own and will proceed with our motion for sanctions pursuant to Rule 11.

Also, Mr. Fiebach, so that we can assess whether you remain responsible for the deficient pleading as well, please let us know if you intend to disavow the pleading by virtue of your withdrawal.

Thank you.

Regards,

Jason
**Jason C. Schwartz**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8242 • Fax +1 202.530.9522
JSchwartz@gibsondunn.com • www.gibsondunn.com

**From:** Rosen, Rona [mailto:RRosen@klehr.com]
**Sent:** Thursday, August 31, 2017 4:26 PM
**To:** Schwartz, Jason C. <JSchwartz@gibsondunn.com>

**Cc:** Leonard, Thomas A. <TLeonard@cozen.com>; Harvey, William <WHarvey@klehr.com>; Fiebach, H. Robert <RFiebach@cozen.com>; Lauren Brody <LBrody@brodybrowne.com>
**Subject:** RE: Magerman v,Renaissance and Magerman v. Mercer

Thank you.

**Rona J. Rosen, Esq.**
KLEHR I HARRISON I HARVEY I BRANZBURG LLP
1835 Market Street, Suite 1400 | Philadelphia, PA 19103
T (215) 569-4145 | F (215) 568-6603 | rrosen@klehr.com

---

**From:** Schwartz, Jason C. [mailto:JSchwartz@gibsondunn.com]
**Sent:** Thursday, August 31, 2017 3:02 PM
**To:** Rosen, Rona
**Cc:** Leonard, Thomas A.; Harvey, William; Fiebach, H. Robert; Lauren Brody
**Subject:** RE: Magerman v,Renaissance and Magerman v. Mercer

I will check with Mr. Mercer and get back to you.

**Jason C. Schwartz**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8242 • Fax +1 202.530.9522
JSchwartz@gibsondunn.com • www.gibsondunn.com

---

**From:** Rosen, Rona [mailto:RRosen@klehr.com]
**Sent:** Thursday, August 31, 2017 1:51 PM
**To:** Schwartz, Jason C. <JSchwartz@gibsondunn.com>
**Cc:** Leonard, Thomas A. <TLeonard@cozen.com>; Harvey, William <WHarvey@klehr.com>; Fiebach, H. Robert <RFiebach@cozen.com>; Lauren Brody <LBrody@brodybrowne.com>
**Subject:** RE: Magerman v,Renaissance and Magerman v. Mercer

Jason:  In light of the fact that Bill and I are new to the case and need to familiarize ourselves with it in order to meaningfully evaluate the Rule 11 Motion,  we are writing to request that you grant a short extension of the safe harbor period until September 8.

**Rona J. Rosen, Esq.**
KLEHR I HARRISON I HARVEY I BRANZBURG LLP
1835 Market Street, Suite 1400 | Philadelphia, PA 19103
T (215) 569-4145 | F (215) 568-6603 | rrosen@klehr.com

---

**From:** Schwartz, Jason C. [mailto:JSchwartz@gibsondunn.com]

**Sent:** Thursday, August 31, 2017 12:02 PM
**To:** Fiebach, H. Robert; Lauren Brody
**Cc:** Leonard, Thomas A.; Harvey, William; Rosen, Rona
**Subject:** RE: Magerman v,Renaissance and Magerman v. Mercer

Thank you.  I trust that you have shared our Rule 11 motion with new counsel and that they are aware of the expiration of the safe harbor period on September 5.  Mr. Harvey and Ms. Rosen, please let us know if you need a copy of those papers.  Regards, Jason

**Jason C. Schwartz**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8242 • Fax +1 202.530.9522
JSchwartz@gibsondunn.com • www.gibsondunn.com

---

**From:** Fiebach, H. Robert [mailto:RFiebach@cozen.com]
**Sent:** Thursday, August 31, 2017 11:57 AM
**To:** Schwartz, Jason C. <JSchwartz@gibsondunn.com>; Lauren Brody <LBrody@brodybrowne.com>
**Cc:** Leonard, Thomas A. <TLeonard@cozen.com>; Harvey, William <WHarvey@klehr.com>; Rosen, Rona <RRosen@klehr.com>
**Subject:** Magerman v,Renaissance and Magerman v. Mercer

Jason and Lauren:  Our firm will be withdrawing our appearances in both matters and we understand that William Harvey and Rona Rosen of the Philadelphia firm of Klehr Harrison will be entering their appearances in the next day or so.  Just wanted  to give you a heads up.

***Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.***

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---