IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID MAGERMAN,<br><br>    Plaintiff,<br><br>v.<br><br>ROBERT MERCER,<br><br>    Defendant. | Civil Action No. 2:17-cv-03490-CDJ<br><br>JURY TRIAL DEMANDED |

### FIRST AMENDED COMPLAINT

Plaintiff, David Magerman, by and through his undersigned counsel, hereby asserts the following claims against Defendant Robert Mercer.

### THE PARTIES

1. Plaintiff, David Magerman, is a resident of the Commonwealth of Pennsylvania residing at 117 Raynham Road, Merion Station, Pennsylvania 19066.

2. Defendant, Robert Mercer, is a resident of the State of New York residing at 149 Harbor Road, Saint James, New York 11780.

### JURISDICTION AND VENUE

3. This Court has personal jurisdiction over Mercer because Mercer purposefully directed his activities at Pennsylvania, the litigation arises out of those activities, and the exercise of personal jurisdiction comports with fair play and substantial justice.

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the action arises under the laws of the United States and all other claims are so related to the claim in the action within the Court's original jurisdiction that they form part of the same case or controversy. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332

because the action is between citizens of different states and the amount in controversy is in excess of $75,000.00, exclusive of interests and costs.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### Overview of Magerman's Work at Renaissance

6.      Magerman was formerly an employee of Renaissance Technologies L.L.C. ("Renaissance"), an investment management company trading in global financial markets and based in East Setauket, New York and New York City.

7.      Although Renaissance is based in New York, for the past seven years Magerman worked primarily from his home in Pennsylvania.

8.      Mercer is Renaissance's co-Chief Executive Officer.

9.      Magerman had been employed by Renaissance for approximately the last 22 years with the exception of one two-year hiatus from the company. Magerman's most recent employment with Renaissance began on or about July 2010 and was governed by an employment agreement revised in January 2015 (the "Employment Agreement"). A copy of the Employment Agreement is attached hereto as Exhibit A.

10.     Pursuant to Section 4 of the Employment Agreement, Renaissance was obligated to pay Magerman a "Base Salary" as well as a "Bonus" payable semiannually, based on the performance as of June 30th and December 31st of each year on the various funds for which Renaissance acts as investment advisor. Furthermore, the Employment Agreement specifically provides that "all Bonus amounts will be prorated for any partial periods of employment."

11. The Base Salary and Bonus were payable in accordance with Renaissance's regular payroll practices.

12. Section 12 of the Employment Agreement contains a provision prohibiting Magerman from making "any disparaging or negative statement about the Company; any of its affiliates; any of their officers, directors, shareholders, members, managers, employees, representatives and agents . . . ."

13. Renaissance also had an employee handbook and policy manual (the "Handbook") and Code of Ethics and Compliance Manual (the "Code of Ethics") that Renaissance claims governs employee conduct.

14. The Handbook provides, among other things, a series of overbroad restrictions employee speech that are in violation of the National Labor Relations Act. 29 U.S.C. § 151, et seq. Specifically, these restrictions purported to restrict Magerman from:

   a) Engaging in "discourtesy, rudeness, and/or abuse to fellow employees or other persons involved in Company business" in violation of the National Labor Board's rulings in *First Transit, Inc.*, 360 NLRB 619 (2011) and *Karl Knaus Motors, Inc.*, 358 NLRB 1754 (2012);

   b) "Making or publishing false, vicious or malicious statements concerning employees, the Company or its business" in violation of the National Labor Board's rulings in *Lafayette Park Hotel,* 326 NLRB 824, 825 (1998), enf'd, 203 F.3d 52 (D.C. Cir. 1999); *Chipotle Servs., LLC*, 364 NLRB No. 72, slip op. at 1 (Aug. 18, 2016); and *Casino San Pablo*, 361 NLRB No. 148, slip op. at 4 (Dec. 16, 2014);

   c) "Communicating with the media in any forms including blogs, chat sites, web forums or editorial pages concerning Renaissance without express written permission from the Chief Compliance Officer, which is a serious infraction of the confidentiality policy" in violation of the National Labor Board's rulings in *Hacienda de Salud-Espanola*, 317 NLRB 962, 966 (1995); and *Pier Sixty, LLC*, 362 NLRB No. 59, slip op. at 23-24 (Mar. 31, 2015), aff'd, *NLRB v. Pier Sixty, LLC*, 855 F.3d 115 (2d Cir. 2017); and

   d) "Engaging in any other act evidencing poor judgment, dishonesty, or disregard for the law or the Company's policies and reputation" in violation of the National Labor Board's rulings in *Lafayette Park Hotel,*

326 NLRB 824, 825 (1998), *enf'd*, 203 F.3d 52 (D.C. Cir. 1999); and *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004).

