## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID MAGERMAN,

               Plaintiff,

     v.

ROBERT MERCER,

               Defendant.

Civil Action No. 2:17-cv-03490-CDJ

## ORDER

AND NOW, on this _____ day of _____, 2017, upon consideration of Defendant's Motion for Rule 11 Sanctions (the "Motion"), and Plaintiff's response thereto, it is hereby ORDERED and DECREED that:

1.      The Motion is dismissed with prejudice;

2.      Defendant Mercer and his counsel shall pay the reasonable fees, costs, and expenses that Plaintiff Magerman incurred in defending against the Motion; and

3.      Plaintiff shall submit his application for fees, costs, and expenses on or before _____, 2017.

 

                                _____

                                  C. Darnell Jones, II
                                  U.S. District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DAVID MAGERMAN,

              Plaintiff,

    v.

ROBERT MERCER,

              Defendant.

Civil Action No. 2017-03490-CDJ

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR RULE 11 SANCTIONS**

William A. Harvey
Rona J. Rosen
KLEHR HARRISON HARVEY BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Fax: (215) 568-6603
wharvey@klehr.com
rrosen@klehr.com

*Attorneys for Plaintiff David Magerman*

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................1

II.    RELEVANT PROCEDURAL HISTORY .......................................................8

III.   FACTUAL BACKGROUND .........................................................................11

IV.    ARGUMENT ..............................................................................................16

    A.   Legal Standard ......................................................................................16

    B.   Mercer Failed to Prove that Magerman's Filing of the Complaint in
        Federal Court Violated Rule 11(b)(2)......................................................19

    C.   Given that the Parties Have Stipulated to Arbitration, the court May Not
        Analyze the Merits of Magerman's Claims For Purposes of Issuing a
        Decision on Rule 11 Sanctions. ..............................................................23

    D.   Should the Court Reach the Merits, the Claims Are Not Frivolous. ....................25

        1.   Magerman's Section 1981 Retaliation Claim Is Not Frivolous................25

        2.   Magerman's Wrongful Discharge Claim Is Not Frivolous........................34

    E.   Mercer Failed to Prove That Magerman Violated Rule 11(b)(1). .........................43

    F.   Magerman is Entitled to Recover Fees and Expenses Incurred in Opposing
        this Motion. ..........................................................................................45

V.     CONCLUSION...........................................................................................46

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abrams v. Lightolier*,
    50 F.3d 1204 (3d Cir. 1995)...................................................................................27

*Al–Khazraji v. Saint Francis College,*
    784 F.2d 505 (3d Cir.1986)....................................................................................31

*Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account,*
    618 F.3d 277 (3d Cir. 2010)......................................................................17, 23, 25

*ATD-American Co. v. Krueger Intern., Inc.,*
    No. 12-00032, 2012 WL 1382472 (E.D. Pa. Apr. 20, 2012).................................35

*Barber v. CSX Distrib. Servs.,*
    68 F.3d 694 (3d Cir.1995).....................................................................................29

*Beck v. Reliance Steel Prod. Co.*,
    860 F.2d 576 (3d Cir. 1988)..................................................................................23

*Bennett v. Republic Servs., Inc.,*
    179 F. Supp. 3d 451, 457 (E.D. Pa. 2016) ...........................................................38

*Black Box Corp. v. Markham,*
    No. 03-3910, 127 F. App'x 22 (3d Cir. 2005) ......................................................34

*Brown v. Dillards, Inc.,*
    430 F.3d 1004 (9th Cir. 2005) ..............................................................................20

*Brown v. J. Kaz, Inc.,*
    581 F.3d 175 (3d Cir. 2009)..................................................................................25

*Bryant v. PEPCO*,
    No. 09-1063, 276 F.R.D. 386 (D.D.C. Sept. 15, 2011) ........................................44

*by*, *Halderman v. Pennhurst State Sch. & Hosp.*,
    673 F.2d 628 (3d Cir. 1982)..................................................................................26

*by Jensen v. Potter,*
    435 F.3d 444 (3d Cir.2006)...................................................................................31

*Caplan v. L. Brands/Victoria's Secret Stores, LLC,*
    210 F. Supp. 3d 744, 753 (W.D. Pa. Sept. 28, 2016)...........................................30

ii

*Cardenas v. Massey,*
269 F.3d 251 (3d Cir.2001)..................................................................................31

*Carvalho-Grevious v. Delaware State Univ.,*
851 F.3d 249 (3d Cir. 2017)..............................................................................32

*Connelly v. Lane Constr. Corp.,*
809 F.3d 780 (3d Cir. 2016)..............................................................................33

*Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.,*
94 F. Supp. 2d 589 (E.D. Pa. 1999) ...............................................................35

*Croker v. Boeing Co.,*
662 F.2d 975 (3d Cir. 1981)..........................................................................26-27

*Curay-Cramer v. Ursuline Academy of Wilmington, DE, Inc.,*
450 F.3d 130 (3d Cir. 2006)..............................................................................29

*Danao v. ABM Janitorial Servs.,*
142 F. Supp. 3d 363, 375 (E.D. Pa. 2015) .....................................................29

*Danow v. Law Office of David E. Borack, P.A.,*
No. 05-61562, 2008 WL 11331716 (S.D. Fla. Jan. 22, 2008)................................44

*Devon Robotics LLC v. DeViedma,*
798 F.3d 136 (3d Cir. 2015)................................................................................5

*Edmondson v. Lilliston Ford, Inc.,*
593 F. App'x 108 (3d Cir. 2014)........................................................................24

*EEOC v. Mavis Discount Tire, Inc.,*
129 F. Supp. 3d 90, 111 (2d Cir. 2015) ........................................................27, 34

*Field v. Philadelphia Elec. Co.,*
565 A.2d 1170 (Pa. Super. 1989)......................................................................40

*First Choice Fed. Credit Union v. Wendy's Co.,*
No. 16-506, 2017 WL 1190500 (W.D. Pa. Mar. 31, 2017) ....................................37

*First Nat'l Bank of Boston v. Bellotti,*
435 U.S. 765 (1978)..........................................................................................38

*Flaherty v. Torquato,*
623 F. Supp. 55 (W.D. Pa. 1985), *aff'd* 800 F.2d 1133 (3d Cir. 1986) ..................44

*Ford Motor Co. v. Summit Motor Prods., Inc.,*
930 F.2d 277 (3d Cir. 1991)..............................................................17, 19, 25, 34

iii

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009) .................................................................................. 28, 32-33

*Foy v. First National Bank of Elkhart,*
    No. 88-2264, 868 F.2d 251 (7th Cir. 1989) ........................................................ 46

*Fraser v. Nationwide Mutual Ins. Co.,*
    352 F.3d 107 (3d Cir. 2003) .............................................................................. 38-40

*Fuerst v. Fuerst,*
    832 F. Supp. 2d 210 (E.D.N.Y. 2011) .............................................................. 43

*Gairdo v. Ethyl Corp,*
    835 F.2d 479 (3d Cir. 1987) .............................................................................. 45

*Garcia v. Mason Contract Prods., LLC,*
    No. 08-23103, 2010 WL 3259922 (S.D. Fla. Aug. 18, 2010) ............................ 20

*Gary v. Braddock Cemetary and Consol Energy,*
    334 F. App'x 465 (3d Cir. June 8, 2009) ........................................................... 18

*General Accident Ins. Co. of Am. v. Fidelity and Deposit Co. of Md.,*
    598 F. Supp. 1233 (E.D. Pa. 1984) .................................................................. 37

*Goodman v. Lukens Steel Co.,*
    777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (187) .................................. 26-27

*Graboff v. The Collern Firm,*
    No. 10-1710, 2010 WL 4456923 (E.D. Pa. Nov. 8, 2010) ................................ 37

*Hammersmith v. TIG Ins. Co.,*
    480 F.3d 220 (3d Cir. 2007) .............................................................................. 36

*Highhouse v. Avery Transp.,*
    660 A.2d 1374 (Pa. Super. Ct. 1995) ................................................................ 34

*Hohider v. United Parcel Serv., Inc.,*
    574 F.3d 169 (3d Cir. 2009) .............................................................................. 27

*International Brotherhood of Teamsters v. United States,*
    431 U.S. 324 (1977) .......................................................................................... 27

*Jiffy Lube Intern., Inc. v. Jify Lube of PA, Inc.,*
    848 F. Supp. 569 (E.D. Pa. 1994) .................................................................... 35

*Jones v. Aria Health,*
    No. 13-1090, 2014 WL 32310 (E.D. Pa. Jan 6, 2014) ...................................... 33

iv

*Jones v. R.R. Donnelly & Son Co.*,
  541 U.S. 360 (2004)................................................................. 25-26

*July v. Board of Sch. Comm'rs*,
  291 F.R.D. 653 (S.D. Ala. May 28, 2013) ...............................27

*Kahan v. Slippery Rock Univ. of Pa.*,
  50 F. Supp. 3d 667, 701 (W.D. Pa. 2014)................................32

*Krushinski v. Roadway Exp., Inc.*,
  627 F. Supp. 934 (M.D. Pa. 1985)............................................38

*Kvaerner U.S. Inc. v. Kemper Environmental Ltd.*,
  No. 06-403, 2006 WL 3064104 (W.D. Pa. Oct. 26, 2006) ......37

*In re Lavigne*,
  114 F.3d 379 (2d Cir. 1997)................................................ 19-20

*Lipman Bros. v. Apprise Software, Inc.*,
  No. 13-4439, 2015 WL 4476983 (E.D. Pa. July 22, 2015) ......35

*Lloyd v. Hovensa LLC*,
  369 F.3d 263 (3d Cir. 2004)......................................................5

*Long v. Wilson*,
  393 F.3d 399 (3d Cir. 2004)....................................................42

*Lundy v. Adamar of NJ, Inc.*,
  34 F.3d 1173 (3d Cir. 1994)....................................................42

*US ex. rel. Maxwell v. Ker McGee Oil and Gas Corp.*,
  No. 04-01224, 2010 WL 582393 (D. Colo. Feb. 17, 2010)......43

*McGhee v. Thomas Jefferson Univ. Hosp.*,
  No. 12-2919, 2013 WL 4663541 (E.D. Pa. Aug. 29, 2013) ......30

*Estate of Oliva ex rel. McHugh v. New Jersey*,
  604 F.3d 788 (3d Cir. 2010).....................................................26

*Meadows v. Atlantic Richfield Co.*,
  No. 84-0711, 1986 WL 9896 (E.D. Pa. Sept. 10, 1986) ..........26

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
  247 F.3d 44 (3d Cir. 2001).......................................................23

*Miller v. Allstate Ins. Co.*,
  763 A.2d 401 (Pa. Super. 2000)...............................................35

v

*Moore Eye Care, P.C. v. Software Solutions, Inc.*,
    No. 15-5290, 2017 WL 3838657 (E.D. Pa. Jan. 1, 2017)........................................34

*Morristown Daily Record, Inc. v. Graphic Commc'ns Union, Local 8N*,
    832 F.2d 31 (3d Cir. 1987).................................................................................25

*Nadeau v. Equity Residential Props. Mgmt. Corp.*,
    No. 16-CV-7986, 2017 WL 1842686 (S.D.N.Y. May 4, 2017) ............................ 4, 19-20, 22

*Payne v. Abbott Labs.*,
    999 F. Supp. 1145 (N.D. Ill. 1998) .......................................................................29

*Presseisen v. Swarthmore Coll.*,
    442 F. Supp. 593 (E.D. Pa. 1977) .........................................................................27

*Prewitt v. Walgreens Co.*,
    No. 12-6967, 2013 WL 6284166 (E.D. Pa. Dec. 2, 2013)....................................38

*Raymond v. Drexel Burnham Lambert Inc.*,
    No. 89-4111, 1989 WL 129359 (E.D. Pa. Oct. 25, 1989) ......................................18

*The Republic of Iraq v. BNP Paribas USA*,
    472 F. App'x. 11 (2d Cir. 2012) ..........................................................................21

*Rettinger v. American Can Co.*,
    574 F. Supp. 306 (M.D. Pa. Sept. 2, 1983)...........................................................41

*Rich Art Sign Co. v. Ring*,
    122 F.R.D. 472 (E.D. Pa. 1988)...........................................................................18

*Rossi v. Sun Refining & Mktg. Corp.*,
    No. 94-3037, 1995 WL 12056 (E.D. Pa. Jan. 11, 1995)........................................40

*Rueda v. Nexeo Sols., LLC*,
    No. 14-3801, 2015 WL 1472057 (D.N.J. Mar. 31, 2017) ......................................30