15.     The National Labor Relations Board has also held in *Quicken Loans, Inc.*, 359 NLRB 1201 (2013), *enf'd*, 830 F.3d 542 (D.C. Cir. 2016), that a non-disparagement provision of the type contained in the Employment Agreement is invalid and unenforceable under the National Labor Relations Act.

16.     The Code of Ethics provides that an employee can communicate with the press or other news media with the approval of either the Chief Compliance Officer or the General Counsel. A copy of the relevant portion of the Code of Ethics is attached as Exhibit B.

17.     Magerman was a research scientist at Renaissance who designed mathematical and statistical algorithms to direct Renaissance's investment decisions on the international financial markets.

18.     The algorithms written by Magerman have been used by Renaissance to earn billions of dollars in revenue and have helped to make Mercer one of the wealthiest people in the United States.

19.     Renaissance managed money for a wide array of clients, including public entities such as the University of California, public employee pension funds for government employees in New York and California, and other entities that required Renaissance to hire and advance minorities, including African Americans, in the workplace.

20.     Renaissance and Mercer recognized the value that Magerman contributed to the company, paying him a salary and bonuses worth millions of dollars annually.

**Employment Practices at Renaissance**

21. During his employment at Renaissance, Magerman also served as a hiring manager for highly-compensated managerial and technical positions for approximately nine years, from approximately 1997-2006.

22. Magerman participated in the hiring of people for around 20-30 positions from among candidates who were presented to him to interview by Renaissance's Human Resources Department or by his superiors at Renaissance.

23. To the best of his recollection, none of the candidates presented to Magerman to be interviewed that were eventually hired were African American.

24. During the time that Magerman was involved in the hiring process, Renaissance employed subjective hiring criteria.

25. During the period from 2010 through the present, Magerman has been generally familiar with the workforce at Renaissance's East Setauket office based on making several visits to that facility per year and making presentations to and otherwise interacting with employees at that location.

26. The East Setauket office has about 200 total employees, which include about 100-125 employees in management or significant technical positions earning salaries and bonuses in excess of $500,000 per year ("Highly-Compensated Employees").

27. During Magerman's employment at Renaissance, there were never any African American employees working as Highly-Compensated Employees in the East Setauket office.

28. Mercer, as co-CEO of Renaissance, established the culture of the company, which is reflected in Renaissance's hiring practices.

**Magerman's Conversations with Mercer**

29. Mercer has long been a public supporter of ultra-conservative political causes and candidates, including then-candidate Donald Trump during the 2016 presidential general election.

30. During the Presidential campaign, Trump engaged in several actions for which he was widely attacked in the media as being racist, including:

- Failing to renounce David Duke, a white nationalist and former Ku Klux Klan in February of 2016;

- Implying in May of 2016 that the Honorable Gonzalo Curiel, the federal judge presiding over a class action against the for-profit Trump University, could not fairly hear the case because of his Mexican heritage;

- Serving as a leading proponent of "birtherism," the racist conspiracy theory that President Barak Obama was not born in the United States;

- Condoning the physical attack on an African American protester at a campaign rally in Alabama in November of 2015.

31. Mercer and his daughter were influential advisors to the Trump campaign, recommending the hiring of two Mercer family associates, Stephen K. Bannon and Kellyanne Conway.

32. Bannon became the Chief Executive Officer of the Trump campaign and is now White House Chief Strategist. Conway became the Campaign Manager of the Trump campaign and is now Counselor to the President.

33. Mercer is also a major investor in Breitbart Holdings, Inc. ("Breitbart"), which operates Breitbart News and Breitbart Media, alt-right media organizations that Bannon used to lead.