*Rupinsky v. Miller Brewing Co.*,
    627 F. Supp. 1181 (W.D. Pa. 1986)......................................................................37

*Sanchez v. Sungard Availability Servs. LP*,
    362 F. App'x 283 (3d Cir. Jan. 28, 2010) .............................................................30

*Santiago v. Citywide Community Counseling Servs., Inc.*,
    No. 13-2114, 2013 WL 4051223 (E.D. Pa. Aug. 12, 2013) ..................................33

*Seldon v. National R.R. Passenger Corp.*,
    452 F. Supp. 2d 604 (E.D. Pa. 2006) ...............................................................26, 30

vi

*Shick v. Shirey*,
716 A.2d 1231 (Pa. 1998) ......................................................................... 37-38

*Simmerman v. Corino*,
27 F.3d 58 (3d Cir. 1994) ...............................................................................18

*Spano v. V & J Nat'l Enterprises, LLC*,
No. 16-06419, 2017 WL 3738555 (W.D.N.Y. Aug. 30, 2017) ........................ 20-22

*Specialty Surfaces Intern., Inc. v. Continental Co.*,
609 F.3d 223 (3d Cir. 2010).............................................................................36

*Stanley v. City of Pitts.*,
No. 15-00555, 2016 WL 3920477 (W.D. Pa. July 15, 2016) ...............................32

*Sussman v. Bank of Isreal*,
56 F.3d 450 (2d Cir. 1995).................................................................................43

*Teamsters Local Union No. 430 v. Cement Exp., Inc.*,
841 F.2d 66 (3d Cir. 1988)................................................................................17

*Turner Const. Co. v. First Indem. of Am. Ins. Co.*,
829 F. Supp. 752 (E.D. Pa. 1993), *aff'd* 22 F.3d 303 (3d Cir. 1994).....................43

*United States Claims, Inc. v. Saffren & Weinberg, LLP*,
No. 07-0543, 2007 WL 4225536 (E.D. Pa. Nov. 29, 2007) .................................35

*United States v. Lansdowne Swim Club*,
713 F. Supp. 785 (E.D. Pa. 1989), *aff'd*, 894 F.2d 83 (3d Cir. 1990)....................27

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008).........................................................................................39

*Weaver v. Harpster*,
975 A.2d 555 (Pa. 2009) ........................................................................... 37-38

## Statutes

42 U.S.C. §1981 ......................................................................................*Passim*

42 U.S.C. § 1981(b) ........................................................................................25

9 U.S.C. § 2 ....................................................................................................19

9 U.S.C. §3.................................................................................................. 4-5

N.Y. Labor Code, § 201-d(2)(c) ......................................................................42

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 11 ......................................................................*Passim*

Plaintiff David Magerman ("Magerman" or "Plaintiff"), by and through his undersigned counsel, hereby submits this opposition to Defendant Robert Mercer's Motion for Rule 11 Sanctions, dated September 8, 2017 (ECF No. 15) (the "Motion").

## I.    INTRODUCTION

Defendant Robert Mercer's motion for Rule 11 sanctions (the "Motion") is meritless. The claims asserted in the Complaint are not frivolous. Further, far from exhibiting the "exceptional" misconduct warranting the stigma of a Rule 11 sanction, plaintiff's counsel (both former and current) have litigated this case cautiously, while also upholding their ethical obligation to provide zealous representation.[1]  Mr. Mercer is one of the wealthiest individuals in the United States. (Compl.,¶16). The Motion is just the latest blatant attempt by Mercer to intimidate and bully Magerman and his counsel, all to further Mercer's goal of asserting his dominance and depriving Magerman of the renumeration that is owed to him.

This lawsuit relates to Defendant Mercer's role in wrongfully suspending and ultimately terminating Plaintiff from his employment with Renaissance Technologies LLC ("Renaissance"), effective April 29, 2017.   Magerman was terminated for speaking out against Mercer's support for racist policies and the implication that Magerman and other Renaissance employees shared those views. (Compl.,¶51). Mercer's politics were well known and a matter of public record long before commencement of this lawsuit. Accordingly, Mercer's contentions in the Motion that this lawsuit was filed for the improper purpose of outing Mercer's political beliefs and embarrassing him are preposterous. Magerman filed this lawsuit because of damages he has suffered as a direct result of Mercer's wrongful acts.

---

[1]     Until September 5, 2017, Cozen O'Connor was counsel of record for Plaintiff.  On September 5, 2017, Klehr Harrison Harvey Branzburg LLP entered its appearance.

For over twenty years, until his recent termination, Plaintiff David Magerman, a research scientist, was a loyal employee of Renaissance.  Magerman designed mathematical and statistical algorithms to direct Renaissance's investment decisions on international financial markets. (Compl.,¶9).  Although Renaissance's headquarters are in New York, for the past seven years, Magerman worked primarily from his home in Pennsylvania. (Compl.,¶7).

Defendant Robert Mercer is the co-Chief Executive Officer of Renaissance. (Compl.,¶8). Mercer has long been a public supporter of ultra-conservative political causes and candidates, including then-candidate Donald Trump during the 2016 presidential general election. (Compl.,¶27). Mercer was an influential advisor to the Trump campaign, recommending the hiring of two Mercer family associates, Stephen K. Bannon and Kellyanne Conway (Compl.,¶29), and is also a major investor in Breitbart Holdings, Inc. ("Breitbart"), which operates Breitbart News and Breitbart Media, the alt-right media organizations that Bannon leads. (Compl., ¶31).

In the Complaint filed on August 3, 2017, Plaintiff stated two claims against  Mercer. The first claim is brought pursuant to 42 U.S.C. §1981, alleging that Magerman's suspension in February 2017 and his ultimate termination from Renaissance in April 2017 were ordered personally by Mercer in retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports. (Compl.,¶¶67 and 75). The second claim is for wrongful discharge. Magerman contends that, by trying to silence him, Mercer was making Magerman tacitly accept Mercer's views and co-opting Magerman's conduit for speech, which is tantamount to forced political speech. (Compl.,¶91).[2]

---

[2]    On September 13, 2017, Magerman filed a First Amended Complaint, adding a claim under the Pennsylvania Wage Payment and Collection Law, 43 P.S. 260.1, *et seq*. ("WPCL").  The Motion was filed

2

At the time of the filing of the Complaint, Magerman was represented by Cozen O'Connor. As discussed below, the claims asserted were not patently unmeritorious or frivolous. By letter dated August 14, 2017, from Mercer's counsel to Cozen O'Connor, Mercer stated his intent to seek sanctions pursuant to Federal Rule of Civil Procedure 11 (the "Rule 11 Letter").[3] In the Rule 11 Letter, although Mercer referred to a pending arbitration proceeding brought by Magerman against Renaissance (the "JAMS Proceeding"), Mercer did not agree to submit to arbitration.  Instead, he demanded that Magerman withdraw all claims with prejudice, which would have left nothing to arbitrate. *Id.*

On September 1, 2017, Mercer tried to cow Cozen O'Connor into disavowing the claims set forth in the Complaint. In an email dated September 1, 2017, Jason C. Schwartz, counsel for Mercer, wrote, "Also Mr. Fiebach, so that we can assess whether you remain responsible for the deficient pleading as well, please let us know if you intend to disavow the pleading by virtue of your withdrawal." *See*, Declaration of Jason C. Schwartz at ¶10 and Exhibit I.[4]  At no time did prior counsel disavow the pleading. Yet, in bad faith, Mercer, with no support whatsoever, tries to insinuate the opposite.[5]

Four days after its entry of appearance, by letter dated September 8, 2017, new counsel responded to the Rule 11 Letter (the "Response Letter"). *See* Magerman Declaration at ¶20 and

---

in connection with the Complaint, and not the First Amended Complaint, and therefore the Complaint is addressed herein.

[3]     A copy of the Rule 11 Letter is attached to the Declaration of David Magerman filed contemporaneously herewith (the "Magerman Declaration") as Exhibit B.

[4]     Mr. Schwartz's Declaration is appended to the Motion.

[5]     In his memorandum of law (the "MOL"), Mercer writes, "Tellingly, again after being served with a Rule 11 motion, his original counsel withdrew." (MOL, page 1).  Unsupported musings such as this cannot serve as a basis for a Rule 11 motion.

3

Exhibit C. In the Response Letter, counsel underscored: (1) Renaissance's breach of its arbitration obligations by, among other things, failing to pay its required fees, which failure effectively shut down the JAMS Proceeding;[6] (2) the fact that, as a result of Renaissance's repudiation of its obligation to arbitrate, Mercer, a non-signatory executive, was precluded from claiming concomitant rights to enforce an arbitration provision in Magerman's employment agreement with Renaissance (the "Employment Agreement");[7] (3) Mercer's waiver of his right to arbitrate by demanding in the Rule 11 Letter that Magerman dismiss his claims with prejudice, the end result of which would be to leave Magerman with no claims to litigate in arbitration; (4) Mercer's waiver of his right to arbitrate by failing to state his willingness to arbitrate from the outset;[8] and (5) that even if the Court were to find that arbitration was warranted, based on binding Third Circuit law and the plain language of Section 3 of the Federal Arbitration Act (the

---

[6]     Renaissance's failure to arbitrate is discussed further in Sections II and IV.B. below.

[7]     In this regard, counsel wrote:

> [Given] the conduct of Renaissance to date, it is debatable whether it can any longer contend that this dispute is subject to arbitration, and, therefore, whether Mercer can assert concomitant arbitration rights. Renaissance has essentially repudiated its obligation to arbitrate as evidenced by: (a) its failure to remit the required retainer to JAMS (which failure has stopped the arbitration dead in its tracks); and (b) the August 22, 2017 letter from Lauren Reiter Brody, Esquire to H. Robert Fiebach, Esquire demanding withdrawal of the arbitration.  *See Nadeau v. Equity Residential Props. Mgmt. Corp.,* No. 16-CV-7986, 2017 WL 1842686 at *3 (S.D.N.Y. May 4, 2017) (holding that an employer cannot move to force arbitration when it breached the contract with the arbitration clause, noting that such a tactic would give employers "an incentive to refuse to arbitrate claims brought by employees in the hope that the frustrated employees would simply abandon them."(quoting *Brown v. Dillards, Inc.*, 430 F.3d 1004, 1012 (9th Cir. 2005)).

*See* Magerman Declaration at Exhibit C.

[8]     Prior to September 5, 2017, when Mercer filed his Motion to Arbitrate and Dismiss (which was subsequently withdrawn pursuant to a Stipulation to Arbitrate), Mercer had never formally agreed to submit to arbitration. Instead, Mercer had threatened on two occasions to file a Rule 11 sanction motion unless Plaintiff withdrew his federal claims with prejudice, which would have left Magerman with no claims to arbitrate.

"FAA"), 9 U.S.C. §3, Mercer would not be entitled to have this action dismissed (with or without prejudice) even if all claims were arbitrable, as Mr. Magerman intended to request a stay. *See Lloyd v. Hovensa LLC,* 369 F.3d 263, 269-71 (3d Cir. 2004); *Devon Robotics LLC v. DeViedma,* 798 F.3d 136, 142-44 (3d Cir. 2015); *see also* Magerman Declaration at Exhibit C.

Undoubtedly, Mercer shared a copy of the Response Letter with Renaissance because, in an attempt to cure its breach of its arbitration obligations, the following week, Renaissance suddenly changed its tune. (*Id. at* ¶22). On September 12, 2017, the JAMS Case Administrator, by email to counsel for Magerman, advised that Renaissance had finally paid its retainer. (*Id. at* ¶23 and Exhibit D). Similarly, that same day, Lauren Reiter Brody, Esquire, counsel for Renaissance, sent a letter to counsel for Magerman, in which she stated, "Renaissance looks forward to resolving this matter in Arbitration…" (*Id. at* ¶24 and Exhibit E).

After Renaissance finally remitted its arbitration fee to JAMS and confirmed its agreement to arbitrate, Plaintiff provided Mercer with a proposed stipulation to arbitrate and stay this action pursuant to Section 3 of the FAA. (*Id. at* ¶25 and Exhibit F). On September 19, 2017, the parties signed and submitted to the Court a "Stipulation Regarding Arbitration and [Proposed] Order To Arbitrate And Stay This Action." (the "Proposed Stipulation"). (*Id. at* ¶26).