34. During the time Mercer was a major investor in Breitbart and Bannon served as chairman of Breitbart Media, Breitbart News was engaged in creating what national media characterized as an online haven for white nationalists.

35. On January 8, 2017, the Wall Street Journal published an article entitled "Meet the Mercers: A Quiet Tycoon and His Daughters Become Power Broker's In Trump's Washington," which article reported on numerous items described in the previous paragraphs. A copy of that article is attached hereto as Exhibit C.

36. On January 16, 2017, Magerman called Mercer and asked if he had time for a personal conversation regarding Mercer's support for President Trump.

37. The two discussed issues such as the Affordable Care Act and the social safety net, with Mercer expressing support for the Trump administration's positions on these issues and Magerman expressing opposition.

38. The conversation then turned to the subject of racial minorities, at which time Mercer then made a series of racist comments, saying things such as:

   a) The United States began to go in the wrong direction after the passage of the Civil Rights Act in the 1960s;

   b) African Americans were doing fine in the late-1950s and early-1960s before the Civil Rights Act;

   c) The Civil Rights Act "infantilized" African Americans by making them dependent on government and removing any incentive to work;

   d) The only racist people remaining in the United States are black; and

   e) White people have no racial animus toward African Americans anymore, and if there is any, it is not something that the government should be concerned with.

39. Mercer also stated that he did not believe in affirmative action.

40. Magerman was stunned by these comments and pushed back, pointing out that society was segregated before the Civil Rights Act and African Americans were required to use separate and inferior schools, water fountains, and other everyday services and items.

41. Mercer responded that those issues were not important.

42. Magerman reported the conversation to Peter Brown, Mercer's co-Chief Executive Officer at Renaissance, along with his belief that Mercer's public political views and association with alt-right groups such as Breitbart News were damaging to the image and reputation of Renaissance, by which Magerman intended to convey, *inter alia*, that Mercer's publicly-stated views prevented the company from hiring a more diverse workforce of Highly-Compensated Employees.

43. Brown expressed disbelief that Mercer would make comments like those. Brown asked if he could share with Mercer his conversation with Magerman and asked if Magerman would be willing to talk to Mercer again. Magerman agreed.

44. Magerman advised Brown that he was concerned that Mercer's embrace of right wing causes and candidates was bad for Renaissance and could damage the company's standing with investors and prospective employees who would not want to be associated with Mercer's ideology.

45. On February 5, 2017, Mercer called Magerman and stated, in a threatening manner, "I hear you're going around saying I'm a white supremacist."

46. Magerman denied that he had labelled Mercer a white supremacist, and denies that he ever used the term "white supremacist" in describing Mercer.

47. Magerman then quoted back to Mercer the comments about African Americans that Mercer had made in their prior conversation and that Magerman had reported to Brown.

48.  At first, Mercer disputed that he had said such things, although he did not actually deny saying them.

49.  In the course of rehashing the conversation, however, Mercer repeated many of these same views, and even cited research that allegedly supported his opinion that the Civil Rights Act harmed African Americans economically.

50.  Magerman was skeptical of the supposed data that Mercer relied on, but nonetheless pointed out that, even if it was true, there is more to someone's well-being than money, and segregation was still degrading and destructive and the United States was right to get rid of it.

51.  Mercer scoffed at this suggestion.

**Magerman Speaks to the Press About Mercer's Political Views**

52.  Magerman continued to be alarmed by his boss's personal views and backing of policies and statements Magerman found to be divisive and harmful to the poor and minorities.

53.  Magerman was also concerned that Renaissance did not employ any African Americans as Highly-Compensated Employees as a result of which he was denied the opportunity to work with and associate with highly-compensated African Americans and other minorities in managerial and technical positions who could be advantageous to Magerman in his future business dealings.

54.  Magerman felt obligated to speak out against Mercer's support for racist policies and the implication that Magerman and other Renaissance employees shared those views.

55.  Magerman, however, was aware of alleged restrictions under the Employment Agreement and Handbook to avoid publicly disparaging either Renaissance or its employees, even though such policies are illegal and unenforceable.