The actions of Magerman's counsel, in pointing out the deficiencies in Mercer's position on September 8, 2017, and in subsequently stipulating to arbitration a short time later, once Renaissance (spurred by the Response Letter) paid its arbitration fees and committed to arbitrate, can hardly be characterized as unreasonable under the circumstances. In fact, Magerman's counsel should be credited with getting the JAMS Proceeding back on track.

In the Motion, Mercer fabricates facts and subjective theories in his zeal to satisfy the objective "improper purpose" standard of Rule 11(b)(1). Mercer's bad faith heavy handedness is

illustrated not only by his fictitious contention that prior counsel repudiated the claims, but also by his improper attempt to vilify the character of Magerman, a long time loyal employee of Renaissance.  In this regard, Mercer peppers the Motion with pejorative literary flourishes like "transparent attempt to generate self-serving publicity," and "personal vendetta against Mercer," accuses Magerman of "fictitious slander," and claims that Magerman is engaging in a smear campaign against Mercer for the purpose of "generating attention for Magerman's own personal and political gain."   (Memorandum of Law ("MOL"), page 1). These characterizations are unsupportable on the face of the record and have no place in a Rule 11 motion. Magerman filed this law suit because he was harmed. Mercer's political beliefs and his related affiliations were public knowledge long before Magerman's suspension and firing in 2017, and Mercer has not hesitated to further his political views through various well-known avenues, including news media, organizations and political campaigns. The articles attached to the Complaint, for example, contain information about Mercer's politics that have long been in the public domain.

Mercer's bad faith heavy handedness is also illustrated by: (a) his less than candid and incomplete description of the JAMS Proceeding; (b) his misrepresentations as the failed settlement negotiations between Renaissance and Magerman, in which Mercer refused to participate; and (c) his unsupported theory as to why Magerman dismissed a prior action against Mercer.

As to the JAMS Proceeding brought by Magerman against Renaissance in May 2017, Mercer gives an incomplete and misleading recitation of its procedural history.   Mercer conveniently omits from his narrative that, as of September 8, 2017 (the date on which Mercer filed his Rule 11 motion), Renaissance had repudiated and breached its duty to arbitrate by: (1) failing to pay its required arbitration fees; and (2) demanding the withdrawal of the JAMS

Proceeding. (Magerman Decl. at ¶¶11-13 and Exhibit A).  Mr. Schwartz, in his declaration in support of the Motion, states at paragraph 6, "Attached hereto as Exhibit E is a true and correct copy of the Amended Notice of Claim and Demand For Arbitration in *Magerman v. Renaissance Technologies LLC,* dated August 3, 2017." *See* Schwartz Declaration at ¶6. Mr. Schwartz  fails to mention, however, that Exhibit E is only a proposed amended claim and needed to be referred to the Arbitration for approval. Likewise, Mr. Schwartz fails to disclose that, as of September 8, 2017, the date that he signed his declaration, the JAMS Case Manager was refusing to forward the Motion To Amend or the Proposed Amended Claim to the Arbitrator because of Renaissance's failure to remit the required Renaissance Retainer. In other words, as of the date of Mercer's filing of the Rule 11 motion, the JAMS Proceeding was stopped dead in its tracks because of Renaissance's failure to comply with its arbitration duties to pay required fees. (Magerman Decl. at ¶¶16-17).

Mercer's characterization of the dismissal without prejudice of a prior law suit brought by Magerman  (Case No. 2:17-cv-02083) (the "Prior Action") also has no basis in fact. (Magerman Decl. at ¶6).  Mercer falsely states that a Dismissal Notice was filed in the Prior Action because of a realization by Magerman and his counsel that the Prior Action was fatally flawed.  (MOL at page 1). To the contrary, the Dismissal Notice was filed because Magerman mistakenly believed that Mercer was going to participate in settlement discussions that had commenced with Renaissance. Dismissing the Prior Action was Plaintiff's act of good faith in connection with those discussions.  (Magerman Decl. at ¶7).  As it turned out, however, Mercer refused to participate in the settlement discussions, and Renaissance and Magerman ultimately were unable to resolve their differences, due in no small part because of  Mercer's refusal to participate in the process. (*Id.* at ¶8).  Mercer's statement that Magerman "walked away from

7

settlement" (MOL at page 1) is not an accurate representation of what transpired. Moreover, given the confidential nature of the settlement discussions between Magerman and Renaissance and Mercer's decision not to participate in the negotiations, it is especially inappropriate for him to discuss or purport to know anything about what transpired in those negotiations. (Magerman Decl. at ¶9). Further, that Magerman and his counsel did not believe the claims were fatally flawed is evidenced by their refiling of the Complaint on August 3, 2017, after the settlement negotiations with Renaissance broke down.

Accordingly, Mercer has not satisfied the heavy burden of proving under Rule 11(b)(1) or (2) that sanctions are warranted against Magerman or his counsel.

## II.     RELEVANT PROCEDURAL HISTORY

On or about May 5, 2017, Plaintiff filed the Prior Action (Case No. 2:17-cv-02083) against Mercer in this Court. At that time, Plaintiff was represented by the law firm of Cozen O'Connor. (Magerman Decl. at ¶2).

On or about May 9, 2017, Magerman filed a Notice of Claim and Demand for a JAMS Employment Arbitration in the matter captioned *Magerman v. Renaissance Technologies LLC*, which was assigned a JAMS Case No. 1425023846 (the "JAMS Proceeding"). On June 26, 2017, JAMS appointed the Honorable Frank Maas as the Arbitrator in the JAMS Proceeding. (*Id.*. at ¶¶3-4).

On June 30, 2017, shortly after the Arbitrator was selected, the parties to the JAMS Proceeding engaged in settlement discussions and wrote a joint letter to the JAMS Case Administrator asking for a stay of the proceedings pending the outcome of those discussions. (*Id.* at ¶5). After the ensuing holiday weekend, on July 5, 2017, a Notice of Dismissal without

8

prejudice was filed in the Prior Action (the "Dismissal Notice") because Magerman mistakenly believed that Mercer was going to participate in the settlement discussions. (*Id.* at ¶¶6-7).

As it turned out, however, Mercer, through counsel or otherwise, refused to participate in the settlement discussions, and Renaissance and Magerman ultimately were unable to resolve their differences, especially in light of Mercer's refusal to participate in the process. The statement made by Mercer that Magerman "walked away from settlement" is not an accurate representation of what transpired in the confidential settlement discussions. Moreover, given Mercer's decision not to participate in the settlement discussions, it is especially inappropriate for him (or his counsel) to discuss or purport to know anything about what transpired in those negotiations. (*Id.* at ¶¶8-9).

On August 3, 2017: (a)  Renaissance and Magerman asked the JAMS Case Administrator to lift the stay on the JAMS Proceeding; (b)  Magerman submitted to JAMS a Motion For Leave To File an Amended Notice of Claim and Demand for Arbitration (the "Motion To Amend"), together with a proposed Amended Notice of Claim and Demand for Arbitration (the "Proposed Amended Claim"); (c) Magerman filed this Action against Mercer; and (d) in order that the JAMS Proceeding could move forward, the JAMS Case Administrator requested that Renaissance, as Respondent pay its required preliminary retainer (the "Renaissance Retainer"), which it had not paid since the inception of the JAMS Proceeding. (*Id.* at ¶¶10-11).

By letter dated August 14, 2017, Mercer sent the Rule 11 Letter, stating his intention to seek sanctions pursuant to Federal Rule of Civil Procedure 11 unless Magerman filed a "Notice of Dismissal With Prejudice" in this Action (the "Rule 11 Letter").  (Magerman Decl. at ¶19 and Exhibit C). In the Rule 11 Letter, although Mercer referred to the JAMS Proceeding of which

Renaissance was the respondent, he did not agree to submit to arbitration.  Instead, he demanded that Plaintiff withdraw all claims with prejudice, which would have left nothing to arbitrate. *Id.*

On August 22, 2017, Lauren Reiter Brody, Esquire, counsel for Renaissance, wrote to counsel for Magerman demanding withdrawal of the JAMS Proceeding.  (*Id.* at ¶12 and Exhibit A).

At no time between August 3, 2017, and the filing of the Motion in this case, however, did Renaissance remit the Renaissance Retainer to JAMS, effectively shutting down the JAMS Proceeding. As a result of Renaissance's failure to submit the Renaissance Retainer, the JAMS case administrator refused to forward the Motion To Amend or the Proposed Amended Claim to the Arbitrator, Judge Maas. (*Id.* at ¶¶13-14).

On September 5, 2017, Mercer filed his Dismissal Motion.

On September 5, 2017, Cozen O'Conner withdrew its appearance as counsel for Plaintiff and substitute counsel, Klehr Harrison Harvey Branzburg LLP, entered its appearance on behalf of Plaintiff in this action. As set forth above, contrary to Mercer's unsupported statements, at no time did Cozen O'Connor ever disavow the Complaint, as Attorney Schwartz requested in his September 1, 2017 email. (*See* Schwartz Declaration at  ¶10 and Exhibit I.).

By letter dated September 8, 2017, counsel for Plaintiff sent the Response Letter to the Rule 11 Letter, which, as discussed above, set forth numerous reasons why it would be inappropriate for Mercer to file the Motion.  Nonetheless, within hours of receipt, Mercer filed the Motion on September 8, 2017.

No doubt, Mr. Mercer shared a copy of the Response Letter dated September 8, 2017 with Renaissance as evidenced by the fact that, the following week, in an attempt to cure its breach of its arbitration obligations, Renaissance suddenly changed its tune. *See* Magerman

10

Declaration at ¶22.  On September 12, 2017, the JAMS Case Administrator, by email to new counsel, advised that Renaissance had finally paid the required Renaissance Retainer.[9] *Id.* at ¶23 and Exhibit D.  In addition, on September 12, 2017, Lauren Reiter Brody, Esquire, counsel for Renaissance, wrote to new counsel, and stated in her letter, "Renaissance looks forward to resolving this matter in Arbitration…"  *Id.* at ¶24 and Exhibit E.

On September 18, 2017, in light of Renaissance having finally remitted the required Renaissance Retainer, counsel for Magerman contacted Mercer's counsel and provided a proposed "Stipulation Regarding Defendant's Motion To Compel Arbitration And Dismiss And [Proposed] Order To Arbitrate And Stay This Action."  *Id.* at ¶25 and Exhibit F.

Shortly thereafter, on September 19, 2017, the parties entered into a "Stipulation Regarding Arbitration And [Proposed] Order To Arbitrate And Stay This Action," which was submitted to the Court that day.

## III.   FACTUAL BACKGROUND

On  January 16, 2017, Magerman, concerned that  Mercer's views were damaging to the image and reputation of Renaissance, called Mercer and asked if he had time for a personal conversation. (Compl., ¶ 33).  Magerman and Mercer had a lengthy conversation and Magerman was stunned by Mercer's comments.  (Compl., ¶¶34-37).

Magerman reported  the conversation to Peter  Brown, Mercer's co-Chief Executive Officer at Renaissance, along with his belief that Mercer's public political views and association with  alt-right groups such as  Breitbart News  were damaging to the image and reputation of

---

[9]     The JAMS Case Administrator wrote, "Previous counsel for Claimant, Cozen O'Connor, sent the attached motion to be forwarded to Judge Maas.  I advised counsel that the motion would be forwarded once the retainer had been paid. The preliminary retainer has now been paid.  Please confirm whether or not you would like the attached motion to be sent to Judge Maas."  *See* Magerman Declaration at ¶23 and Exhibit D.

11

Renaissance, by which Magerman intended to convey, *inter alia*, that Mercer's publicly-stated views prevented the company from hiring a more diverse workforce of Highly-Compensated Employees who expressed disbelief that Mercer would make comments like those.  (Compl., ¶ 39).  Brown expressed disbelief that Mercer would make comments like those.  Brown asked if he could share with Mercer his conversation with Magerman and asked if Magerman would be willing to talk to Mercer again. Magerman agreed. (Compl., ¶40). Magerman advised Brown that he was concerned that Mercer's embrace of right wing causes and candidates was bad for Renaissance and could damage the company's standing with investors and prospective employees who would not want to be associated with Mercer's ideology. (Compl., ¶41).

On February 5, 2017, Mercer called Magerman and stated, in a threatening manner, "I hear you're going around saying I'm a white supremacist." (Compl., ¶42). Magerman denied that he had labelled Mercer a white supremacist, and denied that he ever used the term "white supremacist" in describing Mercer. (Compl., ¶43). Magerman then quoted back to Mercer the comments about African Americans that Mercer had made in their prior conversation and that Magerman had reported to Brown. At first, Mercer disputed that he had said such things, although he did not actually deny saying them. In the course of rehashing the conversation, however, Mercer repeated many of these same views, and even cited research that allegedly supported his opinion that the Civil Rights Act harmed African Americans economically. Magerman was skeptical of the supposed data that Mercer relied on, but nonetheless pointed out that, even if it was true, there is more to someone's well-being than money, and segregation was still degrading and destructive and the United States was right to get rid of it. Mercer scoffed at this suggestion.  (Compl., ¶¶44-48).