56. On January 29, 2017, before speaking publicly, Magerman sent a written memorandum to several Renaissance executives, including General Counsel Carla Porter, Chief Compliance Officer Mark Silber and Director of Human Resources Lavonne Wesner. A copy of Magerman's January 29, 2017 memorandum, sent by email, is attached hereto as Exhibit D.

57. In that memorandum, Magerman stated, *inter alia*, "the Mercers' public and blatant support for the Trump candidacy, presidency and agenda has cast a taint on all Renaissance employees, including myself. To disallow employees to politely and honestly, but publicly, respond to this taint, and to prevent us from disavowing it in as public a forum as he has been allowed to promote it, is frankly unfair and untenable." (Ex. D.)

58. Magerman also sought guidance in writing as to what he would be allowed to say that would not subject him "to any retaliation in the workplace for my public speech." (*Id.*)

59. Magerman never received a written response to this email.

60. After sending the email, however, Magerman did consult telephonically with Silber, the Chief Compliance Officer, regarding Magerman's intention to speak to the press about his concerns.

61. Silber told Magerman that he could speak to the press, but that Renaissance's biggest concerns were that its trade secrets were protected and that the company did not appear to have infighting among its employees.

62. Magerman told Silber that Silber would have a chance to review the statements Magerman made to the media before they were published.

63. Magerman then gave an interview to a reporter for the *Wall Street Journal*, in which Magerman criticized President Trump and Mercer's support for the President's agenda.

64. Magerman's statements were made available to Silber, who then denied that Magerman had ever been given permission to speak to the press.

65. Upon information, Magerman alleges that Mercer became aware that Magerman had given an interview to a reporter for the *Wall Street Journal,* and communicated false information about Magerman to John Gasthalter, a public relations representative of Renaissance, in an effort to coerce Magerman from having any further communications with the press about Mercer.

66. Upon information, Magerman alleges Gasthalter, called the *Wall Street Journal* reporter and threatened to cut him off from any further information from Renaissance if he published an article regarding Magerman's interview.

67. Upon information, Magerman alleges that Gasthalter, at the instigation of Mercer, also made a number of false accusations about Magerman to the *Wall Street Journal* reporter and downplayed the significance of Magerman's substantial contributions to the success and profitability of Renaissance.

68. Despite this effort to sabotage Magerman and silence his opinions, an article regarding the interview was published in the *Wall Street Journal* on February 23, 2017. A copy of this article is attached hereto as Exhibit E.

69. The following day, February 24, 2017, Magerman was suspended from Renaissance without pay.

70. Upon information and belief, Magerman's suspension was ordered personally by Mercer and was in retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports.

71. Media stories about the *Wall Street Journal* article and Magerman's ensuing suspension were subsequently published in several other new sources, including the *Philadelphia Inquirer*, Philly.com and Dealbreaker.com.

72. Magerman and Renaissance attempted to work out a resolution of Magerman's suspension that would allow Magerman to return to work without compromising his right to free speech.

73. During his suspension, and prior to his employment being terminated, Magerman again told Brown that Mercer's public political views and association with the alt-right were harmful to the image and reputation of Renaissance, by which Magerman intended to convey, *inter alia*, that Mercer's publicly-stated views and activities prevented the company from hiring a more diverse workforce of Highly-Compensated Employees.

74. During his suspension, and prior to his employment being terminated, Magerman advised his immediate supervisors at Renaissance, Jim Herrnstein and Stephen Della Pietra, that public awareness of Mercer's views, combined with the lack of minorities in the company would damage Renaissance from an EEO perspective. Upon information and belief, Magerman alleges that Herrnstein and Della Pietra reported their conversations with Magerman to senior management at Renaissance and that this information was conveyed to Mercer.

75. On or around March 30, 2017, Renaissance paid Magerman the base compensation that it had withheld but *de facto* continued the suspension by locking Magerman out of the company's computers, isolating him from his colleagues and otherwise denying him the right to return to work.

76. On or around April 20, 2017, Magerman attended a charity poker tournament in New York City attended by many Renaissance employees, including Mercer and his daughter.

77. At the tournament, Mercer's daughter confronted Magerman, calling him "pond scum" and saying that "[k]arma is a bitch." An April 29, 2017 article from the *Wall Street Journal* describing this altercation is attached hereto as Exhibit F.