12

Magerman continued to be alarmed by his boss's personal views and backing of policies and statements Magerman found to be divisive and harmful to the poor and minorities. Magerman was also concerned that Renaissance did not employ any African Americans as Highly-Compensated Employees. (Compl., ¶¶49-50). Magerman felt obligated to speak out against Mercer's support for racist policies (Compl., ¶51). Magerman, however, was aware of alleged restrictions under the Employment Agreement and Handbook to avoid publicly disparaging either Renaissance or its employees, even though such policies are illegal and unenforceable. (Compl., ¶52).  Accordingly, on January 29, 2017, before speaking publicly, Magerman sent a written memorandum to several Renaissance executives, including General Counsel Carla Porter, Chief Compliance Officer Mark Silber and Director of Human Resources Lavonne Wesner.  (Compl., ¶53 and Exhibit C). In that memorandum, Magerman stated, *inter alia*, "the Mercers' public and blatant support for the Trump candidacy, presidency and agenda has cast a taint on all Renaissance employees, including myself.  To disallow employees to politely and honestly, but publicly, respond to this taint, and to prevent us from disavowing it in as public a forum as he has been allowed to promote it, is frankly unfair and untenable." (*Id.,* Exhibit C).  Magerman also sought guidance in writing as to what he would be allowed to say that would not subject him "to any retaliation in the workplace for my public speech," but never received a written response to this email. (Compl., ¶¶55-56).  After sending the email, however, Magerman did consult telephonically with Silber, the Chief Compliance Officer, regarding Magerman's intention to speak to the press about his concerns. Silber told Magerman that he could speak to the press, but that Renaissance's biggest concerns were that its trade secrets were protected and that the company did not appear to have infighting among its employees.

13

Magerman told Silber that Silber would have a chance to review the statements Magerman made to the media before they were published. (Compl., ¶¶57-59).

Magerman then gave an interview to a reporter for the *Wall Street Journal*, in which Magerman criticized President Trump and Mercer's support for the President's agenda. (Compl., ¶ 60). Magerman's statements were made available to Silber, who then denied that Magerman had ever been given permission to speak to the press. (Compl., ¶61).

Upon information, Magerman alleges that: Mercer became aware that Magerman had given an interview to a reporter for the *Wall Street Journal,* and communicated false information about Magerman to John Gasthalter, a public relations representative of Renaissance, in an effort to coerce Magerman from having any further communications with the press about Mercer. (Compl., ¶62); Gasthalter, called the *Wall Street Journal* reporter and threatened to cut him off from any further information from Renaissance if he published an article regarding Magerman's interview. (Compl., ¶63); and Gasthalter, at the instigation of Mercer, also made a number of false accusations about Magerman to the *Wall Street Journal* reporter and downplayed the significance of Magerman's substantial contributions to the success and profitability of Renaissance. (Compl., ¶64).

Despite this effort to sabotage Magerman and silence his opinions, an article regarding the interview was published in the *Wall Street Journal* on February 23, 2017. A copy of this article is attached hereto as Exhibit D. (Compl., ¶65 and Exhibit D).

The following day, February 24, 2017, Magerman was suspended from Renaissance without pay. (Compl., ¶66). Upon information and belief, Magerman's suspension was ordered personally by Mercer and was in retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports. (Compl., ¶¶67). Media stories about the *Wall Street*

14

*Journal* article and Magerman's ensuing suspension were subsequently published in several other new sources, including the *Philadelphia Inquirer*, Philly.com and Dealbreaker.com." (Compl., ¶68).

Magerman and Renaissance attempted to work out a resolution of Magerman's suspension that would allow Magerman to return to work without compromising his right to free speech. (Compl., ¶69).

During his suspension, and prior to his employment being terminated, Magerman again told Brown that Mercer's public political views and association with the alt-right were harmful to the image and reputation of Renaissance, by which Magerman intended to convey, *inter alia*, that Mercer's publicly-stated views and activities prevented the company from hiring a more diverse workforce of Highly-Compensated Employees. (Compl., ¶70). During his suspension, and prior to his employment being terminated, Magerman advised his immediate supervisors at Renaissance, Jim Herrnstein and Stephen Della Pietra, that public awareness of Mercer's views, combined with the lack of minorities in the company would damage Renaissance from an EEO perspective. Upon information and belief, Herrnstein and Della Pietra reported their conversations with Magerman to senior management at Renaissance and that this information was conveyed to Mercer. (Compl., ¶71).

On or around March 30, 2017, Renaissance paid Magerman the base compensation that it had withheld but *de facto* continued the suspension by locking Magerman out of the company's computers, isolating him from his colleagues and otherwise denying him the right to return to work. (Compl., ¶72).

On or around April 20, 2017, Magerman attended a charity poker tournament in New York City attended by many Renaissance employees, including Mercer and his daughter.

(Compl., ¶73).  At the tournament, Mercer's daughter confronted Magerman, calling him "pond scum" and saying that "[k]arma is a bitch."  (Compl., ¶74).  An April 29, 2017 article from the *Wall Street Journal* describing this altercation is attached to the Complaint as Exhibit E.

Renaissance, at the direction of Mercer and in further retaliation for Magerman's criticisms of Mercer's political activities and the causes he supports, fired Magerman as of April 29, 2017, in a letter Magerman received on May 3, 2017. (Compl., ¶75).  Mercer has decision-making control over Renaissance hiring practices and the hiring of Highly Compensated Employees .(Compl., ¶76).  Mercer's political views affect the culture at Renaissance. (Compl., ¶77).  The failure of Renaissance to hire African Americans to managerial and technical positions as Highly Compensated Employees is, on belief, the result of the effect of Mercer's political views on the culture of Renaissance. (Compl., ¶77).

## IV.   ARGUMENT

### A.   Legal Standard

Federal Rule of Civil Procedure 11(b) provides:

> Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)   it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2)   the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3)   the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary

16

> support after a reasonable opportunity for further investigation or discovery; and
>
> (4)  the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

Rule 11 sanctions are appropriate "only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous," *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (quoting *Doering v. Union Cty. Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988)) (internal quotations omitted), and where the accused attorney's conduct was not "objectively reasonable under the circumstances." *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 297 (3d Cir. 2010) (citation omitted) (reversing the granting of Rule 11 sanctions where counsel's argument was "ultimately unpersuasive" but not "patently unmeritorious or frivolous.").

Rule 11 "'must not be used as an automatic penalty against an attorney or party advocating the losing side of a dispute,' and it 'should not be applied to adventuresome, though responsible, lawyering which advocates creative legal theories.'" *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d at 297. In determining whether a document was submitted in violation of Rule 11, "the court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading was submitted." *Teamsters Local Union No. 430 v. Cement Exp., Inc.*, 841 F.2d 66, 68 (3d Cir. 1988). Rule 11 sanctions are "appropriate regarding the initiation of a lawsuit only if the filing of the complaint constituted abusive litigation or misuse of the court's process." *Id.*; *see also Ario*, 618 F.3d at 297 ("Rule 11 sanctions are reserved for correcting litigation abuse.").

17

There is very good reason for the limited use of Rule 11 sanctions.  As the Third Circuit

has emphasized, sanctions

> act as a symbolic statement about the quality and integrity of an
> attorney's work – a statement that may have a tangible effect upon
> the attorney's career.  Thus the Supreme Court, in recognizing the
> inherent power of a court over the members of its bar,
> acknowledged that the limits of procedural due process
> circumscribe the manner in which otherwise proper sanctions may
> be imposed.  It held that sanctions "should not be assessed lightly
> or without fair notice and an opportunity for hearing on the
> record."

*Simmerman v. Corino*, 27 F.3d 58, 64 (3d Cir. 1994) (quoting *Roadway Express, Inc. v. Piper*,

447 U.S. 752, 767 (1980)).

The burden of proving a Rule 11 violation falls on the party moving for sanctions.  *See*

*Gary v. Braddock Cemetary and Consol Energy*, 334 F. App'x 465, 467 (3d Cir. June 8, 2009);

*see also Rich Art Sign Co. v. Ring*, 122 F.R.D. 472, 474 (E.D. Pa. 1988) (denying defendants'

motion for Rule 11 sanctions where defendants failed to demonstrate that plaintiff's claims were

frivolous).  Should the movant satisfy his burden, the amount of "costs and attorneys' fees" to be

awarded, if any, "is a matter committed to the district court's discretion."  *Raymond v. Drexel*

*Burnham Lambert Inc.*, No. 89-4111, 1989 WL 129359, at *1 (E.D. Pa. Oct. 25, 1989) (quoting

*Kane Gas Light & Heating Co. v. International Brotherhood of Firemen & Oilers,* 687 F.2d 673,

682 (3rd Cir. 1982)) (internal quotations omitted).

Here, Mercer contends that Rule 11 sanctions are warranted because Magerman's claims

"lack any reasonable basis in law" in violation of Rule 11(b)(2) and were asserted for the

improper purposes of publicly harassing and "smear[ing]" Mercer in violation of Rule 11(b)(1).

(*See* MOL. at 11).  Both of these allegations are wholly without merit.  Indeed, the Motion is

merely another thinly-veiled attempt *by Mercer* to harass and penalize Magerman for voicing

18

political opinions that are contrary to those held and publicly voiced by Mercer. Notably, Mercer does not allege that Magerman or his counsel violated Rule 11(b)(3), as it is obvious that Magerman has sufficiently pled specific factual contentions that support his claims. (*See* Compl., ¶¶6-78 (setting forth the factual basis for Magerman's dispute with Mercer in 72 detailed paragraphs)). Mercer likewise cannot and does not allege that Magerman violated Rule 11(b)(4), as the political statements made by Mercer that are at issue in this action are public statements, and Mercer does not dispute that he made such statements.

For the reasons discussed below, Mercer falls far short of meeting his burden to show the "exceptional circumstances" required for Rule 11 sanctions.

### B. Mercer Failed to Prove that Magerman's Filing of the Complaint in Federal Court Violated Rule 11(b)(2).

To prove a violation of Rule 11(b)(2) such that sanctions are warranted, a movant must demonstrate that the filing of a complaint or other legal document was "patently unmeritorious or frivolous," or constituted an "abusive litigation or misuse of the court's process." *Ford Motor Co.*, 930 F.2d at 289. Mercer has not met this burden, and indeed, he cannot do so.

Section 2 of the FAA provides that an otherwise-valid arbitration agreement can be rendered unenforceable based "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under New York law, grounds for revocation include the principal that a party that materially breaches a contract cannot then enforce the contract against a non-breaching party. *See Nadeau v. Equity Residential Properties Mgmt. Corp.*, No. 16-7986, 2017 WL 1842686, at *3 (S.D.N.Y. May 5, 2017); *see also In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997) (holding that a breach is "material" where it "substantially defeats the purpose of that contract"). Where an employment agreement contains an arbitration provision, an employer's refusal to arbitrate constitutes a material breach of the agreement, such that the employer cannot

19

seek to enforce the arbitration provision as grounds to dismiss the complaint.  *See id.*; *see also Spano v. V & J Nat'l Enterprises, LLC*, No. 16-06419, 2017 WL 3738555, at *9 (W.D.N.Y. Aug. 30, 2017).

*Nadeau v. Equity Residential Properties Mgmt. Corp.* is instructive on this point.  In that case, defendant sought to dismiss plaintiff's complaint on the grounds that plaintiff's employment contract contained an arbitration provision.  2017 WL 1842686, at *3.  The Court rejected defendant's argument, holding that "when an employer enters into an arbitration agreement with its employees, it must itself participate in properly initiated arbitration proceedings or forego its right to compel arbitration."  *Id.*  The court found that defendant had materially breached the agreement by failing to pay arbitration fees and otherwise generally refusing to arbitrate before the AAA, and was therefore not entitled to use the agreement to compel arbitration of plaintiff's claims.  *Id.*  In reaching this decision, the Court noted that to hold otherwise "would set up a perverse incentive scheme, contrary to the FAA and common sense."  *Id.*; *see also Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1011 (9th Cir. 2005) (finding that arbitration agreement was unenforceable where defendant "breached the arbitration agreement by refusing to participate in properly initiated arbitration proceedings" and the "breach was tantamount to a repudiation of the arbitration agreement"); *Garcia v. Mason Contract Prods., LLC,* No. 08-23103, 2010 WL 3259922, at *3 (S.D. Fla. Aug. 18, 2010) (holding that "[b]y failing to timely pay its share of the arbitration fee, Defendant materially breached its obligations, thereby 'scuttling' [its] opportunity" to insist on arbitration).