78. Renaissance, at the direction of Mercer and in further retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports, fired Magerman as of April 29, 2017, in a letter Magerman received on May 3, 2017.

79. Renaissance has failed to pay Magerman for amounts due under Section 4 of the Employment Agreement, to wit, the Bonus he was entitled to based on Renaissance's performance as of June 30, 2017.

80. Mercer has decision-making control over Renaissance hiring practices and the hiring of Highly Compensated Employees.

81. Mercer's political views affect the culture at Renaissance.

82. The failure of Renaissance to hire African Americans to managerial and technical positions as Highly Compensated Employees is, on belief, the result of the effect of Mercer's political views on the culture of Renaissance.

## COUNT I
### Violation of 42 U.S.C. § 1981

83. Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

84. Upon information and belief, Mercer created a pattern and practice of racial discrimination in the hiring of African Americans at Renaissance, as evidenced by the complete exclusion of African Americans in positions as Highly Compensated Employees.

85. Mercer's public political views, association with the alt-right, and racist comments deterred potential qualified African Americans from applying for positions as Highly Compensated Employees at Renaissance.

86. Magerman, by reporting Mercer's racist comments to Brown, calling attention to the negative impact that Mercer's public political views, association with the alt-right, and racist comments were having on the image and reputation of Renaissance to Brown and others in management such as Porter, Silber, and Wesner, and exercising his right to free speech to criticize what he believes are hateful statements and policies from President Trump and Mercer's support thereof, engaged in protected activity to oppose racial discrimination in the making and enforcement of contracts.

87. Mercer, as co-Chief Executive Officer of Renaissance, took an adverse employment action against Magerman by suspending him, threatening him, and then firing him. Based on Mercer's role in the company, it is inconceivable to Magerman that Mercer did not personally direct that he be fired.

88. Magerman's protected activity – reporting Mercer's racist comments to a superior, calling attention to the negative impact that Mercer's public political views, association with the alt-right, and racist comments were having on the image and reputation of Renaissance and its ability to recruit diverse employees, and speaking out against Mercer's support for President Trump's prejudiced policies – was the direct and proximate cause of the adverse employment action taken by Mercer.

89. Any contention that Magerman was not discharged because of his taking issue with Mercer's alt-right and racist comments and his criticism that these policies were hurting the

image and reputation of the company and preventing it from having a more diverse workforce is pretextual.

90. Mercer has therefore violated Magerman's civil rights by firing him for engaging in protected activity in opposing racial discrimination in the making and enforcement of contracts. Mercer's conduct is an outrageous attempt to deny Magerman his constitutional and federal statutory rights.

91. As a direct and proximate result of this adverse employment action and Mercer's violation of Magerman's civil rights, Magerman has incurred and continues to incur significant damages in the form of lost compensation, bonuses, and investment income, and emotional and physical distress. In addition, Magerman has been deprived of retirement benefits to which he was entitled.

WHEREFORE, Plaintiff, David Magerman, demands judgment be entered in his favor and against Defendant, Robert Mercer, and prays that this Court enter an Order granting the following relief:

1. Compensatory damages in excess of $150,000.00;
2. Expectation damages and consequential damages to be determined at trial;
3. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;
4. Punitive damages; and
5. Such other relief that the Court deems appropriate.

### COUNT II
### Wrongful Discharge

92. Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

93. Under the Employment Agreement, Magerman was an employee at will at Renaissance. (Ex. A, ¶ 2.)

94. Mercer attempted to silence Magerman and prevent him from speaking out on political issues, even after Magerman received permission from Renaissance's Chief Compliance Officer to make the public statements attributed to him.

95. Mercer's actions are tantamount to forced political speech because, by insisting that Magerman remain publicly silent about political issues, Mercer is forcing Magerman to tacitly support, or at least condone, Mercer's publicly announced and very visible political views. *See, e.g.*, Exhibit C.

96. By advocating for a race-neutral image of Renaissance, Magerman was, *inter alia*, seeking to have the company comply with its legal obligations in connection with its handling of public funds.