Similarly, in *Spano v. V & J Nat'l Enterprises, LLC*, defendants failed to timely pay arbitration fees, ultimately resulting in termination of the arbitration.  No. 16-06419, 2017 WL 3738555, at *9 (W.D.N.Y. Aug. 30, 2017).  Plaintiff then filed a complaint in federal court, and

defendants sought to have plaintiff's claims dismissed or compelled to arbitration.  *Id.*  The court found that defendants' "delay in payment . . . amounted to a material breach of the arbitration agreement because, otherwise, 'a party refusing to cooperate with arbitration [could] indefinitely postpone litigation,'" and defendants' "dilatory tactics have resulted in protracted litigation completely at odds with the laudatory objectives of the FAA."  *Id.* at *12 (citing *Sink v. Aden Enters., Inc.,* 352 F.3d 1197, 1201 (9th Cir. 2003)).   The court therefore concluded that defendants' "lost their right to compel Plaintiff to arbitrate his claims."  *Id.*

Notably, the *Spano* court's reasoning and conclusions applied not only to the employer-signatory, but also to all non-signatory defendants.  2017 WL 3738555, at *13 ("The Agreement is between Plaintiff and V & J Employment—Defendants are not signatories to the Agreement.").  "Just because a signatory has agreed to arbitrate issues of arbitrability with another party does not mean that it must arbitrate with any nonsignatory."  *Spano*, 2017 WL 3738555, at *5 (citing *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 209 (2d Cir. 2005)); *see also The Republic of Iraq v. BNP Paribas USA*, 472 F. App'x. 11, 13 (2d Cir. 2012) (holding that evidence of a "clear and unmistakable" "intent to have an arbitrator determine its jurisdiction with regard to disputes" between the parties to the agreement did not evince a similar intent "with respect to any dispute raised by a *non-party*") (emphasis in original).

In the Motion, Mercer contends that Magerman's claims asserted against him in this action were "filed in clear violation of" the arbitration provision in the employment agreement with Renaissance, as Mercer is a "nonsignatory agent" of Renaissance.  (MOL. at 31.)  However, as of the date that Magerman filed the Complaint, and continuing through the time that Mercer filed the instant Motion on September 8, 2017, Renaissance had failed to pay the required arbitration fees to JAMS.  Magerman Decl. ¶¶11-13.  The Motion wholly ignores the fact that

Renaissance – of which Mercer is the co-Chief Executive Officer – had materially breached the Employment Agreement and effectively blocked Magerman's attempt to pursue arbitration. Mercer's self-invoked status as "agent" for Renaissance under the Employment Agreement, however, means that Mercer must also be bound by the fact that Renaissance breached the Employment Agreement by delaying payment of its arbitration fees. Like in *Nadeau* and *Spano*, such a material breach by Renaissance rendered the arbitration provision wholly unenforceable not only against Renaissance, but also against Mercer as the self-proclaimed "nonsignatory agent" of Renaissance. *See* MOL. at 15; *see also Spano*, 2017 WL 3738555, at *13. Renaissance did not cure its default in the arbitration proceedings until approximately September 12, 2017 – which was four days *after* Mercer filed the instant Motion and several days *after* counsel for Magerman pointed out Renaissance's default to Mercer. *See* Magerman Decl. ¶¶22-23.

Moreover, on or about September 18, 2017, after Renaissance finally paid its arbitration fees and appeared willing to arbitrate in good faith, counsel for Magerman took reasonable steps to contact counsel for Mercer to inquire whether Mercer would stipulate to arbitration. The parties ultimately stipulated and agreed, among other things, that (i) the claims and defenses in the above-captioned action would be arbitrated in the JAMS Proceeding with Mercer's claims against Renaissance, and (ii) this action would be stayed pending the arbitration. This stipulation was delivered to the Court on September 19, 2017.

In light of these facts, the Court cannot conclude that Magerman or his counsel were frivolous or abused the litigation process in filing this action in federal court. When Renaissance stalled the arbitration by failing to pay, this action was not only reasonable, but also necessary to preserve Magerman's rights against Mercer, especially because Mercer had demanded that

22

Magerman withdraw his claims with prejudice.  Indeed, even if the Court were to have ruled against Magerman and compelled the parties to arbitrate, sanctions still would not be appropriate, as simply being "unpersuasive" or on the "losing side of a dispute" is not sufficient under Rule 11(b)(2).  *See Ario*, 618 F.3d at 297 (reversing the granting of Rule 11 sanctions where counsel's argument was "ultimately unpersuasive" but not "patently unmeritorious or frivolous.").

Moreover, the Court should not fault Magerman's counsel for the position taken in the Response Letter of September 8, 2017 – sent four days after current counsel was retained – that Renaissance had effectively repudiated arbitration and Mercer could not enforce the Employment Agreement, when in fact Renaissance was in default at that time.  Had counsel acted otherwise and somehow agreed that Mercer was entitled to arbitration when in fact the JAMS Proceeding was dead in its tracks, counsel would have breached his duty to Magerman to act as a zealous advocate for his client.  The actions of Magerman's counsel, in pointing out the deficiencies in Mercer's position on September 8, 2017, and subsequently stipulating to arbitration a short time later, once Renaissance (spurred by the Response Letter) paid its arbitration fees and committed to arbitrate, were appropriate.  Indeed, it was as a result of counsel's letter that the JAMS Proceeding against Renaissance resumed.

### C.     Given that the Parties Have Stipulated to Arbitration, the Court May Not Analyze the Merits of Magerman's Claims For Purposes of Issuing a Decision on Rule 11 Sanctions.

It is well-established that where a court determines that there is an agreement to arbitrate and the claims in dispute fall within the scope of such agreement, the court "must submit the matter to arbitration without ruling on the merits of the case."  *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001); *see also Beck v. Reliance Steel Prod.*

23

*Co.*, 860 F.2d 576, 579 (3d Cir. 1988) ("in deciding whether the parties have agreed to submit a particular grievance to arbitration [the court] is not to rule on the potential merits of the underlying claims").  In *Edmondson v. Lilliston Ford, Inc.*, 593 F. App'x 108 (3d Cir. 2014), for example, the Third Circuit reversed a decision of the District Court which ruled on the defendant's motion to dismiss prior to determining whether arbitration of the claims asserted in plaintiff's complaint was appropriate.  *Id.* at 112.

Here, Renaissance cured its default in the JAMS Proceeding by paying the required fees on or about September 12, 2017.  Shortly thereafter, the parties stipulated and agreed that the claims and defenses in this action will be arbitrated in the JAMS Proceeding.  (*See* Magerman Declaration at ¶26.  Mercer's Rule 11 motion is thus an improper attempt to evade the purview of the arbitrator by having this Court examine the merits of and issue a decision on Magerman's section 1981 and wrongful discharge claims, which Mercer has already consented to arbitrate. Mercer should not be able to capitalize on the fact that Renaissance breached the Employment Agreement – thus leading Magerman to file the Complaint – to not only seek sanctions against Magerman (which Magerman submits are not warranted for the reasons stated herein), but also to get a decision on the merits of the underlying claims now subject to arbitration.  Mercer has cited no case law supporting such a premise.  To the contrary, the court's decision in *Edmondson* declining to adjudicate a motion to dismiss after determining that claims are subject to arbitration is most analogous to the instant situation, and warrants this Court declining to reach the merits in adjudicating Mercer's Motion for Rule 11 sanctions.  *See Edmondson v. Lilliston Ford, Inc.*, 593 F. App'x at 112.

**D.      Should the Court Reach the Merits, the Claims Are Not Frivolous.**

In the alternative, should the Court determine that, despite the fact that the claims are to be arbitrated, the Court should nonetheless adjudicate the merits of Magerman's underlying claims at this stage of the litigation, Magerman respectfully submits that his claims are reasonably grounded in applicable law – or, at the very least, are not so "patently unmeritorious or frivolous" as to warrant the imposition of sanctions under Rule 11(b)(2).  *Ford Motor Co.*, 930 F.2d at 289.[10]

**1.      Magerman's Section 1981 Retaliation Claim Is Not Frivolous.**

Mercer contends that Magerman's assertion of a claim under section 1981 warrants the imposition of sanctions because "[Magerman] has not plausibly alleged that Mercer retaliated against him for reporting racial discrimination in the making and enforcement of contracts." (MOL. at 12.)  Rule 11(b)(2), however, imposes sanctions "only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous," or constitutes an abuse of the litigation process.  *See Ford Motor Co.*, 930 F.2d at 289.    For the reasons set forth below, Mercer has not proven that the section 1981 claim is frivolous.

Section 1981 "prohibits racial discrimination in the making and enforcement of contracts," in the "termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," including contracts for employment. 42 U.S.C. § 1981(b); *Jones v. R.R. Donnelly & Son Co.*, 541 U.S. 360, 371 (2004); *Brown v. J. Kaz, Inc.*,

---

[10]      Even if Magerman does not ultimately prevail on the merits of his claims, such still would not be grounds for sanctions under Rule 11, which "must not be used as an automatic penalty against an attorney or party advocating the losing side of a dispute." *Ario*, 618 F.3d at 297 (reversing the granting of Rule 11 sanctions where counsel's argument was "ultimately unpersuasive" but not "patently unmeritorious or frivolous"); *see also Morristown Daily Record, Inc. v. Graphic Commc'ns Union, Local 8N*, 832 F.2d 31, 32 (3d Cir. 1987) ("We caution litigants that Rule 11 is not to be used routinely when the parties disagree about the correct resolution of a matter in litigation. Rule 11 is instead reserved for only exceptional circumstances.").

581 F.3d 175, 181 (3d Cir. 2009); *Seldon v. National R.R. Passenger Corp.*, 452 F. Supp. 2d 604, 608 (E.D. Pa. 2006). Section 1981 also prohibits retaliation against someone who has tried to help a different individual, suffering racial discrimination, secure his/her Section 1981 rights. *Estate of Oliva ex rel. McHugh v. New Jersey,* 604 F.3d 788, 798 (3d Cir. 2010) (citing *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, ___, 128 S. Ct. 1951, 1958 (2008)). As the Third Circuit in *Castleberry v. STI Grp.* recently explained:

> To establish a retaliation claim in violation of § 1981, a plaintiff must establish the following *prima facie* case: (1) [he] engaged in [protected] activity; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action. In a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation. In doing so, the plaintiff must have acted under a good faith, reasonable belief that a violation existed.

863 F.3d 259, 267 (3d Cir. 2017) (internal citations and quotations omitted).

On the underlying Section 1981 violation, ordinarily, a plaintiff must allege facts that support the following elements: "(1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts." *Estate of Oliva*, 604 F.3d at 797. That said, the Third Circuit and this Court have recognized that evidence of a discriminatory pattern or practice may prove intentional discrimination under Section 1981. *See Goodman v. Lukens Steel Co.*, 777 F.2d 113, 121 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (187), *superceded by statute on other grounds as recognized by Jones*, 541 U.S. at 371; *Croker v. Boeing Co.*, 662 F.2d 975, 989 (3d Cir. 1981), *disavowed on other grounds by*, *Halderman v. Pennhurst State Sch. & Hosp.*, 673 F.2d 628, 635 (3d Cir. 1982); *Meadows v. Atlantic Richfield Co.*, No. 84-0711, 1986 WL 9896, *2 (E.D. Pa. Sept. 10, 1986);

26

*Presseisen v. Swarthmore Coll.*, 442 F. Supp. 593, 599 (E.D. Pa. 1977) (citing *Hazlewood Sch. Dist. v. United States*, 433 U.S. 299, 306-09 (1977), *aff'd* 582 F.2d 1275 (3d Cir. 1978); *see also July v. Board of Sch. Comm'rs*, 291 F.R.D. 653, 657 (S.D. Ala. May 28, 2013) (citing *Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 965 n.17 (11th Cir. 2008)).   To state a Section 1981 violation under this theory, Magerman must only plead sufficient facts on which it can be inferred that a discriminatory policy (i.e., a standard operating procedure) existed.   He need not "offer evidence that each person for whom [he would] ultimately seek relief was a victim of the employer's discriminatory policy." *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358-59 (1977).