97. Mercer's decision to suspend and subsequently fire Magerman violates a clear mandate of public policy against forced political speech and conditioning employment on political subordination, as well as the legal requirement that, by handling public funds, Renaissance was required to be at least race-neutral in hiring.

98. Magerman was also fired for the exercise of free speech that was originally approved by Renaissance.

99. Specifically, Magerman sought permission from Silber, Renaissance's Chief Compliance Officer, to speak to the media, pursuant to the Code of Ethics. (Exs. B, C.)

100. Magerman received permission to speak to the press from Silber.

101. Upon information, when Silber informed Mercer that Magerman had spoken to the press, Mercer ordered that Magerman be suspended, notwithstanding Silber's granting of permission to Magerman.

102. Mercer therefore wrongfully discharged Magerman under Pennsylvania law.

103. In addition, to the extent that Mercer contends that Magerman's employment was terminated as a result of a violation of the company's non-disparagement or other restrictive policies against speech, said policies are illegal and in violation of the National Labor Relations Act. *See First Transit, Inc.*, 360 NLRB 619 (2011); *Karl Knaus Motors, Inc.*, 358 NLRB 1754 (2012); *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998), *enf'd*, 203 F.3d 52 (D.C. Cir. 1999); *Chipotle Servs., LLC*, 364 NLRB No. 72, slip op. at 1 (Aug. 18, 2016); *Casino San Pablo*, 361 NLRB No. 148, slip op. at 4 (Dec. 16, 2014); *Hacienda de Salud-Espanola*, 317 NLRB 962, 966 (1995); *Pier Sixty, LLC*, 362 NLRB No. 59, slip op. at 23-24 (Mar. 31, 2015), *aff'd, NLRB v. Pier Sixty, LLC*, 855 F.3d 115 (2d Cir. 2017); and *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004).

104. As a direct and proximate result of Mercer's wrongful discharge of Magerman, Magerman incurred and continues to incur significant damages in the form of lost compensation and emotional and physical distress.

WHEREFORE, Plaintiff, David Magerman, demands judgment be entered in his favor and against Defendant, Robert Mercer, and prays that this Court enter an Order granting the following relief:

1. Compensatory damages in excess of $150,000.00;
2. Expectation damages and consequential damages to be determined at trial;
3. Attorneys' fees and costs;
4. Punitive damages; and

5.     Such other relief that the Court deems appropriate.

## COUNT III
## Violation of the
## Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq.*

105.    Magerman incorporates by reference the foregoing paragraphs as if set forth at length herein.

106.    At all pertinent times hereto, Magerman was an "employee" of Renaissance and Mercer, as defined by the Pennsylvania Wage Payment and Collection Law, 43 P.S. 260.1, *et seq.* ("WPCL").

107.    At all pertinent times hereto, Mercer was an "employer" to Magerman, as defined in the WPCL. As Renaissance's Co-Chief Executive Officer, not only was Mercer an agent and/or officer of the company, but also participated in policy-making functions of the company, and, in particular, upon information and belief, made the decision to deprive Magerman of all wages and bonuses to which he was entitled, in violation of the WPCL.

108.    Mercer has improperly withheld paying wages that were due and owing to Magerman consisting of the bonus to which he was entitled relating to the Renaissance's performance for the period ending June 2017, in violation of the WPCL.

109.    Mercer did not have a good faith basis for withholding wages from Magerman.

110.    Accordingly, and in addition to the other remedies available to him under the WPCL, Magerman is entitled to payment of the statutory penalty equal to 25% of the withheld wages.

111.    Also, under the WPCL, Magerman is entitled to the reasonable attorneys' fees he incurs in connection with this claim.

**WHEREFORE,** plaintiff, David Magerman, respectfully requests that judgment be entered in his favor and against defendant for all unpaid wages and compensation, in an amount in excess of $50,000 exclusive of interest and costs, plus the statutory penalty of 25% thereof, together with his reasonable attorneys' fees and costs, and such other and further relief as are just and proper.

Respectfully submitted,

KLEHR HARRISON
HARVEY BRANZBURG LLP

Dated: September 13, 2017

William A. Harvey (PA 25344)
Rona J. Rosen (PA 32440)
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-2700
215-568-6603 (fax)
*Counsel for Plaintiff, David Magerman*