A discriminatory practice can be shown through a combination of statistical and anecdotal evidence. *See Goodman*, 777 F.2d at 121 (the record contained anecdotal and statistical evidence); *Croker*, 662 F.2d at 997 ("statistics have a significant place in Title VII litigation"); *United States v. Lansdowne Swim Club*, 713 F. Supp. 785, 805-06 (E.D. Pa. 1989)*, aff'd*, 894 F.2d 83 (3d Cir. 1990); *see also Abrams v. Lightolier*, 50 F.3d 1204, 1217 (3d Cir. 1995) (recognizing that statistical evidence can be circumstantial evidence of intentional discrimination).   This is especially so when the statistics show "a glaring absence" of minorities, with zero minorities in a particular position. *See EEOC v. Mavis Discount Tire, Inc.*, 129 F. Supp. 3d 90, 111 (2d Cir. 2015) (no doubt as to sufficiency of prima facie case of gender discrimination when statistics showed that zero females were hired over a four year period).   Importantly, absent rebuttal evidence from the employer, discrimination can be found and the plaintiff can be entitled to relief (albeit prospective relief) based on just a prima facie showing.   *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 178, 184 (3d Cir. 2009) (quoting *Teamsters*, 431 U.S. at 360-61).

27

Moreover, a "plausible" retaliation claim can be alleged without presenting a full prima facie case of discrimination. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009). "[A] plaintiff is not required to establish the elements of a prima facie case but instead, need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" *Id*.  (citations omitted).  Indeed, "Under the Federal Rules of Civil Procedure, an evidentiary standard is not a proper measure of whether a complaint fails to state a claim." *Id.*

Here, Magerman alleged pattern and practice evidence that, when coupled with the specific allegations concerning Mercer, "raise a reasonable expectation that discovery [would] reveal evidence" of an underlying Section 1981 violation sufficient to withstand dismissal at this stage.[11] *See Fowler*, 578 F.3d at 213.  Magerman alleged that, from 1997 to 2006, no African Americans were hired into highly-compensated managerial and technical positions and, from 2010 until his termination, no African American occupied one of the 100-125 Highly Compensated Employee positions at the Company.  Also, contrary to Mercer's contention, Magerman's underlying allegations of a Section 1981 violation do not rely solely on statistical evidence. *See* MOL, p. 24.  In addition to statistical evidence, Magerman alleges that Mercer was not just anyone at Renaissance but was the Co-CEO of Renaissance who had decision-making control over Renaissance's hiring practices and the hiring of Highly Compensated Employees. Compl. at ¶¶8, 21-26, 76.  Magerman also alleges that he personally had two telephone calls with Mercer during which Mercer made numerous comments that objectively express hostility for

---

[11]    In the Motion, Mercer summarily states that, because some leaders at Renaissance lean Democratic and/or support Democrats, Magerman's claim that Mercer could create a discriminatory atmosphere is "implausible." MOL, at p. 23 n. 12.  The comparison between Mercer's and others' respective impacts on the image and culture of Renaissance is a subjective, factual issue not appropriately decided on a Rule 11 motion, as Rule 11 looks to an "objective" standard.

28

African Americans. *Id.* at ¶¶33-36, 42-48.  Further, Magerman alleged that, among Mercer's comments were those to the effect that Mercer opposed a law and a practice directed towards eradicating race discrimination in employment and/or hiring, *i.e.,* the Civil Rights Act and affirmative action.[12] *Id.* at ¶¶35-38, 46-48.  These allegations plausibly support an inference of discrimination in violation of Section 1981. *Cf. Payne v. Abbott Labs.*, 999 F. Supp. 1145, 1153 (N.D. Ill. 1998) (allegations dismissed when based <u>solely</u> on reports that "majority" of high level positions were occupied by whites);

Having alleged sufficient facts to state an underlying violation under Section 1981, Magerman also alleged that he engaged in protected activity.  As Mercer acknowledges, protected activity need not rise to the level of "formal charges of discrimination," and may include "informal protests of discriminatory employment practices, including making complaints to management." *Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 702 (3d Cir.1995) (internal quotations omitted).  In fact, the Third Circuit has held that "protected activity" includes opposition to an illegal employment practice that identifies only the employer and the practice – "if not specifically, at least by context" – and even mere "public manifestations of disagreement with illegal employment practices." *Curay-Cramer v. Ursuline Academy of Wilmington, DE, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).

Here, Magerman engaged in protected activity when he reported Mercer's racist comments and called attention to the negative impact that Mercer's public political views and association with the alt-right were having on Renaissance's ability to recruit African American

---

[12]    Mercer suggests that this Court should not even consider his objectively racist remarks because, according to Mercer, they are mere stray remarks that cannot be actionable under Section 1981.  It is axiomatic, however, that, while true "stray remarks" are not <u>direct</u> evidence of discrimination, they still are relevant circumstantial evidence probative of a decision maker's motivations. *See Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 375 (E.D. Pa. 2015) (citing *Davis v. Gen. Accident Ins. Co. of Am.*, No. 98–4736, 2000 WL 1780235, at *7 (E.D. Pa. Dec. 4, 2000)).

employees and on African Americans' desire to apply for Highly Compensated Employee positions. Compl. at ¶¶80, 84.[13]   Magerman did not complain simply about general unfair treatment.  Rather, Magerman alleges that, in the same conversation during which he reported Mercer's racist comments, he also "advised Brown that he was concerned that Mercer's embrace of right wing causes and candidates was bad for Renaissance and could damage the company's standing with investors *and prospective employees who would not want to be associated with Mercer's ideology*." Compl. at ¶¶39-41 (emphasis added).  By communicating this to Brown, he called attention to the adverse impact that Mercer's actions had and continue to have on the Company's ability to recruit African Americans. *Id.* at ¶84.  In this way, the instant case is materially distinguishable from the cases Mercer cites when discussing "protected activity." *See Rueda v. Nexeo Sols., LLC*, No. 14-3801, 2015 WL 1472057, **1-2 (D.N.J. Mar. 31, 2017) (plaintiff merely alleged hostile and harassing behavior without alleging any facts to suggest that behavior was based on race); *McGhee v. Thomas Jefferson Univ. Hosp.*, No. 12-2919, 2013 WL 4663541, *4 (E.D. Pa. Aug. 29, 2013) (plaintiff specifically asserts she was retaliated against merely for complaints about lack of lunch time); *Caplan v. L. Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 753 (W.D. Pa. Sept. 28, 2016) (ambiguous photograph having no reference to a racially discriminatory employment practice not protected activity); *Sanchez v. Sungard Availability Servs. LP*, 362 F. App'x 283, 287-88 (3d Cir. Jan. 28, 2010) (plaintiff's statement that he was being discriminated against, harassed and bullied, without reference to any protected characteristic, was not sufficient); *Seldon v. National R.R. Passenger Corp.*, 452 F.

---

[13]     Contrary to Mercer's contention, Magerman's complaints were not based solely on Mercer's support for conservative candidates and causes. MOL, at p. 23.  Rather, Magerman's complaints also included Mercer's numerous racist comments about African Americans and Mercer's callous disregard for the laws and practices that protect them from discrimination, harassment and retaliation.

Supp. 2d 604, 610 (E.D. Pa. 2006) (complaints about non-selection to training, without reference to discrimination, not protected activity).

Magerman also has plausibly alleged Mercer's individual liability under Section 1981. The Third Circuit has explained that an individual may be liable under this statute when the individual "intentionally cause[d] an infringement of rights protected by Section 1981," regardless of whether the employer also may be liable. *Cardenas v. Massey,* 269 F.3d 251, 268 (3d Cir.2001) (citing *Al–Khazraji v. Saint Francis College,* 784 F.2d 505, 518 (3d Cir.1986)), *abrogated in part by Jensen v. Potter,* 435 F.3d 444 (3d Cir.2006)).   More specifically, if an individual is "personally involved in the discrimination" against the plaintiff, and if he "intentionally caused the [employer] to infringe on [plaintiff's] Section 1981 rights, or if [he] *authorized, directed, or participated* in the alleged discriminatory conduct, [he] may be held liable." *Al-Khazraji*, 784 F.2d at 518 (emphasis added).

Contrary to Mercer's assertions, Magerman alleged more than bald assertions that Mercer authorized, directed or participated in the decision to retaliate against him (Magerman) for reporting Mercer's racist statements and also complaining that Mercer's embrace of right wing causes and candidates could damage the company's standing with prospective employees. Compl. at ¶¶39-41.  Magerman supports his allegations of individual liability against Mercer with facts.  Specifically, Magerman alleges that Mercer directed various retaliatory actions against Magerman, Compl. at ¶¶62-64, 67, 75, and, in support thereof, alleges a pattern of retaliation against Magerman against shortly after Magerman complained about not just anyone, but about Mercer. *Id.* at ¶¶60-66, 71-72.  Magerman also alleges that Mercer, in fact, spoke to him in a threatening manner and "scoffed" at Magerman after Magerman consented to Mercer being told of Magerman's complaints about Mercer. *Id.* at ¶¶42, 47-48.  These allegations,

coupled with the fact that Mercer is the Co-CEO of Renaissance and made racist comments to Magerman – which were specifically averred - are sufficient to "raise a reasonable expectation that discovery [would] reveal evidence" that Mercer personally assisted, directed or authorized retaliatory actions against Magerman in violation of Section 1981. *See Fowler*, 578 F.3d at 213; *see e.g.*, *Stanley v. City of Pitts.*, No. 15-00555, 2016 WL 3920477, *4 (W.D. Pa. July 15, 2016).

Finally, Magerman has sufficiently alleged that, but for Magerman reporting Mercer's racist comments to a superior and calling attention to the negative impact that Mercer's public political views were having on the Company's ability to attract prospective African Americans employees, Magerman would not have suffered an adverse employment action. The Third Circuit has made clear that, to raise an inference of causation, a plaintiff must produce evidence only "sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse employment action." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 263 (3d Cir. 2017) (emphasis in original). An inference of causation may arise when, as here, there are facts to support: (1) temporal proximity between the protected activity and the retaliatory conduct; (2) ongoing antagonism or retaliatory animus; or (3) any other evidence in the record sufficient to support the inference of retaliatory animus. *Kahan v. Slippery Rock Univ. of Pa.*, 50 F. Supp. 3d 667, 701 (W.D. Pa. 2014) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)).

Here, Magerman alleges facts of temporal proximity plus ongoing antagonism. He contends: (a) only three weeks transpired between when Magerman reported Mercer's racist comments to Brown and when Magerman received a telephone call from Mercer during which Mercer was threatening and scoffed at Magerman, Compl. at ¶¶33, 39-42; (b) just three weeks after this threatening phone call from Mercer, Magerman was suspended, *id.* at ¶66; (c) after

32

Magerman was suspended and a short time after Magerman complained again about Mercer's very public views and the lack of minorities at the Company, Magerman was locked out of the Company's computers, isolated from his colleagues and denied reinstatement; *id.* at ¶72; and (d) just one month later, he was terminated, after being verbally attacked by Mercer's daughter for Magerman's criticisms of Mercer. *Id.* at ¶¶74-75. [14]

What is more, Magerman alleged sufficient facts from which it can be inferred that Mercer had notice of Magerman's initial reporting of Mercer's racist comments to Brown. Specifically, during Magerman's first conversation with Brown, Magerman gave Brown permission to tell Mercer about Magerman's complaint. Compl. at ¶40. Shortly thereafter, Mercer called Magerman and seemed to confront Magerman about those complaints. *Id.* at ¶42. All of these allegations, when taken as true and given all reasonable inferences in Magerman's favor, "raise a reasonable expectation that discovery [would] reveal evidence" that, but for Magerman's protected activity, he would not have suffered from adverse employment actions. *See Fowler*, 578 F.3d at 213; *see e.g., Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 792-93 (3d Cir. 2016) (complaint plausibly stated causation element of retaliation even though insufficient temporal proximity, where allegations included instances of "gradual deterioration" in her relationship with her employer following protected activity); *Santiago v. Citywide Community Counseling Servs., Inc.*, No. 13-2114, 2013 WL 4051223, *4 (E.D. Pa. Aug. 12, 2013) (when complaint sets forth the "'how, when and where' underlying Plaintiff's claims," it adequately provides notice to Defendant and shall not be dismissed).

---

[14]     Even if the Court finds that the following events are not "temporally proximate," this, by itself, does not foreclose a plausible causal connection. *Jones v. Aria Health*, No. 13-1090, 2014 WL 32310, *5 (E.D. Pa. Jan 6, 2014) (citing *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 179 (3d Cir.1997)).

Given the foregoing facts and applicable law, the Court cannot conclude that Magerman or his counsel were frivolous or abused the litigation process in filing Magerman's section 1981 claim in federal court.

### 2.     Magerman's Wrongful Discharge Claim Is Not Frivolous.

As with Magerman's section 1981 claim, Mercer has not proven – and, in fact, cannot prove – that Magerman's wrongful discharge claim is so "patently unmeritorious or frivolous," that sanctions are warranted under Rule 11(b)(2).  *See Ford Motor Co.*, 930 F.2d at 289.

### i.     Pennsylvania Law Applies to Magerman's Wrongful Discharge Claims.

Contrary to Mercer's contention, there is no provision in the Employment Agreement that governs Plaintiff's tort claim for wrongful discharge.[15] Because Pennsylvania recognizes a tort claim for wrongful discharge under the circumstances of this case, to defeat the claim, Mercer seeks to convince the Court that New York's substantive law applies.  In furtherance of its efforts, Mercer intentionally misparaphrases the choice of law provision in the Employment Agreement.

The actual provision in the Employment Agreement provides, "*This Agreement shall be governed by the laws of the State of New York without reference to the conflict or choice of laws provisions thereof.*"  *See* Compl., Ex. A at Section 20 (italics added). The applicable case law clearly holds that such unequivocal language does not apply to Magerman's wrongful discharge claim. *See Black Box Corp. v. Markham*, No. 03-3910, 127 F. App'x 22, 25 (3d Cir. 2005); *Moore Eye Care, P.C. v. Software Solutions, Inc.*, No. 15-5290, 2017 WL 3838657, *5 (E.D. Pa. Jan. 1, 2017); *Broederdorf v. Bacheler*, 129 F. Supp. 3d 182, 191 (E.D. Pa. 2015);

---

15      Wrongful discharge is a tort in Pennsylvania. *See Highhouse v. Avery Transp.*, 660 A.2d 1374 (Pa. Super. Ct. 1995).

*ATD-American Co. v. Krueger Intern., Inc.*, No. 12-00032, 2012 WL 1382472, *7 (E.D. Pa. Apr. 20, 2012); *United States Claims, Inc. v. Saffren & Weinberg, LLP*, No. 07-0543, 2007 WL 4225536, *8 n.8 (E.D. Pa. Nov. 29, 2007); *Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F. Supp. 2d 589, 593 (E.D. Pa. 1999); *Jiffy Lube Intern., Inc. v. Jify Lube of PA, Inc.*, 848 F. Supp. 569, 575 (E.D. Pa. 1994).

Mercer, in recognition that the Employment Agreement's choice of law provision does not aid his cause, deliberately chose to misparaphrase it by stating, "Magerman agreed that his employment would be 'governed by the laws of the State of New York . . . " omitting the words "*This Agreement shall be*" italicized above. MOL, p. 25.   Section 20 of the Employment Agreement simply does not state that Magerman's "<u>employment</u> shall be governed by the laws of the State of New York," as misrepresented by Mercer. In addition to inaccurately summarizing Section 20 of the Employment Agreement, Mercer cites to two inapposite cases in an effort to support his expansive reading of the choice of law provision.[16]

Because there is no contractual provision in the Employment Agreement governing the choice of law for the wrongful discharge claim, this Court must apply Pennsylvania conflict of interest laws to determine which state law applies. *Broederdorf*, 129 F. Supp. 3d at 191-92. When no choice of law provision applies to a claim, Pennsylvania employs a "flexible rule which

---

[16] *Miller v. Allstate Ins. Co.*, 763 A.2d 401, 403 (Pa. Super. 2000), does not apply because the choice of law provision in that case clearly and explicitly applied to the claims at issue: it specifically stated that the local rules of law applied to the arbitration and the arbitration was held in Pennsylvania. *Id.*  Likewise, *Lipman Bros. v. Apprise Software, Inc.*, No. 13-4439, 2015 WL 4476983 (E.D. Pa. July 22, 2015), does not apply. Here, unlike in *Lipman Bros.*, the choice of law provision is in a distinct one sentence paragraph, the arbitration provision is in a separate and distinct paragraph, the agreement does not state it was entered into in the State of New York (and, in fact, Magerman signed the agreement in Pennsylvania), and while the arbitration provision states that the arbitration shall take place in New York City, it does not state that the laws of New York apply.  Given these material differences and the relative ease by which the parties could have stated clearly that any claims arising out of the parties' employment relationship shall be governed by New York law, this Court should find that the choice of law provision here does not apply to Magerman's tort claims.

permits analysis of the policies and interests underlying the particular issue before the court" and directs courts to apply the law of the state with the "most interest in the problem." *Specialty Surfaces Intern., Inc. v. Continental Co.*, 609 F.3d 223, 229-30 (3d Cir. 2010) (quoting *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 227 (3d Cir. 2007)).  Where there is a true conflict of laws, as here, "Pennsylvania courts use the 'most significant relationship' test, which qualitatively weighs the parties' contacts with the forums 'according to their relation to the policies and interests underlying the issues in dispute." *Hammersmith,* 480 F.3d at 231. To determine the "most significant relationship," courts consider factors listed in Section 6 of the Restatement, which are: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) the ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6.

Applying these factors to the instant case, it is apparent that Pennsylvania has the greatest nexus with the controversy. Mercer should have expected that any employment claim Magerman had against him would be construed under Pennsylvania law for the following reasons: (a) Magerman primarily performed the services for Renaissance and Mercer in Pennsylvania; Compl. at ¶¶7, 9; (b) Magerman is domiciled and resides in Pennsylvania; *id*. at ¶¶1, 7; (c) the injury from which the wrongful discharge claim arose occurred in Pennsylvania when Magerman was terminated by way of a letter directed to his home in Pennsylvania; *id.* at ¶75; (d) the protected activity in which Magerman engaged (including all of the discussions Magerman alleges took place with Mercer, Silber, Brown, and Simons, as well as his interviews), took place

36

while Magerman was working in Pennsylvania; *id.* at ¶¶33, 39, 42, 53 (including Ex. C to Compl.), 57, 60, 65 (including Ex. D to Compl. noting the interview was given at his home in Pennsylvania); and (e) Mercer knowingly directed his activities about which Magerman complains at a Pennsylvania resident and employee working in Pennsylvania (Magerman), *id.* at ¶3. *Rupinsky v. Miller Brewing Co.*, 627 F. Supp. 1181, 1183-84 (W.D. Pa. 1986) (on wrongful discharge claim, state's law applied where plaintiff worked, resided, signed employment agreement, and was discharged).[17]

> ### ii.   Magerman Stated a Claim for Wrongful Discharge Under Pennsylvania Law.

In Pennsylvania, an "employer's privilege to dismiss an employee with or without cause is not absolute . . . and may be qualified by the dictates of public policy." *Shick v. Shirey*, 716 A.2d 1231, 1233 (Pa. 1998).  Accordingly, an employee may bring a cause of action for a termination "where the termination implicates a clear mandate of public policy." *Weaver v. Harpster*, 975 A.2d 555, 564 (Pa. 2009).

The Third Circuit in *Novosel v. Nationwide Ins. Co.*, held that a private employee who had been discharged for refusal to participate in a former employer's lobbying effort and his privately stated opposition to the company's political stand stated a claim for wrongful discharge

---

[17]    Conducting a conflict of law analysis is "fact-intensive and context specific." *Graboff v. The Collern Firm*, No. 10-1710, 2010 WL 4456923, *8 (E.D. Pa. Nov. 8, 2010).  Given "the complexity of the choice of law analysis, when confronted with a choice of law issue at the motion to dismiss stage, courts within the Third Circuit have concluded that it is not appropriate to address the issue at the early pleading stage of a case. *Id.* at *8 (citing *Hayes v. American Intern. Group,* No. 09–2874, 2009 WL 4591531, at *3 (E.D. Pa. Nov. 30, 2009)); *see also General Accident Ins. Co. of Am. v. Fidelity and Deposit Co. of Md.*, 598 F. Supp. 1233, 1230 (E.D. Pa. 1984) (denying motion to dismiss because the facts necessary for the choice of law analysis were not in the record at that stage of litigation); *Kvaerner U.S. Inc. v. Kemper Environmental Ltd.*, No. 06-403, 2006 WL 3064104, *4 (W.D. Pa. Oct. 26, 2006) (same); *First Choice Fed. Credit Union v. Wendy's Co.*, No. 16-506, 2017 WL 1190500, at *1 (W.D. Pa. Mar. 31, 2017) (same).  Just as it would have been premature for the Court to grant a motion to dismiss based on Mercer's invocation of New York law, it would be inappropriate to determine that New York law applies in the context of this Rule 11 motion, especially where the action is to be stayed pending arbitration.

under Pennsylvania law. 721 F.2d 894, 900-01 (3d Cir. 1983).  Specifically, in that case, the Third Circuit explained, "[P]ublic policy is in fact implicated wherever the power to hire and fire is utilized to <u>dictate the terms of employee political activities</u> . . . and [in] the protection of political freedoms." *Id.* at 900 (emphasis added).  Thus, an employer cannot condition employment on "political subordination." *Id.*  In so holding, the *Novosel* court also recognized the policy expressed by Supreme Court Justice White in a dissenting opinion in *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 809 (1978), that the vast economic power possessed by corporations must be regulated so that they do not dominate the economy and "the very heart of our democracy, the electoral process" and do not "acquire an unfair advantage in the political process" by their amassed wealth. *Novosel*, 721 F.2d at 900-01.

Notably, the source of the public policy in *Novosel* was not the Pennsylvania Constitution but, rather, "Pennsylvania common law developments." 721 F.2d at 900; *see also Krushinski v. Roadway Exp., Inc.*, 627 F. Supp. 934, 936-37 (M.D. Pa. 1985) (recognizing that *Novosel* court did not rest upon the Pennsylvania Constitution in finding public policy implicated by wrongful discharge).  This comports with Pennsylvania law, as the Pennsylvania Supreme Court has affirmed that a public policy may be founded in case law. *Weaver*, 975 A.2d at 563; *accord Shick*, 716 A.2d at 1235 (public policy is not limited to that which has been legislatively enacted); *Prewitt v. Walgreens Co.*, No. 12-6967, 2013 WL 6284166, *4 (E.D. Pa. Dec. 2, 2013) (citing *Fraser v. Nationwide Mutual Ins. Co.*, 352 F.3d 107, 112 (3d Cir. 2003)).

As Mercer recognizes, the Third Circuit in *Fraser*, 352 F.3d at 112-13, reaffirmed the portion of the holding in *Novosel* that a claim for wrongful termination may stand when the termination was based on "forced political speech." MOL, pp. 35; *see also Prewitt*, 2013 WL 6284166, *4 n.18 (recognizing *Fraser*'s holding as still sustainable); *Bennett v. Republic Servs.,*

38

*Inc.*, 179 F. Supp. 3d 451, 457 (E.D. Pa. 2016) (recognizing *Novosel*'s holding "that former employee stated claim for wrongful discharge under Pennsylvania law after he refused to participate in former employer's lobbying effort and privately stated opposition to company's political stance"). The *Fraser* court, however, did not define the term "forced political speech." As a result, Mercer urges this Court to adopt a purported definition in *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 457 n. 10 (2008). That case, however, is distinguishable on its facts and, even if it were not, its definition of "forced political speech" supports Magerman's argument that he has sufficiently alleged his wrongful discharge claim.

In particular, in *Washington State Grange*, the Court was asked to determine whether a statute that allowed a candidate to list on the ballot the political party with which he chose to identify himself forced the Republican Party to speak out to prevent confusion and clarify that the designation was based on the candidate's personal preference and not a party endorsement. *Id.* at 445, 448. Unlike here, there was no allegation in *Washington State Grange* that there was a suppression of the plaintiff's ability to express his position. Indeed, if there were such an allegation in that case, it appears that the *Washington State Grange* Court would have found that "forced speech" was involved. In the Court's footnote 10 (which Mercer himself cites, although incompletely), the Supreme Court recognized that "forced speech" not only is requiring another to speak against their will, but also when one "co-opt[s]" another's "own conduits for speech." *Id.* at 457 n.10.

Here, Magerman alleges that Mercer essentially co-opted Magerman's conduit for speech (*i.e.,* tried to sabotage Magerman and silence his opinions). Magerman alleges that Mercer: (a) became aware that Magerman had given an interview to a reporter for the *Wall Street Journal,* and communicated false information about Magerman to John Gasthalter, a public relations

39

representative of Renaissance, in an effort to coerce Magerman from having any further communications with the press about Mercer; Compl., at ¶62;[18] (b) instigated Gasthalter to make a number of false accusations about Magerman to the *Wall Street Journal* reporter and downplayed the significance of Magerman's substantial contributions to the success and profitability of Renaissance; *id.* at ¶64; and (c) in a further attempt to silence Magerman and to retaliate against him for speaking to the *Wall Street Journal*, first personally ordered Magerman's suspension from Renaissance without pay, the day after the interviewed was published, and, thereafter, directed Magerman's termination. *Id.* at ¶¶66-67. In short, Mercer's actions were tantamount to forced political speech because, by insisting that Magerman remain publicly silent about political issues, Mercer was forcing Magerman to tacitly support, or at least condone, Mercer's publicly announced and very visible political views. *Id.* at ¶91. Thus, Magerman stated a claim for wrongful termination based on the holdings in *Fraser* and *Novosel*.

Mercer argues that, based on *Geary*, 319 A.2d at 180, the claim should be dismissed for the "separate and independent reason that 'the complaint itself discloses a plausible and legitimate reason for terminating [his] at-will employment relationship.'" MOL, at p. 38.[19] This

---

[18]     Magerman also alleged that Gasthalter thereafter called the *Wall Street Journal* reporter and threatened to cut him off from any further information from Renaissance if he published an article regarding Magerman's interview. *Id.* at ¶ 63.

[19]     It is important to note that the *Geary* Court explicitly stated, "We hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge." 319 A.2d at 184-85 (emphasis added); *cf.* MOL, at p. 33 (inserting the word "or" for the word "and" in the Court's holding). Based on a plain reading of the Court's holding, it is apparent that the use of the word "and" means that both must be present for the Court to find that Magerman has failed to state a claim. Thus, because Magerman sufficiently has alleged a clear mandate of public policy that was violated by his termination, his claim, even under *Geary*, should not be dismissed. *See Rossi v. Sun Refining & Mktg. Corp.*, No. 94-3037, 1995 WL 12056, **8-10 (E.D. Pa. Jan. 11, 1995) (*Geary* established a two pronged inquiry, such that, even if the Complaint discloses a plausible and legitimate reason for terminating plaintiff, plaintiff can still withstand motion to dismiss if he alleges a violation of public policy); *But see Field v. Philadelphia Elec. Co.*, 565 A.2d 1170, 1182 (Pa. Super. 1989) (stating that, "[e]ven where an important public policy is involved, an employer may discharge an

40

argument fails because Magerman contends in his Complaint that Mercer's daughter verbally attacked him at the poker game. *Id.* at ¶74.  Also, Magerman contends in his Complaint that the restrictions in the Employee Agreement and Handbook are unlawful under the National Labor Relations Act based on numerous recent National Labor Relations Board decisions. Compl. at ¶¶12-13, 99.  Further, stating that the Company might enforce those unlawful policies and fire him is not an admission that any such termination was legitimate.  What is more, he alleges facts that create an inference that he was not terminated for the incident at the poker game as Mercer suggests.  Magerman alleges that, months before the poker game and within close temporal proximity to his interview with the *Wall Street Journal*, he began to suffer from retaliation at the hands and/or direction of Mercer. *Id.* at ¶¶14, 43-44, 48-66.  In accepting these well-pleaded facts as true, it is plausible that Magerman may prove that he was discharged not for the incident at the poker game or for violating lawful workplace rules, but for his protected speech. *Cf. Rettinger v. American Can Co.*, 574 F. Supp. 306, 311 (M.D. Pa. Sept. 2, 1983) ("Where a fact finder can infer one conclusion for an employee's discharge which violates public policy and one which is plausible and legitimate," the question should go to a jury).  Given Magerman's allegations, questions of fact remain on his claims, which should not be resolved by this Court on a Motion to Dismiss.

---

employee if he has separate, plausible reasons for doing so," but declining to grant demurrer when plausible, legitimate reason is not "<u>apparent</u>" from the Complaint).

        **iii.**        **Even if New York Law Applies, Magerman Has Alleged Facts That Would Support a Claim under New York Labor Code, Section 201-d.**

Even if this Court finds that New York law applies, Magerman has alleged facts sufficient to state a claim for a violation of New York Labor Code, Section 201-d.  Section 201-d provides, in pertinent part:

> Unless otherwise provided by law, it shall be unlawful for any employer or employment agency to refuse to hire, employ or license, or to discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment because of: . . . an individual's legal recreational activities outside work hours, off of the employer's premises and without use of the employer's equipment or other property.

N.Y. Labor Code, § 201-d(2)(c).  "Recreational activities" is defined as "any lawful, leisure-time activity, for which the employee receives no compensation and which is generally engaged in for recreational purposes . . . ." *Id.* at § 201-d(1).  Magerman alleges facts showing that he engaged in "recreational activities" under this section, for which he could not be terminated. *See* Complaint, ¶¶60 and 65.  Indeed, in a case involving similar facts, *Cavanaugh v. Doherty*, the court held that having "a discussion during recreational activities outside of the workplace in which [the employee's] political affiliations became an issue," is a recreational activity under Section 201-d(1). 675 N.Y.S.2d 143, 149 (N.Y. App. Div. 1998).

The Third Circuit often has held that, "absent undue or substantial prejudice, an amendment should be allowed under Rule 15(a) unless 'denial [can] be grounded in bad faith or dilatory motive, *truly undue or unexplained delay,* repeated failure to cure deficiency by amendments previously allowed or futility of amendment.'" *Long v. Wilson*, 393 F.3d 399, 300 (3d Cir. 2004) (*Lundy v. Adamar of NJ, Inc.*, 34 F.3d 1173, 1196 (3d Cir. 1994)).  Thus, this

Court should allow Magerman leave to amend his Complaint to add a claim under the above-quoted section of the New York Labor Code.

Given the foregoing facts and applicable law, the Court cannot conclude that Magerman or his counsel were frivolous or abused the litigation process in filing Magerman's wrongful discharge claim in federal court.

### E.   Mercer Failed to Prove That Magerman Violated Rule 11(b)(1).

The test for whether a pleading has been filed for an improper purpose in violation of Rule 11(b)(1) is an "objective" one. *Turner Const. Co. v. First Indem. of Am. Ins. Co.*, 829 F. Supp. 752, 768 (E.D. Pa. 1993), *aff'd* 22 F.3d 303 (3d Cir. 1994) (citing *Lieb v. Topstone Industries, Inc.,* 788 F.2d 151, 157 (3d Cir. 1986)).   Rule 11(b)(1) "focuses on the improper purpose of the signer, objectively tested," rather than the subjective view of the signer's opponent. *US ex. rel. Maxwell v. Ker McGee Oil and Gas Corp.*, No. 04-01224, 2010 WL 582393, *8 (D. Colo. Feb. 17, 2010); *see also Fuerst v. Fuerst*, 832 F. Supp. 2d 210, 218-19 (E.D.N.Y. 2011) (holding that the Court would not "delve into the subjective motivations of parties" in examining whether there was an improper purpose under Rule 11(b)(1)).   The Court may consider the conduct of both sides. *US ex. rel. Maxwell*, 2010 WL 582393, at *8.

Sanctions will not be imposed for non-frivolous claims, even where a party's motives for asserting such claims may not be "entirely pure." *Sussman v. Bank of Isreal*, 56 F.3d 450, 458-59 (2d Cir. 1995).   It is not the role of Rule 11 to "safeguard a defendant from public criticism that may result from the assertion of nonfrivolous claims." *Id.*

Conduct forming the basis of a charge of "harassment" under Rule 11(b)(1) "must do more than in fact bother, annoy or vex the complaining party." *US ex. rel. Maxwell*, 2010 WL 582393, at *8.   Sanctions will not be awarded where the alleged harassment is based on

43

conclusory statements and speculation.  *See Danow v. Law Office of David E. Borack, P.A.*, No. 05-61562, 2008 WL 11331716, *2 (S.D. Fla. Jan. 22, 2008) (Rule 11 motion denied when claim of improper purpose based only on speculation); *Bryant v. PEPCO*, No. 09-1063, 276 F.R.D. 386, 388-89 (D.D.C. Sept. 15, 2011) (same); *Flaherty v. Torquato*, 623 F. Supp. 55, 59-60 (W.D. Pa. 1985), *aff'd* 800 F.2d 1133 (3d Cir. 1986) (same).

Here, Mercer wrongly accuses Magerman of filing suit solely to "harass[ ] Mercer for his political views, embarrass[ ] Renaissance, and generat[e] attention for Magerman's own personal and political gain."  (MOL. at 12.)  Mercer bases these accusations on the false and unsubstantiated claim that Magerman "concocted a conflict with Mercer" to "take advantage of the national platform afforded by Mercer's wide renown [sic]."  (MOL. at 36-37.)  Such conclusory accusations, however, are directly contradicted by the specific facts recited in the more than 70 detailed paragraphs set forth in the Factual Background section of the Complaint. (*See* Compl. ¶¶6-78.)  Magerman was a loyal employee to Renaissance for more than twenty years, until he was terminated by Mercer.  Magerman has experienced no personal or political gain – to the contrary, Magerman lost his job and his long-time source of gainful income as a result of this dispute with Mercer.

Moreover, for the reasons set forth above, all of Magerman's claims are grounded in applicable law and likely to be meritorious – or, at the very least, nonfrivolous – and thus lack an improper purpose under Rule 11(b)(1).  Magerman and his counsel acted reasonably in filing the Complaint – not to seek publicity, as Mercer claims – but rather because Magerman was wronged by Mercer and is pursuing the remedies available to him.  Given that Renaissance had defaulted in the arbitration by failing to pay the required fees, if not for initiating this action in federal court, Magerman may have been without any avenue for pursuing his claims against

44

Mercer.  Once the default was cured, counsel reasonably offered to stipulate to arbitration.  All of these actions were justified based on counsel's review of the applicable law.  That Mercer may be experiencing public backlash as a result of this suit does not transform Magerman's valid pursuit of his rights into some personal "vendetta" against Mercer.

Accordingly, Mercer has not met his heavy burden of proving that Magerman pursued this matter for an improper purpose, or that "exceptional circumstances" exist warranting Rule 11 sanctions.

### F.     Magerman is Entitled to Recover Fees and Expenses Incurred in Opposing this Motion.

Rule 11(c)(2) provides that, "[i]f warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion."  The Advisory Committee Notes explain that, because of this provision, a party successfully opposing a Rule 11 motion need not file a cross-motion to be awarded its expenses.  The Notes provide:

> As under former Rule 11, the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions.  However, service of a cross motion under Rule 11 should rarely be needed since under the revision the court may award to the person who prevails under Rule 11 – whether the movant or the target of the motion – reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion.

Fed. R. Civ. P. 11 Notes of Advisory Committee on 1993 Amendments.

Awarding to Magerman the fees and expenses that he has incurred in responding to the Motion is warranted. For the reasons stated above, Mercer has no basis for arguing that Magerman or his counsel engaged in the "exceptional circumstances" meriting a Rule 11 sanction.  Indeed, by filing this motion, Mercer has ignored the Third Circuit's caution against using Rule 11 as a tool for harassment rather than to prevent it. *See Gairdo v. Ethyl Corp*, 835

F.2d 479, 484 (3d Cir. 1987) ("[W]hen issues are close, the invocation of Rule 11 borders on the abusive . . . Rule 11 is intended only for exceptional circumstances.") (citation omitted); *see also Foy v. First National Bank of Elkhart,* No. 88-2264, 868 F.2d 251, 258 (7th Cir. 1989) ("A frivolous request for sanctions is itself sanctionable.").  Thus, awarding Magerman his fees and costs is appropriate under Rule 11(c)(2).

## V.   CONCLUSION

For the reasons stated above, Plaintiff David Magerman respectfully requests that the Court enter an Order denying the Motion in its entirety, awarding to Magerman the fees and expenses that he incurred in responding to the Motion, and such other and further relief as the Court deems just and proper.


Dated: September 22, 2017          By:   */s/ Rona J. Rosen*
                                        William A. Harvey
                                        Rona J. Rosen
                                        KLEHR HARRISON HARVEY BRANZBURG LLP
                                        1835 Market Street, Suite 1400
                                        Philadelphia, PA 19103
                                        Telephone: (215) 569-2700
                                        Fax: (215) 568-6603
                                        wharvey@klehr.com
                                        rrosen@klehr.com

                                        *Attorneys for Plaintiff David Magerman*

46